# United States Court of Appeals
# for the District of Columbia Circuit

NORWICH PHARMACEUTICALS, INC.,

*Plaintiff-Appellant*,

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES; DR. MARTIN A. MAKARY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF FOOD AND DRUGS; UNITED STATES FOOD AND DRUG ADMINISTRATION,

*Defendants-Appellees*,

TEVA PHARMACEUTICALS, INC.; SALIX PHARMACEUTICALS, INC.;

*Intervenors for Defendants-Appellees*.

On Appeal from the United States District Court for the District of Columbia,
No. 1:25-cv-91 (Hon. Beryl A. Howell)

## OPENING BRIEF OF APPELLANT
## NORWICH PHARMACEUTICALS, INC.
## PUBLIC COPY—SEALED MATERIAL DELETED

Matthew S. Murphy
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100
mmurphy@axinn.com

Nicholas L. Schlossman
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
(737) 910-7314
nicholas.schlossman@lw.com

August 18, 2025

Andrew D. Prins
Rachael L. Westmoreland
Lia Rose Barrett
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.prins@lw.com

*Counsel for Plaintiff-Appellant*
*Norwich Pharmaceuticals, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.  Parties and Amici

Appellant Norwich Pharmaceuticals, Inc. was plaintiff in the case below.

Appellees Robert F. Kennedy, Jr., Secretary of the Department of Health and Human Services; Martin Makary, Commissioner of Food and Drugs; and the United States Food and Drug Administration were defendants in the case below. Individuals sued in their official capacities have been substituted.

Salix Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. intervened in support of defendants below and remain intervenors in this appeal.

There were no other parties, intervenors, or amici before the district court, and no amici have appeared in this Court.

## B.  Ruling Under Review

The final judgment under review is the Order granting the government defendants' and intervenor-defendants' Cross-Motions for Summary Judgment and denying Plaintiff's Motion for Summary Judgment (Apr. 17, 2025), JA__-__ (Dkt. 81); *see also* JA__ (Dkt. 83) (Clerk's judgment).  The judgment was supported by a Memorandum Opinion (Apr. 17, 2025), JA__-__, __-__ (Dkts. 82, 86).  The district

court's opinion is available at *Norwich Pharmaceuticals, Inc. v. Kennedy*, No. 1:25-cv-091, 2025 WL 1148463 (D.D.C. Apr. 18, 2025) (Howell, J.).

### C. Related Cases

This case has not been previously before this Court. This case involves substantially the same parties and similar issues as *Norwich Pharmaceuticals, Inc. v. Kennedy*, No. 23-5311 (D.C. Cir.). A motions panel directed the Clerk to "schedule No. 23-5311 and No. 25-5137 for oral argument on the same day before the same panel." Order, *Norwich Pharmaceuticals, Inc. v. Kennedy*, No. 23-5311 (D.C. Cir. May 21, 2025).

The following cases also involved the same parties and similar or related issues: *Salix Pharmaceuticals, Ltd. v. Norwich Pharmaceuticals Inc.*, 98 F.4th 1056 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 567 *and* 145 S. Ct. 983 (2024); *Salix Pharmaceuticals, Inc., et al. v. Norwich Pharmaceuticals, Inc., et al.*, No. 1:24-cv-7140 (D.N.J. filed June 20, 2024).

/s/ *Andrew D. Prins*
Andrew D. Prins

*Attorney for Appellant*
*Norwich Pharmaceuticals, Inc.*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Appellant Norwich Pharmaceuticals, Inc. certifies that the following are parent companies, subsidiaries, affiliates, or companies which directly or indirectly own at least 10% of the stock of Norwich:  Alvogen Pharma US, Inc.; Alvogen Group, Inc.; New Alvogen Group Holding, Inc.; Alvogen Lux Holding S.à.r.l.; and Aztiq Pharma Partners S.a.r.l.

/s/ *Andrew D. Prins*
Andrew D. Prins

*Attorney for Appellant*
*Norwich Pharmaceuticals, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. iii

TABLE OF AUTHORITIES ................................................................vi

GLOSSARY.......................................................................................x

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION......................................................8

ISSUES PRESENTED........................................................................8

STATUTES AND REGULATIONS....................................................8

STATEMENT OF THE CASE............................................................9

      A.    Legal Background ..............................................................9

            1.    Legal Framework for Approval of Generic Drugs ...................9

            2.    Patent Certifications.................................................9

            3.    The Four Statutory Approval Timing Rules............................11

            4.    Timing Rule (iv):  The 180-Day Exclusivity Period ...............14

      B.    Factual Background.............................................................18

            1.    Rifaximin and Salix's Xifaxan...........................................18

            2.    Actavis's ANDA for Rifaximin ................................................18

            3.    Norwich's ANDA No. 214,369 ................................................19

            4.    Norwich's ANDA No. 214,370 ................................................20

      C.    Procedural Background .........................................................21

STANDARD OF REVIEW .................................................................23

SUMMARY OF ARGUMENT ............................................................23

ARGUMENT ...................................................................................25

I.    ACTAVIS'S CERTIFICATION TO THE HEPATIC
      ENCEPHALOPATHY PATENT DOES NOT BLOCK APPROVAL
      OF NORWICH'S APPLICATION EXCLUDING THAT
      PATENTED USE ..........................................................................25

      A.    Actavis's Hepatic Encephalopathy Patent Certification Does
            Not Directly Block Approval Of Norwich's Application,
            Because Norwich Did Not Certify To That Patent ............................26

            1.    Only Patent Certifications Made By The Subsequent
                  Applicant Can Directly Block Approval Of That
                  Applicant's ANDA Under § 355(j)(5)(B) ................................26

            2.    The Statute's History Confirms Norwich's Interpretation .......32

      B.    Actavis's Hepatic Encephalopathy Patent Certification Does
            Not Indirectly Block Approval Of Norwich's Application,
            Because Norwich Did Not Certify To That Patent ............................37

            1.    Actavis Forfeited The 180-Day Exclusivity Period
                  Applicable To The IBS-D And Polymorph Patent
                  Certifications Because An Enumerated Event Occurred
                  With Respect To Each Of Those Patents...................................38

            2.    No Enumerated Event Was Required With Respect To
                  The Hepatic Encephalopathy Patent Because Norwich
                  Did Not Certify To That Patent ..................................................43

II.   ALTERNATIVELY, ACTAVIS FORFEITED ANY EXCLUSIVITY
      BECAUSE ███████████████████ PRECLUDED
      APPROVAL OF ITS APPLICATION FOR OVER 30 MONTHS..............48

      A.    Actavis Forfeited Exclusivity By Failing To Obtain Tentative
            Approval By June 18, 2018....................................................49

      B.    Even Under FDA's Incorrect Causation Standard, Actavis
            Forfeited Any Exclusivity By Failing To Obtain Tentative
            Approval By November 16, 2018 .......................................55

CONCLUSION ........................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Actavis Laboratories FL, Inc. v. United States*,
    161 Fed. Cl. 334 (2022) ..................................................................46

*Amneal Pharmaceuticals LLC v. FDA*,
    285 F. Supp. 3d 328 (D.D.C. 2018) ..............................................9, 55

*Apotex Inc. v. FDA*,
    414 F. Supp. 2d 61 (D.D.C. 2006) ..............................................16, 35

*Apotex, Inc. v. Pfizer Inc.*,
    385 F. Supp. 2d 187 (S.D.N.Y.), *aff'd*, 159 F. App'x 1013
    (Fed. Cir. 2005) ...........................................................................17

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ..................................................................53, 54

*Burrage v. United States*,
    571 U.S. 204 (2014) ..............................................................53, 54, 55

*Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*,
    566 U.S. 399 (2012) ........................................................1, 10, 29, 48

*Duncan v. Walker*,
    533 U.S. 167 (2001) ......................................................................32

*Granutec, Inc. v. Shalala*,
    139 F.3d 889, 1998 WL 153410 (4th Cir. 1998) ............................14

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels
    Association*,
    594 U.S. 382 (2021) ......................................................................29

*Jazz Pharmaceuticals, Inc. v. Kennedy*,
    141 F.4th 254 (D.C. Cir. 2025) ................................................27, 36

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) .....................................................54

vi

**Page(s)**

*King v. Burwell,*
    576 U.S. 473 (2015)......................................................................30

*Monsalvo Velázquez v. Bondi,*
    145 S. Ct. 1232 (2025)...............................................................36

*Mylan Pharmaceuticals, Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000).............................................45

*Sandoz Inc. v. Becerra,*
    57 F.4th 272 (D.C. Cir. 2023)..............................................9, 57

*SBC Communications, Inc. v. FCC,*
    373 F.3d 140 (D.C. Cir. 2004).................................................39

*Sierra Club v. EPA,*
    536 F.3d 673 (D.C. Cir. 2008).................................................27

*Sinclair Wyoming Refining Co. v. EPA,*
    114 F.4th 693 (D.C. Cir. 2024)...............................................53

*Teva Pharmaceuticals USA, Inc. v. Azar,*
    369 F. Supp. 3d 183 (D.D.C. 2019).....................................16, 34

*Teva Pharmaceuticals, USA, Inc. v. Leavitt,*
    548 F.3d 103 (D.C. Cir. 2008)...............................................9, 10

*Teva Pharmaceuticals USA, Inc. v. Sebelius,*
    595 F.3d 1303 (D.C. Cir. 2010).........................................3, 14, 49

*Thaler v. Perlmutter,*
    130 F.4th 1039 (D.C. Cir. 2025)..............................................23

*University of Texas Southwestern Medical Center v. Nassar,*
    570 U.S. 338 (2013)...................................................................55

## STATUTES AND REGULATIONS

5 U.S.C. § 701-706.............................................................................8

5 U.S.C. § 706(2)(A)........................................................................23

21 U.S.C. § 355(a)-(b) ........................................................................9

21 U.S.C. § 355(d) ..............................................................................9

21 U.S.C. § 355(j)(2)(A) ....................................................................45

21 U.S.C. § 355(j)(2)(A)(vii) ....................................................2, 10, 27

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ........................................................2

21 U.S.C. § 355(j)(2)(A)(viii) ............................................................10

21 U.S.C. § 355(j)(5)(A) ....................................................................11

21 U.S.C. § 355(j)(5)(B) ..................... 5, 6, 11, 13, 23, 26, 27, 30, 36, 46

21 U.S.C. § 355(j)(5)(B)(i) ..........................................................12, 28

21 U.S.C. § 355(j)(5)(B)(ii) ....................................................12, 28, 29

21 U.S.C. § 355(j)(5)(B)(iii) ...................................................12, 28, 29

21 U.S.C. § 355(j)(5)(B)(iv) .............................3, 12, 14, 16, 28, 39

21 U.S.C. § 355(j)(5)(B)(iv) (2002)....................................................15

21 U.S.C. § 355(j)(5)(B)(iv)(I) ........................ 5, 30, 32, 35, 36, 38, 45

21 U.S.C. § 355(j)(5)(B)(iv)(I) (2002) ...............................................35

21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa)....................................................45

21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb) ......................................31, 32, 35

21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd) ...................................................49

21 U.S.C. § 355(j)(5)(D)........................................................4, 24, 39

21 U.S.C. § 355(j)(5)(D)(i) .................................................................41

21 U.S.C. § 355(j)(5)(D)(i)(I) .............................................................17

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) ................................4, 17, 41, 42, 43, 44

21 U.S.C. § 355(j)(5)(D)(i)(IV) ........................................ 7, 8, 18, 21, 25, 49, 50, 52

21 U.S.C. § 355(j)(5)(D)(ii) ............................................................17, 40

21 U.S.C. § 355(q)(1)(G) ......................................................56

28 U.S.C. § 1291 ......................................................................8

28 U.S.C. § 1331 ......................................................................8

Pub. L. No. 98-417, 98 Stat. 1585 (1984) ..............................33

21 C.F.R. § 314.107(c)(1) (1995 to 2016) .........................15, 33

## OTHER AUTHORITIES

*Black's Law Dictionary* (7th ed. 1999) .......................................30, 42, 52

149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) .................................55

149 Cong. Rec. S15884 (daily ed. Nov. 25, 2003) ........................15, 16, 17, 34, 47

59 Fed. Reg. 50338 (Oct. 3, 1994) ........................................33

H.R. Rep. No. 98-857, 1984 U.S.C.C.A.N. 2647 (1984) ........................................33

David E. Korn et al., *A New History and Discussion of 180-Day Exclusivity*, 64 Food & Drug L.J. 335 (2009) ....................................35

*Webster's Third New International Dictionary* (2002) ...........................................42

# GLOSSARY

| Abbreviation/acronym | Description |
|---|---|
| '369 ANDA | abbreviated new drug application No. 214,369 |
| '370 ANDA | abbreviated new drug application No. 214,670 |
| Actavis | Actavis Laboratories FL, Inc. |
| ANDA | abbreviated new drug application |
| APA | Administrative Procedure Act |
| FDA | Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| HE | overt hepatic encephalopathy |
| IBS-D | irritable bowel syndrome with diarrhea |
| Norwich | Norwich Pharmaceuticals, Inc. |
| Salix | Salix Pharmaceuticals, Inc. |
| Teva | Teva Pharmaceuticals USA, Inc. |

## INTRODUCTION

Congress enacted the Hatch-Waxman Act in 1984 to facilitate rapid approval of generic drugs to treat patients "as soon as patents allow." *Caraco Pharm. Laboratories, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012). This case concerns the Food and Drug Administration's ("FDA") decision to depart from the statute and delay the marketing of critical generic drugs years beyond when patents would otherwise allow their approval. FDA's decision is inconsistent with the text, structure, and purpose of the Hatch-Waxman Act.

