# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NORWICH PHARMACEUTICALS, INC.,
*Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY, JR.; et al.,
*Defendants-Appellees,*

TEVA PHARMACEUTICALS USA, INC.; et al.,
*Intervenors-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia

---

## BRIEF FOR APPELLEES
## PUBLIC COPY – SEALED MATERIAL DELETED

---

*Of Counsel:*

ROBERT FOX FOSTER
  *Acting General Counsel*
  *Chief Counsel for Food, Research*
    *and Drugs*
  *U.S. Department of Health and*
    *Human Services*

SEAN R. KEVENEY
  *Chief Counsel*
  *Food and Drug Administration*

WENDY VICENTE
  *Deputy Chief Counsel, Litigation*

JAMES ALLRED
  *Associate Chief Counsel*

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
GABRIEL I. SCHONFELD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7219*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3306*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

The plaintiff-appellant is Norwich Pharmaceuticals, Inc (Norwich).

The defendants-appellees are Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services; Martin A. Makary, M.D., in his official capacity as Commissioner of Food and Drugs; and the United States Food and Drug Administration.

Salix Pharmaceuticals, Inc. (Salix) and Teva Pharmaceuticals USA, Inc. (Teva) intervened in the district court in support of defendants-appellees and remain intervenors on appeal.

No amici appeared in the district court, and none are currently before this Court.

## B.    Rulings Under Review

Norwich appeals from an order of the district court (Howell, J.) granting summary judgment for the government, Salix, and Teva, and denying Norwich's motion for summary judgment. *See* Order, JA__-__

[Dkt. 81] (Apr. 17, 2025); Memorandum Opinion, JA__-__ [Dkt. 82] (Apr. 17, 2025); Clerk's Judgment, JA__-__ [Dkt. 83] (Apr. 17, 2025).

The district court's sealed memorandum opinion is unreported. A public redacted version of that opinion is available at *Norwich Pharmaceuticals, Inc. v. Kennedy*, No. 25-091, 2025 WL 1148463 (D.D.C. Apr. 18, 2025).

### C.   Related Cases

This case has not previously been before this Court. This case is related to one other currently pending before this Court. *See Norwich Pharms., Inc. v. Kennedy*, No. 23-5311 (D.C. Cir. filed Dec. 29, 2023). The clerk has been directed to schedule these cases for oral argument on the same day and before the same panel. Order, *Norwich Pharms.* (May 21, 2025). Undersigned counsel is not aware of any related cases currently pending in any other court within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Gabriel I. Schonfeld*
Gabriel I. Schonfeld

# TABLE OF CONTENTS

**Page**

GLOSSARY

STATEMENT OF THE ISSUES ................................................................ 1

PERTINENT STATUTES AND REGULATIONS .................................... 2

STATEMENT OF THE CASE ................................................................. 2

    A.    Statutory and Regulatory Background .................................. 2

    B.    Factual Background ............................................................... 12

    C.    Prior Proceedings ................................................................. 16

          1.    Administrative Proceedings ....................................... 16

          2.    District Court Proceedings ......................................... 20

SUMMARY OF ARGUMENT ................................................................ 24

STANDARD OF REVIEW .................................................................... 27

ARGUMENT ......................................................................................... 28

ACTAVIS HAS NOT FORFEITED ITS ELIGIBILITY FOR 180-
    DAY EXCLUSIVITY ................................................................... 28

    A.    There Has Been No Forfeiture for Failure to Market,
          Because Actavis's Certification to the '573 Patent
          Qualifies It for Exclusivity Regardless of Norwich's
          Certification Strategy. ......................................................... 29

    B.    Actavis's Failure to Obtain Tentative Approval Within
          30 Months Was Not a Forfeiture Event Because One
          Cause of That Failure Was a Change in The Studies
          FDA Required for Approval. ................................................ 43

CONCLUSION......................................................................................... 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Apotex Inc. v. FDA,*
  414 F. Supp. 2d 61 (D.D.C. 2006) ..................................... 10

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ........................................................... 47

*Burrage v. United States,*
  571 U.S. 204 (2014) ..................................................... 46, 48

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S,*
  566 U.S. 399 (2012) ......................................................... 3, 5

*Delaware Dep't of Nat. Res. & Env't Control v.
  Environmental Prot. Agency,*
  895 F.3d 90 (D.C. Cir. 2018) ............................................ 49

*Delaware v. Surface Transp. Bd.,*
  859 F.3d 16 (D.C. Cir. 2017) ............................................ 49

*Doris Day Animal League v. Veneman,*
  315 F.3d 297 (D.C. Cir. 2003) .......................................... 42

*Janssen Pharmaceutica, N.V. v. Apotex, Inc.,*
  540 F.3d 1353 (Fed. Cir. 2008) .......................................... 9

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
  376 F.3d 1123 (D.C. Cir. 2004) ................................... 47, 48

*Niz-Chavez v. Garland,*
  593 U.S. 155 (2021) ........................................................... 34

*Paroline v. United States,*
  572 U.S. 434 (2014) ........................................................... 46

*Purepac Pharm. Co. v. Thompson,*
  354 F.3d 877 (D.C. Cir. 2004) ............................................ 9

*Sandoz Inc. v. Becerra,*
  57 F.4th 272 (D.C. Cir. 2023) ........................................... 27

v

*Seed Co. Ltd. v. Westerman, Hattori, Daniels & Adrian, LLP*,
961 F.3d 1190 (D.C. Cir. 2020) .......................................... 49

*Sinclair Wyo. Refining Co. v. Environmental Prot. Agency*,
114 F.4th 693 (D.C. Cir. 2024) .......................................... 48

*Teva Pharms. USA, Inc. v. Sebelius*,
595 F.3d 1303 (D.C. Cir. 2010) ...................................... 9, 10

*University of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ........................................................ 47

*Watson Lab'ys, Inc. v. Sebelius*,
No. 12-1344, 2012 WL 6968224 (D.D.C. Oct. 22, 2012),
*vacated on other grounds*,
2013 WL 11250319 (D.C. Cir. June 10, 2013) ............................ 10, 34

**Statutes:**

Drug Price Competition and Patent Term
Restoration Act of 1984,
Pub L. No. 98-417, 98 Stat. 1585 ........................................... 3

Medicare Prescription Drug, Improvement, and
Modernization Act of 2003,
Pub. L. No. 108-173, 117 Stat. 2066 ..................................... 10

5 U.S.C. § 706(2)(A) ........................................................ 27

21 U.S.C. § 355(b) ........................................................... 3

21 U.S.C. § 355(b)(1) ........................................................ 3

21 U.S.C. § 355(b)(1)(A)(viii) ............................................... 3

21 U.S.C. § 355(j) ............................................................ 3

21 U.S.C. § 355(j)(2) ......................................................... 3

21 U.S.C. § 355(j)(2)(A)(i)-(vi) ............................................. 4

21 U.S.C. § 355(j)(2)(A)(vii) ................................................ 4

21 U.S.C. § 355(j)(2)(A)(vii)(I)-(II)............................................ 4

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ................................... 4, 28-29

21 U.S.C. § 355(j)(2)(A)(viii)............................................... 5

21 U.S.C. § 355(j)(2)(B) ................................................... 5

21 U.S.C. § 355(j)(5)(B) ............................................. 5, 38

21 U.S.C. § 355(j)(5)(B)(i)................................................ 37

21 U.S.C. § 355(j)(5)(B)(ii).............................................. 38

21 U.S.C. § 355(j)(5)(B)(iii).......................................... 5, 6, 38

21 U.S.C. § 355(j)(5)(B)(iv)............................................... 7

21 U.S.C. § 355(j)(5)(B)(iv)(I) .......................... 8, 10, 28, 29, 34, 39, 42

21 U.S.C. § 355(j)(5)(B)(iv)(II)........................................... 32

21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa) ......................... 26, 31, 33-34, 39, 40

21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa)-(bb)................................... 21

21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb) ............................ 8, 26, 29, 31, 33

21 U.S.C. § 355(j)(5)(B)(v) .............................................. 38

21 U.S.C. § 355(j)(5)(D)(i)-(ii)........................................... 10

21 U.S.C. § 355(j)(5)(D)(i)(I)............................................ 10

21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)(BB) ..................................... 11

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)............... 1, 2, 12, 25, 30, 31, 32, 33, 35

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA)-(BB)................................. 30

21 U.S.C. § 355(j)(5)(D)(i)(IV) ............................. 1, 2, 11, 12, 23, 24, 26,
                                                  27, 43, 44, 45, 46, 48

21 U.S.C. § 355(j)(5)(D)(ii) ............................................. 34

21 U.S.C. § 355(j)(5)(D)(iii) ..................................................... 8, 10, 29, 35

21 U.S.C. § 355(q)(1)(G) ................................................ 12, 24, 45, 50, 51

35 U.S.C. § 271(e)(2) ................................................................... 6

**Regulations:**

21 C.F.R. § 314.3 ........................................................................ 11

21 C.F.R. § 314.94(a)(4)-(8) ........................................................ 4

21 C.F.R. § 314.105(d) ............................................................... 11

21 C.F.R. § 314.107(c)(1) ............................................................ 8

**Other Authorities:**

FDA, *Dissolution Methods: Rifaximin*, https://www.
    accessdata.fda.gov/scripts/cder/dissolution/index.cfm
    (search "rifaximin") (last updated July 21, 2011) .............................15

FDA, *Patent and Exclusivity for: N021361*,
    https://www.accessdata.fda.gov/scripts/cder/ob/
    patent_info.cfm?Product_No=002&Appl_No=
    021361&Appl_type=N (last visited Sep. 17, 2025) .............................13