In 2019, Plaintiff-Appellant Norwich Pharmaceuticals, Inc. ("Norwich") submitted to FDA a generic drug application (known as an "abbreviated new drug application" or "ANDA") No. 214,369 (the "'369 ANDA"). The ANDA sought approval to market a generic version of the antibiotic rifaximin for treatment of irritable bowel syndrome with diarrhea ("IBS-D"), a common gastrointestinal condition, and to reduce the risk of recurrence of overt hepatic encephalopathy ("HE"), a brain disorder. In ensuing patent litigation with the branded drug's sponsor Intervenor-Defendant-Appellee Salix Pharmaceuticals, Inc. ("Salix"), Norwich obtained judgments that Salix's patents concerning the use of rifaximin for the treatment of IBS-D were invalid or not infringed by the '369 ANDA, but that certain patents covering the distinct use of rifaximin for the prevention of HE were valid and infringed by the '369 ANDA's then-labeled use to also prevent HE.

Because the patent judgment made clear that generic rifaximin was approvable for the non-infringing use to treat IBS-D, on May 10, 2024, Norwich amended its separate, then-pending ANDA No. 214,370 (the "'370 ANDA")—which also sought approval for a rifaximin drug product—to seek approval for treatment of only IBS-D, and asked FDA to immediately approve that application.

The Hatch-Waxman Act requires ANDAs to include patent "certification[s]" identifying patents associated with the prior, branded drug, to facilitate notice to branded drug sponsors like Salix that their rights might be impacted by such an ANDA, so that they can litigate any relevant patent claims. 21 U.S.C. § 355(j)(2)(A)(vii). Among other types of patent certifications, an applicant may make "Paragraph IV certifications" challenging the validity or infringement of the branded drug's patent(s). *See id.* § 355(j)(2)(A)(vii)(IV). In the amended '370 ANDA, Norwich made Paragraph IV certifications to the IBS-D-related patents, but not to Salix's HE patent (No. 8,642,573), because Norwich does not seek approval for the prevention of HE. The question in this case is whether the HE patent nevertheless blocks FDA's approval of the '370 ANDA *for IBS-D* pursuant to the Hatch-Waxman Act's so-called "180-day exclusivity period." It does not.

The gist of the 180-day exclusivity period is this: The first generic drug applicant to submit an ANDA containing a Paragraph IV certification is known as a "first applicant," and by default no subsequent applicants submitting ANDAs

containing the same Paragraph IV certification(s) to the same patent(s) can obtain FDA approval until 180 days after the "first applicant" comes to market. *Id.* § 355(j)(5)(B)(iv). This 180-day exclusivity period is intended to expedite generic entry by "induc[ing] challenges" by first applicants to branded patents and "successful[ly]" proving them invalid or not infringed. *Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1318 (D.C. Cir. 2010). When this framework works as intended, the first applicant is rewarded for risking patent litigation and successfully litigating any asserted patents with a brief opportunity to market free from generic competition—giving it a head start at acquiring market share—before rapid entry of other generics that drive down prices to competitive levels.

But that is not what happened here—to this day, there is still no generic rifaximin competition. That is because "first applicant" Actavis Laboratories FL, Inc. ("Actavis")[1] settled Salix's patent infringement suit in 2018 and agreed with Salix not to market generic rifaximin until at least January 1, 2028, *i.e.*, over 12 years after Actavis filed its ANDA. And because Actavis's potential exclusivity only starts running when Actavis begins *marketing* the drug, the agreement between Salix and Actavis serves to keep the generic rifaximin market closed until mid-2028 at the earliest. Courts and commenters have broadly condemned such agreements to

---

[1] Intervenor-Defendant-Appellee Teva Pharmaceuticals, Inc. ("Teva") later acquired Actavis.

"park" a first applicant's exclusivity, blocking generic entry for years and costing consumers and payors billions of dollars.

Congress, however, was aware of this problem and addressed it. In 2003, Congress enacted new "forfeiture" provisions to stop exclusivity parking. 21 U.S.C. § 355(j)(5)(D). Now, if the "first applicant" fails to come to market within 75 days of a court's judgment declaring "invalid or not infringed" "each of the patents" for which there are certifications qualifying the first applicant for the 180-day exclusivity period, that period is forfeited. *Id.* § 355(j)(5)(D)(i)(I)(bb). Put simply, once the "runway is clear" of patent-related obstacles such that a generic can enter the market to treat patients with some condition(s), the "first applicant" must launch its generic to treat them, or it forfeits its ability to prevent others from doing so.

Here, the favorable resolution of the prior patent litigation means that the runway is clear of patents that directly block the '370 ANDA's approval for the treatment of IBS-D. But FDA nevertheless refused to grant Norwich final approval on the grounds that a single Actavis certification to the *HE patent*, not implicated by Norwich's '370 ANDA, delays approval of that ANDA for treatment of *IBS-D*— and by FDA's logic, blocks *any* other ANDA for rifaximin to treat any condition— until at least 2028, when Actavis might or might not enter the market.

FDA is wrong. To determine whether a 180-day exclusivity period could delay approval of a subsequent ANDA, Congress instructed FDA to analyze "each

certification made" in that subsequent (Norwich) ANDA. *Id.* § 355(j)(5)(B). Under that framework, "a certification" made by the subsequent applicant can only give rise to the 180-day exclusivity period where the first applicant also made "such a certification," *i.e.*, the same certification to the same patent. *Id.* § 355(j)(5)(B)(iv)(I). Here, Norwich did not make any certification to the HE patent, because Norwich's drug is not labeled to treat HE. Accordingly, Norwich's ANDA does not contain "a certification" to the HE patent for which Actavis has also made "such a certification." *Id.* Actavis's certification to the HE patent therefore does not qualify it for any 180-day exclusivity period that could delay approval of Norwich's ANDA. And, as detailed below, any *other* patent certifications that might have qualified Actavis for the 180-day exclusivity period have been forfeited. So Norwich's ANDA is presently approvable to benefit IBS-D patients today.

Notably, the district court acknowledged that Norwich would prevail under the pre-2003 version of the statute—prior to Congress's amendments intended to address the very problem of "parking" exclusivity—and FDA's regulation interpreting that statute: All Norwich needed was a "time machine" to succeed. JA__ (Dkt. 82 at 1). But that quip emphasizes why Norwich is correct. Congress's 2003 amendments preserved the relevant statutory text that requires certifications to the *same patent* in the first and subsequent ANDAs for 180-day exclusivity to block approval of the subsequent ANDA. FDA interpreted the pre-2003 statutory text in

that manner by regulation beginning in 1994. In its 2003 amendments, Congress readopted that statutory text, removing any doubt that it agreed with FDA's longstanding interpretation, under which Norwich concededly would prevail in a "time machine." Indeed, Congress's amendments doubled down on FDA's longstanding interpretation, making clear that FDA is to determine the approval date of an ANDA by applying the timing rules "to each certification made" by the subsequent applicant. 21 U.S.C. § 355(j)(5)(B). Certifications made solely by the first applicant are completely beside the point.

FDA's new interpretation of the same statutory language also violates Congress's express purpose. Congress enacted its 2003 amendments to constrain 180-day exclusivity and expedite generic entry. Yet FDA's decision here means those amendments dramatically *expanded* 180-day exclusivity, to delay approval of *all ANDAs* for a given drug for many years beyond when relevant patents allow, far longer than the pre-2003 version of the statute or FDA's then-extant regulation. That cannot be right.

FDA's conclusion that Norwich's '370 ANDA was not immediately approvable also fails for a second, independent reason. Actavis forfeited any 180-day exclusivity period because it "fail[ed] to obtain tentative approval"—a determination that an application is scientifically sufficient and approvable—

"within 30 months" of filing its ANDA. *Id.* § 355(j)(5)(D)(i)(IV). It is undisputed that Actavis failed to satisfy this requirement.

The statute provides one narrow exception to such forfeiture, excusing the failure to obtain tentative approval within 30 months when it "is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed." *Id.* FDA concluded that this "caused by" standard was met because FDA changed its review requirements during the pendency of Actavis's ANDA. JA__ (AR7). That was wrong because at that 30-month mark, ██████████████████████████████████████████████ ████████████████████████████████████████   ███████████ ████████████████████████████████ the failure of tentative approval cannot be said to be "caused by" an unrelated change in law. FDA's and the district court's contrary determinations departed from the ordinary meaning of the statutory term "caused by," which requires a showing of but-for causation—that but-for FDA's change in approval requirements, Actavis's ANDA would have timely obtained tentative approval. Courts presume that the statutory phrase "caused by" requires but-for causation. Neither FDA nor the district court identified any textual clues to overcome that presumption here.

The Court should reverse, with instructions to grant Norwich summary judgment.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331, because the action arose under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The court entered an order and final judgment, JA__-__ (Dkt. 81), and memorandum opinion, JA__-__ (Dkt. 82), on April 17, 2025, denying Norwich's motion for summary judgment and granting FDA's, Teva's, and Salix's cross-motions for summary judgment. Norwich filed a notice of appeal on April 18, 2025. JA__-__ (Dkt. 85). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I. Whether a first applicant's Paragraph IV certification to a patent covering a specific use of a drug qualifies it for a 180-day exclusivity period that blocks approval of subsequent ANDAs that do *not* seek approval for that use of the drug and do *not* make any Paragraph IV certification to that same patent.

II. Whether a first applicant's failure to meet the 30-month deadline to gain tentative approval under 21 U.S.C. § 355(j)(5)(D)(i)(IV) is excused on grounds that the delay was "caused by" a change in FDA review requirements, where the ANDA was not ███████████████████████████████████████

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

**STATEMENT OF THE CASE**

**A.      Legal Background**

**1.      Legal Framework for Approval of Generic Drugs**

The Federal Food, Drug, and Cosmetic Act ("FDCA") prohibits the sale of a "new drug" unless it is safe and effective.  21 U.S.C. § 355(a)-(b), (d).  Getting one of these "new 'branded' drug[s] to market is a time-consuming process" involving extensive and costly studies.  *Teva Pharm., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008).

In view of the high prices commanded by new, branded drugs, Congress recognized the importance of expediting marketing of generic drugs, *id.*, which "increase market competition and ... lower prices for consumers," *Amneal Pharm. LLC v. FDA*, 285 F. Supp. 3d 328, 332 (D.D.C. 2018).  Accordingly, in the Hatch-Waxman Act of 1984, Congress added "a more streamlined path for the approval of generic drugs" that rely on the original manufacturer's evidence of safety and efficacy for the "same" drug.  *Sandoz Inc. v. Becerra*, 57 F.4th 272, 274 (D.C. Cir. 2023).

**2.      Patent Certifications**

Recognizing that branded drugs may be protected by applicable patents, however, Congress, designed a process to "speed the introduction of low-cost

9

generic drugs to market" by facilitating the approval of generic drugs "as soon as patents allow." *Caraco*, 566 U.S. at 405.

To start the process, an ANDA applicant must submit a certification for "each patent" claiming either a drug or a method of using a drug—for example, a method of using a drug to treat a specific disease—"for which the applicant is seeking approval." *Teva*, 548 F.3d at 104; *see also* 21 U.S.C. § 355(j)(2)(A)(vii).

The ANDA applicant then files patent certifications—for some drugs, dozens of certifications pertaining to dozens of patents—to "assure the FDA that its proposed generic drug will not infringe the brand's patents." *Caraco*, 566 U.S. at 406. There are four types of certifications: a "Paragraph I" certification that relevant patent information has not been filed by the branded manufacturer; a "Paragraph II" certification that a relevant patent has expired; a "Paragraph III" certification that a relevant patent will expire on a specified date in the future; and—most importantly for this case—a "Paragraph IV" certification that a relevant patent is "invalid or will not be infringed" by the generic drug or its use(s). 21 U.S.C. § 355(j)(2)(A)(vii).

As a distinct alternative to a patent certification, an applicant may "submit a so-called section viii statement, which asserts that the generic manufacturer will market the drug for one or more methods of use not covered by the brand's patents," and will "'carve[] out' from the brand's approved label the still-patented methods of use." *Caraco*, 566 U.S. at 406 (citing 21 U.S.C. § 355(j)(2)(A)(viii)).

### 3. The Four Statutory Approval Timing Rules

Once FDA determines that an ANDA satisfies the scientific criteria for approval, FDA must determine the effective date for its approval.

The baseline rule is that ANDAs must be approved or denied within 180 days of filing. 21 U.S.C. § 355(j)(5)(A). But where an applicant makes patent certifications, that 180-day approval deadline is qualified: "approval … shall be made effective on the *last applicable date* determined by applying the following [four timing rules] to *each certification made* under paragraph (2)(A)(vii)." *Id.* § 355(j)(5)(B) (emphases added). That is, the statute provides an algorithm that considers "each" of the patent certifications "made" in the ANDA, individually, in turn, to determine a date associated with each certification; and then, among these dates, selects the "last applicable date" as the date the ANDA may become effective. For example: If an ANDA contains 20 certifications, the four timing rules will run individually on "each certification" and will produce 20 distinct dates (one for "each certification"); the "last" date is the effective date, thus ensuring approval of generics as soon as relevant patents allow.

Different timing rules apply depending on the nature of the patent certification:

- **Timing Rule (i):** When the application contains "a certification" that there are no relevant patents (a "Paragraph I" certification) or any relevant patents

have expired (a "Paragraph II" certification), "the approval may be made effective immediately." *Id.* § 355(j)(5)(B)(i).