Order, *Norwich Pharms., Inc. v. Kennedy*,
    No. 23-5311 (D.C. Cir. May 21, 2025) .................................................17

*Qualification*, Black's Law Dictionary (7th ed. 1999) .............................32

*Qualified*, Webster's Third New International
    Dictionary (2002) ...............................................................................32

Salix Pharms. Inc., *Xifaxan Prescribing Information*
    (Oct. 2023), https://perma.cc/YG3S-32TB .............................13

Stipulated Consent Judgment and Injunction,
    *Salix Pharms*, No. 16-cv-00188 (Sep. 14, 2018), Dkt. 111 ..................14

## GLOSSARY

| | |
|---|---|
| '573 patent | U.S. Patent No. 8,642,573 |
| Actavis | Actavis Laboratories FL, Inc. |
| ANDA | abbreviated new drug application |
| FDA | Food and Drug Administration |
| HE | hepatic encephalopathy |
| IBS-D | irritable bowel syndrome with diarrhea |
| MMA | Medicare Prescription Drug, Improvement and Modernization Act of 2003 |
| Norwich | Norwich Pharmaceuticals, Inc. |
| Salix | Salix Pharmaceuticals, Inc. |
| Teva | Teva Pharmaceuticals USA, Inc. |

# STATEMENT OF THE ISSUES

The Federal Food, Drug, and Cosmetic Act permits generic drugmakers to include in their abbreviated new drug applications (ANDAs) so-called "paragraph IV" certifications asserting that patents covering the brand name drug are invalid or will not be infringed by the proposed generic. Submitting such a certification invites costly and time-consuming patent litigation, but can clear away barriers to generic competition. For these reasons, federal law incentivizes the submission of paragraph IV certifications by providing that the first generic manufacturers to do so for a given drug are eligible for a 180-day period of marketing exclusivity.

Congress has also established grounds on which a first applicant may forfeit eligibility for 180-day exclusivity. As relevant to this case, a first applicant may forfeit its eligibility either (1) by failing to market its generic after a court has ruled that all the patents to which the first applicant maintains certifications "qualifying" it for exclusivity are invalid or not infringed, *see* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), or (2) by failing to obtain tentative approval from FDA within 30 months after its ANDA is filed, *see id.* § 355(j)(5)(D)(i)(IV). The questions presented are:

**1.** Whether, for purposes of failure-to-market forfeiture under 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), the paragraph IV certifications "qualifying" a first generic applicant for exclusivity include all certifications meeting the statutory criteria for first applicant status, or only those regarding patents as to which a subsequent generic applicant also maintains a paragraph IV certification.

**2.** Whether a first generic applicant's failure to obtain tentative approval of its application within 30 months is excused under 21 U.S.C. § 355(j)(5)(D)(i)(IV) if a change in requirements for Food and Drug Administration (FDA) approval was a sufficient cause for that failure, or if such a failure is excused only if the change in approval requirements was a but-for cause.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

**1.** Brand manufacturers, *i.e.*, companies that research and develop novel drugs, file New Drug Applications. A New Drug Application requires a host of information, including a list of the drug's components,

scientific data about the drug's safety and effectiveness, and proposed labeling for the drug. 21 U.S.C. § 355(b). Most importantly for present purposes, New Drug Applications identify any patent that the brand manufacturer contends covers the new drug or a method for using that drug. *See id.* § 355(b)(1)(A)(viii). FDA lists all the patents identified in approved New Drug Applications in a central repository, colloquially known as the "Orange Book." *See, e.g.*, *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405-06 (2012); 21 U.S.C. § 355(b)(1).

Other manufacturers, called generic manufacturers, submit what is known as an Abbreviated New Drug Application (ANDA) relying on FDA's prior findings of safety and effectiveness for the brand name drug. 21 U.S.C. § 355(j). This process, established under the Hatch-Waxman Amendments, is "designed to speed the introduction of low-cost generic drugs to market." *Caraco*, 566 U.S. at 405; *see also* Drug Price Competition and Patent Term Restoration Act of 1984, Pub L. No. 98-417, 98 Stat. 1585. It allows generic manufacturers to avoid the often costly requirements to prove a drug's safety and efficacy, typically by allowing the generic to rely on FDA's findings for the brand name drug. *See* 21 U.S.C. § 355(j)(2). Subject to certain other requirements, a

generic drug will generally be approvable if it is bioequivalent to the brand name drug, is the "same" as the brand name drug in certain other respects, and meets quality standards. *See id.* § 355(j)(2)(A)(i)-(vi); 21 C.F.R. § 314.94(a)(4)-(8).

As part of its ANDA, a generic manufacturer must address any patents listed in the Orange Book for the relevant brand name drug. 21 U.S.C. § 355(j)(2)(A)(vii). If the Orange Book does not list any relevant patents, or if it lists only expired patents, the generic manufacturer can provide a certification to that effect. *Id.* § 355(j)(2)(A)(vii)(I)-(II). When the Orange Book does list at least one unexpired patent, the generic manufacturer might certify that it will delay seeking approval of its ANDA until all listed patents expire. *See id.* § 355(j)(2)(A)(vii)(III). But if a generic manufacturer seeks approval of its ANDA before one or more of the Orange Book listed patents expire, it has two options.

It can submit one or more "paragraph IV certifications"—named after the relevant statutory subsection. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). To take this path, the generic manufacturer must certify that a listed patent "is invalid or will not be infringed." *Id.* If an ANDA applicant chooses to include a paragraph IV certification, it must provide notice to

the relevant patent owner and the relevant New Drug Application holder. *Id.* § 355(j)(2)(B).

The second option, a so-called "section viii statement," is available only for patents that claim a method of using the drug (known as "method of use" patents), as opposed to patents that cover only the drug itself. *See* 21 U.S.C. § 355(j)(2)(A)(viii); *Caraco*, 566 U.S. at 405. It is not uncommon for a drug to have multiple uses, only some of which are covered by a particular method-of-use patent. *See Caraco*, 566 U.S. at 405. In that circumstance, an ANDA applicant may seek approval only for the non-patented uses by including a section viii statement in its application and omitting the patented uses from its labeling. 21 U.S.C. § 355(j)(2)(A)(viii). Often, this is referred to as a "section viii carveout," alluding to the fact that the applicant intends to carve out a patented use from the labeling for its generic drug.

Patent certifications can affect when an ANDA may be approved. 21 U.S.C. § 355(j)(5)(B). When an ANDA applicant has "made a certification" under paragraph IV, the effective date of any approval hinges on the patent litigation that usually follows. *See id.* § 355(j)(5)(B)(iii). In particular, the submission of an ANDA with a

paragraph IV certification is treated as an act of patent infringement,

allowing the brand manufacturer to sue immediately rather than

waiting for the drug to be marketed (which may give rise to more

traditional patent infringement). *See* 35 U.S.C. § 271(e)(2). If such a suit

is filed within a specified statutory period, and alleges infringement of a

patent that was submitted to FDA before submission of the ANDA,

approval of the application is automatically delayed for 30 months

unless the generic manufacturer obtains a favorable judgment, or

certain other litigation events occur, within that time. 21 U.S.C.

§ 355(j)(5)(B)(iii).

The ANDA process incentivizes and provides mechanisms for

manufacturers to resolve patent disputes expeditiously. As noted above,

submitting an ANDA with one or more paragraph IV certifications is

itself treated as an act of patent infringement. 35 U.S.C. § 271(e)(2).

And the statutory scheme encourages both brand and generic

manufacturers to engage in litigation without delay. Speed can all but

guarantee the brand manufacturer 30 months of exclusive sales. 21

U.S.C. § 355(j)(5)(B)(iii) (delaying ANDA approval when an

infringement action is brought shortly after a paragraph IV certification).

**2.** At issue here is a set of related but distinct provisions governing 180-day exclusivity—a statutory incentive designed to encourage generic manufacturers to be the first to challenge Orange Book-listed patents. Although the details can get complicated, the concept is straightforward. The first ANDA applicant (or multiple such applicants if they all move on the same day) to submit a substantially complete application with at least one paragraph IV certification to a listed patent for the brand drug is the first to face the risks and expenses of patent litigation. But if it prevails in the resulting patent litigation, it potentially opens the door for other ANDA applicants to market generic versions of the same drug.

To provide an incentive to take on these burdens and open the field for generic competition, these "first applicant[s]" are eligible for a period of marketing exclusivity. *See generally* 21 U.S.C. § 355(j)(5)(B) (iv). If one or more generic manufacturers are qualified as first applicants for a drug and have not otherwise lost their eligibility for exclusivity, FDA cannot approve ANDAs from "subsequent applicants"

for the same drug until 180 days after any first applicant begins commercial marketing. *Id.* § 355(j)(5)(B)(iv)(I), (D)(iii); 21 C.F.R. § 314.107(c)(1).

Whether a *first applicant is eligible* for exclusivity, and whether that eligibility *prevents approval* of a particular other ANDA, are separate questions. A generic manufacturer qualifies as a first applicant eligible for exclusivity by 1) "submit[ting] a substantially complete [ANDA] that contains and lawfully maintains a [paragraph IV] certification," and 2) doing so "on the first day on which a substantially complete application containing a [paragraph IV] certification . . . is submitted for approval of [that] drug." 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).

That eligibility, however, will operate to block a competing application only to the extent it is the ANDA of a "subsequent applicant." 21 U.S.C. § 355(j)(5)(B)(iv)(I), (D)(iii); 21 C.F.R. § 314.107(c)(1). An ANDA is that of a subsequent applicant if it "contains a paragraph IV certification for a relevant patent" but does not meet the other criteria to qualify its sponsor as a first applicant. 21 C.F.R. § 314.107(c)(1); *see also* 21 U.S.C. § 355(j)(5)(B)(iv)(I), (D)(iii). An

ANDA that is not that of a subsequent applicant may be approved without regard to whether a first applicant is eligible for exclusivity.