- **Timing Rule (ii):** When the application contains "a certification" that there is a relevant, unexpired, valid patent (a "Paragraph III" certification), the approval may be made effective on the date "such patent will expire." *Id.* § 355(j)(5)(B)(ii).

- **Timing Rule (iii):** When the application contains "a certification" that there is a dispute over validity or infringement of a relevant patent (a "Paragraph IV" certification), "the approval shall be made effective immediately unless," within 45 days, "an action is brought for infringement of the patent that is the subject of the certification." *Id.* § 355(j)(5)(B)(iii). If the branded drug sponsor timely files such a patent infringement action, final approval of the ANDA is subject to a 30 month stay, to permit completion of the patent litigation. *Id.*

- **Timing Rule (iv):** When the application contains "a certification" under Paragraph IV and a first applicant submitted "such a certification" under Paragraph IV, the statute delays approval of the later-filed ANDA for 180 days after first marketing by the first applicant under certain circumstances. *Id.* § 355(j)(5)(B)(iv). This fourth timing rule is the focus of this case and is discussed further below.

By contrast, no timing rule applies to a section viii "statement" because it is not a "certification made" by the subsequent applicant. *Id.* § 355(j)(5)(B). Thus, a section viii statement does not affect an ANDA's approval date.

To summarize, this chart shows how the four timing rules would apply to a hypothetical ANDA, containing three certifications and one statement:



## 4. Timing Rule (iv): The 180-Day Exclusivity Period

Timing rule (iv) may provide a 180-day exclusivity period to the "first applicant" to make any Paragraph IV certification for a drug. *Id.* § 355(j)(5)(B)(iv).

Congress created this exclusivity to incentivize ANDA applicants to quickly file Paragraph IV certifications and "successfully" "show[] the invalidity or inefficacy" of a branded drug's patents—often through patent litigation—and thus clear the patent thicket to allow earlier generic entry. *Teva*, 595 F.3d at 1304, 1318. Timing rule (iv) has evolved over time.

### a. The Pre-2003 180-Day Exclusivity Periods

Prior to 2003, timing rule (iv) provided:

The approval of an [ANDA] … shall be made effective on the last applicable date determined under the following [timing rules] ...

> (iv) If the application [subsequent ANDA] *contains a certification described in subclause (IV)* of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection continuing[2] *such a certification*, the application shall be made effective not earlier than one hundred and eighty days after—
>
> > (I) the date the Secretary receives notice from the *applicant under the previous application of the first commercial marketing of the drug under the previous application*, or

---

[2] Courts have viewed "continuing" as a scrivener's error for "containing." *See, e.g., Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410, at *2 (4th Cir. 1998) (per curiam).

(II) the date of a decision of a court ... holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphases added).

Breaking this down: FDA evaluated each Paragraph IV certification made by the subsequent ANDA applicant. *See id.* If a "previous application" maintained "such a certification," *i.e.*, a Paragraph IV certification to the *same patent*, then the subsequent ANDA could not be approved until 180 days after either (I) the previous applicant began marketing; or (II) a court held that specific patent to be invalid or not-infringed. *Id.* FDA's then-extant regulation likewise provided for a delay to approval only where both ANDAs made a Paragraph IV certification that "*the same patent was invalid, unenforceable, or would not be infringed.*" 21 C.F.R. § 314.107(c)(1) (1995 to 2016) (emphasis added).

### b. The 2003 Amendments

Congress amended the statute in 2003 to "stop … abuses" by "brand-name and generic drug companies," who "ha[d] exploited certain aspects of the Hatch-Waxman Act to delay generic competition." 149 Cong. Rec. S15884 (daily ed. Nov. 25, 2003). Congress intended the amendments to "ensure Americans more timely access to affordable pharmaceuticals" by solving two particular problems. *Id.*

**Problem 1:** Prior to 2003, FDA construed the statute to allow multiple, sequential 180-day exclusivity periods for a single drug. Specifically, FDA awarded a 180-day exclusivity period to *each* ANDA with a *specific* Paragraph IV certification to a listed patent. Courts referred to FDA's multiple-exclusivity-period interpretation, allowing multiple exclusivity periods arising from each certified patent, as "'patent-based' exclusivity." *Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 64 (D.D.C. 2006). By contrast, a "drug-product" interpretation of exclusivity would "permit[] only one exclusivity period" per drug product. *Id.*

To fix this problem of "multiple 180-day periods of exclusivity for a single drug product," *Teva Pharm. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 191 (D.D.C. 2019), Congress amended the statute to allow only *one* period of exclusivity, *i.e.*, a "product-by-product exclusivity rather than a patent-by-patent exclusivity." 149 Cong. Rec. at S15884. Specifically, the amendment provided that exclusivity would begin to run "180 days after the date of the first commercial marketing of the drug ... by *any* first applicant" that was first to file a Paragraph IV certification for a drug. 21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added). So today, the statute only allows at most one exclusivity period to arise in relation to a particular drug product, running, and expiring, for *all* uses of the drug, after a first applicant begins marketing. *Apotex*, 414 F. Supp. 2d at 64.

16

**Problem 2:** There was a second problem with the pre-2003 statute: A "first applicant" could agree with the branded manufacturer not to launch a generic for years, "often through a settlement agreement," thus "parking" the 180-day exclusivity and ensuring "subsequently filed ANDAs [could not] be approved" for an indefinite period. *Apotex, Inc. v. Pfizer Inc.*, 385 F. Supp. 2d 187, 190 (S.D.N.Y.), *aff'd*, 159 F. App'x 1013 (Fed. Cir. 2005).

Congress sought to "prevent parking" by adopting new provisions "in which a generic company with the exclusivity forfeits the exclusivity." 149 Cong. Rec. at S15884. The new forfeiture provision provides that the 180-day exclusivity period "shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant." 21 U.S.C. § 355(j)(5)(D)(ii). Such "forfeiture event[s]" include circumstances when a first applicant "fails to market the drug" within a certain time. *Id.* § 355(j)(5)(D)(i)(I). As relevant here, that time is within 75 days of "the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv)," each such patent has been subject to a judgment of invalidity or non-infringement—*i.e.*, all relevant patents allow approval of the generic for some population of patients. *Id.* § 355(j)(5)(D)(i)(I)(bb).

Alternatively, a "forfeiture event" independently occurs if "[t]he first applicant fails to obtain tentative approval of the application within 30 months after

the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed." *Id.* § 355(j)(5)(D)(i)(IV).

## B. Factual Background

### 1. Rifaximin and Salix's Xifaxan

Salix markets rifaximin under the brand Xifaxan and owns or licenses related patents. JA__ (AR13). Despite Salix entering the market with its first rifaximin product over 20 years ago, no generic is available, leaving patients with no affordable alternative to Salix's drug. JA__ (Dkt. 39 at 10).

### 2. Actavis's ANDA for Rifaximin

On December 18, 2015, Actavis submitted ANDA No. 208,959 for rifaximin. JA__ (AR13).

Actavis's ANDA was the first filed relying on Xifaxan to show safety and efficacy, and it contained Paragraph IV certifications, including to the HE patent. JA__-__ (AR13-15). FDA thus deems Actavis the "first applicant" for generic rifaximin. JA__ (AR14).

In September 2018, Actavis settled ongoing patent litigation with Salix over rifaximin. JA__ (Dkt. 82 at 10). Actavis abandoned its patent challenges, and, in return, received a royalty-free license, effective on January 1, 2028, to market its ANDA product or launch an "authorized generic," *i.e.*, a licensed version of the

branded drug. JA__-__ (AR634-35). That is, Actavis agreed to not enter the market for more than 12 years after it filed its ANDA (with a conditional right for accelerated entry if another ANDA applicant obtained approval and launched its generic earlier).

████████████████████████████, Actavis's ANDA still has not received FDA tentative approval—a determination that an application is scientifically sufficient and approvable—almost a decade after it was filed. JA__ (AR28).

### 3. Norwich's ANDA No. 214,369

In December 2019, Norwich submitted the '369 ANDA for generic rifaximin, 550 mg, to treat both IBS-D and HE. JA__-__ (AR14-15).

During ensuing patent litigation with Salix, the parties agreed to, and the court entered, a stipulation that "[a] final judgment of noninfringement [be] entered" with respect to Norwich's then-current ANDA No. 214,369 regarding 19 of Salix's patents. JA__-__ (AR580-81). For the remaining contested patents, the court ruled that Salix's patents were invalid, *except* that certain claims within Salix's HE-related patents were valid and infringed by the '369 ANDA for treatment of HE. JA__-__ (AR602-03). The court therefore delayed approval of that ANDA until the 2029 expiration of the HE patents. *Id.*

### 4. Norwich's ANDA No. 214,370

Also in December 2019, Norwich submitted the '370 ANDA for rifaximin 200 mg tablets. JA__-__ (AR16-17).

On May 10, 2024, Norwich amended the '370 ANDA to add rifaximin 550 mg tablets, solely to treat IBS-D. *Id.*

Norwich also submitted Paragraph IV certifications to a number of patents, though not any HE-related patents. *Id.* Norwich made the following Paragraph IV certifications, which Actavis also maintains:

| Salix's Patent Subject to Certification | Type | Outcome of Delaware Patent Litigation |
|---|---|---|
| 8,518,949 | Polymorph | Not-Infringed |
| 8,741,904 | Polymorph | Not-Infringed |
| 8,193,196 | Polymorph | Not-Infringed |
| 8,309,569 | IBS-D | Invalid |

JA__-__, __-__, __-__ (AR14-16, 21-22, 524-25).[3]

Unlike the '369 ANDA, there has not been relevant patent litigation triggering a 30-month stay of approval of the '370 ANDA (though there is pending litigation in New Jersey as to two later-filed patents that did not trigger a stay, *Salix Pharm., Inc. v. Norwich Pharm., Inc.*, No. 1:24-cv-7140 (D.N.J. filed June 20, 2024)).

On January 10, 2025, FDA granted Norwich's '370 ANDA tentative approval. JA__-__ (AR890-95). FDA withheld final approval on the grounds that Actavis had

---

[3] Certain other polymorph patents have expired and are not in dispute.

not forfeited all certifications qualifying it for the 180-day exclusivity period. *Id.* Specifically, FDA found that Actavis's HE patent certification was one "qualifying the first applicant for the 180-day exclusivity period," and that a forfeiture was required with respect to that certification under § 355(j)(5)(D)(i)(I)(bb) before Norwich's ANDA could be made effective. JA__, __ (AR10, 24 n.78).

FDA also concluded that Actavis was excused from meeting the 30-month deadline to obtain tentative approval, 21 U.S.C. § 355(j)(5)(D)(i)(IV), because Actavis's failure was "caused by a change in ... the requirements for approval" of the application. JA__ (AR7). Specifically, FDA found that its requirements for the studies necessary to gain approval of generic rifaximin had changed while Actavis's ANDA was pending. *Id.* FDA found it *immaterial* that ███████████ ███████████████████████████████, as Actavis's failure to achieve tentative approval was "caused at least in part[] by" the change in FDA requirements. JA__-__ (AR2-5).

### C. Procedural Background

On January 13, 2025, Norwich filed its complaint alleging that FDA's refusal to grant the '370 ANDA final approval was contrary to law and arbitrary and capricious under the APA. JA__-__, __-__ (Dkts. 1, 9).

On April 17, 2025, the district court granted FDA and Intervenors summary judgment. JA__-__, __-__ (Dkts. 81-83, 86). The court agreed with FDA that "no

forfeiture for failure to market has happened" because "Actavis' Paragraph IV Certification for the '573 patent (the HE indication patent) qualified it as a first applicant, which has not been subject to a forfeiture event." JA__ (Dkt. 82 at 27). The court thus held that a forfeiture was required with respect to *every* patent for which Actavis maintained a Paragraph IV certification, regardless of whether Norwich also certified to each of those patents, including the HE patent. *Id.*

Further, the district court found that, even if Norwich were correct that the 180-day exclusivity period provision in § 355(j)(5)(B)(iv)(I) were relevant to its analysis, the HE patent *also* operated under that provision to block approval of Norwich's ANDA. JA__-__ (Dkt. 82 at 26-27). The court so-found because Norwich made *any* Paragraph IV certification, and Actavis had made "such a certification," *i.e.*, *any* Paragraph IV certification, to the distinct HE patent. JA__ (Dkt. 82 at 26). That is, the court looked only to the *type* of certification made, not to the details of that certification, and found that the fact that Norwich and Actavis each made *any* Paragraph IV certification gave rise to the 180-day exclusivity period. JA__ (Dkt. 82 at 27).

Finally, the district court agreed with FDA that Actavis had not forfeited exclusivity by failing to meet the 30-month deadline to obtain tentative approval, because that delay was "caused by a change in ... the requirements for approval of the application." JA__ (Dkt. 82 at 34). The court agreed that it is enough if a change

in review requirements "is one of the causes of failure to get tentative approval,"

even if the ANDA ███████████████████████████████████████

███████████ JA__ (Dkt. 82 at 39).

Norwich timely appealed. JA__-__ (Dkt. 85).

## STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment in a case concerning agency action *de novo*. *Thaler v. Perlmutter*, 130 F.4th 1039, 1044 (D.C. Cir. 2025). Under the APA, FDA's decision must be set aside if it is arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2)(A).

## SUMMARY OF ARGUMENT

Actavis's HE patent certification does not block approval of Norwich's '370 ANDA for the treatment of IBS-D.

I.     Actavis's HE patent certification has no relevance to the effective approval date of Norwich's ANDA because Norwich did not certify to the HE patent.