Congress intended the 180-day exclusivity provisions to incentivize generic manufacturers to quickly submit ANDAs that include paragraph IV certifications. The point is to encourage early challenges to weak patents that would otherwise block generic competition for the full length of the patent term. *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010); *Janssen Pharmaceutica, N.V. v. Apotex, Inc.*, 540 F.3d 1353, 1356 (Fed. Cir. 2008); *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004). Without the exclusivity period, generic manufacturers could have an incentive to wait for other manufacturers to take on the time and expense of patent litigation and then file their own applications if the litigation was successful.

Under a prior version of the statute, a separate exclusivity period was available for each challenged patent. But Congress changed that in 2003 amendments, providing ANDA applicants a chance to qualify for "a single exclusivity period [that] attaches to the drug product as a whole," rather than multiple periods "attache[d] to each individual

patent" for which a paragraph IV certification has been submitted. *See Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 64, 73 & n.6 (D.D.C. 2006); *see also* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (MMA); *Watson Lab'ys, Inc. v. Sebelius*, No. 12-1344, 2012 WL 6968224, at *13 n.11 (D.D.C. Oct. 22, 2012) (noting that the MMA "foreclosed FDA from granting exclusivity on a patent-by-patent basis"), *vacated on other grounds*, 2013 WL 11250319 (D.C. Cir. June 10, 2013) (per curiam).

**3.** As relevant here, an applicant that has qualified for and maintained status as a first applicant is eligible for 180-day exclusivity unless it has forfeited that eligibility under provisions added in the same 2003 amendments. *See* 21 U.S.C. § 355(j)(5)(B)(iv)(I), (D)(i)-(ii); *Teva*, 595 F.3d at 1306. A first applicant forfeits exclusivity if any of six enumerated "forfeiture event[s]" occur with respect to that applicant. 21 U.S.C. § 355(j)(5)(D)(i)-(ii). "If all first applicants forfeit," then 180-day exclusivity will no longer limit approval of "any application containing a [paragraph IV] certification." *Id.* § 355(j)(5)(D)(iii). Two of those forfeiture events are potentially relevant here: (1) a failure to market within a statutorily prescribed period of time, *id.* § 355(j)(5)(D)(i)(I), and

(2) a failure to obtain tentative approval[1] of the application within 30 months (subject to an exception or certain extensions), *id.* § 355(j)(5)(D)(i)(IV).

**a.** Failure-to-market forfeiture can be triggered in a number of ways, but only one is relevant here: A first applicant that submitted its ANDA more than 30 months ago, *see* 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)(BB), will forfeit its eligibility for 180-day exclusivity if it does not market its drug within 75 days of "the date as of which . . . at least 1 of the following [enumerated events] has occurred" as to "each of the patents" that underlie the paragraph IV certifications "qualifying [it] for the 180-day exclusivity period":

> (AA)    In an infringement action brought against that applicant with respect to the patent . . . a court enters a final decision from which no appeal (other than a [certiorari] petition to the Supreme Court . . .) has been or can be taken that the patent is invalid or not infringed.
>
> (BB)    In an infringement action . . . described in subitem (AA), a court signs a settlement order or consent

---

[1] FDA issues a "tentative approval" when it determines that an ANDA meets all other statutory requirements for approval but cannot be approved due to a patent or a statutory exclusivity. 21 C.F.R. § 314.3, 314.105(d). A drug with tentative approval "is not an approved drug," and may not be lawfully marketed until FDA grants final approval. *See id.* § 314.105(d).

11

> decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

*Id.* § 355(j)(5)(D)(i)(I)(bb).

**b.** Forfeiture for failure to obtain tentative approval may occur if the first applicant "fails to obtain tentative approval . . . within 30 months" of the date its ANDA is filed. 21 U.S.C. § 355(j)(5)(D)(i)(IV). There is no forfeiture, however, if that failure "is caused by a change in or a review of the requirements for approval of the [ANDA] imposed after the date on which the [ANDA] is filed." *Id.*

Separately, the 30-month deadline is "deemed to be extended" if FDA "approval of the application was delayed because of a [citizen] petition." 21 U.S.C. § 355(q)(1)(G). Such an extension is for "a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition (inclusive of such beginning and ending dates)." *Id.* This provision applies "without regard to whether [FDA] grants, in whole or in part, or denies, in whole or in part, the petition." *Id.*

**B.   Factual Background**

**1.** Rifaximin is a prescription drug that is FDA-approved, *inter alia*, to reduce the risk of hepatic encephalopathy (HE), a brain disorder

caused by severe liver disease, and to treat irritable bowel syndrome with diarrhea (IBS-D). *See* Salix Pharms. Inc., *Xifaxan Prescribing Information* §§ 1.2, 1.3 (Oct. 2023), https://perma.cc/YG3S-32TB. Intervenor-Defendant Salix Pharmaceuticals, Inc. (Salix) markets rifaximin under the brand name Xifaxan.

At all times relevant to this case, FDA's Orange Book has listed multiple patents covering rifaximin. Some of these patents (the "HE patents") cover rifaximin's use for HE, some (the "IBS-D patents") cover its use for IBS-D, and others (the "polymorph patents") cover certain forms of its active ingredient. *See generally* FDA, *Patent and Exclusivity for: N021361*, https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=002&Appl_No=021361&Appl_type=N (last visited Sep. 17, 2025).

**2.** The first ANDA for rifaximin was submitted on December 18, 2015, by Actavis Laboratories FL, Inc. (Actavis)—a wholly owned subsidiary of Intervenor-Defendant Teva Pharmaceuticals USA, Inc. (Teva). JA__ [AR13]. Actavis's ANDA was substantially complete and contained paragraph IV certifications. *See* JA__-__ [AR13-15]. Thus, that submission qualified Actavis as the sole first applicant for generic

rifaximin, and it has since maintained that status by lawfully

maintaining paragraph IV certifications to eight patents.[2] After Actavis

submitted its ANDA, Salix filed a patent infringement suit in the U.S.

District Court for the District of Delaware. *See Salix Pharms., Ltd. v.

Actavis Lab'ys FL, Inc.*, No. 1:16-cv-00188 (D. Del. Filed Mar. 23, 2016).

Actavis and Salix later settled that suit without any finding of

invalidity or non-infringement. *See* Stipulated Consent Judgment and

Injunction, *Salix Pharms*, No. 16-cv-00188 (Sep. 14, 2018), Dkt. 111.

Under the terms of that settlement, Actavis may begin marketing

generic rifaximin no later than January 1, 2028. JA__-__ [Dkt. 82 at 10-

11].

 At the time Actavis submitted its ANDA, FDA had published draft

product-specific guidance that, if finalized, would have recommended

that applicants seeking to market generic rifaximin conduct

"comparative dissolution testing" designed to assess whether a proposed

generic met quality standards, but not that they conduct such testing to

demonstrate its bioequivalence to Salix's brand name drug. JA__-__

---

[2] Multiple additional patents to which Actavis originally
submitted paragraph IV certifications have since expired. Those patents
are not relevant to the outcome of this case.

[AR29-30], JA__-__ [AR252-53]; *see also* FDA, *Dissolution Methods: Rifaximin*, https://www.accessdata.fda.gov/scripts/cder/ dissolution/index.cfm (search "rifaximin") (last updated July 21, 2011). Actavis's ANDA was submitted ███████████████████████████ ██████████████████████████████. JA__ [AR5], JA__-__ [AR204-06].

While Actavis's ANDA was under review, however, FDA's thinking evolved, based in part on a citizen petition that Salix had submitted on October 17, 2016. *See generally* JA__-__ [AR39-122]. The agency granted Salix's petition in part on March 16, 2017, and subsequently revised its draft product-specific guidance for rifaximin to recommend additional dissolution studies designed to help demonstrate bioequivalence. JA__-__ [AR210-11], JA__-__ [AR252-53].

Consistent with the scientific thinking memorialized in the new draft guidance, FDA subsequently determined that Actavis's ████████████████████████████████. JA__-__ [AR265-66]. The agency ██████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████. JA__-__ [AR5-6], JA__-__

[AR279-80], JA__ [AR283]. Actavis ███████████████████

██████████████████████. JA__-__ [AR6-7], JA__

[AR284], JA__-__ [AR303-10]. FDA was still reviewing ███

███████ on the date—June 18, 2018—that was 30 months after

Actavis submitted its ANDA. JA__ [AR7]. FDA did not complete its

review of ████████████████████████ until ███████

███. JA__ [AR7], JA__-__ [AR312-31]. Actavis's ANDA remains

pending with FDA. JA__ [AR21].

### C.    Prior Proceedings

#### 1.    Administrative Proceedings

Plaintiff Norwich Pharmaceuticals, Inc. (Norwich) initially

submitted the ANDA at issue in this case—No. 214370—in 2019. JA__-

__ [AR16-17]. Norwich's ANDA originally sought approval only for 200

mg rifaximin tablets, and for a different indication related to traveler's

diarrhea. Salix has actively sought to enforce its rights under its

patents by filing infringement suits against would-be competitors who

submit ANDAs for rifaximin that include paragraph IV certifications. It

filed one of those suits against Norwich in the U.S. District Court for

16

the District of Delaware.[3] *See Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, No. 1:20-cv-00430 (D. Del. filed Mar. 26, 2020). As relevant here, that litigation resulted in final judgments (1) that the proposed generic for which Norwich seeks approval here would not infringe several of Salix's polymorph and HE patents, and (2) that one of Salix's IBS-D patents was invalid, *but* (3) that one of the HE patents (U.S. Patent No. 8,642,573 ('573 patent)) was both valid and infringed. *See* JA__-__ [AR14-16], JA__-__ [AR21-22].