I.A.  Actavis's HE patent certification does not directly block approval of Norwich's ANDA under the 180-day exclusivity period provision.

The four statutory timing rules analyze individually "each certification made" by the subsequent applicant. 21 U.S.C. § 355(j)(5)(B). Specifically, FDA must consider individually, for each such certification, whether it is "a certification described in" Paragraph I, II, III, or IV, respectively, and apply specific rules

depending on the contents of that *specific* certification made by the subsequent applicant. Under timing rule (iv), "a certification" made by a subsequent applicant under Paragraph IV can only give rise to a 180-day exclusivity period if the first applicant made "such a certification" to the same patent. Certifications made by a "first applicant" alone therefore have no effect on the approval date for a subsequent applicant's ANDA. The statutory history confirms this: Congress adopted the pivotal text in 1984, FDA correctly interpreted that language by regulation beginning in 1994, and Congress reaffirmed that construction in its 2003 amendments.

I.B. Actavis's HE patent certification does not indirectly block approval of Norwich's ANDA, either. Norwich and Actavis *did* certify to some common patents—but not the HE patent. And any exclusivity period applicable to those other, common patents was forfeited. The district court was wrong to conclude that a forfeiture was required with respect to the HE patent as well. Under the statute's plain text, a forfeiture need only occur with respect to each of the certifications "qualifying" the first applicant for the 180-day exclusivity period under § 355(j)(5)(B)(iv). *Id.* § 355(j)(5)(D). Because Norwich did not certify to the HE patent, Actavis's HE patent certification is not a certification "qualifying" Actavis for the 180-day exclusivity period, and it cannot delay approval of Norwich's ANDA.

II.     Alternatively, Actavis forfeited any 180-day exclusivity on an independent ground:  Actavis failed to secure tentative approval within Congress's 30-month deadline.  *Id.* § 355(j)(5)(D)(i)(IV).  Actavis failed to satisfy the statute's exemption—which excuses delay beyond 30 months where the delay is "caused by" a change in FDA review requirements—for the simple reason that Actavis's ANDA

███████████████████████████████████████████████████

███████████████  The failure to obtain tentative approval therefore cannot be said to be "caused by" an unrelated change in FDA review requirements.  FDA's contrary determination departed from the plain-text meaning of "caused by," which requires a showing of but-for causation.

## ARGUMENT

### I.     ACTAVIS'S CERTIFICATION TO THE HEPATIC ENCEPHALOPATHY PATENT DOES NOT BLOCK APPROVAL OF NORWICH'S APPLICATION EXCLUDING THAT PATENTED USE

The district court held that there were two distinct ways in which Actavis's HE patent certification blocked approval of Norwich's ANDA.  It believed that the HE patent certification blocked approval of Norwich's ANDA *directly* under the 180-day exclusivity period provision in § 355(j)(5)(B)(iv).  Alternatively, the court believed the certification blocked approval of Norwich's ANDA *indirectly* under the forfeiture provision in § 355(j)(5)(D).  Both conclusions are wrong for the same reason:  A first applicant's patent certification cannot block approval of a subsequent

ANDA under *either* provision where the subsequent ANDA does not contain a certification to *that* patent. This is a core structural feature of the statute and how Congress ensured approval "as soon as patents allow."

A. **Actavis's Hepatic Encephalopathy Patent Certification Does Not Directly Block Approval Of Norwich's Application, Because Norwich Did Not Certify To That Patent**

The district court concluded that approval of Norwich's ANDA was directly blocked by the 180-day exclusivity period arising from Actavis's HE patent certification, because Norwich made a Paragraph IV certification to *any* (non-HE) patent, and Actavis made a Paragraph IV certification to *any* (HE) patent. JA__-__ (Dkt. 82 at 26-27). That is incorrect. Actavis's certification to the HE patent does not directly block approval of Norwich's ANDA under the 180-day exclusivity provision in § 355(j)(5)(B)(iv), because Norwich did not certify to that HE patent.

1. **Only Patent Certifications Made By The Subsequent Applicant Can Directly Block Approval Of That Applicant's ANDA Under § 355(j)(5)(B)**

The statute determines the effective approval date of a subsequent ANDA based solely on certifications made in that subsequent ANDA. Patent certifications to other patents *not* made by the subsequent applicant are beside the point.

Congress provided that "[t]he approval of an [ANDA] ... shall be made effective on the last applicable date determined by applying *the following* to *each certification made* under paragraph (2)(A)(vii):...." 21 U.S.C. § 355(j)(5)(B)

(emphases added). The phrase "each certification made under paragraph (2)(A)(vii)" refers to each individual certification made by the subsequent applicant in its ANDA. *See id.* § 355(j)(2)(A)(vii) (requiring subsequent applicant to make certifications). And "applying *the following* to each certification made under paragraph (2)(A)(vii):" means applying the following four timing rules in § 355(j)(5)(B)(i)-(iv)—nested below and after the colon—to "each" certification made by the subsequent applicant, individually, in turn. *See, e.g.*, *Jazz Pharm., Inc. v. Kennedy*, 141 F.4th 254, 261 (D.C. Cir. 2025) (explaining that statutory terms "must be read in their context and with a view to their place in the overall statutory scheme"); *Sierra Club v. EPA*, 536 F.3d 673, 678 (D.C. Cir. 2008) ("'Each' means '[e]very one of a group considered individually.'").

Moreover, the reference to making the subsequent ANDA "effective on the *last* applicable date determined by applying the following to each certification," anticipates that the four timing rules will produce multiple dates, one associated with each certification—potentially dozens of dates—and selects the "last" of those dates as the effective date for the subsequent ANDA. 21 U.S.C. § 355(j)(5)(B).

This global instruction to analyze "each certification made" by the subsequent applicant gives meaning to each of the timing rules that follow. Those rules instruct FDA to apply each rule, as applicable, where an ANDA contains "a certification

described in" Paragraphs I, II, III, or IV, respectively.  *Id.* § 355(j)(5)(B)(i)-(iv).  The

statute provides:

> The approval of an [ANDA] ... shall be made effective on the ***last***
> ***applicable date determined by applying the following to each***
> ***certification made under paragraph (2)(A)(vii):***
>
> > [Rule (i)] If the applicant only made ***a certification*** *described in*
> > *subclause (I) or (II)* ... the approval may be made effective
> > immediately.
> >
> > [Rule (ii)] If the applicant made ***a certification*** *described in*
> > *subclause (III)* ... the approval may be made effective on the date
> > certified under subclause (III).
> >
> > [Rule (iii)] If the applicant made ***a certification*** *described in*
> > *subclause (IV)* ... the approval shall be made effective
> > immediately unless [a lawsuit is brought on that patent].
> >
> > [Rule (iv)] 180-day exclusivity period ... Subject to subparagraph
> > (D), if the application contains ***a certification*** *described in*
> > *paragraph (2)(A)(vii)(IV)* ***and is for a drug for which a first***
> > ***applicant has submitted an application containing such a***
> > ***certification***, the application shall be made effective on the date
> > that is 180 days after the date of the first commercial marketing
> > of the drug (including the commercial marketing of the listed
> > drug) by any first applicant.

*Id.* (emphases added).  The term "a certification" in timing rules (i)-(iv) always refers

to a particular certification with *particular contents* made by a subsequent applicant

considered *individually*, one at a time, under each timing rule.  Otherwise, the timing

rules make no sense.

For example, timing rule (ii) provides that "[i]f the applicant made a

[Paragraph III] certification ... the approval may be made effective on the date

certified under subclause (III)." *Id.* § 355(j)(5)(B)(ii). That cannot mean that if an applicant makes *any* Paragraph III certification—that a valid patent will expire on a given date—its ANDA is approvable on *any* date carried by *any* one of those certifications. Why? Because that would mean the *earliest* expiring of the Paragraph III certifications would authorize immediate approval, even while other patents subject to Paragraph III certifications remain in force. *Contra Caraco*, 566 U.S. at 405 (FDCA permits approval only once patents allow). For similar reasons, timing rule (iii) likewise only makes sense if "a certification" means a *specific* certification made by a subsequent applicant, considered individually under timing rule (iii).[4]

That consistent usage of "a certification" in each of timing rules (i) to (iv) has an identical meaning: Each certification made by the subsequent applicant is considered individually under each timing rule as "a certification" to produce the date associated with that *specific* certification under a given rule. *See HollyFrontier*

---

[4] Timing rule (iii) provides that "[i]f the applicant made a certification described in subclause (IV) ... the approval shall be made effective immediately unless … [within] 45 days … an action is brought for infringement of the patent." 21 U.S.C. § 355(j)(5)(B)(iii). If a subsequent application includes five Paragraph IV certifications, and the branded manufacturer sues on only *one* patent, the ANDA is delayed by 30 months, even though with respect to *four of the five certifications*, Congress instructed "the approval shall be made effective immediately."

*Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 389 (2021) ("[A]bsent contrary evidence, [a] [c]ourt normally presumes consistent usage" of terms.).

The meaning of "a certification" in timing rule (iv), the 180-day exclusivity period, is parallel to its meaning in rules (i), (ii), and (iii). Thus, timing rule (iv)'s instruction to determine "if the [subsequent] application contains *a certification described in paragraph (2)(A)(vii)(IV)*" refers to a *specific* patent certification considered *individually* under timing rule (iv), 21 U.S.C. § 355(j)(5)(B)(iv)(I) (emphasis added), consistent with the parallel "a certification" text in rules (i), (ii), and (iii), and Congress's overarching instruction to apply the timing rules "to each certification made under paragraph (2)(A)(vii)" individually. *Id.* § 355(j)(5)(B).

The immediately following clause in timing rule (iv), that the application must be "for a drug for which a first applicant has submitted an application *containing such a certification*," means that the first applicant's application must contain the *same* "certification described in paragraph [IV]" made by the subsequent applicant to the same patent. *Id.* § 355(j)(5)(B)(iv)(I) (emphasis added). "Such" means "[t]hat or those; having just been mentioned." *Such, Black's Law Dictionary* (7th ed. 1999); *King v. Burwell*, 576 U.S. 473, 487 (2015) (same). And the "certification" that was just mentioned is a specific, individual "certification described in paragraph (2)(A)(vii)(IV)" made by the subsequent applicant and considered individually, one

at a time, under the timing rules. *Supra* at 28-30. Other patents *not* certified by the subsequent applicant are beside the point.

The district court disagreed, finding that § 355(j)(5)(B)(iv)—timing rule (iv)—provides that the 180-day exclusivity period delays approval of a subsequent ANDA if its applicant made *any* Paragraph IV certification to *any* patent ("a certification described in paragraph [IV]"), and a "first applicant" made "any Paragraph IV Certification for the drug," *i.e.*, "such a certification." *See* JA__-__ (Dkt. 82 at 26-27). In other words, all that mattered to the court was that both applicants submitted a particular type of certification—a Paragraph IV certification—regardless of the particular patent to which the certification was directed. The court thus concluded that Actavis's HE patent certification gives rise to a 180-day exclusivity period delaying approval of Norwich's ANDA, even though Norwich did not certify to that patent, because Norwich submitted unrelated Paragraph IV certifications. *Id.*

To reach that conclusion, FDA and the district court had to ignore every textual and structural clue described above. *Supra* at 27-30. That is wrong. Their construction also renders much of timing rule (iv) surplusage. A "first applicant" is defined as an applicant that is first to submit an ANDA that "contains and lawfully maintains a certification described in paragraph (2)(A)(vii)(IV) for the drug." 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb). So every "first applicant" has filed *some*

Paragraph IV certification. Timing rule (iv) delays approval "if the [subsequent] application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application **containing such a certification**." *Id.* § 355(j)(5)(B)(iv)(I) (emphasis added). The court's interpretation that "such a certification" merely means "*any* Paragraph IV certification" improperly renders the underlined phrase surplusage, because all first applicants by definition (*see id.* § 355(j)(5)(B)(iv)(II)(bb)) have already submitted *some* Paragraph IV certification. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (in general, "no clause, sentence, or word shall be superfluous").

The district court's interpretation is incorrect. Only patent certifications "made" by a subsequent applicant can delay approval of its application. Norwich did not "make" any certification to the HE patent, and so Actavis's HE patent certification cannot delay approval of Norwich's ANDA under the 180-day exclusivity period provision.

## 2. The Statute's History Confirms Norwich's Interpretation

Norwich's plain-text interpretation is not new: It is what Congress wrote and intended in the 1984 Act and what FDA adopted in its 1994 regulation. The dispute here concerns whether Congress changed this construction in 2003. It did not: Congress was solving a different problem altogether. And as to the interpretive question at issue here, Congress actually ratified FDA's interpretation in 2003.

The original Hatch-Waxman Act contained similar language in timing rule (iv):

> The approval of an [ANDA] shall be made effective on the last applicable date determined under the following: ...
>
> > (iv) If the application contains *a certification* described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection continuing *such a certification*, the application shall be made effective not earlier than one hundred and eighty days after [first commercial marketing of the drug or a favorable court decision on that patent].

Pub. L. No. 98-417, § 101, 98 Stat. 1585, 1588-89 (1984) (emphases added). And Congress then understood "such a certification" to mean "the same certification of invalidity or non-infringement," *i.e.*, certification to the same patent. H.R. Rep. No. 98-857, 28, 1984 U.S.C.C.A.N. 2647, 2661 (1984) (committee report adopting "same certification" interpretation).