Norwich amended its ANDA in 2024 to add the 550 mg strength for which it now seeks approval. JA__-__ [AR16-17]. Norwich's amended ANDA contains both paragraph IV certifications and section viii statements to Salix's patents. As relevant here, the current version of

---

[3] The Delaware patent litigation alleged infringement based upon Norwich's submission of a separate ANDA—No. 214369—that is not at issue in this case. ANDA No. 214369 seeks approval for 550 mg rifaximin tablets for both the HE and IBS-D indications. Related litigation between Norwich and FDA over ANDA No. 214369 is currently pending before this Court, which has directed the Clerk to schedule it for argument on the same day and before the same panel as this appeal. Order, *Norwich Pharms., Inc. v. Kennedy*, No. 23-5311 (D.C. Cir. May 21, 2025). FDA has not evaluated whether the 180-day exclusivity at issue here would also block approval of ANDA No. 214369, which FDA has determined is not presently approvable for a different reason.

Norwich's ANDA contains paragraph IV certifications as to the polymorph and IBS-D patents, and section viii statements regarding the HE patents. JA__ [AR10]. In other words, Norwich's ANDA seeks approval to market 550 mg rifaximin tablets for the IBS-D indication only—not for the HE indication as to which it lost its patent suit.[4]

Following its 2024 dosage strength amendment, Norwich asked FDA for immediate approval to market 550 mg rifaximin tablets. *See generally* JA__-__ [AR809-31]. Norwich acknowledged that the agency had previously determined Actavis to be a first applicant eligible for 180-day exclusivity. JA__ [AR812]. Norwich argued, however, that its ANDA should nevertheless be approved before the end of the exclusivity period because Actavis had forfeited eligibility based on a failure to market and/or a failure to obtain tentative approval. *See generally* JA__-__ [AR814-31].

FDA disagreed. It determined that there was no forfeiture for failure to market because the '573 patent has not been found invalid or not infringed and is one of the patents to which Actavis has maintained

_____

[4] Salix has filed another patent suit over Norwich's new strength amendment to the ANDA at issue here. *Salix Pharms., Inc. v. Norwich Pharms., Inc.*, No. 3:24-cv-7140 (D.N.J. filed Jun. 20, 2024).

a paragraph IV certification qualifying it for 180-day exclusivity. JA__-
__ [AR19-27]. FDA rejected the argument that because *Norwich* had

submitted a section viii statement to the '573 patent rather than a

paragraph IV certification, *Actavis's* paragraph IV certification to the

same patent was therefore not a "qualifying" one. JA__-__ [AR23-27].

FDA also rejected Norwich's claim that Actavis had forfeited its

eligibility by failing to obtain tentative approval. FDA determined that

the change in requirements with respect to the ██████████████

needed for Actavis to ████████████████ was a cause of Actavis's

failure to obtain tentative approval within 30 months of filing its

ANDA. Before the 30-month date, FDA had ████████████████

████████████████████████, and when that date arrived, the agency

was still reviewing ████████████████████████████. JA__-__

[AR1-7], JA__-__ [AR17-19].

Having determined that Actavis is a first applicant eligible for

180-day eligibility, and that such eligibility had not been forfeited, FDA

was required to delay final approval of Norwich's subsequent ANDA.

Because Norwich had otherwise submitted "adequate information . . . to

demonstrate that [its] drug meets the requirements for approval," FDA

19

tentatively approved its ANDA on January 10, 2025. JA__-__ [AR890-95].

## 2. District Court Proceedings

Norwich commenced this litigation on January 13, 2025, *see* Dkt. 1, challenging as arbitrary and capricious and contrary to law FDA's determination that Actavis's eligibility for 180-day exclusivity prevents final approval of Norwich's ANDA, *see* JA__-__ [Dkt. 35] (amended complaint). Salix and Teva intervened as defendants supporting FDA's decision. *See* Minute Order (Jan. 28, 2025); Minute Order (Jan. 30, 2025). On cross-motions for summary judgment, the district court ruled in favor of the government and intervenors. JA__-__ [Dkt. 82] (sealed opinion); *see also* Dkt. 86 (public redacted opinion).

At the outset, the district court emphasized the narrow scope of the issues presented. The parties agreed (1) that Actavis "is a 'first applicant' eligible for . . . 180-day exclusivity," and (2) that Actavis's eligibility "bars [approval of] Norwich's . . . ANDA unless a forfeiture event with respect to Actavis has occurred." JA__ [Dkt. 82 at 23]. "The only dispute [was] whether the FDA erred in finding that Actavis has

not forfeited its 180-day marketing exclusivity" based on either a failure to market or a failure to obtain tentative approval. JA__ [Dkt. 82 at 23].

**a.** The district court first held that the statutory text "forecloses Norwich's position" that FDA should assess forfeiture based only on "the patents to which both a first applicant and a subsequent applicant have asserted Paragraph IV Certifications." JA__-__ [Dkt. 82 at 23-34]. Rather, the statute asks FDA to analyze each patent to which a first applicant maintains "a certification qualifying it for the 180-day exclusivity period," JA__-__ [Dkt. 82 at 25-26], and to determine whether (as relevant here) it has been found by a court to be invalid or not infringed. Relying on the plain meaning of the word "qualifying," as well as the statutory definition of the "180-day exclusivity period," the district court held that the only "precedent condition[] a first applicant must meet to become eligible" for exclusivity is being a first applicant, JA__-__ [Dkt. 82 at 26-27] (discussing 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa)-(bb)). The district court reasoned that since Actavis's certification to the '573 patent was "one of [the] class" of paragraph IV certifications that made Actavis a first applicant, the same certification also qualified

Actavis for 180-day exclusivity. JA__ [Dkt. 82 at 27] (quotation marks omitted).

The district court rejected Norwich's argument that whether a paragraph IV certification qualifies a first applicant for exclusivity depends on whether that certification would block approval of a specific subsequent ANDA. JA__-__ [Dkt. 82 at 27-28]. It held that "[w]hether a first applicant's ANDA bars subsequent ANDAs reveals nothing regarding what *qualifies* a first applicant for the 180-day exclusivity because blocking a subsequent applicant is not a 'precedent condition' or 'necessary' for a first applicant to qualify for the 180-day exclusivity period." JA__ [Dkt. 82 at 28]. The court also explained that Norwich's position—which would require "consideration of [each] subsequent applicant's certifications" to assess forfeiture, and could result in different periods of exclusivity as to different subsequent ANDAs—was inconsistent with the fact that "forfeiture events can occur without any subsequent applicant asserting Paragraph IV Certifications" at all, and with Congress's consistent choice to refer to "the 180-day exclusivity period" using "a definite article with a singular noun." JA__-__ [Dkt. 82 at 29-30] (citation and emphasis omitted).

**b.** The district court likewise granted summary judgment for the government on Norwich's claim that Actavis had forfeited exclusivity by failing to obtain tentative approval within 30 months of filing its ANDA. *See* JA__-__ [Dkt. 82 at 34-41]. The Court agreed with FDA that no forfeiture had occurred because the delay in approval was "caused by" FDA's 2017 decision to require ███████████████████ before Actavis's application could be approved. JA__-__ [Dkt. 82 at 38-41] (quoting 21 U.S.C. § 355(j)(5)(D)(i)(IV)).

In doing so, the district court rebuffed Norwich's argument that the existence of ███████████████████ in Actavis's ANDA precluded a finding that the change in approval requirements "caused" the failure to obtain approval. JA__-__ [Dkt. 82 at 38-41]. Based on the plain meaning of the word "cause," the court held that the statutory language "does not require but-for causation," but is satisfied "as long as a change in . . . the requirements for approval . . . is one of the causes of failure to get tentative approval." *Id.*

Finally, the district court held that Norwich had waived its argument that because FDA changed the requirements for approval of Actavis's ANDA based partly on suggestions made in Salix's 2016

citizen petition, any delay attributable to that change was "because of [a] petition" under 21 U.S.C. § 355(q)(1)(G), and the agency should have applied that provision to toll Actavis's 30-month approval deadline until late 2018, rather than set it aside entirely under 21 U.S.C. § 355(j)(5)(D)(i)(IV). JA__ n.10 [Dkt. 82 at 35 n.10] (quotation marks omitted). The district court explained that in a letter to FDA urging approval of its own application, Norwich had stated that "'there was never any delay "because of" [Salix's] petition,'" and rejected Norwich's argument that it lacked sufficient information to argue the opposite before it gained access to the confidential administrative record after filing suit. JA__ n.10 [Dkt. 82 at 35 n.10] (alteration in original).

## SUMMARY OF ARGUMENT

This Court should affirm the grant of summary judgment for FDA. FDA applied the correct legal standards to determine that Norwich's ANDA may not be immediately approved because Actavis has not forfeited its eligibility for 180-day exclusivity based on either failure to market or failure to obtain tentative approval.

The Federal Food, Drug, and Cosmetic Act permits generic drugmakers to include in their abbreviated new drug applications

(ANDAs) so-called "paragraph IV" certifications asserting that patents covering the brand name drug are invalid or will not be infringed by the proposed generic. Submitting such a certification invites costly and time-consuming patent litigation, but can clear away barriers to generic competition. For these reasons, federal law incentivizes the submission of paragraph IV certifications by providing that the first generic manufacturers to submit them for a given drug are eligible for a 180-day period of marketing exclusivity.