From 1994 to 2016, FDA expressly adopted by regulation this plain-text interpretation of "such a certification":

> If an [ANDA] contains a [Paragraph IV] certification ... and ... one or more ... [ANDAs] were previously submitted containing a [Paragraph IV] certification *that the same patent* was invalid, unenforceable, or would not be infringed, approval of the subsequent [ANDA] will be made effective no sooner than 180 days from whichever of the following dates is earlier ....

21 C.F.R. § 314.107(c)(1) (1995 to 2016) (emphasis added); 59 Fed. Reg. 50,338, 50,367 (Oct. 3, 1994). FDA repeatedly applied that same-patent interpretation of

"such a certification" prior to 2016, including *after* the 2003 amendments. JA__ (Dkt. 39 at 26 n.15); JA__ (AR828).

But there was a wholly distinct problem with the pre-2003 statute. FDA separately interpreted the statute to mean that there could be multiple, sequential 180-day exclusivity periods for a single drug. Specifically, FDA believed that *each* Paragraph IV certification made by *any* previous ANDA applicant allowed a separate 180-day exclusivity period. FDA's "multiple exclusivity period[]" interpretation became known as "'patent based' exclusivity." *Apotex*, 414 F. Supp. 2d at 64. The details of how these multiple exclusivity periods operated are complex and described in detail in *Apotex*, but the issue turned on the statute's silence on the number of "previous" applications that could benefit from exclusivity. *Id.* at 64-71.

In the 2003 amendments, Congress overrode *this* aspect of FDA's interpretation by instead providing for a *single* 180-day period of exclusivity for each drug product, *see Teva*, 369 F. Supp. 3d at 191, thus making the exclusivity "a product-by-product exclusivity rather than a patent-by-patent exclusivity." 149 Cong. Rec. at S15884. Congress did so by defining a "first applicant" narrowly as only the initial applicant[5] to submit a complete ANDA containing any Paragraph IV certification, rather than allowing exclusivity to arise from *any* "previous"

---

[5] Or initial applican*t*s, if multiple applicants file on the same day.

application.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).  Congress then specified that

a *single* exclusivity period would run for *all* first applicants upon marketing by "*any*

first applicant":

> ~~If~~ **Subject to subparagraph (D), if** the application contains a
> certification described in ~~subclause (IV) of~~ paragraph (2)(A)(vii)**(IV)**
> and is for a drug for which a ~~previous~~ **first applicant has submitted
> an** application ~~has been submitted under this subsection continuing~~
> **containing** such a certification, the application shall be made effective
> ~~not earlier than one hundred and eighty~~ **on the date that is 180** days
> after ~~(I)~~ the date ~~the Secretary receives notice from the applicant
> under the previous application~~ of the first commercial marketing of the
> drug ~~under the previous application, or~~ **(including the commercial
> marketing of the listed drug) by any first applicant.**

*Compare*   21   U.S.C.   § 355(j)(5)(B)(iv)(I)   (2002),   *with*   21   U.S.C.

§ 355(j)(5)(B)(iv)(I) (bolded text added by amendment) (underline emphasis added).

Under this new "drug-product" approach, a *single* 180-day exclusivity period may

apply to any product, and it begins running for *all* first applicants upon marketing

by "*any* first applicant," allowing "only one exclusivity period to arise in relation to

a particular drug product."  *Apotex*, 414 F. Supp. 2d at 64; *see also* David E. Korn

et al., *A New History and Discussion of 180-Day Exclusivity*, 64 Food & Drug L.J.

335, 344 (2009) (explaining that the amendments permit "one 180-day exclusivity

period per reference product" after marketing by "'any' first applicant").

    The upshot is that while Congress did make substantial changes to the statute

in 2003, those changes were to allow only a single potential 180-day exclusivity

period for a given drug product.  They did not change the fundamental requirement

that FDA must analyze each certification made by the subsequent applicant, individually, in turn, on a patent-by-patent basis, to determine whether that exclusivity blocks a subsequent applicant. The amendments reaffirmed as much, by adding the clarifying text expressly requiring FDA to analyze "each certification made" by the subsequent applicant. 21 U.S.C. § 355(j)(5)(B).

And the amendments did not alter, but preserved, the text in timing rule (iv) requiring a comparison, individually, of "a certification described in" Paragraph IV made by the subsequent applicant with "such a certification" by the first applicant, which FDA had long interpreted to require a certification to the same patent. *Id.* § 355(j)(5)(B)(iv)(I). So if there was any doubt about what Congress historically meant (there is not), Congress's 2003 amendments ratified FDA's longstanding construction of "such a certification" to delay approval only with respect to the *same* patent certification made by *both applicants*. *See, e.g.*, *Monsalvo v. Bondi*, 145 S. Ct. 1232, 1242 (2025) ("When Congress adopts a new law against the backdrop of a 'longstanding administrative construction,' this Court generally presumes the new provision should be understood to work in harmony with what has come before."); *Jazz*, 141 F.4th at 262 (similar, collecting cases).

Contrary to FDA's interpretation here, the 2003 amendments were not intended to alter the fact that the 180-day exclusivity period could only arise from "such a certification" made by *both* applicants. FDA's newfound interpretation

today improperly *expands* the scope of exclusivity to allow a first applicant's single certification to *any* use of a drug to block approval of the *entire drug product* for unpatented uses unrelated to that certification.

**B. Actavis's Hepatic Encephalopathy Patent Certification Does Not Indirectly Block Approval Of Norwich's Application, Because Norwich Did Not Certify To That Patent**

The district court also held that approval of Norwich's ANDA was blocked on a distinct ground. The court reasoned that, even assuming Norwich were *correct* that Actavis's *HE patent* certification cannot give rise to the 180-day exclusivity delaying approval of Norwich's ANDA (as Norwich argues *supra* at 26-37), (1) *other* matching certifications by Norwich and Actavis trigger timing rule (iv) (this was correct), which in turn (2) requires a forfeiture to occur with respect to any and all Paragraph IV certifications *made solely by the first applicant*, Actavis, including the HE certification (this was incorrect). That is, even assuming that Actavis's HE patent certification cannot *directly* block approval of Norwich's ANDA under the 180-day exclusivity period, the court found that the HE patent certification *indirectly* blocks approval of the ANDA under the forfeiture provision.

That is wrong. Congress did not intend for its provisions providing for the *forfeiture* of the 180-day exclusivity period to indirectly have a *broader* blocking effect than the 180-day exclusivity period provision itself. In finding to the contrary, the district court made the conceptual error of viewing the 180-day exclusivity

period as an independent status or entitlement held by the "first applicant" that blocks all subsequent ANDAs, unless and until that status expired or was forfeited.

Part of FDA and the district court's analysis is correct: Even under Norwich's interpretation of timing rule (iv), there are four certifications that *do* block approval of Norwich's ANDA by default—the certifications to the three polymorph patents (the '949, '904, and '196 patents), and the IBS-D patent (the '569 patent). Each is "a certification" made by Norwich, for which Actavis made "such a certification" to that patent. 21 U.S.C. § 355(j)(5)(B)(iv)(I). So, by default, those four certifications *would* give rise to the 180-day exclusivity period under timing rule (iv).

But the key insight the district court missed is that Actavis forfeited the 180-day exclusivity period potentially applicable to the polymorph and the IBS-D patent certifications (but not applicable to the HE patent certification), because Norwich secured judgments of non-infringement or invalidity for each of those four patents. Norwich was *not* required to secure a judgment of non-infringement or invalidity as to the HE patent because Norwich did not certify to the HE patent or seek approval for its patented use, and so Actavis could not benefit from a 180-day period applicable to the HE patent that could block approval of Norwich's ANDA.

**1. Actavis Forfeited The 180-Day Exclusivity Period Applicable To The IBS-D And Polymorph Patent Certifications Because An Enumerated Event Occurred With Respect To Each Of Those Patents**

Actavis forfeited the 180-day exclusivity period applicable to the IBS-D and

polymorph patent certifications because enumerated events giving rise to forfeiture (the favorable judgments in the '369 ANDA patent litigation) occurred for each of those patents.

The forfeiture sub-rule qualifies the operation of timing rule (iv), the 180-day exclusivity period, each time that timing rule runs on a *specific* patent certification. Recall that timing rule (iv) provides:

> The approval of an [ANDA] ... shall be made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii):
>
> (iv) 180-day exclusivity period.
>
> > (I) Effectiveness of application.
> >
> > > *Subject to subparagraph (D)*, if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added). "Subparagraph (D)" is the forfeiture sub-rule. *Id.* § 355(j)(5)(D). And making § 355(j)(5)(B)(iv)(I) "subject to" subparagraph D means that subparagraph D serves to limit, or qualify, the operation of timing rule (iv) in § 355(j)(5)(B)(iv)(I), each and every time the conditions in rule (iv) are met by a specific patent certification. *See SBC Commc'ns, Inc. v. FCC,*

373 F.3d 140, 149-50 (D.C. Cir. 2004) (explaining that "subject to" means to "qualify" or "condition" a rule).

The forfeiture sub-rule explains *how* it qualifies the operation of the 180-day exclusivity period in § 355(j)(5)(B)(iv): "The 180-day exclusivity period described in subparagraph [§ 355(j)(5)](B)(iv) shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant."   21 U.S.C. § 355(j)(5)(D)(ii).  Because the IBS-D and polymorph patents *do* potentially give rise to the 180-day exclusivity period under § 355(j)(5)(B)(iv)—since both Actavis and Norwich certified to those patents—FDA must determine whether a "forfeiture event occur[ed]" with respect to the first applicant.  *Id.*

The "forfeiture event" definition is complex, but the parties agree that the only relevant portion is § 355(j)(5)(D)(i)(bb):

> (i) … [T]he term "forfeiture event", with respect to an application under this subsection, means the occurrence of any of the following:
>
> > (I) Failure to market.—The first applicant fails to market the drug by the later of—
> >
> > > (aa) [certain events[6]] *or*
> > >
> > > (bb) with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is *75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the*

---

[6] All parties agree that only period (bb) is relevant to approval of Norwich's ANDA, because the periods in (aa) expired in 2018, 30 months after Actavis filed its ANDA.

40

> *180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred*:
>
>> (AA) In an infringement action … *a court enters a final decision* from which no appeal … has been or can be taken *that the patent is invalid or not infringed*.
>>
>> (BB) In an infringement action … *a court* signs a settlement order or consent decree that *enters a final judgment that includes a finding that the patent is invalid or not infringed*.
>>
>> (CC) The patent information ... is withdrawn....

*Id.* § 355(j)(5)(D)(i) (emphases added). The gist of this provision is that a "first applicant" must start marketing its drug expeditiously, no later than 75 days after the date that the patents qualifying it for the 180-day exclusivity period under § 355(j)(5)(B)(iv) have been held invalid, not infringed, or withdrawn from the Orange Book. *Id.* Or, more simply: Once the "runway is clear" of patent-related obstacles such that some patents can benefit from the generic, the first applicant must market the generic, or other applicants may do so. *See id.*

Under § 355(j)(5)(D)(i)(I)(bb), FDA must evaluate "each of the patents with respect to which the first applicant submitted and lawfully maintained a certification *qualifying* the first applicant *for the 180-day exclusivity period* under subparagraph (B)(iv)," and determine if an enumerated event occurred as to each patent. *Id.* § 355(j)(5)(D)(i)(I)(bb) (emphases added). The plain text shows that these patents "qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv)" are those that could give rise to the 180-day exclusivity period under § 355(j)(5)(B)(iv), *i.e.*, that could potentially delay approval of Norwich's

ANDA under § 355(j)(5)(B)(iv). The word "qualifying" means "possess[ing] ... qualities or properties ... legally necessary to make ... eligible." *Qualification*, *Black's Law Dictionary*, *supra*; *see also Qualified*, *Webster's Third New Int'l Dictionary* (2002) (similar). As detailed above, the only patents with respect to which a first applicant maintains a certification satisfying *all* of the properties or conditions to make it eligible "for the 180-day exclusivity period under subparagraph (B)(iv)," 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), are those certifications to patents *also* certified in the subsequent applicant's ANDA, and thus could potentially give rise to a 180-day exclusivity period. *Supra* at 26-37.

From there, the resolution of this case is straightforward: The only "qualifying" certifications, *i.e.*, the certifications made by *both* Actavis and Norwich, are to the four IBS-D and polymorph patents. And FDA agrees that enumerated (forfeiture) events occurred with respect to all four patents, *i.e.*, the judgments of noninfringement and invalidity in '369 ANDA suit. JA__-__ (AR21-22).

For these reasons, a "forfeiture event" occurred, and Actavis's potential 180-day exclusivity period applicable to the IBS-D and polymorph patent certifications cannot delay approval of Norwich's ANDA.

### 2. No Enumerated Event Was Required With Respect To The Hepatic Encephalopathy Patent Because Norwich Did Not Certify To That Patent

Here is where things went wrong below: FDA and the district court found it was *also* necessary for Actavis to forfeit the 180-day exclusivity period *applicable to the HE patent certification*. That was mistaken: Because Norwich did not certify to the HE patent, Actavis's HE patent certification is not a certification "qualifying" Actavis for the 180-day exclusivity period under § 355(j)(5)(B)(iv), and no enumerated event was required with respect to that patent.

The dispute in this case boils down to *which* patent certifications by the first applicant are those for which the first applicant maintains "a certification qualifying the first *applicant for the 180-day exclusivity period* under subparagraph (B)(iv)." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb). If FDA is correct that the HE patent certification is a certification "qualifying" Actavis for the 180-day exclusivity period, it follows that because no enumerated forfeiture event has occurred for that patent (because the Delaware court upheld the patent as applicable to generic rifaximin), Norwich's ANDA—and all other rifaximin ANDAs—will be blocked by that HE patent certification—which only expires in 2029—unless Actavis launches earlier, in 2028.