In order to prevent these "first applicants" from indefinitely blocking approval of other generics, Congress has also established several grounds on which eligibility for this 180-day exclusivity may be forfeited. FDA and the district court properly rejected Norwich's arguments that Actavis has forfeited its eligibility on two such grounds.

**A.** Actavis has not forfeited eligibility for exclusivity based on a failure to market. Finding failure-to-market forfeiture in this case would require a judicial finding of invalidity or non-infringement "as to each of the patents with respect to which [Actavis] submitted and lawfully maintained a certification *qualifying* [Actavis] for the 180-day exclusivity period." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) (emphasis added).

Because one of Actavis's paragraph IV certifications is to a patent as to which no such finding has been made, there was no forfeiture here.

Norwich argues that no such finding was necessary because even though Actavis submitted a paragraph IV certification to the relevant patent, Norwich did not. In Norwich's view, this meant that the patent was not one "qualifying" Actavis for exclusivity. But that is incorrect. The only statutory prerequisite to be eligible for 180-day exclusivity is becoming a "first applicant," 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa), by submitting an ANDA that (among other statutory criteria not relevant here) "contains and lawfully maintains a [paragraph IV] certification," *id.* § 355(j)(5)(B)(iv)(II)(bb). *Every* paragraph IV certification that met those criteria made Actavis a first applicant, and thereby qualified it for 180-day exclusivity.

**B.** Actavis likewise has not forfeited eligibility for 180-day exclusivity by failing to gain tentative approval from FDA within 30 months. 21 U.S.C. § 355(j)(5)(D)(i)(IV). Such failure results in forfeiture unless it "[was] caused by a change in or a review of the requirements for approval . . . imposed after the date on which the application is filed." *Id.*

26

FDA correctly found that exception satisfied here, where a change in approval requirements for Actavis's ANDA meant that it could not have been tentatively approved by the 30-month date even if it was adequate in every other respect. That change was therefore a "cause[]" of Actavis's failure to obtain approval within that time. *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).

Norwich argues that the statute actually requires "but-for" causation, and urges that this standard was not satisfied here because Actavis's ANDA was also non-approvable for other reasons apart from new requirements imposed by FDA. But the term "caused" is capacious enough to capture either the concept of but-for causation or the concept of a sufficient cause, and FDA did not act contrary to the statute by applying the latter standard here.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Sandoz Inc. v. Becerra*, 57 F.4th 272, 277 (D.C. Cir. 2023). A reviewing court must uphold an agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

# ARGUMENT

## ACTAVIS HAS NOT FORFEITED ITS ELIGIBILITY FOR 180-DAY EXCLUSIVITY

This case arises because the Federal Food, Drug, and Cosmetic Act provides a 180-day period of exclusivity to certain generic manufacturers who challenge the patents held by brand name manufacturers. There is no dispute that Actavis was eligible for such a period of exclusivity. The only question in the case is whether Actavis has forfeited that eligibility in one of two ways. FDA and the district court properly concluded that there had been no forfeiture, and this Court should affirm.

The 180-day exclusivity provisions operate by postponing the permissible approval date of a subsequent abbreviated new drug application (ANDA) if an ANDA for the same drug has already been submitted by a "first applicant." *See* 21 U.S.C. § 355(j)(5)(b)(iv)(I). A "first applicant" is defined as any applicant that submitted a substantially complete application containing a paragraph IV certification—that is, a certification urging that one or more of the patents asserted by the brand manufacturer to cover its drug or a method of using it is invalid or not infringed, *see id*.

§ 355(j)(2)(A)(vii)(IV)—on the first day that any such application was submitted, *id.* § 355(j)(5)(b)(iv)(II)(bb). There is no dispute that Actavis submitted such an application and qualifies as a "first applicant." JA__-__ [AR13-15].

Years later, Norwich submitted its own ANDA containing paragraph IV certifications to multiple relevant patents. JA__-__ [AR16-17]. As relevant here, unless a statutory ground for forfeiture applies, Norwich's drug cannot be approved until "180 days after the date of the first commercial marketing of the drug" by Actavis. 21 U.S.C. § 355(j)(5)(B)(iv)(I), (D)(iii). FDA and the district court properly concluded that no forfeiture ground applied.

### A. There Has Been No Forfeiture for Failure to Market, Because Actavis's Certification to the '573 Patent Qualifies It for Exclusivity Regardless of Norwich's Certification Strategy.

**1.** As FDA and the district court properly concluded, Norwich is mistaken to suggest that Actavis forfeited its eligibility for exclusivity by failing to market its drug on the timeframe required by the statute. Failure-to-market forfeiture can apply to the facts of this case only if "at least 1 of" certain statutorily enumerated events has occurred "as to each of the patents with respect to which [Actavis] submitted and

lawfully maintained a certification qualifying [Actavis] for the 180-day exclusivity period." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb). The only statutory event relevant to this case is a final, unappealable order—after litigation or by agreement—that a given patent "is invalid or not infringed," *id.* § 355(j)(5)(D)(i)(I)(bb)(AA)-(BB).

One of Actavis's paragraph IV certifications—that is, one of the "certification[s] qualifying [Actavis] for the 180-day exclusivity period," 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)—was to Salix's patent number 8,642,573 (the '573 patent). And although Norwich was successful in its patent litigation as to the various other patents at issue, the patent court concluded that the '573 patent was valid and infringed. JA__-__ [AR14-16], JA__-__ [AR21-22]. Thus, the statutory conditions for forfeiture are not satisfied as to that patent. And because the statutory conditions must be satisfied for "each of the patents" that qualified Actavis for 180-day exclusivity in order for exclusivity to be forfeited, there has been no forfeiture on this ground. 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb).

Norwich does not dispute most of this. As noted above, it concedes that Actavis was a "first applicant." It also does not dispute that the

'573 patent was held to be valid and infringed, and thus that the statutory conditions for forfeiture are not met for that patent. Its only argument is that as to Norwich, Actavis's certification to the '573 patent is not a "qualifying" one at all. Norwich Br. 41-48.

That is not correct. As the district court rightly held, *see* JA__-__ [Dkt. 82 at 25-28], *every* paragraph IV certification that a first applicant submits on the statutory first day and thereafter lawfully maintains is one "qualifying [it] for the 180-day exclusivity period," *see* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb). The "180-day exclusivity period" is "the 180-day period ending on the day before the date on which an application submitted by an applicant other than a first applicant could become effective under this clause." *Id.* § 355(j)(5)(B)(iv)(II)(aa). On its face, the statute identifies only one way to become eligible for the 180-day exclusivity period—becoming a "first applicant." *Id.* And it further provides that an applicant becomes a "first applicant" by submitting on the first day a "substantially complete application that contains and lawfully maintains a [paragraph IV] certification." *Id.* § 355(j)(5)(B)(iv)(II)(bb).

To sum up: a sponsor qualifies for 180-day exclusivity by becoming a first applicant, and qualifies as a first applicant by being the first (or one of the first) to submit and lawfully maintain at least one paragraph IV certification in a substantially complete ANDA. So *any* paragraph IV certification submitted in such an application on the first day and thereafter lawfully maintained is one "qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv)." *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), (B)(iv)(II); *see also* JA__-__ [Dkt. 82 at 26-27]. Applicants who file a paragraph IV certification on the first day become a first applicant and are eligible for a 180-day period of exclusivity; applicants who fail to file such a certification are not. That is the very definition of "qualifying." *Qualification*, Black's Law Dictionary (7th ed. 1999) ("The . . . qualities or properties . . . legally necessary to make one eligible . . . ."); *see also Qualified*, Webster's Third New International Dictionary (2002) ("[H]aving complied with the specific requirements or precedent conditions").

That is enough to affirm the district court. There is no dispute that Actavis's certification to the '573 patent meets each condition necessary to qualify Actavis as a first applicant. It is a paragraph IV

certification, was submitted in a substantially complete ANDA on the statutory first day, and has since been lawfully maintained. JA__-__ [AR13-15]; *see also* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb). Since that certification therefore qualified Actavis for 180-day exclusivity, and since that patent has not been held to be invalid or not infringed, there can be no finding of forfeiture for failure to market. 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb); *see also* JA__-__ [Dkt. 82 at 26-27].

**2.** Norwich's contrary arguments cannot be reconciled with the statute's text and are largely at war with themselves. The main error in Norwich's analysis comes in its suggestion that whether Actavis qualified for the 180-day exclusivity period must be evaluated separately in relation to each certification in Norwich's ANDA, or must be assessed independently for each subsequent ANDA applicant. The problems with this approach are legion.

As an initial matter, the text of the provision establishing the 180-day exclusivity period makes plain that it is only applied once, rather than multiple times. Congress described the exclusivity period in the singular when defining it as "*the* 180-day period" immediately preceding the date on which a subsequent ANDA could be approved. 21 U.S.C.

§ 355(j)(5)(B)(iv)(II)(aa) (emphasis added); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021) (explaining that a "definite article with a singular noun" refers to "a discrete thing"). And the period runs from any commercial marketing of the drug "by any first applicant" without regard to the particular mix of patent certifications that qualified a first applicant for that status. *See* 21 U.S.C. § 355(j)(5)(B)(iv)(I). Simply put (although, as Norwich points out, before 2003 the statute was written differently), under the current version of the statute FDA is "foreclosed . . . from granting [180-day] exclusivity on a patent-by-patent basis." *Watson Lab'ys, Inc. v. Sebelius*, No. 12-1344, 2012 WL 6968224, at *13 n.11 (D.D.C. Oct. 22, 2012), *vacated on other grounds*, 2013 WL 11205319 (D.C. Cir. June 10, 2013) (per curiam).