FDA and the district court believed that to determine *which* certifications were those "qualifying" Actavis for the 180-day exclusivity period, all that was necessary was to look to the definition of a "first applicant," and determine which certifications

give rise to "first applicant" status. *See id.*; JA__-__ (Dkt. 82 at 27-28). According to FDA and the district court, those certifications *per se* qualify an applicant for the 180-day exclusivity period. *Id.* Because a "first applicant" is defined as the first applicant that submits an ANDA "that contains and lawfully maintain[s] a [Paragraph IV certification] for the drug," FDA and the district court found a forfeiture was required with respect to all of the Paragraph IV certifications made by Actavis, including the HE patent certification, *whether or not* Norwich made that same certification. JA__, __-__ (AR26 & n.86; Dkt. 82 at 27-28).

That was mistaken. As detailed above, the only certifications that have all the properties to make the first applicant eligible (qualifying) "for the 180-day exclusivity period under subparagraph (B)(iv)," 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), are those to patents *both* certified in the first applicant's and subsequent applicant's ANDA, and thus could *potentially* give rise to a 180-day exclusivity period.

Congress made this express: The statute's reference to certifications "qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv)" contains the defined term "180-day exclusivity period." Congress defined the "180-day exclusivity period" to mean "the 180-day period ending on the day before the date on which an application submitted by an applicant other than a first applicant *could become effective under this clause*." 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa) (emphasis added). And "this clause" is

§ 355(j)(5)(B)(iv).[7]   The portion of § 355(j)(5)(B)(iv) that discusses when an application "could become effective" is § 355(j)(5)(B)(iv)(I), timing rule (iv), which describes when the subsequent application "shall be made effective," and is entitled, "Effectiveness of application." *Id.* § 355(j)(5)(B)(iv)(I).   Tying this all together, then, the certifications "qualifying" the first applicant for "the 180-day exclusivity period under subparagraph (B)(iv)" are those that can give rise to a 180-day exclusivity period under § 355(j)(5)(B)(iv)(I), *i.e.*, when it is applied the subsequent application under review.   Thus, a certification is only "qualifying" if it is made by *both* applicants.

FDA and the district court instead viewed the 180-day exclusivity period more abstractly, as a status or property right belonging to a first applicant independent of the certifications made by the subsequent application under review.   But Congress chose a different design.   The 180-day exclusivity period is a purely relational concept, restricting the "date" on which "the application" that is submitted by a subsequent applicant and "contains" specific patent certifications "shall be made effective."   *Id.*   The 180-day exclusivity period can only potentially come into existence by applying the four timing rules "to each certification made" in a

---

[7]   The statute refers to romanette 355(j)(5)(B)(iv) as a "clause." *See, e.g.*, 21 U.S.C. § 355(j)(2)(A) (referring to "clause (i)" and "clauses (ii) through (vi)"); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000) (referring to "21 U.S.C. § 355(j)(5)(B)(iv)" as "clause (iv)").

subsequent application.  *Id.* § 355(j)(5)(B).  As Actavis has correctly explained and another court agreed, the 180-day exclusivity period "is not an intangible right of the generic drug company that enjoys it, but merely a limitation on FDA's authority to approve *other* ANDAs; *i.e.*, it is a *disability* impeding those other companies."[8] Where a subsequent applicant does not make a Paragraph IV certification to a specific patent, the first applicant's certification to that patent cannot give rise to the 180-day exclusivity period, and that certification is not one "qualifying" the first applicant for the 180-day exclusivity period.

Of course, Congress could have made the exclusivity a status of the first applicant, by referring to the certifications "qualifying the first applicant **as a first applicant**."  It did not do so.  And for good reason:  The point of the forfeiture provision is to forfeit the 180-day exclusivity period under § 355(j)(5)(B)(iv)(I) *vis-à-vis the subsequent application*.  *See supra* at 39-42, 44-45 (discussing interrelationship of § 355(j)(5)(B)(iv)(I) and § 355(j)(5)(D)).

FDA's construction destroys this fundamental structure.  On FDA's view, even if a first applicant's patent certification *cannot* give rise to the 180-day exclusivity period when § 355(j)(5)(B)(iv)(I) is applied to the subsequent

---

[8] Pl.'s Mem. in Supp. Mot. Summ. J. 39, *Actavis Laboratories FL, Inc. v. United States*, 161 Fed. Cl. 334 (2022) (No. 19-798), Dkt. 31-1; *Actavis*, 161 Fed. Cl. at 371 n.29 (adopting Actavis's position).

application under FDA consideration, that certification gives rise to a freestanding "first applicant" status under § 355(j)(5)(D) that *does* block approval of the ANDA.

*FDA cannot be right that the forfeiture provision indirectly blocks approval of a subsequent ANDA more broadly than "the 180-day exclusivity period" in § 355(j)(5)(B)(iv) itself blocks approval directly.* So, because Actavis's HE patent certification cannot directly block approval of Norwich's ANDA under the 180-day exclusivity provision in § 355(j)(5)(B)(iv) itself, *see supra* at 26-37, it cannot then be true that the HE patent certification indirectly blocks approval of Norwich's ANDA under the forfeiture provision in § 355(j)(5)(D). That would make no sense: Congress's goal in enacting the forfeiture provision in 2003 was to "ensure Americans more timely access to affordable pharmaceuticals," and stop use of the 180-day exclusivity period as a "bottleneck" to competition. 149 Cong. Rec. at S15884. The forfeiture provision was not intended to *expand upon* the direct blocking effect of the 180-day exclusivity period and block ANDAs *more broadly*.

It is worse than that: The district court acknowledged that Norwich's ANDA would have been approvable under the pre-2003 statute and FDA's parallel regulation in a "time machine." JA__ (Dkt. 82 at 1). FDA's current interpretation thus means that Congress's 2003 amendment to add the *forfeiture* provision actually *expands* the scope of the *pre-2003* 180-day exclusivity period.

This is how: Prior to 2003, the statute allowed approval of each ANDA once the patents subject to Paragraph IV certifications made in *that ANDA* expired or were subject to a judgment of non-infringement or invalidity. *Supra* at 33. In that way, Congress authorized approval of so-called "skinny labels" for unpatented uses that "carve[] out" the still-patented uses of the drug. *See Caraco*, 566 U.S. at 406. Accordingly, each patient population with a given condition could access a drug as soon as patents allowed. *See id.* Yet on FDA's current view, the entire drug product is now blocked for *all* patients until *all* patents subject to Paragraph IV certifications by the first applicant expire or are forfeited. JA__-__ (Dkt. 82 at 23-34 & nn.6-8). Rather than addressing the "parking" problem that Congress was actually trying to solve in 2003, FDA's interpretation of the "forfeiture" provision effectively merges together and expands the multiplicity of pre-2003 exclusivities into a single block of "super exclusivity" covering *all* conditions and *all uses* of a drug covered by the first applicant's Paragraph IV certifications, until the *last* patent governing *any* use expires or is subject to forfeiture. That is the opposite of Congress's intent.

## II. ALTERNATIVELY, ACTAVIS FORFEITED ANY EXCLUSIVITY BECAUSE ██████████████████ PRECLUDED APPROVAL OF ITS APPLICATION FOR OVER 30 MONTHS

If the Court agrees with Norwich that Actavis's HE patent does not block approval of the '370 ANDA, that is sufficient to resolve this case. If the Court disagrees, however, Actavis forfeited the 180-day exclusivity period on the

independent ground that Actavis failed to timely obtain tentative approval of its ANDA within 30 months of filing, as the statute requires. And FDA acted contrary to law when it excused Actavis's failure to obtain tentative approval on grounds that the failure was "caused by" a change in FDA approval requirements.

## A. Actavis Forfeited Exclusivity By Failing To Obtain Tentative Approval By June 18, 2018

To maintain any exclusivity, Actavis needed to obtain tentative approval by June 18, 2018. Even seven years later in 2025, Actavis still does not have tentative approval. It is inconceivable that when Congress authorized applicants to take beyond 30 months to obtain tentative approval when such delay was "caused by" a change in FDA approval requirements, Congress meant to allow a "first applicant" to park exclusivity indefinitely ████████████████████████████

████████████████████████████████████

Beyond a "failure to market" forfeiture, a "forfeiture event" may also occur where the "first applicant" fails to "obtain tentative approval of the application within 30 months after the date on which the application is filed." 21 U.S.C. § 355(j)(5)(D)(i)(IV). Tentative approval means an application meets the FDCA's scientific and medical requirements for approval, but either a patent- or exclusivity-related obstacle delays final approval. *Id.* § 355(j)(5)(B)(iv)(II)(dd); *see also Teva*, 595 F.3d at 1311. So, at a minimum, a "first applicant" needs to file a scientifically approvable ANDA within 30 months of filing its application. Actavis failed to

obtain tentative approval by June 18, 2018, 30 months after it filed its application. Absent an exception, it forfeited any exclusivity. 21 U.S.C. § 355(j)(5)(D)(i)(IV).

The statute provides one narrow exception, excusing forfeiture where "the failure [to obtain tentative approval within 30 months] is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed." *Id.* FDA concluded this "caused by" standard was met, because Actavis's failure to obtain tentative approval by June 18, 2018 was "caused at least in part[] by" FDA's change in legal requirements. JA__ (AR2). But contrary to FDA's conclusion, the failure to obtain tentative approval was not "caused by" a change in FDA review requirements, because as of June 18, 2018,

████████████████████████████████████████████████████

██████████████████████████████████████, any change in the requirements for approval.

████████████████████████ were based on separate long-established, preexisting FDA requirements. For instance, FDA identified that, as of June 18, 2018,

████████████████████████████████████████████████████

████████████████████████████████ FDA had issued draft product specific guidance in 2012 advising applicants to include a "BE [bioequivalence] study with Clinical Endpoint." JA__-__ (AR29-30). ████████

50

████████████████████████████████████████ ███

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

      ██████████████████████████████████████████

████████   FDA nonetheless concluded Actavis's failure to obtain approval by

that date was excused *by a change in FDA requirements* that FDA made in

March 2017, ████████████████████████   This is the context:  While

Actavis's ANDA remained pending, FDA's "thinking evolved" on the necessary

studies to obtain approval of generic rifaximin, "based in part on a citizen petition

submitted by Salix on October 17, 2016," for FDA to require "'in vitro dissolution

testing'" of generic rifaximin.  JA__ (Dkt. 82 at 11) (citing AR39-122, 253 (JA__-

__, __)).  Upon FDA granting Actavis's petition on March 16, 2017, FDA published "new draft rifaximin guidance that, if finalized, would have recommended [these] additional dissolution studies."  JA__-__ (Dkt. 82 at 11-12) (citing AR210-30, 252-53 (JA__-__, __-__)).  ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████    ██████████████

███████████

Based on these facts, FDA found it sufficient that Actavis's failure to obtain tentative approval by June 18, 2018 was "caused *at least in part[]* by" FDA's change in legal requirements.  JA__ (AR2) (emphasis added).  FDA never explained what "caused at least in part" means, but it made explicit that "but for" causation does not apply.  *See id.*  FDA was mistaken.

Recall that a "forfeiture event" occurs when tentative approval is delayed beyond 30 months, "unless the failure is caused by a change in or a review of the requirements for approval of the application."  21 U.S.C. § 355(j)(5)(D)(i)(IV).  To "cause" an effect means "[t]o bring about or effect."  *Cause*, *Black's Law Dictionary*,

*supra*. "[C]aused by" and similar causal language is therefore typically read to "require but-for causality." *Burrage v. United States*, 571 U.S. 204, 210, 212 (2014). That is because it is "natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter." *Id.* at 212. For example: A baseball team's victory would be "caused by" a single homerun if the game ends 1-to-0, but not "caused by" that homerun if it ends 10-to-0. *See id.* at 210-12.

Thus, "[w]here there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from'" "because of," "based on," and "by reason of" to "require but-for causality." *Id.* at 212-13; *id.* at 210 (treating the phrase "caused by" as interchangeable with "resulting from"). This Court has likewise explained that a statutory requirement that an effect "must be caused by" or "results from" or be "based on" an event "require[s] simple but-for causation." *Sinclair Wyo. Refin. Co. v. EPA*, 114 F.4th 693, 708-09 (D.C. Cir. 2024). This "but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020); *see also Sinclair Wyo. Refin.*, 114 F.4th at 709 ("A 'but-for cause' is '[t]he cause without which the event could not have occurred.'").

This but-for causation standard is not just the plain-text meaning of "caused by": This "common understanding of cause" is one of the "traditional background

principles 'against which Congress legislate[s].'" *Burrage*, 571 U.S. at 211, 214; *see also Bostock*, 590 U.S. at 656 (similar).