The scope of forfeiture mirrors the scope of exclusivity. Forfeiture is likewise singular—no matter what the triggering event, it applies without limitation to "[*t*]*he* 180-day exclusivity period described in subparagraph (B)(iv)." 21 U.S.C. § 355(j)(5)(D)(ii) (emphasis added). And while forfeiture is assessed individually "with respect to [each] *first* applicant," *see id.* (emphasis added), its effect on *other* applicants is

indivisible. "If all first applicants forfeit the 180-day exclusivity period," then exclusivity no longer limits "approval of *any* application containing a [paragraph IV] certification." *Id.* § 355(j)(5)(D)(iii) (emphasis added). Forfeiture is a binary question—it either occurs once and for all, or it does not occur.

The events that give rise to failure-to-market forfeiture in particular also plainly do not depend on considering the certifications contained in a particular subsequent ANDA. As noted above, the events that give rise to forfeiture under that provision must have occurred for "each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb). The statute's reference to certifications that "the first applicant submitted and lawfully maintained" makes clear that the forfeiture provision turns on an analysis of the first applicant's certifications and not on those of any subsequent applicant. *See id.* Additionally, the reference to "each of the patents" makes clear that failure-to-market forfeiture is not applied separately for each certification contained in a particular subsequent ANDA. *See id.* Whether an enumerated event has occurred

regarding "each of the patents" qualifying the first applicant for exclusivity is a yes-or-no question. The answer cannot be different for one of a subsequent applicant's certifications (or for one subsequent ANDA) versus another. Like forfeiture generally, failure-to-market forfeiture has either occurred for a given first applicant, or it has not. Either way, the effect on all subsequent applicants is the same.

At times, Norwich acknowledges that "the statute only allows at most one exclusivity period . . . in relation to a particular drug product, running, and expiring, for *all* uses of the drug, after a first applicant begins marketing." Norwich Br. 16; *see also* Norwich Br. 34-35 (similar). But that concession is fatal to its position that the exclusivity period somehow depends on the identity of the subsequent applicant being excluded or the particular patents to which a subsequent applicant submitted a paragraph IV certification. In particular, Norwich's correct statement that there is only one exclusivity period cannot be reconciled with its statements elsewhere that FDA and the district court erred by failing to recognize that Actavis had forfeited "the 180-day exclusivity period applicable to the IBS-D and polymorph patent certifications," and "could not benefit from" (but did not forfeit) "a 180-day period

applicable to the ['573] patent." Norwich Br. 38-39; *see also* Norwich Br. 42 (arguing that "a forfeiture event occurred" with respect to "Actavis's potential 180-day exclusivity period applicable to the IBS-D and polymorph patent certifications" (quotation marks omitted)); Norwich Br. 43 (arguing that it was not "necessary for Actavis to forfeit the 180-day exclusivity period applicable to the ['573] patent certification" (emphasis omitted)). There is only one exclusivity period, so there cannot be different periods applicable to a given patent or a given certification.

The error in Norwich's approach is underscored by its effort to equate the statutory provisions that govern qualifying for and forfeiting 180-day exclusivity with three others that must be applied to each certification individually. *See* Norwich Br. 28. In those three provisions, Congress accounted for each of the kinds of certifications that could be made by the generic manufacturer. For paragraph I certifications (no relevant patents) and paragraph II certifications (all patents expired), "the approval may be made effective immediately." 21 U.S.C. § 355(j)(5)(B)(i). For paragraph III certifications (unexpired patent that is not challenged), "the approval may be made effective on the date

certified"—that is, the date the patent expires. *Id.* § 355(j)(5)(B)(ii). For paragraph IV certifications, there is a complex set of rules governing when the approval may be made effective. *Id.* § 355(j)(5)(B)(iii). Congress preceded this description of the consequences of various types of certifications by saying that the approval "shall be made effective on the last applicable date determined by applying the following to each certification." *Id.* § 355(j)(5)(B).

But Congress did not apply the "each certification" language in the separate provisions determining eligibility for and forfeiture of 180-day exclusivity, for the reasons stated above (and as Norwich at times acknowledges). And Congress likewise did not provide for each certification to be considered separately in the next provision, which establishes an exclusivity period for competitive generic therapies that does not refer to or depend on patent certifications at all. 21 U.S.C. § 355(j)(5)(B)(v). Reading the statute as a whole, there can be no serious dispute that FDA is directed to apply the provisions specific to individual patent certifications on a patent-by-patent basis, select the latest date, and then determine separately whether another applicant

has qualified for and/or forfeited an exclusivity period that might delay final approval. That is exactly what FDA properly did here.

**3.** Norwich's makes several efforts to rehabilitate its position on appeal, all of which fall wide of the mark.

First, Norwich argues that because Congress defined the "180-day exclusivity period" in relation to the date another application "could become effective," it must have understood that a first applicant would "qualify[]" for exclusivity only in blocking approval of a specific subsequent ANDA. Norwich Br. 44-45 (quoting 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa)). But the definition of the "180-day exclusivity period" treats blocking a subsequent ANDA as an event that "*could*" occur (but need not) and refers generically to the effect exclusivity might have on "*an* application submitted by . . . other than a first applicant." *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa) (emphasis added). The provision that is specific to the subsequent applicant is the one captioned "[e]ffectiveness of application," and that refers to what "*shall*" happen when exclusivity is applied to "*the* application" for which FDA is considering approval. *Id.* § 355(j)(5)(B)(iv)(I) (emphasis added). As the district court recognized, *see* JA__ [Dkt. 82 at 27], this text only

reinforces the fact that Congress treated a first applicant's qualification for exclusivity as a threshold determination not dependent on comparison with the contents of any other ANDA.

Second, Norwich argues that because Congress designed 180-day exclusivity as "a limitation on FDA's authority to approve other ANDAs" rather than as a "property right belonging to a first applicant," whether a first applicant qualifies for exclusivity can only be assessed in relation to the contents of another specific ANDA. Norwich Br. 45-46 (quotation marks omitted). This likewise does not follow, for essentially the same reason discussed above. Eligibility does not even depend on the existence of another ANDA, but instead governs when approval of other applications "could" be delayed as a general matter. 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa). And in any case, whether a first applicant has met the threshold qualifications to be eligible for exclusivity is a separate question from whether that eligibility will prevent approval of any specific other ANDA.

Third, Norwich insists that FDA's approach to failure-to-market forfeiture must be wrong because Actavis is, in effect, maintaining exclusivity based on a paragraph IV certification to a patent it did not

ultimately succeed in challenging, while Norwich is being blocked from approval despite its section viii statement that it does not seek approval for the method of use that patent claims. But the point of the exclusivity is to provide an incentive to challenge the brand drug's listed patents via paragraph IV certifications, and potentially obtain an answer to the question of validity and infringement from which other applicants might benefit. The first applicant (or applicants) to do so is rewarded for first exposing itself to the risk and expense of litigation. Actavis was first to do so here and has, under the terms of the statute, properly established and maintained its eligibility for 180-day exclusivity.

Finally, Norwich urges that if Congress had intended to adopt FDA's interpretation, it would have defined forfeiture in terms of the certifications "qualifying the first applicant as a first applicant." Norwich Br. 46 (emphasis omitted). Congress was not required to legislate with such redundancy. There is no other plausible reading of the provision as written for the reasons discussed above. And in any event, even if Norwich's proposed alternative would make the provision even clearer, that would "prove[] very little," since Congress "almost

always could write a provision . . . more clearly." *Doris Day Animal League v. Veneman*, 315 F.3d 297, 299 (D.C. Cir. 2003).

**4.** Unable to rebut the district court's analysis of the provisions whose application is actually disputed, Norwich devotes a substantial section of its brief to an issue that has no bearing on this case. As noted above, Norwich does not deny that this case turns on the application of the forfeiture provisions. In particular, it concedes that its "application contains a [paragraph IV] certification . . . and is for a drug for which [Actavis] has submitted an application containing such a certification." 21 U.S.C. § 355(j)(5)(B)(iv)(I); *see also* Norwich Br. 38. Accordingly, Norwich's lengthy discussion of *which* certifications cause that condition to be satisfied is entirely beside the point. *See* Norwich Br. 26-37. In particular, nothing in this case turns on the question addressed by Norwich—whether blocking approval of a specific ANDA based on 180-day exclusivity requires at least one patent as to which both the first applicant and the other applicant filed paragraph IV certifications, or whether it is sufficient that the other applicant filed any paragraph IV certification. Here, there is no dispute that there were four patents— numbers 8,518,949, 8,741,904, 8,193,196, and 8,309,569—as to which

both Actavis and Norwich filed paragraph IV certifications. JA __ [AR14], JA__ [AR17]. Resolution of the question Norwich raises should be reserved for a case in which it makes a difference.

> **B.**    **Actavis's Failure to Obtain Tentative Approval Within 30 Months Was Not a Forfeiture Event Because One Cause of That Failure Was a Change in The Studies FDA Required for Approval.**

**1.** Actavis filed its ANDA on December 18, 2015, but did not obtain tentative approval "within 30 months after" that date—on or before June 18, 2018. The statute provides that a failure to obtain tentative approval within that timeframe leads to forfeiture of the 180-day exclusivity period "unless the failure [was] caused by a change in or a review of the requirements for approval . . . imposed after the date on which the application is filed." 21 U.S.C. § 355(j)(5)(D)(i)(IV). FDA determined that no forfeiture had occurred, because Actavis's failure to obtain tentative approval by the 30-month date was caused by a change in the ▮▮▮▮ that FDA required ▮▮▮▮▮▮▮▮▮▮. The district court correctly held that this determination was not contrary to law, JA__-__ [Dkt. 82 at 34-41]. This court should affirm.