FDA cannot simply rewrite the statutory "caused by" standard into a "caused at least in part[] by" standard lacking any but-for causation requirement. *See* JA__ (AR2). When Congress means to impose a "more forgiving standard" like "motivating factor" causation, it does so expressly. *Bostock*, 590 U.S. at 657. By contrast, under the "caused by" standard Congress chose, "it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event." *Burrage*, 571 U.S. at 212. Here, any change in FDA approval requirements played a "nonessential" role in delaying Actavis's approval beyond June 18, 2018, given

████████████████████████████████████████████████

████████████████████████     ████████████████████████

████████████████████████

To be sure, in "rare" instances, there can be "textual or contextual indication[s]" that can excuse but-for causation. *Id.* at 212, 214. Two arsonists cannot escape liability just because both burned down a building at the same time. Two state sponsors of terrorism cannot escape liability just because both jointly engaged in a terrorist attack. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C. Cir. 2004). But such exceptions to the

normal meaning of "caused by" are "rare" and require a clear textual signal from Congress. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013) (refusing to adopt exception). FDA has never attempted to identify any such "textual or contextual" basis to depart from the ordinary meaning of "caused by" in this case. *Burrage*, 571 U.S. at 210, 212. Just the opposite: Congress sought to ensure the 180-day exclusivity period could not be "used as a bottleneck to prevent additional generic competition." *Amneal*, 285 F. Supp. 3d at 334 (quoting 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003)). Congress clearly did not intend to excuse the 30-month deadline and "bottleneck" competition with a ███████████ ANDA parking exclusivity for years.

**B.     Even Under FDA's Incorrect Causation Standard, Actavis Forfeited Any Exclusivity By Failing To Obtain Tentative Approval By November 16, 2018**

Even if Norwich were wrong about the meaning of "caused by," and FDA were correct that the delay beyond June 18, 2018, *was* "caused by" the change in FDA review standards resulting from Salix's citizen petition, Actavis *still* forfeited its exclusivity by failing to come to market by November 16, 2018, *i.e.*, the extended deadline the statute would provide assuming *arguendo* that this change in FDA review standards *did* in fact "cause" delay in tentative approval of Actavis's ANDA.

The statute provides for an extension of the first applicant's 30-month deadline:

> If the filing of an application resulted in first-applicant status under subsection (j)(5)(D)(i)(IV) and *approval of the application was delayed because of a petition*, the 30-month period under such subsection is *deemed to be extended* by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition ... without regard to whether the Secretary grants, in whole or in part, or denies, in whole or in part, the petition.

21 U.S.C. § 355(q)(1)(G) (emphases added). So, to the extent that Actavis's ANDA allegedly "was delayed because of a petition," *i.e.*, by Salix's 2016 petition and the resulting change in FDA review requirements in March 2017 under FDA's purported "caused at least in part by" standard, JA__ (AR2), it follows that the 30-month period to receive tentative approval would be extended to November 16, 2018, *i.e.*, the 151-day period that Salix's citizen petition remained pending. *See* 21 U.S.C. § 355(q)(1)(G); JA __-__ (AR819-20). ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ *Supra* at 52. So it could not be said that a "change in requirements" delayed tentative approval beyond that point.

The district court refused to reach this issue, finding that Norwich "waived" the issue by failing to raise it to FDA. JA__ (Dkt. 82 at 35 n.10). That is incorrect. Norwich argued to FDA that "even if approval had been delayed 'because of' Salix's 2016 petition," it could "only extend the 30-month tentative approval deadline by just under five months," so "Teva [Actavis] had long-since forfeited any

exclusivity," even if forfeiture had been "tolled" while the petition was pending. JA__-__ (AR819-20). Norwich clearly raised the issue. And in all events, there was no requirement that Norwich even raise this issue before FDA, in proceedings on Actavis's ANDA to which Norwich was not a party. *See Sandoz*, 57 F.4th at 278 (finding no "exhaustion requirement" requiring nonparty opposing drug approval to raise argument to FDA).

# CONCLUSION

For the foregoing reasons, the Court should reverse and instruct the district

court to grant Norwich summary judgment.

Dated: August 18, 2025

Matthew S. Murphy
AXINN, VELTROP & HARKRIDER
LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100
mmurphy@axinn.com

Respectfully submitted,

*/s/ Andrew D. Prins*
Andrew D. Prins
Rachael L. Westmoreland
Lia Rose Barrett
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.prins@lw.com

Nicholas L. Schlossman
LATHAM & WATKINS LLP
300 Colorado Street
Suite 2400
Austin, TX 78701
(737) 910-7314
nicholas.schlossman@lw.com

*Counsel for Plaintiff-Appellant Norwich Pharmaceuticals, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Federal Rule of Appellate Procedure 32(f) and (g), and D.C. Cir. Rule 32(e)(2), because it contains 12,965 words, including 134 words manually counted in any visual images.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

*/s/ Andrew J. Prins*
Andrew J. Prins

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

I further certify that the confidential version of the foregoing brief was also served on counsel for all parties by electronic transfer.

*/s/ Andrew J. Prins*
Andrew J. Prins

# ADDENDUM
## Pursuant to Rule 28(a)(5)

# TABLE OF CONTENTS

**Page**

21 U.S.C. § 355(j) ...............................................................................ADD1

# 21 U.S.C. § 355

## § 355. New drugs

* * *

## (j) Abbreviated new drug applications

(1)  Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2)(A)  An abbreviated application for a new drug shall contain—

(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

(ii)(I) if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

(II)  if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

(III)  if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 321(p) of this title, and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv)  information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

(v)  information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi)  the items specified in clauses (ii) through (vi) of subsection (b)(1)(A);

(vii)  a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c)—

(I)  that such patent information has not been filed,

(II)  that such patent has expired,

(III)  of the date on which such patent will expire, or

(IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(viii)  if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

(B) NOTICE OF OPINION THAT PATENT IS INVALID OR WILL NOT BE INFRINGED.—

(i) AGREEMENT TO GIVE NOTICE.—An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give notice as required by this subparagraph.

(ii) TIMING OF NOTICE.—An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall give notice as required under this subparagraph—

(I) if the certification is in the application, not later than 20 days after the date of the postmark on the notice with which the Secretary informs the applicant that the application has been filed; or

(II) if the certification is in an amendment or supplement to the application, at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application.

(iii) RECIPIENTS OF NOTICE.—An applicant required under this subparagraph to give notice shall give notice to—

(I) each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

(II) the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

(iv) CONTENTS OF NOTICE.—A notice required under this subparagraph shall—

(I) state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification; and

(II) include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

(C)  If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary seeking permission to file such an application.  The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve such a petition unless the Secretary finds—

 (i) that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug; or

 (ii) that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

(D)(i)  An applicant may not amend or supplement an application to seek approval of a drug referring to a different listed drug from the listed drug identified in the application as submitted to the Secretary.

(ii)  With respect to the drug for which an application is submitted, nothing in this subsection prohibits an applicant from amending or supplementing the application to seek approval of a different strength.

(iii)  Within 60 days after December 8, 2003, the Secretary shall issue guidance defining the term "listed drug" for purposes of this subparagraph.

(3)(A)  The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1), which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

(B) The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of bioavailability and bioequivalence studies needed for approval of such application.  The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of such studies.  Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant.

(C)  Any agreement regarding the parameters of design and size of bioavailability and bioequivalence studies of a drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary. Such agreement shall not be changed after the testing begins, except—

   (i)  with the written agreement of the sponsor or applicant; or

   (ii)  pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

(D)  A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

(E)  The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance office personnel unless such field or compliance office personnel demonstrate to the reviewing division why such decision should be modified.

(F)  No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

(G)  For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection (including scientific matters, chemistry, manufacturing, and controls).

(4)  Subject to paragraph (5), the Secretary shall approve an application for a drug unless the Secretary finds—

   (A)  the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity;

   (B)  information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

(C)(i) if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

(ii) if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

(iii) if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed drug, information submitted with the application is insufficient to show—

(I) that the other active ingredients are the same as the active ingredients of the listed drug, or

(II) that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 321(p) of this title,

or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

(D)(i) if the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

(ii) if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

(E) if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

(F) information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information submitted in the application is insufficient to show that

the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

(G) information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or because the drug and the listed drug are produced or distributed by different manufacturers;

(H) information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included;

(I) the approval under subsection (c) of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e), the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) for grounds described in the first sentence of subsection (e), the approval under this subsection of the listed drug referred to in the application under this subsection has been withdrawn or suspended under paragraph (6), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

(J) the application does not meet any other requirement of paragraph (2)(A); or

(K) the application contains an untrue statement of material fact.

(5)(A) Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

(B)  The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii):

(i)  If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

(ii)  If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

(iii)  If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in paragraph (2)(B) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under subsection (b)(1) or (c)(2) before the date on which the application (excluding an amendment or supplement to the application), which the Secretary later determines to be substantially complete, was submitted.  If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that—

(I)  if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on—

(aa)  the date on which the court enters judgment reflecting the decision; or

(bb)  the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

(II)  if before the expiration of such period the district court decides that the patent has been infringed—

(aa)  if the judgment of the district court is appealed, the approval shall be made effective on—

(AA) the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or

(BB) the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

(bb) if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of title 35;

(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in subclause (I); or

(IV) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in subclause (II).

In such an action, each of the parties shall reasonably cooperate in expediting the action.

(iv) 180-DAY EXCLUSIVITY PERIOD.—

(I) EFFECTIVENESS OF APPLICATION.—Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

(II) DEFINITIONS.—In this paragraph:

(aa) 180-DAY EXCLUSIVITY PERIOD.—The term "180-day exclusivity period" means the 180-day period ending on the day

before the date on which an application submitted by an applicant other than a first applicant could become effective under this clause.

(bb) FIRST APPLICANT.—As used in this subsection, the term "first applicant" means an applicant that, on the first day on which a substantially complete application containing a certification described in paragraph (2)(A)(vii)(IV) is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a certification described in paragraph (2)(A)(vii)(IV) for the drug.

(cc) SUBSTANTIALLY COMPLETE APPLICATION.—As used in this subsection, the term "substantially complete application" means an application under this subsection that on its face is sufficiently complete to permit a substantive review and contains all the information required by paragraph (2)(A).

(dd) TENTATIVE APPROVAL.—

(AA) IN GENERAL.—The term "tentative approval" means notification to an applicant by the Secretary that an application under this subsection meets the requirements of paragraph (2)(A), but cannot receive effective approval because the application does not meet the requirements of this subparagraph, there is a period of exclusivity for the listed drug under subparagraph (F) or section 355a of this title, or there is a 7-year period of exclusivity for the listed drug under section 360cc of this title.

(BB) LIMITATION.—A drug that is granted tentative approval by the Secretary is not an approved drug and shall not have an effective approval until the Secretary issues an approval after any necessary additional review of the application.

(v) 180-DAY EXCLUSIVITY PERIOD FOR COMPETITIVE GENERIC THERAPIES.—

(I) EFFECTIVENESS OF APPLICATION.—Subject to subparagraph (D)(iv), if the application is for a drug that is the same as a competitive generic therapy for which any first approved applicant has commenced commercial marketing, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the competitive generic therapy (including the commercial marketing of the listed drug) by any first approved applicant.

(II) LIMITATION.—The exclusivity period under subclause (I) shall not apply with respect to a competitive generic therapy that has previously received an exclusivity period under subclause (I).

(III) DEFINITIONS.—In this clause and subparagraph (D)(iv):

(aa) The term "competitive generic therapy" means a drug—

(AA) that is designated as a competitive generic therapy under section 356h of this title; and

(BB) for which there are no unexpired patents or exclusivities on the list of products described in section 355(j)(7)(A) of this title at the time of submission.

(bb) The term "first approved applicant" means any applicant that has submitted an application that—

(AA) is for a competitive generic therapy that is approved on the first day on which any application for such competitive generic therapy is approved;

(BB) is not eligible for a 180-day exclusivity period under clause (iv) for the drug that is the subject of the application for the competitive generic therapy; and

(CC) is not for a drug for which all drug versions have forfeited eligibility for a 180-day exclusivity period under clause (iv) pursuant to subparagraph (D).

(C) CIVIL ACTION TO OBTAIN PATENT CERTAINTY.—

(i) DECLARATORY JUDGMENT ABSENT INFRINGEMENT ACTION.—

(I) IN GENERAL.—No action may be brought under section 2201 of title 28 by an applicant under paragraph (2) for a declaratory judgment with respect to a patent which is the subject of the certification referred to in subparagraph (B)(iii) unless—

(aa) the 45-day period referred to in such subparagraph has expired;

(bb) neither the owner of such patent nor the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brought a civil action against the applicant for infringement of the patent before the expiration of such period; and

(cc) in any case in which the notice provided under paragraph (2)(B) relates to noninfringement, the notice was accompanied by a document described in subclause (III).

(II) FILING OF CIVIL ACTION.—If the conditions described in items (aa), (bb), and as applicable, (cc) of subclause (I) have been met, the applicant referred to in such subclause may, in accordance with section 2201 of title 28, bring a civil action under such section against the owner or holder referred to in such subclause (but not against any owner or holder that has brought such a civil action against the applicant, unless that civil action was dismissed without prejudice) for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval, except that such civil action may be brought for a declaratory judgment that the patent will not be infringed only in a case in which the condition described in subclause (I)(cc) is applicable.  A civil action referred to in this subclause shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

(III) OFFER OF CONFIDENTIAL ACCESS TO APPLICATION.—For purposes of subclause (I)(cc), the document described in this subclause is a document providing an offer of confidential access to the application that is in the custody of the applicant under paragraph (2) for the purpose of determining whether an action referred to in subparagraph (B)(iii) should be brought.  The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information.  A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract.  Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted

by the applicant to remove any information of no relevance to any issue of patent infringement.

(ii) COUNTERCLAIM TO INFRINGEMENT ACTION.—

(I) IN GENERAL.—If an owner of the patent or the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) or (c) on the ground that the patent does not claim either—

(aa) the drug for which the application was approved; or

(bb) an approved method of using the drug.

(II) NO INDEPENDENT CAUSE OF ACTION.—Subclause (I) does not authorize the assertion of a claim described in subclause (I) in any civil action or proceeding other than a counterclaim described in subclause (I).