The relevant facts are straightforward. When Actavis submitted its ANDA in 2015, FDA's draft product-specific guidance would (if finalized) have recommended "comparative dissolution testing" only to show that Actavis's product met quality standards. JA__ [AR5], JA__-__ [AR29-30], JA__-__ [AR204-06], JA__-__ [AR252-53]. Actavis's ANDA ████████████████████████████████████. But FDA's thinking later changed, and in 2017 it memorialized its new scientific thinking by publishing revised draft product-specific guidance that would (if finalized) have recommended additional dissolution studies meant to demonstrate bioequivalence. JA__-__ [AR210-11]. The agency subsequently ████████████████████████████████████████ ██████████████████████. JA__-__ [AR5-6], JA__-__ [AR279-80], JA__ [AR283]. Actavis ████████████████████████████████████ █████, and FDA was still reviewing ████████████ at the 30-month date. JA__ [AR7], JA__-__ [AR312-31].

This triggered the forfeiture exception for failures to obtain tentative approval "caused by" a change in requirements. *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV). The logic is simple: because FDA was still considering Actavis's efforts to address the change in approval

requirements at the 30-month date, Actavis's ANDA could not have been tentatively approved by that deadline even if it was adequate in every other respect. That change was therefore a "cause[]" of Actavis's failure to obtain tentative approval within that time, and FDA was correct to find no forfeiture on that basis. *See id.*

**2.** Norwich responds that FDA applied the wrong legal standard in two respects. First, it argues that the relevant forfeiture exception applies only if a change in requirements was a "but-for" cause of a first applicant's failure to obtain tentative approval. Norwich Br. 49-55. Second, Norwich argues that because the relevant change in approval requirements was partly based on suggestions made in a citizen petition, the agency should have applied the statutory tolling rule for approval delays that are "because of a petition." Norwich Br. 55-57 (emphasis omitted) (quoting 21 U.S.C. § 355(q)(1)(G)). Neither one of these arguments show that FDA's finding of no forfeiture was contrary to law.

**a.** To begin with, FDA's longstanding approach to causation under the relevant forfeiture exception, which does not require but-for causation, is fully consistent with the statutory text. That approach

makes sense in this particular context, where an ANDA may contain multiple shortcomings that are each independently sufficient to preclude tentative approval, since "the most common exception to the but-for causation requirement is applied where multiple sufficient causes independently produce a result." *Paroline v. United States*, 572 U.S. 434, 451 (2014) (quotation marks and alterations omitted); *see also Burrage v. United States*, 571 U.S. 204, 214-15 (2014) (acknowledging the existence of causation standard that is satisfied even "when multiple sufficient causes" would have "independently" produced the result), *id.* at 218-19 (limiting holding that but-for cause is required to cases where the defendant's actions were "not an independently sufficient cause" of injury). And it is perfectly natural for exclusivity not to be subject to forfeiture when an event outside the applicant's control prevented the applicant from obtaining tentative approval, regardless of the presence or absence of any additional hurdles to approval. FDA did not act contrary to law by applying its longstanding approach in this case.

Norwich disagrees, arguing that this Court should read the phrase "caused by" in 21 U.S.C. § 355(j)(5)(D)(i)(IV) to require but-for causation

because courts have held that similar language does so in statutes that set out the elements of a crime or tort. *See* Norwich Br. 52-55. But the term "caused" is capacious enough to capture either the concept of but-for causation or the concept of a sufficient cause. This Court has, for example, declined to require but-for causation when interpreting an exception to the Foreign Sovereign Immunities Act. *See, e.g.*, *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-30 (D.C. Cir. 2004) (declining to require but-for causation to satisfy jurisdictional requirement). And as noted above, precisely when there can be multiple sufficient causes, the term "caused" is more likely to refer merely to a sufficient cause.

The tort and criminal cases on which Norwich relies are inapposite because they rest on the presumption that Congress legislates against the backdrop of "textbook tort law" when it defines a tort, *see University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013); *see also Bostock v. Clayton County*, 590 U.S. 644, 656 (2020), and the "traditional understanding" of criminal causation when it defines a

crime, *see Burrage*, 571 U.S. at 210-16.[5] The failure-to-obtain-tentative-approval forfeiture provision for 180-day exclusivity (21 U.S.C. § 355(j)(5)(D)(i)(IV)) does not create civil or criminal liability. *Cf. Kilburn*, 376 F.3d at 1127-30 (declining to require but-for causation where statute contained jurisdictional causation requirement but did not create "a substantive cause of action").

**b.** Norwich is likewise wrong that forfeiture occurred because FDA should have applied the tolling rule for approval delays that are "because of" a citizen petition. *See* Norwich Br. 55-57. Norwich's convoluted theory in this regard is that Actavis was entitled to, but did not receive, the benefit of tolling because of a citizen petition that was filed by Salix, but that tolling actually hurts Actavis because although the change in approval requirements was still preventing Actavis from obtaining tentative approval 30 months after Actavis filed its ANDA, it

---

[5] Norwich also cites this Court's decision in *Sinclair Wyoming Refining Co. v. Environmental Protection Agency*, 114 F.4th 693 (D.C. Cir. 2024) (per curiam), which applied *Burrage* in the context of an exception to a regulatory requirement. Norwich Br. 53 (citing *Sinclair*, 114 F.4th at 708-09). The exception at issue in *Sinclair*, however, did not use the word "cause" or similar. 114 F.4th at 706, 708. Nor did this Court analogize it to the same. *Id.* at 709 (analogizing language of exception to distinct terms such as "based on," "by reason of," and "results from" (quotation marks omitted)).

was no longer an obstacle by the time the tolled deadline arose. Norwich Br. 56.

To begin with, the district court did not abuse its discretion in holding that Norwich affirmatively waived this claim before the agency. *Cf. Seed Co. Ltd. v. Westerman, Hattori, Daniels & Adrian, LLP*, 961 F.3d 1190, 1195 (D.C. Cir. 2020). At the time it was seeking approval of its ANDA, it was taking the more conventional position of opposing tolling, and accordingly told FDA that "'there was never any delay "because of" [Salix's] petition.'" JA__ n.10 [Dkt. 82 at 35 n.10] (alteration in original). FDA, in turn, "agree[d]" with Norwich's position. JA__ [AR19]. "The hard and fast rule of administrative law, rooted in simple fairness, is that issues not raised before an agency are waived and will not be considered by a court on review." *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 21 (D.C. Cir. 2017) (quotation marks and alteration omitted). And even more to the point, Norwich "may not take a position in this court opposite from that which it took below, particularly when its position has prevailed before [FDA]." *See Delaware Dep't of Nat. Res. & Env't Control v. Environmental Prot. Agency*, 895 F.3d 90, 96 (D.C. Cir. 2018).

In any case, Norwich is also wrong on the merits. As a factual matter, FDA reviewed the record of Actavis's ANDA and found "no evidence . . . that FDA's *consideration* of the petition caused a delay in approval or tentative approval." JA__ [AR5] (emphasis added). Norwich does not challenge that finding. It proposes an alternate theory of causation instead—that because FDA's decision to partially grant Salix's petition caused a change in approval requirements, and the change in approval requirements caused a delay in approval, then the delay in approval was "because of [the] petition" under 21 U.S.C. § 355(q)(1)(G). *See* Norwich Br. 55-56 (quotation marks omitted).

That provision, however, expressly applies to delays caused by FDA's *consideration* of a citizen petition, rather than those caused by changed approval requirements stemming from FDA's ultimate decision to *grant* a citizen petition. The relevant text provides that:

> If . . . approval of the [first applicant's] application was *delayed because of a petition*, the 30-month [forfeiture] period . . . *is deemed to be extended* by a period of time equal to the period beginning on the date on which [FDA] received the petition and ending on the date of final agency action on the petition (inclusive of such beginning and ending dates), *without regard to whether [FDA] grants . . . or denies . . . the petition.*

21 U.S.C. § 355(q)(1)(G) (emphases added).

The point is that while an applicant is waiting for FDA to resolve a citizen petition, that time should not be counted toward the 30-month clock for obtaining tentative approval. But Norwich's argument is not that Actavis's ANDA was slowed down because it was waiting for FDA to resolve the citizen petition. Its argument instead is that the disposition of that petition caused the change in review requirements, and that change in review requirements in turn caused the delay. But that is plainly not what the provision is aiming at. Congress specified that the extension occurs "without regard to whether [FDA] grants . . . or denies . . . the petition." 21 U.S.C. § 355(q)(1)(G). Suggesting that the disposition of the petition, rather than the time taken to consider the petition, is the relevant statutory trigger turns the provision on its head.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

*Of Counsel:*

DANIEL TENNY

ROBERT FOX FOSTER
  *Acting General Counsel*
  *Chief Counsel for Food, Research,*
    *and Drugs*
  *U.S. Department of Health and*
    *Human Services*

 */s/ Gabriel I. Schonfeld*
GABRIEL I. SCHONFELD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7219*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3306*
  *gabriel.i.schonfeld@usdoj.gov*

SEAN R. KEVENEY
  *Chief Counsel*
  *Food and Drug Administration*

WENDY VICENTE
  *Deputy Chief Counsel, Litigation*

JAMES ALLRED
  *Associate Chief Counsel*
  *Food and Drug Administration*
  *10903 New Hampshire Ave.*
  *White Oak 31*
  *Silver Spring, MD 20993-0002*

September 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,854 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Gabriel I. Schonfeld*
Gabriel I. Schonfeld

# ADDENDUM

# TABLE OF CONTENTS

21 U.S.C. § 355(j) ......................................................................A1

**21 U.S.C. § 355**

**§ 355. New Drugs**

**(a) Necessity of effective approval of application**

No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug.