(iii) NO DAMAGES.—An applicant shall not be entitled to damages in a civil action under clause (i) or a counterclaim under clause (ii).

(D) FORFEITURE OF 180-DAY EXCLUSIVITY PERIOD.—

(i) DEFINITION OF FORFEITURE EVENT.—In this subparagraph, the term "forfeiture event", with respect to an application under this subsection, means the occurrence of any of the following:

(I) FAILURE TO MARKET.—The first applicant fails to market the drug by the later of—

(aa) the earlier of the date that is—

(AA) 75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or

(BB) 30 months after the date of submission of the application of the first applicant; or

(bb) with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity

period under subparagraph (B)(iv), at least 1 of the following has occurred:

(AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

(BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

(II) WITHDRAWAL OF APPLICATION.—The first applicant withdraws the application or the Secretary considers the application to have been withdrawn as a result of a determination by the Secretary that the application does not meet the requirements for approval under paragraph (4).

(III) AMENDMENT OF CERTIFICATION.—The first applicant amends or withdraws the certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period.

(IV) FAILURE TO OBTAIN TENTATIVE APPROVAL.—The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

(V) AGREEMENT WITH ANOTHER APPLICANT, THE LISTED DRUG APPLICATION HOLDER, OR A PATENT OWNER.—The first applicant enters into an agreement with another applicant under this subsection for the drug, the holder of the application for the listed drug, or an owner of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV), the Federal Trade Commission or the Attorney General files a complaint, and there is a final decision of the Federal Trade Commission or the court with regard to the complaint from which no

appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the agreement has violated the antitrust laws (as defined in section 12 of title 15, except that the term includes section 45 of title 15 to the extent that that section applies to unfair methods of competition).

(VI) EXPIRATION OF ALL PATENTS.—All of the patents as to which the applicant submitted a certification qualifying it for the 180-day exclusivity period have expired.

(ii) FORFEITURE.—The 180-day exclusivity period described in subparagraph (B)(iv) shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant.

(iii) SUBSEQUENT APPLICANT.—If all first applicants forfeit the 180-day exclusivity period under clause (ii)—

(I) approval of any application containing a certification described in paragraph (2)(A)(vii)(IV) shall be made effective in accordance with subparagraph (B)(iii); and

(II) no applicant shall be eligible for a 180-day exclusivity period.

(iv) SPECIAL FORFEITURE RULE FOR COMPETITIVE GENERIC THERAPY.— The 180-day exclusivity period described in subparagraph (B)(v) shall be forfeited by a first approved applicant if the applicant fails to market the competitive generic therapy within 75 days after the date on which the approval of the first approved applicant's application for the competitive generic therapy is made effective.

(E) If the Secretary decides to disapprove an application, the Secretary shall give the applicant notice of an opportunity for a hearing before the Secretary on the question of whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

(F)(i) Repealed. Pub. L. 117–9, §1(b)(1)(B), Apr. 23, 2021, 135 Stat. 258.

(ii) If an application submitted under subsection (b) for a drug, no active moiety (as defined by the Secretary in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) of which has been

approved in any other application under subsection (b), is approved after September 24, 1984, no application may be submitted under this subsection which refers to the drug for which the subsection (b) application was submitted before the expiration of five years from the date of the approval of the application under subsection (b), except that such an application may be submitted under this subsection after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in subclause (IV) of paragraph (2)(A)(vii). The approval of such an application shall be made effective in accordance with subparagraph (B) except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (B)(iii) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

(iii) If an application submitted under subsection (b) for a drug, which includes an active moiety (as defined by the Secretary in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) that has been approved in another application approved under subsection (b), is approved after September 24, 1984, and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under this subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) for such drug.

(iv) If a supplement to an application approved under subsection (b) is approved after September 24, 1984, and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under this subsection for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b).

(v) If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active moiety (as defined by the Secretary in section 314.3 of title 21, Code of Federal Regulations (or any

successor regulations)) that has been approved in another application under subsection (b), was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted or which refers to a change approved in a supplement to the subsection (b) application effective before the expiration of two years from September 24, 1984.

(6) If a drug approved under this subsection refers in its approved application to a drug the approval of which was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under this paragraph or which, as determined by the Secretary, has been withdrawn from sale for safety or effectiveness reasons, the approval of the drug under this subsection shall be withdrawn or suspended—

(A) for the same period as the withdrawal or suspension under subsection (e) or this paragraph, or

(B) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

(7)(A)(i) Within sixty days of September 24, 1984, the Secretary shall publish and make available to the public—

(I) a list in alphabetical order of the official and proprietary name of each drug which has been approved for safety and effectiveness under subsection (c) before September 24, 1984;

(II) the date of approval if the drug is approved after 1981 and the number of the application which was approved; and

(III) whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications filed under this subsection which will refer to the drug published.

(ii) Every thirty days after the publication of the first list under clause (i) the Secretary shall revise the list to include each drug which has been approved for safety and effectiveness under subsection (c) or approved under this subsection during the thirty-day period.

(iii) When patent information submitted under subsection (c) respecting a drug included on the list is to be published by the Secretary, the Secretary

shall, in revisions made under clause (ii), include such information for such drug.

(iv) For each drug included on the list, the Secretary shall specify any exclusivity period that is applicable, for which the Secretary has determined the expiration date, and for which such period has not yet expired, under—

(I) clause (ii), (iii), or (iv) of subsection (c)(3)(E);

(II) clause (iv) or (v) of paragraph (5)(B);

(III) clause (ii), (iii), or (iv) of paragraph (5)(F);

(IV) section 355a of this title;

(V) section 355f of this title;

(VI) section 360cc(a) of this title; or

(VII) subsection (u).

(v)(I) With respect to an application submitted pursuant to subsection (b)(2) for a drug that is subject to section 353(b) of this title for which the sole difference from a listed drug relied upon in the application is a difference in inactive ingredients not permitted under clause (iii) or (iv) of section 314.94(a)(9) of title 21, Code of Federal Regulations (or any successor regulations), the Secretary shall make an evaluation with respect to whether such drug is a therapeutic equivalent (as defined in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) to another approved drug product in the prescription drug product section of the list under this paragraph as follows:

(aa) With respect to such an application submitted after December 29, 2022, the evaluation shall be made with respect to a listed drug relied upon in the application pursuant to subsection (b)(2) that is a pharmaceutical equivalent (as defined in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) to the drug in the application pursuant to subsection (b)(2) at the time of approval of such application or not later than 180 days after the date of such approval, provided that the request for such an evaluation is made in the original application (or in a resubmission to a complete response letter), and all necessary data and information are submitted in the original application (or in a resubmission in response to a complete response letter) for the therapeutic equivalence evaluation, including information to demonstrate bioequivalence, in a form and manner prescribed by the Secretary.

(bb) With respect to such an application approved prior to or on December 29, 2022, the evaluation shall be made not later than 180 days after receipt of a request for a therapeutic equivalence evaluation submitted as part of a supplement to such application; or with respect to an application that was submitted prior to December 29, 2022, but not approved as of December 29, 2022, the evaluation shall be made not later than 180 days after the date of approval of such application if a request for such evaluation is submitted as an amendment to the application, provided that—

(AA) such request for a therapeutic equivalence evaluation is being sought with respect to a listed drug relied upon in the application, and the relied upon listed drug is in the prescription drug product section of the list under this paragraph and is a pharmaceutical equivalent (as defined in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) to the drug for which a therapeutic equivalence evaluation is sought; and

(BB) the amendment or supplement, as applicable, containing such request, or the relevant application, includes all necessary data and information for the therapeutic equivalence evaluation, including information to demonstrate bioequivalence, in a form and manner prescribed by the Secretary.

(II) When the Secretary makes an evaluation under subclause (I), the Secretary shall, in revisions made to the list pursuant to clause (ii), include such information for such drug.

(B) A drug approved for safety and effectiveness under subsection (c) or approved under this subsection shall, for purposes of this subsection, be considered to have been published under subparagraph (A) on the date of its approval or September 24, 1984, whichever is later.

(C) If the approval of a drug was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under paragraph (6) or if the Secretary determines that a drug has been withdrawn from sale for safety or effectiveness reasons, it may not be published in the list under subparagraph (A) or, if the withdrawal or suspension occurred after its publication in such list, it shall be immediately removed from such list—

(i) for the same period as the withdrawal or suspension under subsection (e) or paragraph (6), or

(ii) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

A notice of the removal shall be published in the Federal Register.

(D) In the case of a listed drug for which the list under subparagraph (A)(i) includes a patent for such drug, and any claim of the patent has been cancelled or invalidated pursuant to a final decision issued by the Patent Trial and Appeal Board of the United States Patent and Trademark Office or by a court, from which no appeal has been, or can be, taken, if the holder of the applicable application approved under subsection (c) determines that a patent for such drug, or any patent information for such drug, no longer meets the listing requirements under this section—

(i) the holder of such approved application shall notify the Secretary, in writing, within 14 days of such decision of such cancellation or invalidation and request that such patent or patent information, as applicable, be amended or withdrawn in accordance with the decision issued by the Patent Trial and Appeal Board or a court;

(ii) the holder of such approved application shall include in any notification under clause (i) information related to such patent cancellation or invalidation decision and submit such information, including a copy of such decision, to the Secretary; and

(iii) the Secretary shall, in response to a notification under clause (i), amend or remove patent or patent information in accordance with the relevant decision from the Patent Trial and Appeals Board or court, as applicable, except that the Secretary shall not remove from the list any patent or patent information before the expiration of any 180-day exclusivity period under paragraph (5)(B)(iv) that relies on a certification described in paragraph (2)(A)(vii)(IV).

(8) For purposes of this subsection:

(A)(i) The term "bioavailability" means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

(ii) For a drug that is not intended to be absorbed into the bloodstream, the Secretary may assess bioavailability by scientifically valid measurements intended to reflect the rate and extent to which the active

ingredient or therapeutic ingredient becomes available at the site of drug action.

(B) A drug shall be considered to be bioequivalent to a listed drug if—

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

(C) For a drug that is not intended to be absorbed into the bloodstream, the Secretary may establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect.

(9) The Secretary shall, with respect to each application submitted under this subsection, maintain a record of—

(A) the name of the applicant,

(B) the name of the drug covered by the application,

(C) the name of each person to whom the review of the chemistry of the application was assigned and the date of such assignment, and

(D) the name of each person to whom the bioequivalence review for such application was assigned and the date of such assignment.

The information the Secretary is required to maintain under this paragraph with respect to an application submitted under this subsection shall be made available to the public after the approval of such application.

(10)(A) If the proposed labeling of a drug that is the subject of an application under this subsection differs from the listed drug due to a labeling revision described under clause (i), the drug that is the subject of

such application shall, notwithstanding any other provision of this chapter, be eligible for approval and shall not be considered misbranded under section 352 of this title if—

(i) a revision to the labeling of the listed drug has been approved by the Secretary within 90 days of when the application is otherwise eligible for approval under this subsection;

(ii) the sponsor of the application agrees to submit revised labeling for the drug that is the subject of the application not later than 60 days after approval under this subsection of the application;

(iii) the labeling revision described under clause (i) does not include a change to the "Warnings" section of the labeling; and

(iv) such application otherwise meets the applicable requirements for approval under this subsection.

(B) If, after a labeling revision described in subparagraph (A)(i), the Secretary determines that the continued presence in interstate commerce of the labeling of the listed drug (as in effect before the revision described in subparagraph (A)(i)) adversely impacts the safe use of the drug, no application under this subsection shall be eligible for approval with such labeling.

(11)(A) Subject to subparagraph (B), the Secretary shall prioritize the review of, and act within 8 months of the date of the submission of, an original abbreviated new drug application submitted for review under this subsection that is for a drug—

(i) for which there are not more than 3 approved drug products listed under paragraph (7) and for which there are no blocking patents and exclusivities; or

(ii) that has been included on the list under section 356e of this title.

(B) To qualify for priority review under this paragraph, not later than 60 days prior to the submission of an application described in subparagraph (A) or that the Secretary may prioritize pursuant to subparagraph (D), the applicant shall provide complete, accurate information regarding facilities involved in manufacturing processes and testing of the drug that is the subject of the application, including facilities in corresponding Type II active pharmaceutical ingredients drug master files referenced in an application and sites or organizations involved in bioequivalence and clinical studies used to support the application, to enable the Secretary to

make a determination regarding whether an inspection of a facility is necessary.  Such information shall include the relevant (as determined by the Secretary) sections of such application, which shall be unchanged relative to the date of the submission of such application, except to the extent that a change is made to such information to exclude a facility that was not used to generate data to meet any application requirements for such submission and that is not the only facility intended to conduct one or more unit operations in commercial production.  Information provided by an applicant under this subparagraph shall not be considered the submission of an application under this subsection.

(C) The Secretary may expedite an inspection or reinspection under section 374 of this title of an establishment that proposes to manufacture a drug described in subparagraph (A).

(D) Nothing in this paragraph shall prevent the Secretary from prioritizing the review of other applications as the Secretary determines appropriate.

(12)  The Secretary shall publish on the internet website of the Food and Drug Administration, and update at least once every 6 months, a list of all drugs approved under subsection (c) for which all patents and periods of exclusivity under this chapter have expired and for which no application has been approved under this subsection.

(13)  Upon the request of an applicant regarding one or more specified pending applications under this subsection, the Secretary shall, as appropriate, provide review status updates indicating the categorical status of the applications by each relevant review discipline.

\* \* \*