\* \* \*

**(j) Abbreviated new drug applications**

**(1)** Any person may file with the Secretary an abbreviated application for the approval of a new drug.

**(2)**

**(A)** An abbreviated application for a new drug shall contain--

**(i)** information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

**(ii)**

**(I)** if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

**(II)** if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

**(III)** if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to

show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 321(p) of this title, and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

**(iii)** information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

**(iv)** information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

**(v)** information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

**(vi)** the items specified in clauses (ii) through (vi) of subsection (b)(1)(A);

**(vii)** a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking

approval under this subsection and for which information is required to be filed under subsection (b) or (c)--

>**(I)** that such patent information has not been filed,

>**(II)** that such patent has expired,

>**(III)** of the date on which such patent will expire, or

>**(IV)** that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

**(viii)** if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

**(B) Notice of opinion that patent is invalid or will not be infringed**

**(i) Agreement to give notice**

An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give notice as required by this subparagraph.

**(ii) Timing of notice**

An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall give notice as required under this subparagraph--

>**(I)** if the certification is in the application, not later than 20 days after the date of the postmark on the notice with which the Secretary informs the applicant that the application has been filed; or

**(II)** if the certification is in an amendment or supplement to the application, at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application.

### (iii) Recipients of notice

An applicant required under this subparagraph to give notice shall give notice to--

**(I)** each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

**(II)** the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

### (iv) Contents of notice

A notice required under this subparagraph shall--

**(I)** state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification; and

**(II)** include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

**(C)** If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary

seeking permission to file such an application. The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve such a petition unless the Secretary finds--

**(i)** that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug; or

**(ii)** that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

**(D)**

**(i)** An applicant may not amend or supplement an application to seek approval of a drug referring to a different listed drug from the listed drug identified in the application as submitted to the Secretary.

**(ii)** With respect to the drug for which an application is submitted, nothing in this subsection prohibits an applicant from amending or supplementing the application to seek approval of a different strength.

**(iii)** Within 60 days after December 8, 2003, the Secretary shall issue guidance defining the term "listed drug" for purposes of this subparagraph.

**(3)**

**(A)** The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1), which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

**(B)** The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection if

the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of bioavailability and bioequivalence studies needed for approval of such application. The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of such studies. Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant.

**(C)** Any agreement regarding the parameters of design and size of bioavailability and bioequivalence studies of a drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary. Such agreement shall not be changed after the testing begins, except--

**(i)** with the written agreement of the sponsor or applicant; or

**(ii)** pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

**(D)** A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

**(E)** The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance office personnel unless such field or compliance office personnel demonstrate to the reviewing division why such decision should be modified.

**(F)** No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

**(G)** For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection (including scientific matters, chemistry, manufacturing, and controls).

**(4)** Subject to paragraph (5), the Secretary shall approve an application for a drug unless the Secretary finds--

**(A)** the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity;

**(B)** information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

**(C)**

**(i)** if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

**(ii)** if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

**(iii)** if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed drug, information submitted with the application is insufficient to show--

**(I)** that the other active ingredients are the same as the active ingredients of the listed drug, or

**(II)** that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 321(p) of this title,

or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

**(D)**

    **(i)** if the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

    **(ii)** if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

**(E)** if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

**(F)** information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information submitted in the application is insufficient to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

**(G)** information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or

because the drug and the listed drug are produced or distributed by different manufacturers;

**(H)** information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included;

**(I)** the approval under subsection (c) of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e), the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) for grounds described in the first sentence of subsection (e), the approval under this subsection of the listed drug referred to in the application under this subsection has been withdrawn or suspended under paragraph (6), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

**(J)** the application does not meet any other requirement of paragraph (2)(A); or

**(K)** the application contains an untrue statement of material fact.

**(5)**

**(A)** Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

**(B)** The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii):

**(i)** If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

**(ii)** If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

**(iii)** If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in paragraph (2)(B) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under subsection (b)(1) or (c)(2) before the date on which the application (excluding an amendment or supplement to the application), which the Secretary later determines to be substantially complete, was submitted. If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--

**(I)** if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--

**(aa)** the date on which the court enters judgment reflecting the decision; or

**(bb)** the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

**(II)** if before the expiration of such period the district court decides that the patent has been infringed--

**(aa)** if the judgment of the district court is appealed, the approval shall be made effective on--

**(AA)** the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or

**(BB)** the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

**(bb)** if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35;

**(III)** if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in subclause (I); or

**(IV)** if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in subclause (II).

In such an action, each of the parties shall reasonably cooperate in expediting the action.

**(iv) 180-day exclusivity period**

**(I) Effectiveness of application**

Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

**(II) Definitions**

In this paragraph:

**(aa) 180-day exclusivity period**

The term "180-day exclusivity period" means the 180-day period ending on the day before the date on which an application submitted by an applicant other than a first applicant could become effective under this clause.

**(bb) First applicant**

As used in this subsection, the term "first applicant" means an applicant that, on the first day on which a substantially complete application containing a certification described in paragraph (2)(A)(vii)(IV) is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a certification described in paragraph (2)(A)(vii)(IV) for the drug.

**(cc) Substantially complete application**

As used in this subsection, the term "substantially complete application" means an application under this subsection that on its face is sufficiently complete to permit a substantive review and contains all the information required by paragraph (2)(A).

**(dd) Tentative approval**

**(AA) In general**

The term "tentative approval" means notification to an applicant by the Secretary that an application under this subsection meets the requirements of paragraph (2)(A), but cannot receive effective approval because the application does not meet the requirements of this subparagraph, there is a period of exclusivity for the listed drug under subparagraph (F) or section 355a of this title, or there is a 7-year period of exclusivity for the listed drug under section 360cc of this title.

**(BB) Limitation**

A drug that is granted tentative approval by the Secretary is not an approved drug and shall not have an effective approval until the Secretary issues an approval after any necessary additional review of the application.

**(v) 180-day exclusivity period for competitive generic therapies**

**(I) Effectiveness of application**

Subject to subparagraph (D)(iv), if the application is for a drug that is the same as a competitive generic therapy for which any first approved applicant has commenced commercial marketing, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the competitive generic therapy (including the commercial marketing of the listed drug) by any first approved applicant.

**(II) Limitation**

The exclusivity period under subclause (I) shall not apply with respect to a competitive generic therapy that has previously received an exclusivity period under subclause (I).

**(III) Definitions**

In this clause and subparagraph (D)(iv):

**(aa)** The term "competitive generic therapy" means a drug--

**(AA)** that is designated as a competitive generic therapy under section 356h of this title; and

**(BB)** for which there are no unexpired patents or exclusivities on the list of products described in section 355(j)(7)(A) of this title at the time of submission.

**(bb)** The term "first approved applicant" means any applicant that has submitted an application that--

**(AA)** is for a competitive generic therapy that is approved on the first day on which any application for such competitive generic therapy is approved;

**(BB)** is not eligible for a 180-day exclusivity period under clause (iv) for the drug that is the subject of the application for the competitive generic therapy; and

**(CC)** is not for a drug for which all drug versions have forfeited eligibility for a 180-day exclusivity period under clause (iv) pursuant to subparagraph (D).

\*   \*   \*

**(D) Forfeiture of 180-day exclusivity period**

**(i) Definition of forfeiture event**

In this subparagraph, the term "forfeiture event", with respect to an application under this subsection, means the occurrence of any of the following:

### (I) Failure to market

The first applicant fails to market the drug by the later of--

> **(aa)** the earlier of the date that is--
>
> > **(AA)** 75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or
> >
> > **(BB)** 30 months after the date of submission of the application of the first applicant; or
>
> **(bb)** with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:
>
> > **(AA)** In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.
> >
> > **(BB)** In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.
> >
> > **(CC)** The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

A15

### (II) Withdrawal of application

The first applicant withdraws the application or the Secretary considers the application to have been withdrawn as a result of a determination by the Secretary that the application does not meet the requirements for approval under paragraph (4).

### (III) Amendment of certification

The first applicant amends or withdraws the certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period.

### (IV) Failure to obtain tentative approval

The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

### (V) Agreement with another applicant, the listed drug application holder, or a patent owner

The first applicant enters into an agreement with another applicant under this subsection for the drug, the holder of the application for the listed drug, or an owner of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV), the Federal Trade Commission or the Attorney General files a complaint, and there is a final decision of the Federal Trade Commission or the court with regard to the complaint from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the agreement has violated the antitrust laws (as defined in section 12 of Title 15, except that the term includes section 45 of Title 15 to the extent that that section applies to unfair methods of competition).

#### (VI) Expiration of all patents

All of the patents as to which the applicant submitted a certification qualifying it for the 180-day exclusivity period have expired.

### (ii) Forfeiture

The 180-day exclusivity period described in subparagraph (B)(iv) shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant.

### (iii) Subsequent applicant

If all first applicants forfeit the 180-day exclusivity period under clause (ii)--

**(I)** approval of any application containing a certification described in paragraph (2)(A)(vii)(IV) shall be made effective in accordance with subparagraph (B)(iii); and

**(II)** no applicant shall be eligible for a 180-day exclusivity period.

### (iv) Special forfeiture rule for competitive generic therapy

The 180-day exclusivity period described in subparagraph (B)(v) shall be forfeited by a first approved applicant if the applicant fails to market the competitive generic therapy within 75 days after the date on which the approval of the first approved applicant's application for the competitive generic therapy is made effective.

*   *   *