**[ORAL ARGUMENT NOT YET SCHEDULED]**
**No. 25-5137**

# United States Court of Appeals
# for the District of Columbia Circuit

NORWICH PHARMACEUTICALS, INC.,

*Plaintiff-Appellant*,

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF
HEALTH AND HUMAN SERVICES; MARTIN A. MAKARY, M.D.,
IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF FOOD AND DRUGS;
UNITED STATES FOOD AND DRUG ADMINISTRATION,

*Defendants-Appellees*,

TEVA PHARMACEUTICALS USA, INC.; SALIX PHARMACEUTICALS, INC.,

*Intervenors-Appellees*.

On Appeal from the United States District Court for the District of Columbia
No. 1:25-cv-00091-BAH (Hon. Beryl A. Howell)

## DEFERRED JOINT APPENDIX (VOLUME I of III)
### Public Appendix—Sealed Material in Separate Supplement
### (JA1 to JA348)

Brett A. Shumate
  *Assistant Attorney General*
Daniel Tenny
Gabriel I. Schonfeld
Attorneys, Appellate Staff
Civil Division, Room 7219
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-3306
gabriel.i.schonfeld@usdoj.gov

*Counsel for Defendants-Appellees*

October 15, 2025

Andrew D. Prins
Rachael L. Westmoreland
Lia Rose Barrett
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.prins@lw.com

*Counsel for Plaintiff-Appellant
Norwich Pharmaceuticals, Inc.*

*(Additional counsel listed on inside cover)*

Bryan M. Killian
Douglas A. Hastings
Colin Sellers Harris
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000
bryan.killian@morganlewis.com

*Counsel for Intervenor-Appellee*
*Salix Pharmaceuticals, Inc.*

Matthew S. Murphy
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100
mmurphy@axinn.com

Nicholas L. Schlossman
LATHAM & WATKINS LLP
300 Colorado Street
Suite 2400
Austin, TX 78701
(737) 910-7314
nicholas.schlossman@lw.com

*Counsel for Plaintiff-Appellant*
*Norwich Pharmaceuticals, Inc.*

Brian T. Burgess
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000
bburgess@goodwinlaw.com

Sierra Perez-Sparks
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
sperezsparks@goodwinlaw.com

*Counsel for Intervenor-Appellee*
*Teva Pharmaceuticals, USA Inc.*

# INDEX TO JOINT APPENDIX

## VOLUME I OF III

### Public Appendix—Sealed Material in Separate Supplement
### (JA1 to JA348)

## I.    Public Appendix—Relevant Lower Court Record

| Document Description | Page |
|---|---|
| Docket for Case No. 1:25-cv-00091-BAH (D.D.C.) | JA1 |
| Amended Complaint (Feb. 7, 2025), Dkt. 35 | JA15 |
| Supplemental Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction, Now Treated as a Motion for Summary Judgment (Feb. 10, 2025), Dkt. 39 (excerpts)<br><br>—Redacted public version<br><br>—Under seal version (Dkt. 38) reproduced in Supplemental Under Seal volume | JA42 |
| Administrative Record (Mar. 28, 2025), Dkt. 77-1 (excerpts)<br><br>—Redacted public version<br><br>—Under seal version (Dkt. 78-2) reproduced in Supplemental Under Seal volume | JA50 |
| Order granting Government Defendant's Cross-Motion for Summary Judgment and Intervenor-Defendants' Cross-Motions for Summary Judgment; Denying Plaintiff's Motion for Preliminary Injunction and Motion for Summary Judgment (Apr. 17, 2025), Dkt. 81 | JA301 |
| Judgment in a Civil Action (Apr. 17, 2025), Dkt. 83 | JA303 |
| Memorandum Opinion (Apr. 17, 2025), Dkt. 86<br><br>—Redacted public version<br><br>—Under seal version (Dkt. 82) reproduced in Supplemental Under Seal volume | JA304 |

| Document Description | Page |
|---|---|
| Notice of Appeal (Apr. 18, 2025), Dkt. 85 | JA346 |

## VOLUME II OF III

### Separate Supplement with Sealed Material
### (JA349 to JA572)

## II.    Supplemental Under Seal—Relevant Lower Court Record

| Document Description | Page |
|---|---|
| Supplemental Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction, Now Treated as a Motion for Summary Judgment (Feb. 10, 2025), Dkt. 38<br><br>—Under seal version<br><br>—Redacted version (Dkt. 39) reproduced in Public volume | JA349 |
| Administrative Record, attached to Motion for Leave to File Documents Under Seal (Mar. 28, 2025), Dkt. 78-2 (excerpts)<br><br>—Under seal version<br><br>—Redacted version (Dkt. 77-1) reproduced in Public volume | JA357 |

## VOLUME III OF III

### Separate Supplement with Sealed Material
### (JA573 to JA810)

## II.    Supplemental Under Seal—Relevant Lower Court Record–Continued

| Document Description | Page |
|---|---|
| Administrative Record, attached to Motion for Leave to File Documents Under Seal (Mar. 28, 2025), Dkt. 78-2 (excerpts) (continued)<br><br>—Under seal version<br><br>—Redacted version (Dkt. 77-1) reproduced in Public volume | JA573 |

| Document Description | Page |
|---|---|
| Memorandum Opinion (Apr. 17, 2025), Dkt. 82<br><br>—Under seal version<br><br>—Redacted version (Dkt. 86) reproduced in Public volume | JA769 |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–00091–BAH

NORWICH PHARMACEUTICALS, INC. v. BECERRA et al

Assigned to: Judge Beryl A. Howell

Case in other court:  USCA, 25–05137

Cause: 05:551 Administrative Procedure Act

Date Filed: 01/13/2025
Date Terminated: 04/17/2025
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NORWICH PHARMACEUTICALS, INC.**

represented by **William Barnett Schultz**
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
202–778–1800
Fax: 202–822–8106
Email: wschultz@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Margaret M. Dotzel**
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
202–778–1800
Fax: 202–822–8106
Email: mdotzel@zuckerman.com
*ATTORNEY TO BE NOTICED*

**Matthew S. Murphy**
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
9th Floor
Hartford, CT 06103
860–275–8146
Fax: 860–275–8101
Email: mmurphy@axinn.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**XAVIER BECERRA**
*in his official capacity as Secretary of Health and Human Services*
*TERMINATED: 02/07/2025*

represented by **Gabriel Schonfeld**
DOJ–Civ
Appellate Staff
950 Pennsylvania Avenue NW
Room 7219
Washington, DC 20530
202–514–3306
Email: gabriel.i.schonfeld@usdoj.gov
*TERMINATED: 05/16/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JA1**

**ROBERT M. CALIFF**
*in his official capacity as Commissioner of Food and Drugs, United States Food and Drug Administration*
*TERMINATED: 02/07/2025*

represented by **Gabriel Schonfeld**
(See above for address)
*TERMINATED: 05/16/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES FOOD AND DRUG ADMINISTRATION**

represented by **Daniel Kadane Crane–Hirsch**
U.S. DEPARTMENT OF JUSTICE
Consumer Protection Branch Civil Division
P.O. BOX 386
Washington, DC 20044
(202) 616–8242
Fax: (202) 514–8742
Email: daniel.crane–hirsch@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gabriel Schonfeld**
(See above for address)
*TERMINATED: 05/16/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOROTHY FINK**
*in her official capacity as Acting Secretary of Health and Human Services*

represented by **DOROTHY FINK**
PRO SE

**Gabriel Schonfeld**
(See above for address)
*TERMINATED: 05/16/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SARA BRENNER**
*in her official capacity as Acting Commissioner of Food and Drugs*

represented by **SARA BRENNER**
PRO SE

**Gabriel Schonfeld**
(See above for address)
*TERMINATED: 05/16/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT F. KENNEDY, JR.**

represented by **Daniel Kadane Crane–Hirsch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**TEVA PHARMACEUTICALS USA, INC.**

represented by **Brian T Burgess**
GOODWIN PROCTER LLP
1900 N St NW
Washington, DC 20036
(202) 346–4000
Fax: (202) 346–4444
Email: BBurgess@goodwinlaw.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sierra Perez–Sparks**
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
617–570–1095
Email: sperezsparks@goodwinlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**SALIX PHARMACEUTICALS, INC.**          represented by

**Brendan Jerome Anderson**
MORGAN, LEWIS & BOCKIUS LLP –
DC OFFICE
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202–739–5992
Fax: 202–739–3001
Email: brendan.anderson@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Colin Sellers Harris**
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202–739–5071
Email: colin.harris@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas Andrew Hastings**
MORGAN LEWIS
1111 Pennsylvania Ave, NW
Washington, DC 20004
202–373–6635
Email: douglas.hastings@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Robert Scherr**
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004–2541
(202) 373–6709
Fax: (202) 739–3001
Email: jr.scherr@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Abernathy**
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Suite 2800
Chicago, IL 60606
312–324–1447
Fax: 312–324–1001
Email: mike.abernathy@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA3**

*ATTORNEY TO BE NOTICED*

**Susan Stradley**
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street
Suite 4000
Houston, TX 77002
713–890–5000
Email: susan.stradley@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wan–Shon Lo**
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
312–324–1000
Fax: 312–324–1001
Email: shon.lo@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R. Peterson**
OFFICE OF THE TEXAS ATTORNEY
GENERAL
209 W 14th Street
Austin, TX 78711
512–936–1700
Fax: 512–474–2697
Email: william.peterson@oag.texas.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/13/2025 | 1 | SEALED MOTION FOR LEAVE TO FILE COMPLAINT UNDER SEAL filed by NORWICH PHARMACEUTICALS, INC.. (Attachments: # 1 SEALED Complaint, # 2 Text of Proposed Order)(Murphy, Matthew) (Entered: 01/13/2025) |
| 01/13/2025 | 2 | NOTICE *Civil Cover Sheet* by NORWICH PHARMACEUTICALS, INC. (Murphy, Matthew) (Entered: 01/13/2025) |
| 01/13/2025 | 3 | REQUEST FOR SUMMONS TO ISSUE *to United States Attorney's Office* filed by NORWICH PHARMACEUTICALS, INC.. (Attachments: # 1 Summons to Becerra, # 2 Summons to Califf, # 3 Summons to FDA, # 4 Summons to Attorney General)(Murphy, Matthew) (Entered: 01/13/2025) |
| 01/13/2025 | 4 | NOTICE of Appearance by Matthew S. Murphy on behalf of NORWICH PHARMACEUTICALS, INC. (Murphy, Matthew) (Entered: 01/13/2025) |
| 01/13/2025 | 5 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NORWICH PHARMACEUTICALS, INC. (Murphy, Matthew) (Entered: 01/13/2025) |
| 01/18/2025 | 6 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by NORWICH PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order to Seal, # 2 Motion for a Preliminary Injunction, # 3 Memorandum in Support of Motion for a Preliminary Injunction, # 4 Declaration of Zaku in Support of Motion for a Preliminary Injunction, # 5 Declaration and Exhibits of Murphy in Support of Motion for a Preliminary Injunction, # 6 Text of Proposed Order for Preliminary Injunction)(Murphy, Matthew) (Entered: 01/18/2025) |

| 01/21/2025 | 7 | NOTICE of Appearance by Gabriel Schonfeld on behalf of XAVIER BECERRA, ROBERT M. CALIFF, UNITED STATES FOOD AND DRUG ADMINISTRATION (Schonfeld, Gabriel) (Entered: 01/21/2025) |
|---|---|---|
| 01/21/2025 | 8 | STIPULATION *of the Proposed Scheduling Order* by NORWICH PHARMACEUTICALS, INC.. (Murphy, Matthew) (Entered: 01/21/2025) |
| 01/23/2025 | | MINUTE ORDER: The Court ORDERS that Plaintiff's 1 Motion for Leave to File Under Seal is DENIED WITHOUT PREJUDICE. Plaintiff apparently seeks to partially seal its Complaint, but it never provides a proposed redline to the Court indicating what should be sealed and what should not. Its Motion is far too vague about what should be sealed and why. Plaintiff may file a renewed Motion to File a Redacted Complaint that includes clean and redlined versions and an explanation of why the redacted portions should be sealed under the Hubbard factors. So ORDERED by Chief Judge James E. Boasberg on January 23, 2025. (lcjeb3) . (Entered: 01/23/2025) |
| 01/27/2025 | 9 | COMPLAINT *unsealed docket entry 1−1* against XAVIER BECERRA, ROBERT M. CALIFF, UNITED STATES FOOD AND DRUG ADMINISTRATION ( Filing fee $ 405 receipt number ADCDC−11434462) filed by NORWICH PHARMACEUTICALS, INC..(Murphy, Matthew) (Entered: 01/27/2025) |
| 01/27/2025 | 10 | MOTION to Intervene by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Text of Proposed Order)(Burgess, Brian) (Entered: 01/27/2025) |
| 01/27/2025 | 11 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by TEVA PHARMACEUTICALS USA, INC. (Burgess, Brian) (Entered: 01/27/2025) |
| 01/28/2025 | | Case Assigned to Judge Beryl A. Howell. (znmw) (Entered: 01/28/2025) |
| 01/28/2025 | 12 | SUMMONS (5) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 01/28/2025) |
| 01/28/2025 | 13 | STANDING ORDER. Signed by Judge Beryl A. Howell on January 28, 2025. (lcbah1) (Entered: 01/28/2025) |
| 01/28/2025 | | MINUTE ORDER (paperless) DENYING WITHOUT PREJUDICE plaintiff's 6 Motion for Leave to File Preliminary Injunction Motion and Exhibits Under Seal ("Pl.'s Mot. to Seal PI"). Plaintiff's motion is nearly identical to the motion plaintiff filed to seal the [1−1] Complaint, *compare* Pl.'s Mot. to Seal PI at 3–5, *with* plaintiff's 1 Motion for Leave to File Complaint Under Seal ("Pl.'s Mot. to Seal Compl.") at 3–5, which was denied without prejudice because "it neither provide[d] a proposed redline to the Court indicating what should be sealed and what should not," Min. Order (Jan. 23, 2025) ("Minute Order"), and was "far too vague about what should be sealed and why," *id.* Plaintiff's instant motion to seal suffers from the same previously identified gaps, *see generally* Pl.'s Mot. to Seal PI (repeating arguments made in Pl.'s Mot. to Seal Compl. and failing to provide a proposed redline), and thus is denied without prejudice for the same reasons stated in the Minute Order. If, by 4 PM on Thursday, January 30, 2025, plaintiff has not filed a renewed motion that includes clean and redlined versions and an explanation of why the redacted portions should be sealed under the *Hubbard* factors, the plaintiff's [6−2] Preliminary Injunction Motion, [6−3] Memorandum in Support, and [6−4], [6−5] Exhibits will be unsealed. Signed by Judge Beryl A. Howell on January 28, 2025. (lcbah1) (Entered: 01/28/2025) |
| 01/28/2025 | | MINUTE ORDER (paperless) GRANTING proposed Defendant–Intervenor Teva Pharmaceuticals USA, Inc.'s ("Teva") 10 Consent Motion to Intervene; and DIRECTING Teva to file its answer to the 1 Complaint on the same date as the already named federal defendants. Signed by Judge Beryl A. Howell on January 28, 2025. (lcbah1) (Entered: 01/28/2025) |
| 01/28/2025 | | MINUTE ORDER (paperless), upon consideration of the parties' 8 Proposed Joint Stipulated Scheduling Order ("Jt. Proposed Schedule"), TREATING plaintiff's 6 Motion for a Preliminary Injunction ("PI Mot.") as a motion for summary judgment; FINDING that a hearing date later than 21 days from the filing of plaintiff's PI Mot., *i.e.*, after February 10, 2025, "will not prejudice the parties," LCvR 65.1(d), where, setting aside this Court's inherent authority to manage its congested docket, plaintiff |

| | | |
|---|---|---|
| | | has not shown that "expedition" is "essential," or that a later hearing date or later decision resolving plaintiff's motion on the papers would "prejudice the parties," LCvR 65.1(d), since the parties' proposed briefing schedule does not contemplate that briefing will become ripe until March 28, 2025, *i.e.*, 46 days after any expedited hearing on plaintiff's motion would have to be held per LCvR 65.1(d), *see* Jt. Proposed Schedule at 2; and ISSUING the following SCHEDULING ORDER jointly proposed by the parties to govern resolution of plaintiff's PI Mot.: <br><br>(a) By January 31, 2025, defendants shall file the Certified Index of Administrative Record (AR) and serve the AR on counsel for plaintiff; <br><br>(b) By February 7, 2025, plaintiff shall file an amended complaint, as necessary, in view of the AR; <br><br>(c) By February 7, 2025, plaintiff shall file any supplement to the PI Mot., as necessary, in view of the AR; <br><br>(d) By February 28, 2025, defendants shall file a combined opposition the PI Mot., which includes any supplement filed on February 7, 2025, and any cross−motion to dismiss or, in the alternative, for summary judgment ("cross−motion"); <br><br>(e) By March 7, 2025, plaintiff shall file a combined reply in further support of its PI Mot. and opposition to any cross−motion; <br><br>(f) By March 24, 2025, defendants shall serve on plaintiff designations of any additional record materials that will be cited in their reply in further support of their cross−motion; <br><br>(g) By March 26, 2025, defendants shall file any reply in support of their cross−motion; <br><br>(h) By March 28, 2025, the plaintiff shall file the joint appendix of the administrative record. Signed by Judge Beryl A. Howell on January 28, 2025. (lcbah1) (Entered: 01/28/2025) |
| 01/28/2025 | | Set/Reset Deadlines: Plaintiff Renewed Motion, If Any, due no later than 4:00PM on 1/30/2025. Defendants Certified Administrative Record due by 1/31/2025. Plaintiff Amended Complaint due by 2/7/2025. Plaintiff Supplement To The PI Motion due by 2/7/2025. Defendant Combined Opposition To PI Motion And Any Cross−Motion To Dismiss Or Summary Judgment due by 2/28/2025. Plaintiff Combined Reply In Further Support Of Its PI Motion due by 3/7/2025. Defendant Reply In Support Of Cross Motion due by 3/26/2025. Plaintiff Joint Appendix Of The Administrative Record due by 3/28/2025. (mac) (Entered: 01/28/2025) |
| 01/28/2025 | 14 | MOTION to Intervene by SALIX PHARMACEUTICALS, INC.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2)(Scherr, Jason) (Entered: 01/28/2025) |
| 01/29/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiff's lack of consent to movant Salix Pharmaceuticals, Inc's ("Salix") 14 Motion to Intervene ("Motion"), DIRECTING plaintiff to file its response to Salix's Motion by 12PM on January 30, 2025, and Salix to file any reply by 12PM on January 31, 2025. Signed by Judge Beryl A. Howell on January 29, 2025. (lcbah1) (Entered: 01/29/2025) |
| 01/29/2025 | | Set/Reset Deadlines: Plaintiff Response To Salix 14 Motion To Intervene due by no later than 12:00PM on 1/30/2025. Salix Reply due no later than 12:00PM on 1/31/2025. (mac) (Entered: 01/29/2025) |
| 01/29/2025 | 15 | RESPONSE re 14 MOTION to Intervene filed by NORWICH PHARMACEUTICALS, INC.. (Murphy, Matthew) (Entered: 01/29/2025) |
| 01/29/2025 | 16 | REPLY to opposition to motion re 14 Motion to Intervene filed by SALIX PHARMACEUTICALS, INC.. (Scherr, Jason) (Entered: 01/29/2025) |
| 01/30/2025 | 17 | MOTION to Amend/Correct *[6−5] Declaration and Exhibits of Murphy in Support of Motion for a Preliminary Injunction* by NORWICH PHARMACEUTICALS, INC.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration of Matthew Murphy, # 2 Exhibit Index, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19)(Murphy, Matthew) (Entered: 01/30/2025) |
| 01/30/2025 | | MINUTE ORDER (paperless) GRANTING proposed Defendant–Intervenor Salix Pharmaceuticals, Inc.'s ("Salix") 14 Motion to Intervene; and DIRECTING Salix to file its answer to the 9 Complaint on the same date as the already named defendants. Signed by Judge Beryl A. Howell on January 30, 2025. (lcbah1) (Entered: 01/30/2025) |
| 01/30/2025 | 18 | Joint MOTION for Protective Order by XAVIER BECERRA, ROBERT M. CALIFF, UNITED STATES FOOD AND DRUG ADMINISTRATION. (Attachments: # 1 Text of Proposed Order)(Schonfeld, Gabriel) (Entered: 01/30/2025) |
| 01/31/2025 | 19 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by XAVIER BECERRA, ROBERT M. CALIFF, UNITED STATES FOOD AND DRUG ADMINISTRATION (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Certified Index of Administrative Record – Unredacted, # 2 Text of Proposed Order)(Schonfeld, Gabriel) (Entered: 01/31/2025) |
| 01/31/2025 | 20 | ADMINISTRATIVE RECORD – *Certified Index – Public Redacted Version* by XAVIER BECERRA, ROBERT M. CALIFF, UNITED STATES FOOD AND DRUG ADMINISTRATION. (Schonfeld, Gabriel) (Entered: 01/31/2025) |
| 01/31/2025 | 21 | PROTECTIVE ORDER. Signed by Judge Beryl A. Howell on January 31, 2025. (lcbah1) (Entered: 01/31/2025) |
| 02/03/2025 | | MINUTE ORDER (paperless) GRANTING plaintiff's 17 Consent Motion to Correct ("Consent Mot."); and DIRECTING plaintiff, in light of its representation that "it will not seek to renew its motion to seal [its] Motion for a Preliminary Injunction," Consent Mot. at 2, to file its preliminary injunction motion and supporting exhibits, including the "corrected set of exhibits to the Murphy Declaration," *id.* at 1, on the public docket by 12 PM on February, 3, 2025. Signed by Judge Beryl A. Howell on February 3, 2025. (lcbah1) (Entered: 02/03/2025) |
| 02/04/2025 | | Set/Reset Deadlines: Plaintiff's Preliminary Injunction Motion and Supporting Exhibits due no later than 12:00PM on 2/3/2025. (mac) (Entered: 02/04/2025) |
| 02/04/2025 | 22 | MOTION for Preliminary Injunction by NORWICH PHARMACEUTICALS, INC.. (Attachments: # 1 Memorandum in Support of Motion for a Preliminary Injunction, # 2 Declaration of Zaku in Support of Motion for a Preliminary Injunction, # 3 Declaration of Murphy in Support of Motion for a Preliminary Injunction, # 4 Exhibit Index, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18, # 23 Exhibit 19, # 24 Text of Proposed Order for Preliminary Injunction)(Murphy, Matthew) (Entered: 02/04/2025) |
| 02/05/2025 | 23 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 2/4/2025. (Murphy, Matthew) (Entered: 02/05/2025) |
| 02/05/2025 | 24 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 1/29/2025. Answer due for ALL FEDERAL DEFENDANTS by 3/30/2025. (Murphy, Matthew) (Entered: 02/05/2025) |
| 02/05/2025 | 25 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES FOOD AND DRUG ADMINISTRATION served on 1/31/2025 (Murphy, Matthew) (Entered: 02/05/2025) |
| 02/05/2025 | 26 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. XAVIER BECERRA served on 2/3/2025 (Murphy, Matthew) (Entered: 02/05/2025) |
| 02/05/2025 | 27 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ROBERT M. CALIFF served on 1/31/2025 (Murphy, Matthew) (Entered: 02/05/2025) |

| | | |
|---|---|---|
| 02/06/2025 | 28 | NOTICE of Appearance by Colin Sellers Harris on behalf of SALIX PHARMACEUTICALS, INC. (Harris, Colin) (Entered: 02/06/2025) |
| 02/06/2025 | 29 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– William R. Peterson, Filing fee $ 100, receipt number ADCDC–11462392. Fee Status: Fee Paid. by SALIX PHARMACEUTICALS, INC.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Harris, Colin) (Entered: 02/06/2025) |
| 02/06/2025 | 30 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Douglas A. Hastings, Filing fee $ 100, receipt number ADCDC–11462448. Fee Status: Fee Paid. by SALIX PHARMACEUTICALS, INC.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Harris, Colin) (Entered: 02/06/2025) |
| 02/06/2025 | 31 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Susan Stradley, Filing fee $ 100, receipt number ADCDC–11462460. Fee Status: Fee Paid. by SALIX PHARMACEUTICALS, INC.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Harris, Colin) (Entered: 02/06/2025) |
| 02/06/2025 | 32 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brendan J. Anderson, Filing fee $ 100, receipt number ADCDC–11462472. Fee Status: Fee Paid. by SALIX PHARMACEUTICALS, INC.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Harris, Colin) (Entered: 02/06/2025) |
| 02/07/2025 | | MINUTE ORDER (paperless) GRANTING defendant–intervenor Salix Pharmaceuticals, Inc.'s ("Salix") 29 Motion for Leave for William R. Peterson to Appear Pro Hac Vice. William R. Peterson may enter an appearance pro hac vice for the purpose of representing Salix in this matter. Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Beryl A. Howell on February 7, 2025. (lcbah1) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER (paperless) GRANTING defendant–intervenor Salix Pharmaceuticals, Inc.'s ("Salix") 30 Motion for Leave for Douglas A. Hastings to Appear Pro Hac Vice. Douglas A. Hastings may enter an appearance pro hac vice for the purpose of representing Salix in this matter. Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Beryl A. Howell on February 7, 2025. (lcbah1) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER (paperless) GRANTING defendant–intervenor Salix Pharmaceuticals, Inc.'s ("Salix") 31 Motion for Leave for Susan Stradley to Appear Pro Hac Vice. Susan Stradley may enter an appearance pro hac vice for the purpose of representing Salix in this matter. Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Beryl A. Howell on February 7, 2025. (lcbah1) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER (paperless) GRANTING defendant–intervenor Salix Pharmaceuticals, Inc.'s ("Salix") 32 Motion for Leave for Brendan J. Anderson to Appear Pro Hac Vice. Brendan J. Anderson may enter an appearance pro hac vice for the purpose of representing Salix in this matter. Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Beryl A. Howell on February 7, 2025. (lcbah1) (Entered: 02/07/2025) |
| 02/07/2025 | 33 | NOTICE of Appearance by William Barnett Schultz on behalf of NORWICH PHARMACEUTICALS, INC. (Schultz, William) (Entered: 02/07/2025) |
| 02/07/2025 | 34 | NOTICE of Appearance by Margaret M. Dotzel on behalf of NORWICH PHARMACEUTICALS, INC. (Dotzel, Margaret) (Entered: 02/07/2025) |
| 02/07/2025 | 35 | AMENDED COMPLAINT against All Defendants filed by NORWICH PHARMACEUTICALS, INC.. (Attachments: # 1 Redlined Complaint)(Murphy, Matthew) (Entered: 02/07/2025) |

| 02/07/2025 | 36 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by NORWICH PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 SEALED Supplemental Memorandum of Points and Authorities in Support of Plaintiffs Motion for a Preliminary Injunction, Now Treated as a Motion for Summary Judgment, # 2 REDACTED Supplemental Memorandum of Points and Authorities in Support of Plaintiffs Motion for a Preliminary Injunction, Now Treated as a Motion for Summary Judgment, # 3 Text of Proposed Order)(Murphy, Matthew) (Entered: 02/07/2025) |
|---|---|---|
| 02/10/2025 | | MINUTE ORDER (paperless) GRANTING government defendants' 19 Sealed Motion for Leave to File Document Under Seal; and DIRECTING government defendants to file the partially sealed certified administrative record under seal and a publicly available version on the docket. Signed by Judge Beryl A. Howell on February 10, 2025. (lcbah1) (Entered: 02/10/2025) |
| 02/10/2025 | | MINUTE ORDER (paperless) GRANTING plaintiff's 36 Motion for Leave to File Under Seal; and DIRECTING plaintiff to file [36−1] under seal and [36−2] on the public docket. Signed by Judge Beryl A. Howell on February 10, 2025. (lcbah1) (Entered: 02/10/2025) |
| 02/10/2025 | 37 | SEALED DOCUMENT filed by XAVIER BECERRA, ROBERT M. CALIFF, UNITED STATES FOOD AND DRUG ADMINISTRATION re 20 Administrative Record, 19 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by XAVIER BECERRA, ROBERT M. CALIFF, UNITED STATES FOOD AND DRUG ADMINISTRATION (This document is SEALED and only available to authorized persons.), Order on Sealed Motion for Leave to File Document Under Seal, (This document is SEALED and only available to authorized persons.)(Schonfeld, Gabriel) (Entered: 02/10/2025) |
| 02/10/2025 | 38 | SEALED DOCUMENT filed by NORWICH PHARMACEUTICALS, INC. re Order on Sealed Motion for Leave to File Document Under Seal, 36 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by NORWICH PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.) (This document is SEALED and only available to authorized persons.)(Murphy, Matthew) (Entered: 02/10/2025) |
| 02/10/2025 | 39 | REDACTED DOCUMENT− Supplemental Memorandum of Points and Authorities in Support of Plaintiffs Motion for a Preliminary Injunction, Now Treated as a Motion for Summary Judgment to 38 Sealed Document, by NORWICH PHARMACEUTICALS, INC.. (Murphy, Matthew) (Entered: 02/10/2025) |
| 02/11/2025 | 40 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by SALIX PHARMACEUTICALS, INC. (Harris, Colin) (Entered: 02/11/2025) |
| 02/12/2025 | 41 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Michael J. Abernathy, Filing fee $ 100, receipt number ADCDC−11476719. Fee Status: Fee Paid. by SALIX PHARMACEUTICALS, INC.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Harris, Colin) (Entered: 02/12/2025) |
| 02/12/2025 | 42 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Wan−Shon Lo, Filing fee $ 100, receipt number ADCDC−11476727. Fee Status: Fee Paid. by SALIX PHARMACEUTICALS, INC.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Harris, Colin) (Entered: 02/12/2025) |
| 02/13/2025 | | MINUTE ORDER (paperless) GRANTING defendant−intervenor Salix Pharmaceuticals, Inc.'s ("Salix") 41 Motion for Attorney Admission Pro Hac Vice. Michael J. Abernathy may enter an appearance pro hac vice for the purpose of representing Salix in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Beryl A. Howell on February 13, 2025. (lcbah1) (Entered: 02/13/2025) |
| 02/13/2025 | | MINUTE ORDER (paperless) GRANTING defendant−intervenor Salix Pharmaceuticals, Inc.'s ("Salix") 42 Motion for Attorney Admission Pro Hac Vice. Wan−Shon Lo may enter an appearance pro hac vice for the purpose of representing Salix in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by |

| | | Judge Beryl A. Howell on February 13, 2025. (lcbah1) (Entered: 02/13/2025) |
|---|---|---|
| 02/21/2025 | 43 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Sierra J. Perez–Sparks, Filing fee $ 100, receipt number ADCDC–11496351. Fee Status: Fee Paid. by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Declaration of Sierra J. Perez–Sparks, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Burgess, Brian) (Entered: 02/21/2025) |
| 02/24/2025 | 44 | NOTICE of Appearance by Michael Abernathy on behalf of SALIX PHARMACEUTICALS, INC. (Abernathy, Michael) (Entered: 02/24/2025) |
| 02/24/2025 | 45 | NOTICE of Appearance by William R. Peterson on behalf of SALIX PHARMACEUTICALS, INC. (Peterson, William) (Entered: 02/24/2025) |
| 02/24/2025 | 46 | NOTICE of Appearance by Wan–Shon Lo on behalf of SALIX PHARMACEUTICALS, INC. (Lo, Wan–Shon) (Entered: 02/24/2025) |
| 02/24/2025 | 47 | NOTICE of Appearance by Susan Stradley on behalf of SALIX PHARMACEUTICALS, INC. (Stradley, Susan) (Entered: 02/24/2025) |
| 02/24/2025 | 48 | NOTICE of Appearance by Brendan Jerome Anderson on behalf of SALIX PHARMACEUTICALS, INC. (Anderson, Brendan) (Entered: 02/24/2025) |
| 02/24/2025 | 49 | NOTICE of Appearance by Douglas Andrew Hastings on behalf of SALIX PHARMACEUTICALS, INC. (Hastings, Douglas) (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER (paperless) GRANTING defendant–intervenor Teva Pharmaceuticals, Inc.'s ("Teva") 43 Motion for Attorney Admission Pro Hac Vice. Sierra J. Perez–Sparks may enter an appearance pro hac vice for the purpose of representing Teva in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions.** Signed by Judge Beryl A. Howell on February 24, 2025. (lcbah1) (Entered: 02/24/2025) |
| 02/28/2025 | 50 | Cross MOTION for Summary Judgment by DOROTHY FINK, SARA BRENNER, UNITED STATES FOOD AND DRUG ADMINISTRATION. (Attachments: # 1 Text of Proposed Order)(Schonfeld, Gabriel) (Entered: 02/28/2025) |
| 02/28/2025 | 51 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by DOROTHY FINK, SARA BRENNER, UNITED STATES FOOD AND DRUG ADMINISTRATION (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Summary Judgment Memorandum, # 2 Proposed Redacted Summary Judgment Memorandum, # 3 Text of Proposed Order)(Schonfeld, Gabriel) (Entered: 02/28/2025) |
| 02/28/2025 | 52 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by SALIX PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A – SEALED Opposition and Cross–Motion for MSJ, # 2 Exhibit B – REDACTED Opposition and Cross–Motion for MSJ, # 3 Exhibit C – Text of Proposed Order regarding Summary Judgment, # 4 Text of Proposed Order regarding Motion to Seal)(Peterson, William) (Entered: 02/28/2025) |
| 02/28/2025 | 53 | NOTICE of Appearance by Sierra Perez–Sparks on behalf of TEVA PHARMACEUTICALS USA, INC. (Perez–Sparks, Sierra) (Entered: 02/28/2025) |
| 02/28/2025 | 54 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by TEVA PHARMACEUTICALS USA, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A – Memorandum in Support of Its Cross–Motion for Summary Judgment and Opposition to Plaintiff's Motions for Summary Judgment and Preliminary Injunction, # 2 Exhibit B – Proposed Redacted Memorandum in Support of Its Cross–Motion for Summary Judgment and Opposition to Plaintiff's Motions for Summary Judgment and Preliminary Injunction, # 3 Text of Proposed Order)(Burgess, Brian) (Entered: 02/28/2025) |
| 02/28/2025 | 55 | Cross MOTION for Summary Judgment by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Text of Proposed Order)(Burgess, Brian) (Entered: 02/28/2025) |

| Date | No. | Description |
|---|---|---|
| 03/07/2025 | 56 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by NORWICH PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A – SEALED Norwichs Combined Reply Memorandum in Further Support of Plaintiffs Motion for a Preliminary Injunction, Now Treated as a Motion For Summary Judgment, and in Opposition to Cross– Motions for Summary Judgment, # 2 Exhibit B – Proposed Redacted Norwichs Combined Reply Memorandum in Further Support of Plaintiffs Motion for a Preliminary Injunction, Now Treated as a Motion For Summary Judgment, and in Opposition to Cross– Motions for Summary Judgment)(Murphy, Matthew) (Entered: 03/07/2025) |
| 03/19/2025 | 57 | Joint MOTION for Extension of Time to File Answer re 35 Amended Complaint – *Unopposed* by DOROTHY FINK, SARA BRENNER, UNITED STATES FOOD AND DRUG ADMINISTRATION. (Attachments: # 1 Text of Proposed Order)(Schonfeld, Gabriel) (Entered: 03/19/2025) |
| 03/21/2025 | | MINUTE ORDER (paperless) GRANTING defendants' 91 Consent Motion for Extension of Time; and DEFERRING the deadline for defendants to file their answer, pending further order from the Court. Signed by Judge Beryl A. Howell on March 21, 2025. (lcbah1) (Entered: 03/21/2025) |
| 03/26/2025 | 58 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by TEVA PHARMACEUTICALS USA, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A – Reply in Support of its Cross–Motion for Summary Judgment, # 2 Exhibit B – Proposed Redacted Reply in Support of its Cross–Motion for Summary Judgment, # 3 Text of Proposed Order)(Burgess, Brian) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER (paperless) GRANTING government defendants' 51 Sealed Motion for Leave to File Document Under Seal; and DIRECTING government defendants to file [51–1] under seal and [51–2] on the public docket. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah1) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER (paperless) GRANTING intervenor–defendant Salix Pharmaceuticals, Inc.'s ("Salix") 52 Sealed Motion for Leave to File Document Under Seal; and DIRECTING Salix to file [52–1] under seal and [52–2] on the public docket. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah1) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER (paperless) GRANTING intervenor–defendant Teva Pharmaceuticals USA, Inc.'s ("Teva") 54 Sealed Motion for Leave to File Document Under Seal; and DIRECTING Teva to file [54–1] under seal and [54–2] on the public docket. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah1) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER (paperless) GRANTING plaintiff's 56 Sealed Motion for Leave to File Document Under Seal; and DIRECTING government defendants to file [56–1] under seal and [56–2] on the public docket. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah1) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER (paperless) GRANTING intervenor–defendant Teva Pharmaceuticals USA, Inc.'s ("Teva") 58 Sealed Motion for Leave to File Document Under Seal; and DIRECTING Teva to file [58–1] under seal and [58–2] on the public docket. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah1) (Entered: 03/26/2025) |
| 03/26/2025 | 59 | REPLY to opposition to motion re 50 Motion for Summary Judgment filed by DOROTHY FINK, SARA BRENNER, UNITED STATES FOOD AND DRUG ADMINISTRATION. (Schonfeld, Gabriel) (Entered: 03/26/2025) |
| 03/26/2025 | 60 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by SALIX PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit A – SEALED Reply in Support of Cross–Motion for Summary Judgment, # 2 Exhibit B – REDACTED Reply in Support of Cross–Motion for Summary Judgment, # 3 Text of Proposed Order)(Peterson, William) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER (paperless) GRANTING intervenor–defendant Salix Pharmaceuticals, Inc.'s ("Salix") 60 Sealed Motion for Leave to File Document Under |

| | | Seal; and DIRECTING Salix to file [60−1] under seal and [60−2] on the public docket. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah1) (Entered: 03/26/2025) |
|---|---|---|
| 03/26/2025 | 61 | SEALED DOCUMENT filed by DOROTHY FINK, SARA BRENNER, UNITED STATES FOOD AND DRUG ADMINISTRATION re 50 Cross MOTION for Summary Judgment (This document is SEALED and only available to authorized persons.)(Schonfeld, Gabriel) (Entered: 03/26/2025) |
| 03/26/2025 | 62 | SEALED OPPOSITION filed by DOROTHY FINK, SARA BRENNER, UNITED STATES FOOD AND DRUG ADMINISTRATION. re 22 Motion for Preliminary Injunction,,, (Schonfeld, Gabriel) (Entered: 03/26/2025) |
| 03/26/2025 | 63 | REDACTED DOCUMENT− Summary Judgment Memorandum to 22 MOTION for Preliminary Injunction , 50 Cross MOTION for Summary Judgment by DOROTHY FINK, SARA BRENNER, UNITED STATES FOOD AND DRUG ADMINISTRATION. (Schonfeld, Gabriel) (Entered: 03/26/2025) |
| 03/26/2025 | 64 | REDACTED DOCUMENT− Memorandum in Support of Its Cross−Motion for Summary Judgment and Opposition to Plaintiff's Motions for Summary Judgment and Preliminary Injunction to 22 MOTION for Preliminary Injunction , 55 Cross MOTION for Summary Judgment by TEVA PHARMACEUTICALS USA, INC.. (Burgess, Brian) (Entered: 03/26/2025) |
| 03/26/2025 | 65 | REDACTED DOCUMENT− Redacted Reply in Support of its Cross−Motion for Summary Judgment to 55 Cross MOTION for Summary Judgment by TEVA PHARMACEUTICALS USA, INC.. (Burgess, Brian) (Entered: 03/26/2025) |
| 03/26/2025 | 66 | SEALED MOTION filed by SALIX PHARMACEUTICALS, INC.(Peterson, William) (Entered: 03/26/2025) |
| 03/26/2025 | 67 | SEALED OPPOSITION filed by SALIX PHARMACEUTICALS, INC.. re 22 Motion for Preliminary Injunction,,, (Peterson, William) (Entered: 03/26/2025) |
| 03/26/2025 | 68 | REDACTED DOCUMENT− Salix's Opposition to Norwich's Motion for Summary Judgment and Cross−Motion for Summary Judgment to 66 SEALED MOTION filed by SALIX PHARMACEUTICALS, INC., 67 Sealed Opposition by SALIX PHARMACEUTICALS, INC.. (Peterson, William) (Entered: 03/26/2025) |
| 03/26/2025 | 69 | SEALED DOCUMENT filed by TEVA PHARMACEUTICALS USA, INC. re 22 MOTION for Preliminary Injunction (This document is SEALED and only available to authorized persons.)(Burgess, Brian) (Entered: 03/26/2025) |
| 03/26/2025 | 70 | SEALED REPLY TO OPPOSITION filed by SALIX PHARMACEUTICALS, INC. re 60 Sealed Motion for Leave to File Document Under Seal, (This document is SEALED and only available to authorized persons.)(Peterson, William) (Entered: 03/26/2025) |
| 03/26/2025 | 71 | REDACTED DOCUMENT− Salix's Reply in Support of Cross−Motion for Summary Judgment to 70 Sealed Reply by SALIX PHARMACEUTICALS, INC.. (Peterson, William) (Entered: 03/26/2025) |
| 03/26/2025 | 72 | SEALED DOCUMENT filed by TEVA PHARMACEUTICALS USA, INC. re 55 Cross MOTION for Summary Judgment (This document is SEALED and only available to authorized persons.)(Burgess, Brian) (Entered: 03/26/2025) |
| 03/26/2025 | 73 | SEALED REPLY TO OPPOSITION filed by TEVA PHARMACEUTICALS USA, INC. re 55 Motion for Summary Judgment (This document is SEALED and only available to authorized persons.)(Burgess, Brian) (Entered: 03/26/2025) |
| 03/27/2025 | 74 | SEALED REPLY TO OPPOSITION filed by NORWICH PHARMACEUTICALS, INC. re 22 Motion for Preliminary Injunction,,, 56 Sealed Motion for Leave to File Document Under Seal,, (This document is SEALED and only available to authorized persons.)(Murphy, Matthew) (Entered: 03/27/2025) |
| 03/27/2025 | 75 | SEALED OPPOSITION filed by NORWICH PHARMACEUTICALS, INC.. re 56 Sealed Motion for Leave to File Document Under Seal,, (Murphy, Matthew) (Entered: 03/27/2025) |

| 03/27/2025 | 76 | REDACTED DOCUMENT– Combined Reply Memorandum in Further Support of Plaintiffs Motion for a Preliminary Injunction, Now Treated as a Motion For Summary Judgment, and in Opposition to Cross– Motions for Summary Judgment to 74 Sealed Reply, 75 Sealed Opposition by NORWICH PHARMACEUTICALS, INC.. (Murphy, Matthew) (Entered: 03/27/2025) |
|---|---|---|
| 03/28/2025 | 77 | JOINT APPENDIX *OF ADMINISTRATIVE RECORD* by NORWICH PHARMACEUTICALS, INC.. (Attachments: # 1 Appendix)(Murphy, Matthew) (Entered: 03/28/2025) |
| 03/28/2025 | 78 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by NORWICH PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Notice of Filing Confidential Joint Appendix of Administrative Record, # 2 Appendix, # 3 Text of Proposed Order)(Murphy, Matthew) (Entered: 03/28/2025) |
| 04/07/2025 | | MINUTE ORDER (paperless) GRANTING plaintiff's 78 Sealed Motion to File Document Under Seal; and DIRECTING plaintiff to file [78–2] Confidential Joint Appendix of Administrative Record under seal. Signed by Judge Beryl A. Howell on April 7, 2025. (lcbah1) (Entered: 04/07/2025) |
| 04/08/2025 | 79 | SEALED DOCUMENT filed by NORWICH PHARMACEUTICALS, INC. re 78 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by NORWICH PHARMACEUTICALS, INC. (This document is SEALED and only available to authorized persons.), Order on Sealed Motion for Leave to File Document Under Seal, (This document is SEALED and only available to authorized persons.)(Murphy, Matthew) (Entered: 04/08/2025) |
| 04/09/2025 | 80 | MOTION for Hearing re 66 SEALED MOTION filed by SALIX PHARMACEUTICALS, INC., 22 MOTION for Preliminary Injunction , 50 Cross MOTION for Summary Judgment , 55 Cross MOTION for Summary Judgment , MOTION for Leave to File *Sur–Reply* by NORWICH PHARMACEUTICALS, INC.. (Attachments: # 1 Text of Proposed Order)(Murphy, Matthew) (Entered: 04/09/2025) |
| 04/17/2025 | 81 | ORDER GRANTING government defendants' 50 Cross–Motion for Summary Judgment and intervenor–defendants' 55 and 60 Cross–Motions for Summary judgment; DENYING plaintiff's 22 Motion for a Preliminary Injunction treated as a Motion for Summary Judgment; and DENYING plaintiff's 80 Motion for Oral Argument, or in the alternative, Leave to File a Sur–Reply. See Order for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on April 17, 2025. (lcbah1) (Entered: 04/17/2025) |
| 04/17/2025 | 82 | SEALED MEMORANDUM OPINION regarding the plaintiffs 22 Motion for a Preliminary Injunction treated as a Motion for Summary Judgment; plaintiffs 80 Motion for Oral Argument, or in the alternative, Leave to File a Sur–Reply; government defendants 50 Cross–Motion for Summary Judgment; and intervenor–defendants 55 and 60 Cross–Motions for Summary judgment. (This document is SEALED and only available to authorized persons.) Signed by Judge Beryl A. Howell on 04/17/25.(zmac) (Entered: 04/17/2025) |
| 04/17/2025 | | Set/Reset Deadlines: Parties Joint Submission due no later than 3:00PM EST on 4/18/2025. (mac) (Entered: 04/17/2025) |
| 04/17/2025 | 83 | CLERK'S JUDGMENT in favor of Government Defendants and Intervenor Defendants. on 04/17/25. (mac) (Entered: 04/17/2025) |
| 04/18/2025 | 84 | Joint NOTICE Concerning Redactions to the Court's Memorandum Opinion (ECF No. 82) re 82 Sealed Memorandum Opinion, by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Burgess, Brian) Modified event title on 4/23/2025 (znmw). (Entered: 04/18/2025) |
| 04/18/2025 | 85 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 83 Clerk's Judgment by NORWICH PHARMACEUTICALS, INC.. Filing fee $ 605, receipt number ADCDC–11628655. Fee Status: Fee Paid. Parties have been notified. (Murphy, Matthew) (Entered: 04/18/2025) |
| 04/18/2025 | 86 | MEMORANDUM OPINION regarding the plaintiff's 22 Motion for a Preliminary Injunction treated as a Motion for Summary Judgment; plaintiff's 80 Motion for Oral |

| | | |
|---|---|---|
| | | Argument, or in the alternative, Leave to File a Sur–Reply; government defendants' 50 Cross–Motion for Summary Judgment; and intervenor–defendants' 55 and 60 Cross–Motions for Summary judgment. Signed by Judge Beryl A. Howell on April 17, 2025. (lcbah1) (Entered: 04/18/2025) |
| 04/22/2025 | 87 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 85 Notice of Appeal to DC Circuit Court. (mg) (Entered: 04/22/2025) |
| 04/23/2025 | | USCA Case Number 25–5137 for 85 Notice of Appeal to DC Circuit Court filed by NORWICH PHARMACEUTICALS, INC.. (mg) (Entered: 04/23/2025) |
| 05/16/2025 | 88 | NOTICE of Appearance by Daniel Kadane Crane–Hirsch on behalf of UNITED STATES FOOD AND DRUG ADMINISTRATION, ROBERT F. KENNEDY, JR (Crane–Hirsch, Daniel) (Entered: 05/16/2025) |
| 05/16/2025 | 89 | NOTICE OF WITHDRAWAL OF APPEARANCE as to SARA BRENNER, DOROTHY FINK, ROBERT F. KENNEDY, JR, UNITED STATES FOOD AND DRUG ADMINISTRATION. Attorney Gabriel Schonfeld terminated. (Schonfeld, Gabriel) (Entered: 05/16/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORWICH PHARMACEUTICALS, INC., | |
| *Plaintiff*, | |
| v. | |
| DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services, | |
| SARA BRENNER, in her official capacity as Acting Commissioner of Food and Drugs, | |
| and | |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, | Civil Action No. 1:25-cv-91 |
| *Defendants*, | |
| and | |
| TEVA PHARMACEUTICALS USA, INC., | |
| *Intervenor-Defendant*, | |
| and | |
| SALIX PHARMACEUTICALS, INC. | |
| *Intervenor-Defendant*. | |

## <u>AMENDED COMPLAINT</u>

Plaintiff Norwich Pharmaceuticals, Inc. ("Norwich") files this amended complaint against Defendants, Dorothy Fink, in her official capacity as Acting Secretary of Health and Human Services; Sara Brenner, M.D., in her official capacity as Acting Commissioner of Food

**JA15**

and Drugs, United States Food and Drug Administration; and the United States Food and Drug

Administration (collectively "FDA"), and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory and injunctive relief arising out of FDA's

arbitrary, capricious, and unlawful determinations that Norwich's Abbreviated New Drug

Application ("ANDA") No. 214370 ("the '370 ANDA") for rifaximin tablets, 550 mg, for the

treatment of irritable bowel syndrome with diarrhea ("IBS-D") in adults ("Norwich's '370

ANDA Product") is not entitled to a grant of "final approval" because Actavis Laboratories FL,

Inc. ("Actavis") submitted an ANDA for generic rifaximin tablets, 550 mg, and maintains its

eligibility for a 180-day exclusivity period for generic rifaximin 550 mg tablets under 21 U.S.C.

§ 355(j)(5)(B)(iv), and that Actavis has not forfeited its eligibility for a 180-day exclusivity

period under 21 U.S.C. §§ 355(j)(5)(D)(I), (IV) and/or 21 C.F.R. § 314.107(c)(3).

2.      On January 10, 2025, FDA granted tentative approval to Norwich's '370 ANDA

for rifaximin 550 mg tablets for the treatment of IBS-D, but refused to grant the '370 ANDA

final approval based on its arbitrary and capricious determination that final approval of the '370

ANDA is blocked by Actavis's eligibility for 180-day exclusivity.

3.      On December 18, 2015, Actavis submitted an ANDA for rifaximin 550 mg tablets

containing a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV

certification"). *See, e.g.*, FDA_00003; FDA_0013.

4.      Actavis is the first applicant to submit an ANDA ("Actavis's ANDA") for

rifaximin tablets, 550 mg. *See, e.g., Norwich Pharmaceuticals, Inc., v. Becerra et al.*, No. 1:23-

cv-01611 (D.D.C.), ECF 56 at 1.

5.      In March 2016, Salix Pharmaceuticals, Inc. ("Salix") (a subsidiary of Bausch Health Companies, Inc. ("Bausch")), the holder of New Drug Application No. 021361 for XIFAXAN (rifaximin) Tablets, 550 mg, sued Actavis for infringement in the District of Delaware.  *See Salix Pharms., Ltd. v. Actavis Labs. FL, Inc.*, No. 1:16-cv-00188 (D. Del.).  That case settled in September 2018.

6.      According to a September 2018 press release by Bausch (https://ir.bauschhealth.com/tools/viewpdf.aspx?page={3862BA6E-F366-4B8B-80DA-7507A2665FC1), the patentee granted Actavis "a nonexclusive license effective Jan. 1, 2028 to the Salix Parties' intellectual property relating to XIFAXAN 550 mg tablets in the United States," however, Actavis "will be able to begin marketing the medicine earlier if another generic rifaximin product is granted approval and starts selling or distributing such generic rifaximin product before Jan. 1, 2028."  In addition, the press release states that "[u]nder the terms of the agreement, beginning Jan. 1, 2028, [Actavis] will have the option to: (1) market a royalty-free generic version of XIFAXAN 550 mg tablets, should it receive [FDA approval of its ANDA], or (2) market an authorized generic version of XIFAXAN 550 mg tablets with drug supply being provided by Salix."

7.      The same press release states that Actavis "acknowledges the validity of the licensed patents."

8.      A Consent Judgment entered in *Salix Pharms., Ltd. v. Actavis Labs. FL, Inc.*, states that "[i]n the event that the claims of [the asserted patents] asserted against [Actavis] are not held invalid or unenforceable, absent a license or other authorization from Plaintiffs, the [asserted patents] would be infringed by any unlicensed manufacture, sale, offer for sale, use, or importation in the United States of the generic products that are the subject of [Actavis's ANDA]

(the 'Actavis Product', as defined in the Parties' Settlement Agreement)."  *See* Civ. No. 1:16-cv-00188, ECF No. 111 (D. Del. Sep. 14, 2018).  The Consent Judgment further enjoins Actavis from infringing the asserted patents, except as licensed.

9.     Norwich also owns ANDA No. 214369 ("the '369 ANDA") for rifaximin tablets, 550 mg, for the treatment of IBS-D in adults, which has obtained tentative approval.  Prior to an amendment in September 2022, the '369 ANDA also sought approval for the treatment of hepatic encephalopathy (the "HE Indication"), the other FDA-approved indication for rifaximin 550 mg tablets in addition to IBS-D.

10.     In a patent litigation concerning the '369 ANDA, Norwich obtained a final, non-appealable judgment or consent decree of invalidity or noninfringement concerning each claim of each patent listed in the Orange Book as of December 2015 concerning rifaximin tablets, 550 mg, for the treatment of IBS-D in adults.  *See Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430, 2022 WL 3225381, at *18-22 (D. Del. Aug. 10, 2022), aff'd, 98 F.4th 1056 (Fed. Cir. 2024); *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430, Order, ECF No. 180  (D. Del. May 12, 2022), aff'd, 98 F.4th 1056 (Fed. Cir. 2024).  The district court also found that two asserted patents covering the HE Indication (the "HE Patents") were valid and infringed.  *Salix v. Norwich,* No. 20-430, 2022 WL 3225381, at *10-11.

11.     FDA should have determined that Actavis has forfeited any eligibility for a 180-day exclusivity under 21 U.S.C. §§ 355(j)(5)(D)(i)(I).  Norwich obtained a final, non-appealable judgment and consent decree concerning each patent that is the subject of a Paragraph IV certification that is qualifying for 180-day exclusivity with respect to Norwich and Actavis did not commercially market its ANDA product within 75 days of entry of the last such judgment.

12.     In addition, FDA's January 10, 2025 tentative approval letter refers to Actavis's ANDA as an "unapproved ANDA."

13.     On information and belief, as of February 7, 2025, FDA has not granted the Actavis ANDA tentative approval despite it having been pending for more than 109 months.

14.     Under 21 U.S.C. §§ 355(j)(5)(D)(IV), FDA should have determined that Actavis, to the extent it lawfully maintained a Paragraph IV Certification, forfeited eligibility for a 180-day exclusivity period because Actavis failed to obtain tentative approval in 30 months, as required by statute.

15.     Actavis's failure to obtain tentative approval for its rifaximin 550 mg tablet ANDA product by the 30-month deadline, or any permitted extension, was not "caused by" a change in or review of the approval requirements imposed after the ANDA was filed.

16.     On January 31, 2025, Norwich learned for the first time of FDA's determination that Actavis's failure to obtain tentative approval was "caused by" a dissolution study specified in the 2017 product-specific guidance for rifaximin 550 mg tablets.

17.     The dissolution study cited by FDA as a change in approval requirements, which purportedly caused Actavis's failure to obtain tentative approval, resulted from a citizen petition filed by Salix in 2016.  More specifically, FDA added the dissolution study to the 2017 product-specific guidance based on Salix's 2016 citizen petition.

18.     Notwithstanding that Salix's citizen petition was the but-for cause of the change in approval requirements that FDA determined caused Actavis's failure to obtain tentative approval, FDA erroneously determined that Salix's citizen petition did not delay the approval.

19.     To the extent that the dissolution study specified in the 2017 product-specific guidance caused Actavis's failure to obtain approval in 30 months from the submission of its

ANDA, Salix's citizen petition necessarily delayed the approval of Actavis's ANDA. Accordingly, the 30 month period should have been extended pursuant to 21 U.S.C. § 355(q)(1)(G).

20.    FDA erred by determining that Actavis had not forfeited its eligibility for 180-day exclusivity under 21 U.S.C. § 355(j)(5)(D)(i)(IV) at least because it applied the wrong causation standard and/or failed to consider whether Actavis failed to obtain tentative approval under any extension of the 30-month period.

21.    Under the correct standard and/or deadline, FDA should have and would have determined that Actavis forfeited its eligibility for 180-day exclusivity under 21 U.S.C. § 355(j)(5)(D)(i)(IV).

22.    FDA's determination that Actavis's eligibility for a 180-day exclusivity period for rifaximin tablets, 550 mg, for the treatment of IBS-D has not been forfeited with respect to Norwich's '370 ANDA is arbitrary and capricious, not in accordance with law, and contrary to Congress's purpose in enacting the Drug Price Competition and Patent Term Restoration Act ("Hatch-Waxman Act").

23.    With this decision, FDA is causing irreparable harm, because every day final approval of Norwich's '370 ANDA Product is delayed is a day closer to another ANDA filer entering the market and shrinking or eliminating the first-mover advantage that would otherwise be enjoyed by Norwich's '370 ANDA Product.

24.    Actavis, along with two other ANDA filers for this product, Sun Pharmaceutical Industries Ltd. ("Sun") and Sandoz, Inc. ("Sandoz"), are barred by a settlement reached with Salix from entering the generic rifaximin market until January 2028.  *See* Bausch Health Companies, Inc., *2021 Annual Report 10-K*, at 78–79 (Feb. 23, 2022) ("Bausch 2021 10-K").

25.     Four other generic manufacturers—Amneal, Zydus, Cipla, and Carnegie—recently submitted ANDAs seeking approval to market generic rifaximin 550 mg tablets. Based on those ANDA submissions, Salix filed suit against Amneal on April 5, 2024, against Zydus on September 27, 2024, and against Cipla and Carnegie on November 1 and 7, 2024, respectively. On information and belief, all four recently-filed ANDAs are subject to 30-month stays, and only Amneal has received tentative approval from FDA.

26.     This means that Norwich's '370 ANDA Product is in the highly valuable position to be the first generic rifaximin product for IBS-D on the market.

27.     Norwich earned this first-mover opportunity by diligently seeking FDA approval after submitting its ANDA, taking on the risks and costs of patent litigation, and successfully obtaining final, non-appealable judgments of invalidity and noninfringement, all with the expectation that FDA would properly grant it final approval.

28.     FDA's determination regarding Actavis's exclusivity is also adversely impacting the public interest by significantly delaying less-expensive alternatives for the treatment of IBS-D from entering the market.

29.     Norwich is therefore entitled to declaratory and injunctive relief, including but not limited to:

      a.  Entry of judgment declaring that FDA's denial of final approval for Norwich's '370 ANDA is arbitrary, capricious, and contrary to law;

      b.  Entry of judgment declaring that the FDA's decision that Actavis has not forfeited the 180-day exclusivity period for rifaximin, 550 mg, for the treatment of IBS-D is arbitrary, capricious, and contrary to law;

  c. Entry of an injunction directing FDA to determine that Actavis's

   eligibility for a 180-day exclusivity period for rifaximin tablets, 550 mg,

   for the treatment of IBS-D has been forfeited or extinguished;

  d. Entry of an injunction directing FDA to grant final approval to Norwich's

   '370 ANDA.

## PARTIES

30. Plaintiff Norwich Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 6826 Highway 12, Norwich, New York 13815.

31. Defendant Dorothy Fink is a party in her official capacity as the Acting Secretary of the United States Department of Health and Human Services, having offices at 200 Independence Avenue, S.W., Washington, D.C. 20201. Secretary Becerra has been authorized by the Congress of the United States to administer the Federal Food Drug and Cosmetic Act, 21 U.S.C. §§ 301 *et seq*. ("FDCA"). Secretary Becerra in turn has delegated his authority under the FDCA to the Commissioner of Food and Drugs.

32. Defendant Sara Brenner M.D. is a party in her official capacity as the Acting Commissioner of Food and Drugs, the head of and highest ranking official within FDA, which has offices at 10903 New Hampshire Avenue, Silver Spring, MD 20993. As noted above, Acting Secretary Fink, as Secretary of Health and Human Services, has delegated to Acting Commissioner Brenner the authority to administer the drug approval provisions of the FDCA through FDA.

33. Defendant FDA is an agency within the Public Health Service, which is a part of Health and Human Services. FDA is charged with overseeing, *inter alia*, the human drug

approval process, including the portions of that process relevant to this case.  Its headquarters are located at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## JURISDICTION AND VENUE

34.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.  This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, 702, 706; the FDCA, 21 U.S.C. §§ 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (commonly referred to as the "Hatch-Waxman Act") (codified as amended in relevant part at 21 U.S.C. § 355 and 35 U.S.C. § 271) and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, § 1102(b)(1), Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271) ("MMA"); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

35.    The Court has personal jurisdiction over the federal Defendants because they are either located in, and/or conduct substantial business in, and/or have regular and systematic contact with, this District.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e).

37.    FDA's decision to deny final approval to Norwich's '370 ANDA and its determinations concerning Actavis's eligibility for a 180-day exclusivity period for rifaximin is a final agency action, which constitutes an actual controversy for which Norwich is entitled to review and relief under 5 U.S.C. §§ 702, 704–706.  Norwich has standing to maintain this action pursuant to the APA as a legal entity that has suffered a legal wrong and has been adversely affected by final agency action.

38.    There exists an actual, substantial, and continuing controversy between the parties regarding FDA's application of the FDCA, the MMA's exclusivity forfeiture provisions, and

9
**JA23**

FDA's regulations.  This Court may declare the rights and legal relations of the parties under 28 U.S.C. §§ 2201, 2202.

## STATUTORY BACKGROUND

39.     The FDCA establishes the requirements for marketing drugs in the United States.  In 1984, Congress amended the FDCA to provide an abbreviated pathway for manufacturers to obtain approval for generic drugs by relying on FDA's finding that the previously approved brand drug (i.e., reference listed drug, or "RLD") is safe and effective.

40.     The central purpose of the 1984 FDCA amendments (commonly referred to as the "Hatch-Waxman Amendments" or the "Hatch-Waxman Act"), codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271(e) and 282, is "to enable competitors to bring cheaper, generic . . . drugs to market as quickly as possible."  *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1344 (Fed. Cir. 2007) (quoting 149 Cong. Rec. S15885 (Nov. 25, 2003)).

### New Drug Applications and Orange Book Patents

41.     Before marketing a new drug in the United States, the FDCA requires FDA to approve a New Drug Application ("NDA") submitted by the drug company seeking to market the drug.  *See* 21 U.S.C. § 355(a), (b).  Once approved, new drugs generally are referred to as brand name drugs because they are marketed under a trade name or trademark for the drug product rather than the chemical name for the active ingredient in the drug product.

42.     The NDA applicant must identify each patent that claims the drug or a method of using the drug that is the subject of the NDA and that could reasonably be asserted in a patent infringement action.  *See* 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53.

43.     Once FDA approves an NDA, FDA publishes the patent information submitted by the brand name drug company in the Approved Drug Products with Therapeutic Equivalence

Evaluations (known as the "Orange Book").  *See* 21 U.S.C. § 355(b)(1)(A)(viii); 21 C.F.R.

§ 314.53(e).

**Abbreviated New Drug Applications, Patent Certifications, and Section viii Statements**

44.    A company seeking FDA approval for a generic version of a new drug can submit

an abbreviated new drug application ("ANDA") showing that the generic drug is bioequivalent

to the branded drug.  *See* 21 U.S.C. § 355(j)(2)(F).

45.    An ANDA applicant must file one of four patent certifications with FDA for each

of the patents listed in the Orange Book for the branded drug.  21 U.S.C.

§ 355(j)(2)(A)(vii).  The relevant patent certification here is the so-called "Paragraph IV

certification," which declares that the Orange Book patent is invalid, unenforceable, or will not

be infringed by the manufacture, use, or sale of the generic drug for which the ANDA is

submitted.  *Id.*; 21 C.F.R. § 314.94(a)(12)(i)(A)(4)(i).

46.    An alternative to filing a Paragraph IV or other patent certification is to provide a

statement filed under 21 U.S.C. § 355(j)(2)(A)(viii) that the applicant is not seeking FDA

approval for a patented method of use (a "section viii statement").  *See Warner–Lambert Co. v.

Apotex Corp.*, 316 F.3d 1348, 1360–61 (Fed. Cir. 2003).

47.    The approval of an ANDA containing only a section viii statement is governed by

21 U.S.C. § 355(j)(5)(A) rather than 21 U.S.C. § 355(j)(5)(B), which concerns the approval of an

ANDA containing a patent certification.  *See also* 21 C.F.R. § 314.107(b)(1)(ii) (describing

FDA's "immediate[]" approval of an ANDA, "if the applicant submits an appropriate statement

[] explaining that a method-of-use patent does not claim an indication or other condition of use

for which the applicant is seeking approval . . . .").

48.    Paragraph IV certifications and section viii statements are "mutually exclusive alternatives," and the "factor that determines which is proper is whether the use patent at issue actually claims a use for which the generic applicant is seeking approval.  If it does, a paragraph IV certification is required; if not, the ANDA should include a section viii statement."  *TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 74 (D.D.C. 2003), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004).

49.    According to FDA, "if a patent claims a method of using the listed drug, and labeling for the ANDA applicant's proposed drug product does not contain any indications covered by the method of use patent, the ANDA applicant" should submit a section viii statement, not a Paragraph IV certification.  ANDA Regulations, Patent and Exclusivity Provisions, 59 Fed. Reg. 50338, 50347 (Oct. 3, 1994).

## ANDA Approvals and Exclusivities

50.    An ANDA applicant that submits a Paragraph IV certification must provide notice of such certification – or a "Notice Letter" – to the patent owner and the NDA holder.  If the patent owner files a patent infringement action concerning a patent timely listed in the Orange Book within 45 days of receiving the Notice Letter, FDA may not approve the ANDA until the earlier of 30 months or a court decision that the patent is not infringed or invalid.  *See* 21 U.S.C. § 355(j)(2)(B)(iii), 355(j)(5)(B)(iii).  This is known as the "30-month stay."  Conversely, if a patent action is not filed within 45 days, or a patent action is filed that only asserts patents that were listed in the Orange Book *after* the date of the original ANDA submission (excluding an amendment or a supplement), FDA may immediately approve the ANDA subject to the provisions of Section 355(j)(5)(B).  21 U.S.C. § 355(j)(5)(B)(iii); 21 U.S.C. § 355(j)(5)(B)(iii).

51.     To incentivize patent challenges, the Hatch-Waxman Act provides 180 days of generic marketing exclusivity to the "first applicant," *i.e.*, the applicant that is first to submit "a substantially complete application that contains and lawfully maintains a [Paragraph IV] certification . . . ."  21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).  This exclusivity operates to block only approval of a subsequent ANDA that "contains a [Paragraph IV] certification . . . and is for a drug for which a first applicant has submitted an application containing such a certification" for a period of 180 days after the first commercial marketing of the drug.  21 U.S.C. § 355(j)(5)(B)(iv)(I).  However, a first applicant's exclusivity may be extinguished if the first applicant does not lawfully maintain its Paragraph IV certification.

52.     Importantly, "[i]f an ANDA applicant seeks to omit the approved method(s) of use covered by a listed patent with a section viii statement, another ANDA applicant's paragraph IV certification to that same patent, and any related 180-day exclusivity, would not block approval of the ANDA that contained the section viii statement."  180-Day Exclusivity: Questions and Answers, Draft Guidance for Industry, at 13 (Jan. 2017) ("180-Day Exclusivity Q&A Guidance").

53.     In response to concerns that first applicants were "parking" their exclusivity to limit generic access to the market as part of settlement agreements with brand manufacturers, Congress added conditions under which the first applicant may "forfeit" 180-day exclusivity eligibility in the MMA.  *See Dey Pharma, LP v. Sunovion Pharms. Inc.*, 677 F.3d 1158, 1164–65 (Fed. Cir. 2012); 21 U.S.C. § 355(j)(5)(D).  The two forfeiture provisions relevant here are the so-called "failure to market" and "failure to obtain timely tentative approval" provisions.

54.     The "failure to market" forfeiture occurs if the first applicant fails to market the drug by the later of two dates, both of which are required to effectuate forfeiture.  21 U.S.C.

§ 355(j)(5)(D)(i)(I).  The first date, under 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa), is either 30 months after submission or 75 days after final approval of the first applicants' ANDA.  The second date, under 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), can be effectuated either by the first applicant, or by any other applicant whose ANDA has been granted tentative approval at any time.  The (bb) date occurs 75 days after a court enters either a settlement order or a final, non-appealable judgment that each relevant patent is invalid or not infringed, or if the patent is withdrawn from the Orange Book by the NDA holder.

55.    The "failure to obtain timely tentative approval" forfeiture occurs when the first applicant fails to obtain tentative approval within 30 months of filing its ANDA.  21 U.S.C. § 355(j)(5)(D)(i)(IV).  The only exception in this forfeiture provision is if the first applicants' failure was "caused by a change in or review of" the approval requirements imposed after the ANDA was filed.  *Id.*  In addition, 21 U.S.C. § 355(q)(1)(G) provides that if "approval of the [first applicant's ANDA] was delayed because of a [citizen] petition, the 30-month period . . . is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition."

56.    When FDA deems that an ANDA is eligible for final approval but for unexpired Orange Book patents or exclusivities, FDA will instead grant the application tentative approval.  *See* ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs, at 4 (Sept. 2020).  But, "[a] drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter[.]"  21 C.F.R. § 314.3(b).  As such, "tentative approval does not allow the applicant to market [its] generic drug product."  Drugs@FDA Glossary of Terms, U.S. Food and Drug

Admin. (Nov. 14, 2017).  Tentative approval therefore "delays final approval of the generic drug

product until all patent or exclusivity issues have been resolved."  *Id.*

## FACTUAL BACKGROUND

### Salix's Xifaxan and Orange Book Patents

57.    Salix is the holder of NDA No. 021361 ("Salix's NDA") for rifaximin tablets

under the brand name Xifaxan, which is currently the only rifaximin product available on the

market.  *See* Orange Book, 44th Edition, at 3-409 (Jan. 2024).  FDA first approved Xifaxan

200 mg tablets in 2004.  Xifaxan 200 mg tablets are indicated for the treatment of travelers'

diarrhea.

58.    FDA later approved supplemental new drug applications for Xifaxan 550 mg

rifaximin tablets for the treatment of IBS-D in adults and for the reduction of the risk of overt

hepatic encephalopathy ("HE") recurrence in adults.  Each of these indications for Xifaxan

tablets has a different dosing regimen.  *See* Label for XIFAXAN® (rifaximin) tablets, for oral

use, Bridgewater, NJ: Valeant Pharmaceuticals North America LLC, Initial U.S. Approval: 2004

at 1.2, 1.3, 2.2, and 2.3.  By December 2019, Salix had listed 23 patents in the Orange Book.

### Norwich's ANDA No. 214370

59.    On December 20, 2019, Norwich submitted ANDA No. 214370 to FDA, seeking

authorization to market generic rifaximin 200 mg tablets.  On January 20, 2020, FDA

acknowledged and received for review ANDA No. 214370.  On October 18, 2022, FDA

tentatively approved Norwich's 200 mg rifaximin tablets.

60.    On May 10, 2024, Norwich submitted to FDA a new dosage strength amendment

to the '370 ANDA for 550 mg rifaximin tablets for the treatment of IBS-D.  On May 23, 2024,

FDA acknowledged receipt of Norwich's amendment.

61.     Norwich's '370 ANDA is not subject to any stay of regulatory approval under 21 U.S.C. § 355(j)(5)(B)(iii) because the patentee and/or NDA holder did not file a patent action within 45 days of receiving a notice letter concerning any patent listed in the Orange Book before the original submission date of the '370 ANDA.

62.     On January 10, 2025, FDA tentatively approved Norwich's '370 ANDA for rifaximin tablets, 550 mg, for the treatment of IBS-D in adults.  FDA's decision not to grant Norwich's 550 mg rifaximin tablets final approval was based on its arbitrary, capricious, and unlawful determination that the '370 ANDA is subject to Actavis's 180-day exclusivity period.

### Other ANDA Applicants for Rifaximin 550 mg Tablets

63.     On information and belief, Actavis and at least two other rifaximin ANDA applicants, Sandoz and Sun, engaged in and settled their patent litigation with Salix, Bausch Health Ireland Ltd., and Alfasigma S.p.A., whereby they agreed to refrain from marketing their generic products until January 1, 2028, with one exception described below.  *See* Press Release, Bausch Health, Bausch Health Announces Resolution of XIFAXAN® Intellectual Property Litigation (Sep. 12, 2018)[1] (hereinafter, "Bausch-Actavis Press Release"); Press Release, Bausch Health, Bausch Health And Alfasigma Announce Resolution Of XIFAXAN® Intellectual Property Litigation (May 06, 2020)[2]; Press Release, Bausch Health, Bausch Health And

---

[1] *Available at* https://www.prnewswire.com/news-releases/bausch-health-announces-resolution-of-xifaxan-intellectual-property-litigation-300710753.html.
[2] *Available at* https://www.reuters.com/article/business/healthcare-pharmaceuticals/bausch-health-and-alfasigma-announce-resolution-of-xifaxan-intellectual-property-idUSFWN2CO0NK/.

Alfasigma Announce Resolution Of XIFAXAN® Intellectual Property Litigation (Sep. 22, 2020).[3]

64.     As discussed above, the terms of that settlement also allow Actavis the option to launch an "authorized generic" of rifaximin—an unbranded version of Xifaxan marketed under Salix's NDA—instead of selling its own generic ANDA product.  *See* Paragraph 6.  Finally, the settlement allows all three manufacturers to market their generic rifaximin products before 2028 should a competitor enter the market.  *Id*.

65.     In addition, Amneal, Zydus, Cipla, and Carnegie  recently submitted ANDAs seeking approval to market generic rifaximin 550 mg tablets.  Based on those ANDA submissions, Salix brought a patent infringement case against Amneal on April 5, 2024, against Zydus on September 27, 2024, and against Cipla and Carnegie on November 1 and 7, 2024, respectively.  On information and belief, all four ANDAs are subject to 30-month stays, and only Amneal has received tentative approval from FDA.

### ACTAVIS HAS FORFEITED 180-DAY EXCLUSIVITY

66.     A first applicant cannot maintain its eligibility for 180-day exclusivity based on expired patents.  Therefore, any eligibility for a first applicant's exclusivity period for rifaximin 550 mg tablets based on an expired patent listed in the Orange Book is extinguished.

67.     As FDA has also recognized, a section viii statement to a method-of-use patent under 21 U.S.C. §§ 355(j)(2)(A)(viii) does not expose a subsequent applicant to a first applicant's 180-day exclusivity period.  In fact, FDA's regulation expressly states that an application containing a section viii statement in the absence of a Paragraph IV certification to a

---

[3] *Available at* https://ir.bauschhealth.com/news-releases/2020/09-22-2020-120037282.

claim of the same patent is "immediately" approvable.  21 C.F.R. § 314.107(b)(1)(ii); *see also* 180-Day Exclusivity Q&A Guidance at 13.

68.    Norwich is not a subsequent Paragraph IV applicant with respect to any claim of any patent covering the HE Indication.  The '370 ANDA does not seek FDA approval for the HE Indication and does not challenge any patent claim covering the HE Indication.  Pursuant to its statutory right and obligation under FDA's regulation, the '370 ANDA contains a section viii statement to each patent concerning the HE Indication.  Therefore, a first applicant's eligibility for 180-day exclusivity based on any patent covering the HE Indication cannot block approval of the '370 ANDA.

69.    21 U.S.C. §§ 355(j)(5)(B)(iv)(I) limits the eligibility for a first applicant's 180-day exclusivity period to only the patents for which a subsequent applicant also submitted a Paragraph IV Certification.  As the statute states, the subsequent application must contain a Paragraph IV Certification and be "for a drug for which a first applicant has submitted an application containing such a certification."

70.    Even if an applicant qualifies for 180-day exclusivity, the exclusivity may be forfeited under rules established in 21 U.S.C. § 355(j)(5)(D).  Under 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), eligibility for 180-day exclusivity may be forfeited based on a court decision or consent decree concerning the "qualifying" patent.  Subsection (bb) refers back to Section 355(j)(5)(B)(iv) to identify "each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv)[.]"

71.    A judgment or consent decree of invalidity or noninfringement obtained by a first applicant or any other applicant concerning a "qualifying" patent extinguishes the first

applicant's eligibility for any 180-day exclusivity period based on that patent if the first applicant does not commercially market a generic product within 75 days.

72.    Each of Actavis's 180-day exclusivity-bearing patents for rifaximin tablets, 550 mg, for the treatment of IBS-D in adults is subject to a final, non-appealable decision or consent decree of invalidity or noninfringement.  *See Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430, 2022 WL 3225381, at *18-22 (D. Del. Aug. 10, 2022), *aff'd*, 98 F.4th 1056 (Fed. Cir. 2024); *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430, Order, ECF No. 180  (D. Del. May 12, 2022), aff'd, 98 F.4th 1056 (Fed. Cir. 2024).

73.    Under section 355(j)(5)(D), Actavis forfeited its exclusivity if it failed to market its drug by the later of two dates, the (aa) date and the (bb) date.  The "(aa)" date under 21 U.S.C. §§ 355(j)(5)(D)(i)(I)(aa) is June 18, 2018 (i.e., 30 months after the submission of Actavis's ANDA).

74.    The "(bb)" date under 21 U.S.C. §§ 355(j)(5)(D)(i)(I)(bb) is September 3, 2024 for U.S. Patent No. 8,309,569 and July 26, 2022 (i.e., 75 days after the entry of a final judgment) for each of the other patents that are the subject of a Paragraph IV Certification in Norwich's '370 ANDA.  No generic rifaximin tablets, 550 mg, for the treatment of IBS-D were marketed by any applicant before either of these dates.

75.    FDA granted Norwich's '369 ANDA tentative approval for the first time on June 2, 2023.

76.    Therefore, any eligibility for a 180-day exclusivity period based on any of the patents that are the subject of a Paragraph IV certification in Norwich's '370 ANDA has been forfeited with respect to rifaximin tablets, 550 mg, for the treatment of IBS-D in adults, as of these "(bb)" dates.  FDA's decision that Actavis maintained eligibility for a 180-day exclusivity

period notwithstanding these final, non-appealable judgments cannot stand; it is arbitrary and capricious and not made in accordance with the law.

77.    The statute also provides for forfeiture if an applicant fails to obtain tentative approval within 30 months after the date the application is filed.  21 U.S.C. § 355(j)(5)(D)(i)(IV).  The only exception to this is if the failure to timely obtain tentative approval must be "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."  FDA has interpreted this to mean that exclusivity will be preserved only if the "evidence demonstrates that there was a change in, or a review of, the requirements for approval and that the applicant was actively addressing issues related to the change in, or review of, approval requirements . . . and these efforts precluded tentative approval or final approval at that time." 180-Day Exclusivity Q&A Guidance, at 22.

78.    Relevant to Actavis's failure to market forfeiture based on a failure to obtain tentative approval, the January 10, 2025 Tentative Approval Letter concerning the '370 ANDA states as follows:

> Although FDA cannot disclose the identity of the first applicant, this letter reflects FDA's determination that an ANDA applicant is eligible for 180-day exclusivity that precludes FDA from granting final approval to your Rifaximin Tablets, 550 mg, at this time. Due to the regulatory restriction on disclosure of information in an unapproved ANDA, however, see 21 CFR 314.430(d)(1), we cannot provide you the basis or bases on which the Agency determined that the first applicant for Rifaximin Tablets, 550 mg, has not forfeited its eligibility for 180-day exclusivity because that analysis rests on information contained in an unapproved ANDA that cannot be disclosed. Nor can we provide our analysis of your argument regarding 21 CFR 314.107(c)(3), because that analysis also rests on information contained in an unapproved ANDA that cannot be disclosed.

79.    Actavis's ANDA was submitted on December 18, 2015, and has now gone more than nine years without ever obtaining tentative approval from FDA.  The 30-month deadline to

obtain approval, absent an extension, expired over six and a half years ago on June 18, 2018. By contrast, subsequent ANDA filers have obtained tentative approval in under 18 months. For example, Sandoz filed its ANDA No. 213713 on July 1, 2019. That ANDA received tentative approval on December 29, 2020, which is only 17 months and 29 days after filing the ANDA.

80.     FDA's determination that Actavis has maintained its eligibility for this exclusivity period, is excused from any obligation to timely obtain tentative approval, and effectively has an endless period to secure tentative approval for its ANDA is arbitrary and capricious and contravenes the purpose of the failure-to-obtain-tentative-approval provisions by creating a bottleneck on the availability of generic rifaximin tablets, 550 mg, for the treatment of IBS-D.

## NORWICH WILL SUFFER IRREPARABLE HARM
## ABSENT IMMEDIATE RELIEF FROM THIS COURT

81.     But for FDA's failure to give final approval to Norwich's '370 ANDA, Norwich's '370 ANDA product is positioned to enjoy a significant first-mover advantage in the generic rifaximin market for treating IBS-D. Unlike the earlier ANDA filers—Actavis, Sun, and Sandoz —Norwich did not settle with Salix for a 2028 entry but took on the burden and expense of litigating Salix's asserted patents through trial and appeal, succeeding in proving invalid the patents covering the rifaximin polymorph and the methods of treating IBS-D.

82.     Although Actavis, Sun, and Sandoz may enter the market sooner if Norwich's '370 ANDA product launches first, they will require time to obtain final approvals for their respective products, make the required launch preparations such as purchasing material and manufacturing product, and to otherwise abide by any conditions of their settlement agreements. Actavis and Sun have not even obtained tentative approval to market generic rifaximin 550 mg tablets. The four later ANDA filers—Amneal, Zydus, Cipla, and Carnegie— are subject to 30-month stays, and all except Amneal also lack tentative approval.

83.     Norwich's '370 ANDA product will thus have a *de facto* generic first-mover advantage if this Court orders FDA to correct its mistake and grant final approval to Norwich's '370 ANDA.  This advantage is highly valuable to Norwich and cannot be recouped through monetary damages or recaptured by later market entry.

84.     Furthermore, as the first generic alternative, Norwich's '370 ANDA product would stand to gain and maintain a significant larger share of the generic rifaximin market for IBS-D than if it launches as just one of several generic alternatives.  Such loss of market share constitutes irreparable harm.

85.     Still further, a period of marketing exclusivity provides a number of more intangible opportunities, including access to valuable customers and the accrual of industry prestige and goodwill.  The generic drug business is highly competitive and the large wholesalers prize the ability to offer newly-available generic drugs to their own customers and thus often aggressively pursue relationships with generic first-movers.  Loss of such goodwill and similar market opportunities that are difficult to quantify or adequately compensate constitutes irreparable harm.

## GRANTING A PRELIMINARY INJUNCTION WILL NOT SUBSTANTIALLY INJURE ANY INTERESTED PARTY

86.     In contrast to the significant and irreparable harm that Norwich will suffer absent preliminary relief, ordering FDA to grant final approval to Norwich's '370 ANDA would not cause substantial injury to FDA or any interested party.

87.     FDA's only interest here is in the correct implementation of the FDCA and the establishment of clear rules to guide the generic pharmaceutical industry.  *See* 21 U.S.C. § 393 (describing one of the objectives of FDA's agency plan as "maximizing the availability and clarity about the process for review of applications and submissions . . . made under [the

FDCA]"); *see also* 65 Fed. Reg. 67012, 67013 ("To strengthen its performance, FDA developed partnerships with stakeholders and stimulated cooperation and partnership by making its activities more understandable and accessible to stakeholders").  The prompt resolution of this suit in Norwich's favor thus promotes FDA's interests.

88.     There is likewise little or no risk of harm to Actavis.  Under the terms of its settlement with Salix, Actavis is barred from launching either its own generic or an authorized generic until January 2028 unless another ANDA filer obtains FDA approval and comes to market.  Actavis's ability to enter the market will therefore be accelerated if FDA is ordered to grant final approval to Norwich's '370 ANDA. The same is true for Sun and Sandoz.

89.     Actavis will also not lose any first-entry opportunity because the settlement agreements with Salix permit at least Sun and Sandoz to launch at the same time as Actavis.

## PRELIMINARY RELIEF WILL FURTHER THE PUBLIC INTEREST

90.     Granting Norwich's motion for a preliminary injunction will further the public interest by permitting Norwich's '370 ANDA product to open a generic market for rifaximin 550 mg tablets for the treatment of IBS-D.

91.     Generic competition for the IBS-D treatment will significantly lower prices for IBS-D patients and payors.  Data from FDA generally show that prices for a drug can drop by as much as 75% within a year of the first generic approval, and that the median price reduction for a single generic on the market is between 31% and 39%.  Thus, the availability of generic rifaximin for treating IBS-D serves the public interest by providing consumers increased access to cheaper, safe generic drugs.

92.     The FDCA is structured to give incentives to companies to file ANDAs so that lower-cost generic drugs are brought to market as soon as possible.  "[T]he public has an interest in receiving the benefit of ANDA-approved generic drugs as soon as those products can lawfully

come to market." *Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.*, 274 F. Supp. 2d 597, 614

(D.N.J.), *aff'd in relevant part*, 85 F. App'x 205 (Fed. Cir. 2003).

93.     The availability of generic rifaximin for treating IBS-D further serves the public

interest by providing a more diverse supply of drugs.  Without generic manufacturers, supplies of

that drug are susceptible to shortages if, for instance, the sole manufacturer encounters

"manufacturing and quality problems, delays, [or] discontinuations."  FDA, *Drug Shortages*

(June 27, 2024), www.fda.gov/drugs/drug-safety-and-availability/drug-shortages.

94.     The entry of Norwich's generic rifaximin product for treating IBS-D will increase

the number of sources, reducing the risk of shortages and helping to ensure that patients receive

the medication they need.  *See* FDA, *Generic Drugs Can Help Promote Health Equity*,

www.fda.gov/media/173765/download ("Generic drugs can help stabilize the supply of

medicines and reduce the risk of drug shortages.").

95.     Ensuring that FDA treats all ANDA applicants the same and interprets the FDCA

properly in this case is similarly beneficial to the public.  *See Bracco Diagnostics, Inc. v.

Shalala*, 963 F. Supp. 20, 30 (D.D.C. 1997*)* ("[r]equiring [FDA] to act lawfully is also very

much in the public interest."); *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 16 (D.D.C. 2002) ("[I]t

is clearly in the public interest to ensure that governmental agencies, such as the FDA, fully

comply with the law.").

## COUNT I
## (VIOLATION OF THE FDCA AND APA)

96.     Norwich repeats and realleges Paragraphs 1 to 95 of the Complaint.

97.     As set forth above, FDA improperly denied Norwich final approval of Norwich's

'370 ANDA to which it is entitled.

98.     In so doing, FDA has taken this final agency action without providing any reasoned basis for its decision.  Actavis has failed to market its ANDA product by the dates established under 21 U.S.C. § 355(j)(5)(D)(i)(I) for each exclusivity-bearing patent with respect to Norwich.

99.     Actavis has failed to obtain tentative approval of its ANDA prior to the statutory 30-month forfeiture deadline, and no statutory exception to forfeiture applies.  See 21 U.S.C. § 355(j)(5)(D)(i)(IV).

100.    Because Actavis has forfeited its right to any 180-day period of marketing exclusivity, FDA's final decision that any exclusivity period blocks approval of Norwich's '370 ANDA final approval is arbitrary, capricious, and contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C), and in violation of the FDCA.

101.    FDA's final decision that Actavis has maintained its right to the 180-day exclusivity period and to deny Norwich's '370 ANDA final approval constitutes final agency action for which Norwich is entitled to judicial review and relief under the APA.

102.    The loss of the first-mover advantage for Norwich's '370 ANDA Product will cause irreparable harm and is contrary to the public interest.

103.    Norwich has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Norwich Pharmaceuticals, Inc. requests this Court to enter judgment in its favor and against Defendants Dorothy Fink, in her official capacity as Acting Secretary of Health and Human Services; Sara Brenner, in her official capacity as Acting Commissioner of Food and Drugs; and the United States Food and Drug Administration as follows:

A.      Entry of judgment declaring that the FDA's denial of final approval for Norwich's
        '370 ANDA is arbitrary, capricious, and contrary to law;

B.      Entry of judgment declaring that the FDA's decision that Actavis has not forfeited
        the 180-day exclusivity period with respect to Norwich's '370 ANDA, is
        arbitrary, capricious, and contrary to law;

C.      Entry of an injunction directing FDA to determine that Actavis has forfeited the
        180-day exclusivity with respect to Norwich's '370 ANDA;

D.      Entry of an injunction directing FDA to grant final approval to Norwich's '370
        ANDA; and

E.      Such other and further relief as this Court deems just and proper.


Dated: February 7, 2025                 Respectfully submitted,

                                        /s/*Matthew S. Murphy*
                                        Matthew S. Murphy (DDC Bar No. CT0025)
                                        AXINN, VELTROP & HARKRIDER LLP
                                        90 State House Square
                                        Hartford, CT 06103
                                        Phone: (860) 275-8100
                                        Fax: (860) 275-8101
                                        mmurphy@axinn.com

                                        William B. Schultz (D.C. Bar No. 218990)
                                        Margaret M. Dotzel (D.C. Bar No. 425431)
                                        ZUCKERMAN SPAEDER LLP
                                        1800 M Street NW, Suite 1000
                                        Washington, DC 20036
                                        Tel: (202) 778-1800
                                        Fax: (202) 822-8106
                                        wschultz@zuckerman.com
                                        mdotzel@zuckerman.com

                                        *Attorney for Plaintiff Norwich*
                                        *Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on February 7, 2025, a copy of the foregoing **AMENDED**

**COMPLAINT** and attachments thereto, filed through the Court's CM/ECF system, was caused

to be served upon the following individuals by electronic mail:

GABRIEL I. SCHONFELD
Consumer Protection Branch
Civil Division
U.S. Department of Justice
PO Box 386
Washington, DC 20044-0386
(202) 353-1531
Gabriel.I.Schonfeld@usdoj.gov

Brian T Burgess
GOODWIN PROCTER LLP
1900 N St NW
Washington, DC 20036
(202) 346-4000
BBurgess@goodwinlaw.com

Colin Sellers Harris
Jason Robert Scherr
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5071
colin.harris@morganlewis.com
jr.scherr@morganlewis.com

/s/*Matthew S. Murphy*
Matthew S. Murphy (DDC Bar No. CT0025)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
T: (860) 275-8100
F: (860) 275-8101
mmurphy@axinn.com

*Attorney for Plaintiff Norwich*
*Pharmaceuticals, Inc.*

**JA41**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORWICH PHARMACEUTICALS, INC., | |
| *Plaintiff,* | |
| v. | |
| DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services, | |
| SARA BRENNER, in her official capacity as Acting Commissioner of Food and Drugs, | |
| and | |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, | Civil Action No. 1:25-cv-91 |
| *Defendants,* | ███████████████ |
| and | |
| TEVA PHARMACEUTICALS USA, INC., | |
| *Intervenor-Defendant,* | |
| and | |
| SALIX PHARMACEUTICALS, INC. | |
| *Intervenor-Defendant.* | |

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY
<u>INJUNCTION, NOW TREATED AS A MOTION FOR SUMMARY JUDGMENT</u>**

**JA42**

## **INTRODUCTION**

Norwich Pharmaceuticals, Inc. ("Norwich") has submitted Abbreviated New Drug Application ("ANDA") No. 214370 ("the '370 ANDA") to the U.S. Food and Drug Administration ("FDA"), seeking authorization to market generic rifaximin 550 mg tablets for the treatment of irritable bowel syndrome with diarrhea ("IBS-D") ("Norwich's ANDA Product"). On January 10, 2025, despite Norwich having cleared a path through the thicket of patents owned by Intervenor-Defendant Salix Pharmaceuticals, Inc. ("Salix") and the '370 ANDA meeting every technical and scientific requirement for approval, FDA refused to grant final approval to the '370 ANDA. Instead, FDA granted only tentative approval based on its incorrect determination that Actavis Laboratories FL Inc. ("Actavis")[1] has not forfeited any eligibility for 180-day generic marketing exclusivity as the first applicant to submit an ANDA for a generic version of Salix's Xifaxan® 550 mg tablets.

Actavis submitted its ANDA in 2015, and it has now languished in FDA's offices for over *nine years* without obtaining even tentative approval. Actavis's failure to move its ANDA to approval is shocking but not surprising. Unlike Norwich, Actavis chose to settle the patent infringement suit brought by Salix for a 2028 market entry date with either Actavis's own generic drug (if ever approved) *or* with an authorized generic version of Xifaxan that relies only on Salix's already-approved drug application. The settlement thus permits Actavis to launch a generic product prior to the expiration of Salix's patents without ever obtaining FDA approval for its ANDA. And as long as Actavis's 180-day marketing exclusivity remains protected, that exclusivity maintains Salix's multi-billion dollar monopoly on rifaximin 550 mg tablets.

---

[1] Actavis is an indirect, wholly owned subsidiary of Intervenor-Defendant Teva Pharmaceuticals USA, Inc. FDA refers to Actavis throughout the Administrative Record and this memorandum will do the same to avoid confusion.

of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:

> (AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

> (BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

> (CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

21 U.S.C. § 355(j)(5)(D)(i)(I).

The failure to obtain tentative approval provision is as follows:

(IV)  Failure to obtain tentative approval.—

> The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

21 U.S.C. § 355(j)(5)(D)(i)(IV).  An exception to the 30-month deadline for obtaining tentative approval is when the first applicants' failure to do so was "caused by a change in or review of" the approval requirements imposed after the ANDA was filed.  *Id.*  In addition, the statute provides that if "approval of the [first applicant's ANDA] was delayed because of a [citizen] petition, the 30-month period . . . is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition[.]"  21 U.S.C. § 355(q)(1)(G).

### c.    *Tentative approval*

When FDA deems that an ANDA is eligible for final approval but for unexpired Orange Book patents or exclusivities, FDA will instead grant the application tentative approval.  *See*

ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs, at 4 (Sept. 2020).[5]  But, "[a] drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter[.]"  21 C.F.R. § 314.3(b).  As such, "tentative approval does not allow the applicant to market [its] generic drug product."  Drugs@FDA Glossary of Terms, U.S. Food and Drug Admin. (Nov. 14, 2017).[6] Tentative approval therefore "delays final approval of the generic drug product until all patent or exclusivity issues have been resolved."  *Id*; 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd).

## II.    FACTUAL BACKGROUND

### A.    <u>Salix's Xifaxan and Orange Book Patents</u>

Salix is the holder of NDA No. 021361 ("Salix's NDA") for rifaximin tablets marketed under the brand name Xifaxan, which is currently the only rifaximin product available on the market.  *See* Orange Book, 45th Edition, at 3-414 (Jan. 2025).[7]  In 2004, FDA approved Xifaxan 200 mg tablets, which are indicated for the treatment of Travelers diarrhea.  In 2010, FDA also approved supplemental new drug applications for Xifaxan 550 mg tablets for the treatment of IBS-D in adults ("the IBS-D Indication") and for the reduction of the risk of overt hepatic encephalopathy ("HE") recurrence in adults ("the HE Indication").

The cost of Xifaxan 550 mg tablets is astounding.  According to GoodRx, a 14-day course of treatment (totaling 42 Xifaxan- 550 mg tablets) for IBS-D retails for between $2,611 to $3,105.[8]

---

[5] *Available at* https://www.fda.gov/media/119718/download (last visited February 7, 2025).
[6] *Available at* https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms. (last visited February 7, 2025).
[7] *Available at* https://www.fda.gov/media/71474/download (last visited February 7, 2025).
[8] GOODRX: XIFAXAN, https://www.goodrx.com/xifaxan?form=tablet&dosage=550mg&quantity =42&label_override=xifaxan (last visited February 7, 2025).

**B.**    **Actavis Submits the First ANDA with Xifaxan as the RLD and Agrees With Salix to Not Market a Generic Until 2028**

On December 18, 2015, Actavis submitted ANDA No. 208959 for Rifaximin Tablets, 550 mg.  FDA_00013.  Actavis's ANDA was the first to be submitted with Xifaxan as RLD and it contained Paragraph IV certifications to twenty-two patents listed in the Orange Book for Xifaxan.  *Id.*  Twelve of these patents have since expired.  FDA_00014 n.20.  According to FDA, Actavis qualified as the sole "first applicant" for Rifaximin Tablets, 550 mg, and is therefore eligible for the generic 180-day marketing exclusivity.  FDA_00014.

In September 2018, Actavis settled its patent litigation with Salix, Bausch Health Ireland Ltd., and Alfasigma S.p.A, the holders of the Orange Book-listed patents.  *See* Press Release, Bausch Health, Bausch Health Announces Resolution of XIFAXAN® Intellectual Property Litigation (Sep. 12, 2018).[9]  Under the terms of the settlement agreement, Actavis abandoned its patent challenges.  In return, Actavis received a royalty-free license, effective on January 1, 2028, to market its ANDA product (if approved), or, alternatively, contracted for the option to launch an "authorized generic" – an unbranded version of Xifaxan marketed under Salix's NDA[10] – instead of selling its own generic ANDA product.  *Id.*  In other words, Actavis agreed to not enter the market for more than *twelve years* after it filed its ANDA with FDA.

**C.**    **Actavis Fails to Obtain Approval for More Than Nine Years**

███████████████████████████████████████████████████████████████ (and still does not). ██████████████████████████████████████████████████

---

[9] https://ir.bauschhealth.com/tools/viewpdf.aspx?page={3862BA6E-F366-4B8B-80DA-7507A2665FC1} (last visited February 7, 2025).

[10] Food and Drug Administration *FDA List of Authorized Generics Drugs*, WWW.FDA.GOV, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs (explaining that an "'authorized generic' drug is most commonly used to describe an approved brand name drug that is marketed without the brand name on its label.") (last visited February 7, 2025).

forfeiture provision) to argue that a failure to market forfeiture event occurred here."). FDA

offers no justification or rationale for this position, which is contrary to the "fundamental canon

of statutory construction that the words of a statute must be read in their context . . . ." *Brown*,

529 U.S. at 133.

**C.    FDA's Decision Here Is Inconsistent With Its Past
        Interpretation of "Such a Certification" in Subparagraph (B)(iv)**

As shown below, assigning 180-day exclusivity in relation to a subsequent application

was a feature of the original Hatch-Waxman Act that remained unchanged by the MMA

amendments:

| Subparagraph (B)(iv) – Pre-MMA | Subparagraph (B)(iv) – Post-MMA |
|---|---|
| If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection continuing (*sic*) *such a certification*, the application shall be made effective not earlier than one hundred and eighty days after—<br><br>(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or<br><br>(II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,<br><br>  whichever is earlier. | Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing *such a certification*, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant. |

21 U.S.C. § 355(j)(5)(B)(iv) (Dec. 3, 2003) (emphasis added); 21 U.S.C. § 355(j)(5)(B)(iv)

(emphasis added). And like the current statute, the pre-MMA version used the phrase "such a

certification" to provide the requirement that the first and subsequent application must have the same Paragraph IV certification.

In its pre-MMA regulation, FDA interpreted this language as requiring Paragraph IV certifications to the "same patent" for the 180-day exclusivity to be effective:

> (c) Subsequent abbreviated new drug application submission. (1) If an abbreviated new drug application *contains a certification* that a relevant patent is invalid, unenforceable, or will not be infringed and the application is for a generic copy of the same listed drug for which one or more substantially complete abbreviated new drug applications were previously submitted containing *a certification that the same patent* was invalid, unenforceable, or would not be infringed, approval of the subsequent abbreviated new drug application will be made effective no sooner than 180 days from whichever of the following dates is earlier . . .

21 C.F.R. § 314.107(c)(1) (April 1, 2003) (emphasis added).[14]  FDA thus plainly (and correctly) interpreted "such a certification" in the statute to mean a matching Paragraph IV certification. Indeed, FDA applied this interpretation in a series of determinations that approval of a subsequent ANDA was not blocked by a 180-day exclusivity in the absence of matching Paragraph IV certifications.[15]  *See also TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 73 n.2 (D.D.C. 2003), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004) ("FDA has clarified that the exclusivity provision delays the approval only of later-submitted

---

[14] The regulation further stated that "[f]or purposes of paragraph (c)(1) of this section, the 'applicant submitting the first application' is the applicant that submits an application that is both substantially complete and contains a [Paragraph IV Certification] prior to the submission of any other application for the same listed drug that [ ] *contains the same certification*."  21 C.F.R. § 314.107(c)(2) (April 1, 2003) (emphasis added).

[15] *See* Murphy Decl., Ex. 10, at 7 ("In the absence of a subsequently submitted Paragraph IV certification to the '570  patent, the applicant is not eligible for 180-day exclusivity as to that patent under Section 505(j)(5)(B)(iv)."); Murphy Decl., Ex. 11, at 3 ("the statute appears to apply exclusivity specifically with respect to an ANDA containing a paragraph IV certification for a patent for which a previous paragraph IV certification has been received for the same patent."); Murphy Decl., Ex. 12, at 4 ("the TorPharm ANDA and at least one subsequent ANDA would have to contain paragraph IV certifications to the '479 patent for there to be any exclusivity as to this patent.").

ANDAs containing a paragraph IV certification to *the same patent* to which a previous applicant has already offered such a certification.")

In its memorandum addressing Actavis's eligibility for 180-day exclusivity, FDA offers no explanation for departing from its prior interpretation of "such a certification" in the statute. And no reasonable explanation exists. As already discussed, the MMA amendments did not change the relevant language. It is a well-settled principle of statutory interpretation that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Congress is therefore assumed to have adopted FDA's interpretation of "such a certification" to mean a matching Paragraph IV certification when it retained that language in the MMA amendments.

That presumption is fully aligned with the central purpose of the MMA's amendments to the 180-day exclusivity provisions, which was to curtail the misuse and proliferation of such exclusivity. For example, prior to the MMA there was a recognition of a growing problem that "private agreements between companies [] had potential to thwart the Hatch–Waxman incentive system through 'parking,' an agency term for when ANDA applicants entitled to the 180–day period of exclusivity agree to avoid triggering that exclusivity and thereby stall the approval of any other pending ANDAs." *Mylan Pharms., Inc. v. Sebelius*, 856 F. Supp. 2d 196, 212 (D.D.C. 2012). The MMA forfeiture provisions sought to remedy this "bottlenecking" problem. *See* 149 Cong. Rec. S15746, (Statement of Sen. Charles Schumer) (noting that amendments to MMA would prevent "abuse[] [of the] exclusivity period—both through collusive agreements and use of other tactics that allow the provision to act as a bottleneck to generic competition."). Thus, the purpose of the amended forfeiture provisions was to reduce the potential of 180-day

*Contains Nonbinding Recommendations*

**Draft Guidance on Rifaximin**

---

This draft guidance, once finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the Office of Generic Drugs.

---

**Active ingredient:**       Rifaximin

**Form/Route:**            Tablet/Oral

**Recommended studies:**    3 studies

1.  Type of study: Fasting Bioequivalence (BE) Study with Pharmacokinetic (PK) endpoints
    Design: Single-dose, two-way crossover in-vivo
    Strength: 550 mg
    Subjects: Healthy males and nonpregnant females, general population.
    Additional Comments: Applicants may consider using a reference-scaled average bioequivalence approach for rifaximin. If using this approach, please provide evidence of high variability in the bioequivalence parameters of AUC and/or Cmax (i.e., within-subject variability $\geq 30\%$). Please refer to the Progesterone Capsule Draft Guidance for additional information regarding highly variable drugs.

---

2.  Type of study: Fed BE Study with Pharmacokinetic (PK) endpoints
    Design: Single-dose, two-way crossover in-vivo
    Strength: 550 mg
    Subjects: Healthy males and nonpregnant females, general population.
    Additional Comments: Please also see additional comment above.

---

3.  Type of study: BE Study with Clinical Endpoint
    Design: Randomized, double blind, parallel, placebo controlled in vivo
    Strength: 200 mg (dose: three times daily for 3 days)
    Subjects: Male and nonpregnant female subjects with traveler's diarrhea
    Additional Comments:
    (1) For details on the design of BE study with clinical endpoint please refer to the Rifaximin Draft Guidance, 200-mg strength.
    (2) The formulation of the 550-mg strength should be proportionally similar to that of the 200 mg strength.

---

**Analytes to measure (in appropriate biological fluid):** Rifaximin in plasma

**Bioequivalence based on (90% CI):** Rifaximin

**Waiver request of *in-vivo* testing:** Not applicable

*Recommended Feb 2012*

FDA_00029

*Contains Nonbinding Recommendations*

**Draft Guidance on Rifaximin**

This draft guidance, once finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public.  You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations.  If you want to discuss an alternative approach, contact the Office of Generic Drugs.

**Dissolution test method and sampling times:** Please note that a **Dissolution Methods Database** is available to the public at the OGD website at http://www.fda.gov/cder/ogd/index.htm.  Please find the dissolution information for this product at this website.  Please conduct comparative dissolution testing on 12 dosage units each of all strengths of the test and reference products.  Specifications will be determined upon review of the application.

*Recommended Feb 2012*

FDA_00030

# BakerHostetler

**Baker & Hostetler LLP**

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304

October 17, 2016

T 202.861.1500
F 202.861.1783
www.bakerlaw.com

Lance L. Shea
direct dial: 202.861.1648
lshea@bakerlaw.com

0547

16

OCT 17

P3 :20

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, rm. 1061
Rockville, MD 20852

### Re:  Salix Pharmaceuticals, Inc. Citizen Petition

To Whom It May Concern:

On behalf of Salix Pharmaceuticals, Inc. ("Salix"), we submit the attached Citizen
Petition requesting that the Commissioner of the United States Food and Drug
Administration refrain from approving any abbreviated new drug application submitted
under Section 505(j) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j),
referencing any strength of Xifaxan® as the reference listed drug, unless such approval is
in full accordance with the actions requested in the Petition.

This Petition is a new filing, separate and distinct from Salix's citizen petition dated May
14, 2008 and assigned docket FDA-2008-P-0300 (filed on May 15, 2008). Although FDA
issued an interim response, the 2008 citizen petition has never been answered.

This Petition is being submitted under Section 505 of the Federal Food, Drug, and
Cosmetic Act, 21 U.S.C. § 355, and in accordance with 21 C.F.R. § 10.30. In order to
protect confidential trade secret information addressed by 21 C.F.R. § 20.61, this
redacted version of the Petition is being filed along with publicly available references,
initially. Once FDA acknowledges receipt of the Petition and provides a docket number,
Salix will submit a non-redacted, confidential version of the Petition and a full set of
references.

Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Denver
Houston    Los Angeles    New York    Orlando    Philadelphia    Seattle    Washington, DC

**FDA_00039**

**JA52**

Should you have any questions regarding this Petition, please do not hesitate to contact the undersigned.

Sincerely,

Lance L. Shea
Partner

**FDA_00040**

## CITIZEN PETITION

The undersigned submits this petition under Section 505(j) of the Federal Food, Drug, and Cosmetic Act to request the Commissioner of Food and Drugs to refrain from approving any abbreviated new drug application submitted under Section 505(j) of the Federal Food, Drug, and Cosmetic Act referencing any strength of Xifaxan® as the reference listed drug, unless such approval is in full accordance with the actions requested herein.

Salix Pharmaceuticals, Inc.

October 17, 2016

**FDA_00041**

**JA54**

███████████

**TABLE OF CONTENTS**

Page

I.  Actions Requested ............................................................................................................. 1

II. Statement of Grounds ....................................................................................................... 3

   A. Executive summary........................................................................................................ 3

   B. Legal grounds................................................................................................................. 6

      1.  Statement of the issue ............................................................................................. 6

      2.  Section 505(j) approval criteria .............................................................................. 7

         a.  The sameness of active ingredient criterion................................................... 8

         b.  The sameness of strength criterion .............................................................. 10

         c.  The bioequivalence criterion........................................................................ 12

   C. Technical grounds........................................................................................................ 14

      1.  Technical facts ...................................................................................................... 14

         a.  Description of Xifaxan®............................................................................... 14

         b.  Rifaximin crystallizes into different polymorph forms, depending on
            manufacturing methods and controls............................................................ 15

         c.  Xifaxan® has a specific polymorph profile.................................................. 16

         d.  *In vitro* dissolution results generated in media containing sodium dodecyl
            sulphate ("SDS") are unsuitable surrogates for *in vivo* solubility
            performance of Proposed Generics,         **Redacted**
                                                or produce results
            relevant to *in vivo* performance: bio-relevant media that distinguish
            between polymorph forms must be used. ..................................................... 18

         e.  Rifaximin polymorphs differ in aqueous solubility, each from the other... 20

         f.  The *in vivo* availability of dissolved rifaximin is polymorph driven.......... 26

           (i)  Free fluid volumes in the gastric and proximal small intestine
              affect rifaximin polymorph solubility.................................................. 26

           (ii)  The soluble concentration of rifaximin in the upper small intestine
              is a function of the polymorph forms present in the Drug Product. ..... 27

         g.  Xifaxan® is poorly soluble *in vivo*. .............................................................. 27

-i-

**TABLE OF CONTENTS**
(continued)

Page

h.

**Redacted** ............................................. 28

i. Xifaxan® virtually is unabsorbed into the systemic circulation ................. 30

j. Rifaximin absorption is solubility-limited,    **Redacted** ........................................................................ 30

k. Rifaximin absorption is not consistent between polymorphs, **Redacted** ............................................. .... 32

l. The site of systemic absorption of Xifaxan®

**Redacted** ......... 37

m. A Proposed Generic formulated **Redacted** could meet the *Draft Rifaximin Bioequivalence Guidance Documents'* bioequivalence endpoints, but be less potent at topical sites of action in the GI lumen ...... 40

n. Higher Solubility Polymorphs pose the risk of oral contraceptive failure from drug-drug interaction and related teratogenicity, especially in HE and IBS-D patients. ..................................................................... 42

(i) Rifaximin as a PXR activator ............................................... 43

(ii) Xifaxan® in clinical CYP3A4 induction drug-drug interaction studies .................................................................................. 43

o. Different Polymorph Proposed Generics composed of Higher Solubility Polymorphs pose the risk of systemic antibiotic resistance in all users; also, Different Polymorph Proposed Generics composed of Lower Solubility Polymorphs pose the risk of systemic antibiotic resistance in HE patients. ................................................................................ 46

p. Different Polymorph Proposed Generics pose the risk of harming diversity of the healthy colonic microbiome. ............................................ 48

2. Application of technical facts .......................................................... 52

a. For approved Xifaxan® indications, potency of a finished rifaximin drug product depends on the polymorph of which its active ingredient is composed, because the bioavailability of dissolved rifaximin is polymorph-specific. ..................................................................... 52

-ii-

FDA_00043

**JA56**

**TABLE OF CONTENTS**
(continued)

Page

(i) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of TD. .................................................. 55

(ii) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of HE. .................................................. 57

(iii)Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of IBS-D. ............................................. 58

b. Potency of the finished rifaximin drug product also depends on fasted/fed conditions **Redacted** because bile acids in the proximal small bowel affect solubility, **Redacted**
............................................................ 59

c. PK parameters are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan®, because Xifaxan® acts topically, is poorly soluble and poorly absorbed, **Redacted**
............................................. 59

d. *In vitro* dissolution results generated in media containing SDS are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics, because that methodology cannot **Redacted** produce results relevant to *in vivo* performance: biologically relevant conditions that distinguish between polymorph forms must be tested. ................................................................... 59

D. Application of legal and technical facts.................................................... 60

1. FDA can lawfully approve ANDAs for Identical Polymorph Proposed Generics, but only if the criteria requested in this Petition are satisfied........... 60

2. Different Polymorph Proposed Generics cannot be demonstrated to meet the sameness of active ingredient, sameness of strength or bioequivalence criteria, because testing technology needed to make those demonstrations does not exist. ...................................................................................................... 60

3. FDA cannot lawfully approve ANDAs for Different Polymorph Proposed Generics, because they cannot meet the sameness or bioequivalence criteria . 61

4. FDA can lawfully approve ANDAs for Non-Q1/Q2 Identical Polymorph Proposed Generics, but only where appropriately designed bioequivalence studies with clinical endpoints are successfully completed.............................. 61

-iii-

**FDA_00044**

**JA57**

**TABLE OF CONTENTS**
(continued)

Page

a.  Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed
    Generics to Xifaxan® 200 mg indicated for treatment of TD. .................... 62

b.  Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed
    Generics to Xifaxan® 550 mg indicated for treatment of HE. .................... 64

c.  Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed
    Generics to Xifaxan® 550 mg indicated for treatment of IBS-D. ............... 65

5.  Failure to grant the actions requested in this Petition will pose substantial
    public health risks. ........................................................................................... 65

E.  Conclusion ................................................................................................................... 66

III. Environmental Impact............................................................................................................ 67

IV. Economic Impact .................................................................................................................... 67

V.  Certification ............................................................................................................................. 67

FDA_00045

JA58

**LIST OF TABLES**

Table 1:    Aqueous Solubility **Redacted** in Various Media

Table 2:    Solubility of Rifaximin Forms in Various Media Under Saturation Conditions

Table 3:    Kinetics of Xifaxan® 200 mg Tablet Contents Transit in the Upper GI Tract

Table 4:    Mean (±SD) Plasma PK Parameters of Rifaximin 550 mg **Redacted**

Table 5:    Dog PK Parameters                **Redacted**

Table 6:    Study of Bioavailability of the Crystalline Forms of Rifaximin in Dogs. Mean ± S.E.M. of the PK Parameters After Oral Administration of 100 mg kg-1 (n=4)

Table 7:    Tmax and Cmax for Various Rifaximin Dosage Forms

Table 8:                    **Redacted**

Table 9:                    **Redacted**

Table 10:                   **Redacted**

Table 11:   Summary of Efficacy Results of All Patients Enrolled in the Traveler's Diarrhea Study Comparing Rifaximin, Ciprofloxacin and Placebo

Table 12:   Clinical Response in Study 1 (ITT population)

FDA_00046

**JA59**

████████████████

## LIST OF FIGURES

Figure 1:       Rifaximin Polymorphic Forms in the Drug Substance.  XRPD analysis
                of six rifaximin API batches (top 6 profiles).

Figure 2:       Xifaxan® Polymorph Profile Across Multiple Manufacturing Lots of
                the Xifaxan® Finished Tablet Product.

Figure 3:       Xifaxan® 550 mg Tablet Dissolution          **Redacted**

Figure 4:       Kinetic Solubility of Different Forms of Rifaximin      **Redacted**

Figure 5:       Kinetic Solubility of Different Forms of Rifaximin    **Redacted**

Figure 6:       Kinetic Solubility of Different Forms of Rifaximin      **Redacted**

Figure 7:       Kinetic Solubility of Different Forms of Rifaximin      **Redacted**

Figure 8:       Kinetic Solubility of Different Forms of Rifaximin      **Redacted**

Figure 9:       Kinetic Solubility of Different Forms of Rifaximin    **Redacted**

Figure 10:      Gastric (A) and Small Bowel (B) Fluid Volumes After Ingestion of
                240mL of Water

Figure 11:      Schematic of Rifaximin Polymorph Formation and Inter-conversion

Figure 12:      Kinetic Solubility of Different Forms of Rifaximin      **Redacted**

Figure 13:                              **Redacted**

Figure 14:      PK Profile of                 **Redacted**
                                              **Redacted**

Figure 15:                              **Redacted**

-vi-

FDA_00047

**JA60**

Figure 16:    Plasma PK Profiles of                    **Redacted**

Figure 17:                              **Redacted**

Figure 18:    Solubility of Rifaximin in the Presence of Increasing Concentrations of
              a Mixture of Synthetic Bile Acids

Figure 19:    Growth of ETEC Strain H10407 in the Presence of and Absence of 16
              ug/mL Rifaximin and the Indicated Bile Acids at a Concentration of 4
              mM

-vii-

**FDA_00048**

## ACTIONS REQUESTED AND STATEMENT OF GROUNDS

### I.    Actions Requested

Salix Pharmaceuticals, Inc. ("Salix") requests that FDA require, at a minimum, the following criteria be satisfied for approval of any ANDA submitted for a drug (a "Proposed Generic") that references either strength and any indication of Xifaxan® as the RLD:

- Characterization studies must demonstrate that the Proposed Generic's active ingredient is identical in rifaximin polymorph profile to that of the Xifaxan® active ingredient (an "Identical Polymorph Proposed Generic");

- For any Identical Polymorph Proposed Generic that is formulated with excipients that are qualitatively the same ("Q1") and quantitatively the same ("Q2") to those in Xifaxan®:

  - ○    Bioequivalence studies with pharmacokinetic ("PK") endpoints conducted under both fed and fasted conditions must demonstrate that the systemic absorption of the active ingredient from the Proposed Generic formulation is not greater than that of Xifaxan®;

  - ○    A bioequivalence study with PK endpoints must establish that the Proposed Generic Formulation does not cause a clinically significant drug-drug interaction with oral contraceptives; and,

  - ○    *In vitro* dissolution testing must demonstrate that the dissolution rate of the Proposed Generic does not differ from that of Xifaxan® by simulating *in vivo* drug release in different portions of the gastrointestinal ("GI") tract using multiple dissolution media at different pH values and with different surfactant levels.

- For any Identical Polymorph Proposed Generic that is not Q1/Q2 to the referenced Xifaxan® product ("Non-Q1/Q2 Identical Polymorph Proposed Generic"):

  - ○    Bioequivalence studies with PK endpoints conducted under both fed and fasted conditions must demonstrate that the systemic absorption of the active ingredient from the Proposed Generic formulation is not greater than that of Xifaxan®;

  - ○    A bioequivalence study with PK endpoints must establish that the Proposed Generic Formulation does not cause a clinically significant drug-drug interaction with oral contraceptives;

1

FDA_00049

**JA62**

o    *In vitro* dissolution testing must demonstrate that the dissolution rate of the Proposed Generic does not differ from that of Xifaxan® by simulating *in vivo* drug release in different portions of the GI tract using multiple dissolution media at different pH values and with different surfactant levels; and,

o    Bioequivalence studies with clinical endpoints must demonstrate bioequivalence at topical sites of action in the GI tract as follows:

▪    For a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 200 mg indicated for treatment of Traveler's Diarrhea ("TD"), bioequivalence studies that include Time to Last Unformed Stool ("TLUS") and declaration of clinical cure endpoints, and non-inferiority margins set in accordance with non-inferiority principles;

▪    For a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of hepatic encephalopathy ("HE"), bioequivalence studies with inclusion criteria and clinical endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the HE indication, and non-inferiority margins set in accordance with non-inferiority principles; or,

▪    For a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of irritable bowel syndrome with diarrhea ("IBS-D"), if the above-mentioned clinical endpoint studies of Xifaxan® 550 mg were not done for the HE indication: bioequivalence studies with inclusion criteria and endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the IBS-D indication, and non-inferiority margins set in accordance with non-inferiority principles.

If all above-listed criteria are not satisfied, Salix requests that FDA refrain from approving the ANDA.

Salix requests that FDA revise the *Draft Rifaximin Bioequivalence Documents*[1] to incorporate the above-listed criteria, at a minimum.

---

[1] FDA, DRAFT GUIDANCE ON RIFAXIMIN (200 MG) (Nov. 2011) [hereinafter *200mg Draft Bioequivalence Guidance*]; FDA, DRAFT GUIDANCE ON RIFAXIMIN (550 MG) (Feb. 2012) [hereinafter *550mg Draft Bioequivalence Guidance*].

2

FDA_00050

## II.    Statement of Grounds

### A.    Executive summary

Xifaxan[®] is an antibiotic drug that acts topically in the GI tract. In addition to treatment of IBS-D,[2] Xifaxan[®] is approved for the reduction in risk of overt HE,[3] and treatment of TD.[4]

While most orally administered drugs work by being rapidly and extensively dissolved in the GI tract and absorbed into the systemic circulation where they are carried to sites of action, Xifaxan[®] operates very differently: it is an antibiotic drug that acts topically in the GI tract to affect bacterial growth and metabolism, and other activities in the GI tract. In that application, characteristics of its active ingredient – characteristics that are unusual for orally administered drugs – raise issues for approval of Proposed Generics.

Xifaxan[®] is unlike most other orally administered drugs. First, it does not work by being absorbed into the bloodstream. Instead, it works by remaining in the GI tract and being carried to topical sites of action along and within shallow layers of the intestinal lining. Thus, the blood levels of its active ingredient, rifaximin, give little information about the rate and extent of rifaximin presence at the topical sites of action. Tablet dissolution and PK studies cannot demonstrate that a generic version of Xifaxan[®] is bioequivalent to Xifaxan[®]. Additionally, those sites of action have not been identified and, even if they were identified, rifaximin presence at those sites cannot be measured directly with currently available technology.

#### Redacted

Redacted              [5] In fact, Xifaxan[®] is an extreme version of a Class 4 molecule under the Biopharmaceutics Classification System ("BCS").[6]

For most drugs, different polymorph forms of the active ingredient molecule behave similarly as to solubility and absorption. For those drugs, it often can be inferred that a generic version satisfies the sameness requirement of Section 505(j) of the Federal Food, Drug, and Cosmetic Act ("FDCA" or "Act") as long as the generic active ingredient is

---

[2] "XIFAXAN[®] is indicated for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults." Xifaxan[®] Prescribing Information § 1.3 (Rev. 11/2015) [hereinafter *Xifaxan[®] PI*].

[3] "XIFAXAN[®] is indicated for reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults." *Xifaxan[®] PI* § 1.2.

[4] "XIFAXAN[®] is indicated for the treatment of travelers' diarrhea (TD) caused by noninvasive strains of *Escherichia coli* in adults and pediatric patients 12 years of age and older." *Xifaxan[®] PI* § 1.1.

[5] **Redacted**

[6] *See* FDA, WAIVER OF IN VIVO BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES FOR IMMEDIATE-RELEASE SOLID ORAL DOSAGE FORMS BASED ON A BIOPHARMACEUTICS CLASSIFICATION SYSTEM: GUIDANCE FOR INDUSTRY (May 2015) [hereinafter *Draft Biowaiver Guidance*].

3

FDA_00051

the same molecule as pioneer active ingredient. For those drugs, molecular identity matters to approval instead of the polymorph form.

Again, Xifaxan® is not like most drugs. Several polymorph forms of rifaximin are available for drug formulation.[7] Each has different solubility characteristics. The polymorph profile of Xifaxan®'s active ingredient is **Redacted**

**Redacted**

Thus, the polymorph profile of the active ingredient matters greatly to approval of generic versions of Xifaxan®. Because the different rifaximin polymorphs will have different levels of bioavailability, they will have different drug potencies at topical sites of action and in the systemic circulation. For Xifaxan® indications, different rifaximin polymorph profiles are different drugs.

This fact raises efficacy and safety concerns. If the generic is less potent than Xifaxan®, there is a risk of lower efficacy at topical sites of action and development of antibiotic resistant bacteria in the GI tract. If the generic is more potent than Xifaxan®, there is a risk of different efficacy effects at topical sites of action. Moreover, there are several safety concerns from higher systemic potency: (1) toxicity in HE and IBS-D patients; (2) drug-drug interactions with oral contraceptives resulting in unwanted pregnancies, especially in IBS-D patients because many are women of childbearing age; and (3) development of antibiotic-resistant bacteria in body systems beyond the GI tract.

As discussed more fully below, the risk of toxicity in HE patients is posed by more soluble generics because those patients experience higher rifaximin levels in the bloodstream than healthy people. For example, when HE patients were given Xifaxan® in one study, they experienced **Redacted**

Use of a generic rifaximin polymorph that is more bioavailable than Xifaxan 's would be expected to push systemic exposures even higher. Although Xifaxan®'s safety profile has been good in HE patients, use of such a generic would raise the risk of toxicity and development of antibiotic resistance.

Risk of drug-drug interactions with oral contraceptives in IBS-D patients is posed because: (1) many IBS-D patients are women of childbearing age; (2) IBS-D patients absorb more rifaximin into the bloodstream than healthy people; and (3) rifaximin in the bloodstream can lower the effectiveness of certain oral contraceptives. For example, when IBS-D patients were given Xifaxan® in one study, **Redacted**

Although
Xifaxan does not increase the risk of oral contraceptive failure, use of a more bioavailable generic rifaximin polymorph could well increase the risk of contraceptive

---

[7] For discussion of rifaximin polymorph forms, see *infra* § II.C.1.b; for discussion of the Xifaxan® polymorph active ingredient, see *infra* § II.C.1.c.; for discussion of solubility differences between polymorphs, see *infra* § II.C.1.e

4

failure, hence unwanted pregnancies. That risk is concerning, because it is magnified in patients taking rifaximin, which has been identified as a dose-dependent teratogen.

Antibiotic resistance risk is posed to all patients because the rifaximin molecule is made from rifamycin. Many rifamycin drugs, such as rifampin, are rapidly absorbed into the bloodstream and used to treat diseases such as tuberculosis. Unfortunately, rifamycin drugs must be prescribed limitedly, as antibiotic resistance to them has been found to develop rapidly. Because of its poor bioavailability, Xifaxan® does not pose substantial risk of antibiotic resistance development in the GI tract or other body systems. This was shown by studies done to support applications for Xifaxan®'s marketing approval. To Salix's knowledge, the same has not been shown for other polymorphs of rifaximin that are available for drug formulation; the requisite testing has not been done.

Stated broadly, this Petition makes the following points:

- Only the Xifaxan® polymorph profile has been studied sufficiently for drug approval; its efficacy, safety and bioavailability have been demonstrated. Those criteria have not been demonstrated for the other rifaximin polymorph profiles.

- Different polymorph forms of rifaximin should be considered different drugs because they have different potencies at topical sites of action in the GI tract (raising efficacy differences) and in the systemic circulation (raising safety concerns). The sameness requirement cannot be met merely because the proposed generic active ingredient has the molecular identity of rifaximin: it must have the same polymorph profile as Xifaxan®.

- Methods to directly measure bioavailability of either Xifaxan® or Proposed Generics at topical sites of action in the GI tract do not exist.

- Tablet dissolution and PK studies provide evidence insufficient to support a finding that the bioequivalence requirement is satisfied for a generic form of Xifaxan®.

- Bioequivalence studies with clinical efficacy endpoints can give evidence to support a finding that the bioequivalence requirement is satisfied; however, such is far from sufficient evidence.

- A generic with an active ingredient polymorph profile different from Xifaxan® that is approved without adequate testing will pose substantial safety concerns.

For the reasons stated in this Petition, FDA should approve a generic version of Xifaxan® only where it has a polymorph profile identical to the Xifaxan® polymorph profile and FDA has sufficient evidence to find that the bioequivalence requirement is met. To that end, the Petition requests that FDA refuse to approve a generic version of Xifaxan® containing an active ingredient that is a rifaximin polymorph profile different from that of the Xifaxan® active ingredient. Further, it requests that FDA require different kinds of

5

FDA_00053

**JA66**

approval testing depending on certain characteristics of the Proposed Generic formulation that contains a polymorph profile identical to that of Xifaxan®.

Salix appreciates the challenges that the Division has attempted to address through the studies recommended in the *Draft Rifaximin Bioequivalence Guidance Documents*. Yet, because of Xifaxan®'s unusual polymorph-specific properties, those studies will not generate data sufficient to ensure that a Proposed Generic will be safe and effective for any currently approved Xifaxan® indication as it is alternated with or substituted for Xifaxan®.

FDA's approval of, and therapeutic equivalence determination with respect to any Proposed Generic that appears to be bioequivalent to Xifaxan® based on the Agency's current criteria, but that is nevertheless not equivalent to Xifaxan® because of insufficient testing, could jeopardize patient health. Additionally, FDA would likely have to downgrade any therapeutic equivalence rating for such a generic from "AB" to "BX," and subsequently seek withdrawal of approval.

This, of course, was the path FDA followed after the Agency determined, based on new bioequivalence information, that generic versions of Bupropion Hydrochloride Extended-Release Tablets, 300 mg, were not therapeutically equivalent to the RLD.[8] More recently, FDA found itself embroiled in long and costly litigation after the Agency downgraded, from "AB" to "BX," the therapeutic equivalence rating for a Methylphenidate HCl Extended-Release Tablets drug product after information showed that the generic was not bioequivalent to its RLD.[9] That litigation continues to this day on appeal to the Fourth Circuit.

Therefore, at a minimum, approval of an ANDA that references either strength and any indication of Xifaxan® as the RLD must be given pursuant to criteria set forth in the Actions Requested, *supra*. Failure to do so will pose real and substantial public health risks.[10]

**B.    Legal grounds**

**1.    Statement of the issue**

For the reasons elaborated *infra*, a Proposed Generic with an active ingredient that is different in polymorph profile to that of the Xifaxan® active ingredient (a "Different Polymorph Proposed Generic") cannot satisfy either the sameness or the bioequivalence

---

[8] *See* Watson Laboratories, Inc., Withdrawal of Approval of Buproplon Hydrochloride Extended-Release Tablets, 300 Milligrams, 79 Fed. Reg. 19,626 (Apr. 9, 2014) [hereinafter *Watson Laboratories Withdrawal*]; Impax Laboratories, Inc., Withdrawal of Approval of Bupropion Hydrochloride Extended-Release Tables, 300 Milligrams, 78 Fed. Reg. 16,685 (Mar. 18, 2013) [hereinafter *Impax Laboratories Withdrawal*].

[9] *See Mallinckrodt Inc. v. FDA*, No. 14-cv-3607 (D. Md. July 29, 2015), ECF. No. 47 [hereinafter *Mallinckrodt v. FDA*].

[10] Likewise, approval of a 505(b)(2) NDA referencing either strength and any indication of Xifaxan® must be given pursuant to the same criteria.

6

FDA_00054

requirements through currently available testing methods, and must seek approval through another regulatory pathway. This is because different polymorphic forms of rifaximin are, in the peculiar context of this BCS Class 4 antibiotic, not properly considered the same active ingredient as Xifaxan® and do not have the same potency (strength), either topically or systemically, when used to treat the indications for which Xifaxan® is approved.

In addition, an Identical Polymorph Proposed Generic cannot satisfy the Act's bioequivalence requirement, absent the testing requested in this Petition.

### 2.    Section 505(j) approval criteria

Under Section 505(j) of the Act,[11] FDA may approve an ANDA for a generic drug without direct evidence of the product's safety and effectiveness, relying instead on the Agency's prior finding that the RLD is safe and effective.

The core principle underlying the generic drug approval system is the assurance that a generic drug will be as safe and effective as the RLD and interchangeable with it.[12] Accordingly, FDA will not approve an ANDA unless it has met the following criteria:

- (1)    Sameness of the active ingredient;[13]

- (2)    Sameness of route of administration, dosage form or strength;[14]

- (3)    Bioequivalence;[15] and

- (4)    Adequacy of methods, or facilities and controls, to assure and preserve identity, strength, quality, and purity.[16]

As to the sameness criteria, a generic drug must be identical to the RLD in four statutory categories: (1) active ingredient; (2) route of administration; (3) dosage form; and (4)

---

[11] 21 U.S.C. § 355(j).

[12] FDA, APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS vii-viii (36th ed. 2016) [hereinafter "*Orange Book*"] ("FDA believes that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will have the same clinical effect and safety profile as the prescribed product.").

[13] 21 U.S.C. § 355(j)(4)(C)(i) ("[I]f the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug.").

[14] 21 U.S.C. § 355(j)(4)(D)(i) ("[I]f the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug . . . .").

[15] 21 U.S.C. § 355(j)(4)(F) ("[I]nformation submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application . . . .").

[16] 21 U.S.C. § 355(j)(4)(A) ("[T]he methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity.").

7

**FDA_00055**

strength. [17] Drugs that satisfy these four statutory categories are considered to be "pharmaceutical equivalents." [18] Pursuant to FDA regulations, a generic is pharmaceutically equivalent to its RLD if it:

> contain[s] identical amounts of the identical active ingredient . . . and meet[s] the identical compendia *or other applicable standard of identity, strength, quality, and purity, including potency* and, where applicable, content uniformity, disintegration times, and/or dissolution rates. [19]

Accordingly, this Petition asserts that any Proposed Generic cannot be "the same as" Xifaxan® in either its active ingredient or strength (potency) unless it is an Identical Polymorph Proposed Generic.

### a.   The sameness of active ingredient criterion

FDA officials have acknowledged that "differences in physical characteristics of the drug substance forms, leading to potential differences in drug product performance" are relevant to the evaluation of sameness, [20] and that the statutory imperative to ensure sameness may require the prescription of "additional standards," including standards for crystalline structure. [21] FDA has also recognized that different solid-state properties "can have a significant influence on the apparent solubility" of a drug substance, and therefore its bioavailability. [22]

Indeed, the Agency's longstanding position is that, in appropriate circumstances, requiring identical polymorphic structure is necessary to comply with the sameness-of-active-ingredient requirement. Specifically, in the 1992 final regulations implementing the Hatch-Waxman Act, the Agency recognized that different polymorphs could sometimes give rise to sameness-of-active-ingredient issues, and maintained that it would assess such arguments on a case-by-case basis:

> Under the statute, an ANDA applicant must show that its active ingredient is the same as that in the reference listed drug. FDA will consider an active ingredient to be the same as that of the reference listed drug if it meets the same standards for identity. In most cases, these standards are

---

[17] 21 U.S.C. §§ 355(j)(4)(C)(i), 355(j)(4)(D)(i).

[18] *Pfizer, Inc. v. Shalala*, 182 F.3d 975, 977 (D.C. Cir. 1999); *see also Ranbaxy Labs., Inc. v. First DataBank, Inc.*, 2015 WL 3618429, at *1 (M.D. Fla. June 9, 2015); *Schering Corp. v. First DataBank, Inc.*, 2007 WL 1176627, at *1 (N.D. Cal. Apr. 20, 2007).

[19] 21 C.F.R. § 320.1(c) (emphasis added).

[20] Frank O. Holcombe, Jr., Ph.D., *Issues of Polymorphism and Abbreviated New Drug Applications*, Advisory Comm. for Pharmaceutical Science (Apr. 8, 2002), *available at* http://www.fda.gov/ohrms/dockets/ac/02/briefing/3860b2_11_holcombe-Issues%20of%20Polymorphism.pdf (last accessed Sept. 26, 2016).

[21] Abbreviated New Drug Application Regulations, 57 Fed. Reg. at 17,959 (Apr. 28, 1992) (internal citations omitted) (emphasis added) [hereinafter *ANDA Regulations*].

[22] FDA, GUIDANCE FOR INDUSTRY, ANDAs: PHARMACEUTICAL SOLID POLYMORPHISM 3 (2007) [hereinafter *Polymorphism Guidance*].

8

FDA_00056

described in the U.S. Pharmacopeia (U.S.P.). *However, in some cases, FDA may prescribe additional standards that are material to the ingredient's sameness. For some drug products, standards for crystalline structure or stereoisomeric mixture may be required.*[23]

It is a well-settled principle of administrative law that "[o]nce a rule is final, an agency can amend it only through a new rulemaking."[24] Accordingly, the FDA's 2007 guidance on polymorphism ("Polymorphism Guidance") must be construed in a way that is harmonious with its 1992 final regulations. This is not a difficult undertaking, since the 2007 Guidance is indeed fully consonant with the 1992 final regulations.

The 2007 Polymorphism Guidance merely rejects the notion that the FDCA's "sameness" language *per se* requires that the active ingredient in a generic "'exhibit the same physical and chemical characteristics . . . and [that] solid state forms of the drug have not been altered.'" [25] Equally unobjectionable is the view, articulated in the Polymorphism Guidance, that, inherently, "differences in drug substance polymorph forms do not render drug substances different active ingredients for the purposes of ANDA approvals within the meaning of the Act and FDA regulations."[26]

FDA has thus recognized that it must assess active ingredient "sameness" on a case-by-case basis, and should prescribe standards—including specification of crystalline structure—when necessary to ensure sameness.

From a technical perspective, molecules of the same chemical structure can exist in different 3-dimensional structures, referred to as enantiomers or chiral forms. It is well-recognized that pure chiral structures of the same chemical formula can have different pharmacokinetic and/or biological properties. At a higher order, above the 3-dimensional molecular conformation, the drug substance can exhibit polymorph crystalline structures.

For BCS Class 4 drugs that act locally in the GI tract, such as Xifaxan®, the polymorph crystalline structure of the drug substance can influence the rate at which the soluble drug substance reaches the site of action. Thus, this is the exact case in which specification of polymorphic crystalline structure is necessary to ensure "sameness" of active ingredient as well as strength (potency). Xifaxan's topical site of action and extremely low solubility create a unique situation in which the drug's potency, solubility and absorption are all polymorph-driven. Consequently, as elaborated below, this Petition demonstrates that FDA should require specification of crystalline structure—the same polymorph profile as Xifaxan®—for any Proposed Generic.

---

[23] Abbreviated New Drug Application Regulations, 57 Fed. Reg. at 17,959 (Apr. 28, 1992) (internal citations omitted) (emphasis added).

[24] *32 Cty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (quoting *Columbia Falls Aluminum Co. v. Env't Prot. Agency*, 139 F.3d 914, 919 (D.C. Cir. 1998)).

[25] FDA, GUIDANCE FOR INDUSTRY, ANDAS: PHARMACEUTICAL SOLID POLYMORPHISM 5 (2007) [hereinafter *Polymorphism Guidance*] (quoting Abbreviated New Drug Application Regulations, 57 Fed. Reg. 17,950, 17,958-59 (Apr. 28, 1992)).

[26] *Polymorphism Guidance* at 5.

9

FDA_00057

**JA70**

#### b.   The sameness of strength criterion

Neither FDA's pertinent final rules nor its Polymorphism Guidance address how differing polymorph forms may impact route of administration, dosage form, and strength. Additionally, the terms "potency" and "strength" are not defined within the FDCA or the specific regulations interpreting the ANDA provisions. However, the Agency has defined both of these terms in its regulations for Current Good Manufacturing Practices, with "potency" being essential to ascertaining a drug's "strength":

Strength means:

(i)   The concentration of the drug substance (for example, weight/weight, weight/volume, or unit dose/volume basis), and/or

(ii)   *The potency,* that is, the therapeutic activity of the drug product as indicated by appropriate laboratory tests or by adequately developed and controlled clinical data (expressed, for example, in terms of units by reference to a standard).[27]

Strength is thus measured not merely by unit dosage (*e.g.*, 550 mg), but by broader reference to potency, which in turn is measured by the therapeutic activity of the drug at a given dose. If a generic drug does not have an identical therapeutic activity at the same dose as its RLD, it cannot be the same strength or potency.

FDA has previously recognized the centrality of potency to sameness. For example, regarding a generic follicle stimulating hormone ("FSH") product based on Pergonal as the RLD, FDA employed the following test:

To be considered to have the same active ingredients as the reference listed drug, generic FSH products based on Pergonal as the reference listed drug must have the same primary structure . . . as Pergonal (assured by the same natural source material), *the same potency*, and the same degree of batch-to-batch uniformity.[28]

In that case, FDA found that the FSH generic had the same active ingredient as Pergonal because it found that any potential difference in potency of the two drugs was not clinically significant.

---

[27] 21 C.F.R. § 210.3(b)(16) (emphasis added). The Agency's regulations implementing the biologics provision of the Public Health Service Act defines potency in a similar manner. *See* 21 C.F.R. § 600.3(s) ("The word *potency* is interpreted to mean the specific ability or capacity of the product, as indicated by appropriate laboratory tests or by adequately controlled clinical data obtained through the administration of the product in the manner intended, *to effect a given result*.") (latter emphasis added).

[28] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Research, to A. Peter Frank, Vice President and Counsel, Docket No. 92P-0487, 12 (June 17, 1997) (emphasis added).

10

FDA_00058

Similarly, in 2010, FDA granted in part a citizen petition ("CP") objecting to a generic version of the anticoagulant Lovenox (enoxaparin sodium injection), a low molecular weight heparin product. In responding to the Lovenox CP, FDA acknowledged that both potency and strength were salient to pharmaceutical equivalence and "sameness."[29] The Agency concluded that the unique characteristics of Lovenox—its inherent molecular diversity—necessitated the establishment of a specific standard of identity, and it employed five criteria to ensure that generic enoxaparin was pharmaceutically equivalent to Lovenox.[30]

FDA's decisions in both the Pergonal and Lovenox CPs resulted in litigation that further elucidated FDA's conceptualization of "sameness" as encompassing not merely an evaluation of the active ingredient alone, but also its potency.[31] Importantly, in the Pergonal litigation, *Serono Laboratories, Inc. v. Shalala*, FDA asserted that pharmaceutical equivalence required a multi-factor assessment of clinical identity, including sameness of potency.[32] The D.C. Circuit deferred to FDA's determination that "sameness" did not require absolute "chemical" identity, but instead a broader notion of "clinical" identity, including identical potency.[33] In affirming this broader definition of sameness, the D.C. Circuit agreed with FDA's position that "the statutory phrase [*i.e.*, sameness] must be read in the context of the kind of drug at issue."[34]

In the Lovenox litigation, *Sanofi-Aventis U.S. LLC v. Food & Drug Administration*, the U.S. District Court for the District of Columbia again deferred to FDA's sameness determination,[35] including FDA's assertion that sameness is determined on a case-by-case basis, "considering the individual characteristics of the particular drug at issue."[36] Because FDA articulated rational bases for establishing its five-part standard of identity criteria for enoxaparin—which included equivalence of potency[37] as well as certain physicochemical properties[38]—its sameness determination was upheld.[39]

---

[29] Letter from Douglas Throckmorton, M.D., Deputy Dir., Ctr. for Drug Eval. & Research, to Peter O. Safir et al., Docket No. 2003-P-0273, 2 n.5, 9 n.40 (July 23, 2010) [hereinafter *FDA Lovenox CP Response*].

[30] *Lovenox CP Response* at 11, 44.

[31] *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) (Pergonal litigation); *Sanofi-Aventis U.S. LLC v. Food & Drug Admin.*, 842 F. Supp. 2d 195 (D.D.C. 2012) (Lovenox litigation; on merits) [hereinafter *Lovenox II*]; *Sanofi-Aventis U.S. LLC v. Food & Drug Admin.*, 733 F. Supp. 2d 162 (D.D.C. 2010) (Lovenox litigation; preliminary injunction denied) [hereinafter *Lovenox I*].

[32] *Serono Labs.*, 158 F.3d at 1318-19.

[33] *Serono Labs.*, 158 F.3d at 1319.

[34] *Serono Labs.*, 158 F.3d at 1319.

[35] *See Lovenox I*, 733 F. Supp. 2d at 169-71; *see also Lovenox II*, 842 F. Supp. 2d at 202.

[36] *Lovenox I*, 733 F. Supp. 2d at 171 (internal quotation marks omitted); *see also Lovenox II*, 842 F. Supp. 2d at 202.

[37] *See FDA Lovenox CP Response* at 2 n.5 (potency is part of the assessment of pharmaceutical equivalency), at 9 n.40 (same), at 11, 44 (issuing a five-part standard of identity for enoxaparin that includes "equivalence of physiochemical properties").

[38] The physicochemical properties of a drug include its solid state properties such as polymorphism. *See* Eun Hee Lee, *A Practical Guide to Pharmaceutical Polymorph Screening & Selection*, 9 ASIAN J. PHARMACEUTICAL SCIS. 163 (2014) [hereinafter *Lee 2014*].

[39] *Lovenox I*, 733 F. Supp. 2d at 173-74; *Lovenox II*, 842 F. Supp. 2d at 214.

11

FDA_00059

The Pergonal and Lovenox litigation illustrate that the sameness criterion is to be addressed on a case-by-case basis, taking into account the specific kind of drug at issue, including differences in potency or physicochemical properties—such as polymorphism—that may significantly affect drug product performance.

Different polymorph forms of a molecule can exhibit differing solubility and dissolution rates.[40] Indeed, FDA has specified that different polymorphs are the "same" active ingredient "when dissolution, solubility and absorption are shown to be equivalent,"[41] and consequently *not the same* when dissolution, solubility or absorption differs.

Different solubility or dissolution rates, in turn, affect a drug's potency and strength and are thus legally relevant to pharmaceutical equivalence/sameness.[42] A Proposed Generic that has a different polymorphic structure from Xifaxan® will have different solubility and dissolution rates and will not be absorbed at the same rate as Xifaxan®. It will therefore not have the same therapeutic activity as Xifaxan® and cannot, by definition, have the same strength (potency). In the words of one federal court, "[D]ifferent polymorphic forms containing the same active ingredient may be considered by the FDA as equivalents. However, this is the case only if the dissolution, solubility and absorption of the polymorphs are the same."[43] Each of these three characteristics—dissolution, solubility and absorption—must be identical to establish "sameness" under the FDCA.

###### c.    The bioequivalence criterion

In addition to sameness (pharmaceutical equivalence), the FDCA requires a generic to be *bioequivalent* to the RLD. The statute states that:

> A drug shall be considered to be bioequivalent to a listed drug if . . . the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses.[44]

---

[40] *Polymorphism Guidance* at 3 ("[T]he solid-state properties of a drug substance can have a significant influence on the apparent solubility of the drug substance. Since polymorph forms differ in their internal solid-state structure, a drug substance that exists in various polymorph forms can have different aqueous solubilities and dissolution rates.").

[41] Letter from Carl C. Peck, M.D., Dir., Ctr. for Drug Eval. & Research, to Thomas A. Hayes, M.D., Dir. of Regulatory Affairs, Bristol-Myers Squibb Co., Docket No. 90P-0240 (Apr. 6, 1992), at 4 ("FDA considers differences in waters of hydration resulting in polymorphic crystal forms of the same active moiety (*i.e.*, different forms of the same active ingredient) to be the same *when dissolution, solubility, and absorption are shown to be equivalent.*") (emphasis added).

[42] *See Zenith Labs., Inc. v. Abbott Labs.*, No. Civ.A. 96-1661, 1996 WL 33344963, at *10 (D.N.J. Aug. 7, 1996) ("[D]ifferent polymorphic forms containing the same active ingredient may be considered by the FDA as equivalents. However, this is the case only if the dissolution, solubility and absorption of the polymorphs are the same.").

[43] *Zenith Labs., Inc. v. Abbot Labs.*, 1996 WL 33344963, at *10 (D.N.J. Aug. 7, 1996).

[44] 21 U.S.C. § 355(j)(8)(B)(i).

12

FDA_00060

FDA regulations further elucidate the meaning of bioequivalence, defining it as "the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available *at the site of drug action* when administered at the same molar dose under similar conditions in an appropriately designed study."[45]

The definition of bioequivalence provided by FDA's regulation—focusing on availability of the active ingredient at the site of drug action—is broader than the FDCA's statutory definition, which focuses solely on "absorption." Nonetheless, federal courts have upheld FDA's broader regulatory definition as a reasonable interpretation of the FDCA because it is ambiguous as to whether Congress intended the narrower statutory definition to be the exclusive definition of bioequivalence.[46]

FDA's broader regulatory definition of bioequivalence is particularly salient to a low solubility, low permeability drug like Xifaxan® that acts at local sites of action instead of systemically. For such locally acting, non-systemically absorbed drugs, the FDCA permits the Agency to adopt alternative methods of assessing bioequivalence (other than systemic bioavailability), so long as those alternative methods "are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect."[47]

The Agency's 2014 Draft BA & BE Studies Guidance has further clarified:

> Documentation of BA [bioavailability] and BE when the drug substance produces its effects by local action in the gastrointestinal tract can be achieved either by using pharmacokinetics, an acceptable PD [pharmacodynamics] end point, clinical efficacy and safety studies, and/or suitably designed and validated in vitro studies, as appropriate.[48]

The Agency's regulations also note that bioequivalence must be shown using evidence obtained by the "most accurate, sensitive, and reproducible approach" among those alternatives identified in FDA regulations.[49]

To aid in assessing bioequivalence, FDA's regulations set forth specific factors to help the Agency identify actual or potential bioequivalence "problems," and direct that FDA "shall consider" those factors in assessing bioequivalence.[50] Among those factors, several are important to approval of any generic version of Xifaxan®, including evidence that the

---

[45] 21 C.F.R. § 320.1(e) (emphasis added).

[46] *Schering Corp. v. Food & Drug Admin.*, 51 F.3d 390, 399-400 (3d Cir. 1995); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 217 (D.D.C. 1996).

[47] 21 U.S.C. § 355(j)(8)(C).

[48] *See* FDA, GUIDANCE FOR INDUSTRY, BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES SUBMITTED IN NDAS OR INDS—GENERAL CONSIDERATIONS 21 (2014) (draft guidance) [hereinafter *Draft BA & BE Studies Guidance*].

[49] 21 C.F.R. § 320.24(a).

[50] 21 C.F.R. at § 320.33.

13

active drug ingredient has a low solubility in water,[51] that certain polymorphs of the drug dissolve poorly and this poor dissolution may affect absorption,[52] evidence that the active ingredient is absorbed in large part in a particular part of the GI tract or is absorbed from a localized site,[53] and evidence that the degree of absorption of the active ingredient is poor.[54]

All of these statutory and regulatory bioequivalence standards compel FDA to grant the Actions Requested by this Petition. In particular, the Agency should require that any Proposed Generic possess the same polymorphic profile as Xifaxan® to ensure "sameness" of active ingredient and strength (potency). In addition, to ensure bioequivalency, the Agency should require that any Proposed Generic undergo the specific types of PK, *in vitro* dissolution, and clinical endpoint testing that are requested.

**C.  Technical grounds**

**1.  Technical facts**

**a.  Description of Xifaxan®**

Xifaxan® may be more particularly described as follows:[55]

- **Product Name:** XIFAXAN® (rifaximin) tablets, for oral administration, 200mg and 550mg, NDA 021361 and NDA 022554.
- **Chemical name:**    Rifaximin [USAN, INN; CAS No. 80621-81-4], (2S,16Z,18E,20S,21S,22R,23R,24R,25S,26S,27S,28E)-5,6,21,23,25-Pentahydroxy-27-methoxy-2,4,11,16,20,22,24,26-octamethyl-2,7-(epoxypentadeca-[1,11,13]trienimino)benzofuro[4,5-e]pyrido[1,2,-α]benzimidazole-1,15(2H)-dione,25-acetate.
- **Molecular formula:**  $C_{43}H_{51}N_3O_{11}$
- **Molecular weight:** 785.89
- **Chemical Structure:**

---

[51] 21 C.F.R. at § 320.33(e)(1).

[52] 21 C.F.R. at § 320.33(e)(4).

[53] 21 C.F.R. at § 320.33(f)(1).

[54] 21 C.F.R. at § 320.33(f)(2).

[55] *See generally, Xifaxan® PI.* Due to an FDA administrative decision, NDA 021361 is the parent file to which submissions for NDA 022554 were filed for review: "[S]alix Pharmaceuticals, Inc. (Salix), on June 24, 2009, submitted as an efficacy supplement to NDA 021361 for XIFAXAN® (rifaximin) tablets [as submission number 010] regarding the proposed orphan drug indication of the maintenance of remission of hepatic encephalopathy (HE) in patients 18 years of age or older. . . . This supplement was a Type 6 NDA, administratively filed under NDA 022554 that provided data for a new strength (550 mg BID) of the currently approved (200 mg) oral tablet dosage form." FDA, Center for Drug Evaluation and Research, Application Number 22-554 – Cross Discipline Team Leader Review 1 (Mar. 8, 2010).

14

FDA_00062

Generally, Xifaxan® has antimicrobial activity of varying levels against Gram-positive, Gram-negative, aerobic, and anaerobic enteric bacteria similar to its parent compound. It acts primarily by binding to the beta-subunit of bacterial DNA-dependent RNA polymerase ("rpoB"), resulting in inhibition of bacterial RNA synthesis.[57]

### b.   Rifaximin crystallizes into different polymorph forms, depending on manufacturing methods and controls.

Rifaximin is a non-aminoglycoside, semi-synthetic antibiotic derived from rifamycin. It is synthesized by a chemical reaction between rifamycin O and 2-amino-4-methylpyridine in a mixture of ethanol and purified water. A solution of purified water, ascorbic acid and hydrochloric acid at pH 2 is added and the entire mixture is chilled to facilitate the precipitation of crude rifaximin. The crude rifaximin is then purified, crystallized and dried to produce the final drug substance.

---

[50] *Xifaxan® PI* at § 11.

[57] *Xifaxan® PI* at § 12.4, "Microbiology – Mechanism of Action" ("Rifaximin is a semi-synthetic derivative of rifampin and acts by binding to the beta-subunit of bacterial DNA-dependent RNA polymerase blocking one of the steps in transcription. This results in inhibition of bacterial protein synthesis and consequently inhibits the growth of bacteria."); Vishesh Kothary et al., *Rifaximin Resistance in Escherichia coli Associated with Inflammatory Bowel Disease Correlates with Prior Rifaximin Use, Mutations in rpoB, and Activity of Phe-Arg-β-Naphthylamide-Inhibitable Efflux Pumps*, 57(2) ANTIMICROBIAL AGENTS & CHEMOTHER. 811, 812 (2013) [hereinafter *Kothary 2013*] ("Rifaximin, like other rifamycins, exerts its antimicrobial effects by binding to the β-subunit of bacterial DNA-dependent RNA polymerase and blocking the path of the elongating RNA transcript at the 5' end, thus inhibiting transcription."); Jamie S. Huang et al., *Use of Rifamycin Drugs and Development of Infection by Rifamycin-Resistant Strains of Clostridium difficile*, 57(6) ANTIMICROBIAL AGENTS & CHEMOTHER. 2690, 2690 (2013) [hereinafter *Huang 2013*] ("Rifaximin is a nonabsorbed (<0.4%) rifamycin with *in vitro* activity against Gram-positive, Gram-negative, and anaerobic bacteria."); C. G. Viscomi et al., *Crystal Forms of Rifaximin and Their Effect on Pharmaceutical Properties*, 10 CRYST. ENG. COMM. 1074, 1074 (2008) [hereinafter *Viscomi 2008*] ("Both *in-vitro* and clinical pharmacology show that rifaximin is a locally acting antibiotic with a broad spectrum of antibacterial action against Gram-positive and Gram-negative, aerobic and anaerobic organisms."); *see generally*, Elizabeth A. Campbell et al., *Structural Mechanism for Rifampicin Inhibition of Bacterial RNA Polymerase*, 104 CELL 901 (2001) [hereinafter *Campbell 2001*].

15

FDA_00063

Rifaximin crystallizes into several different polymorph forms. The generation of each form is the result of the use of specific purification and crystallizing solvents and specific temperature and timing controls for the crystallization and drying steps of the manufacturing process. [58]   Each polymorph form exhibits differing solid-state characteristics as measured by tests such as x-ray powder diffraction ("XRPD"), differential scanning calorimetry, dynamic vapor sorption, hot-stage microscopy, thermogravimetric analysis, Karl-Fischer titration, moisture sorption/desorption, and infrared and Raman spectroscopy. Among many forms, amorphous rifaximin and five distinct polymorph forms have been described in the journal or patent literature as important to drug formulation: alpha ("Form α"), beta ("Form β"), gamma ("Form γ"), delta ("Form δ") and epsilon ("Form ε"). [59]

c.   Xifaxan® has a specific polymorph profile.

The active ingredient in both Xifaxan® 200 mg and 550 mg tablets is manufactured from the same drug substance. The drug substance manufacturing process is strictly controlled and fully validated to consistently produce a substance **Redacted**                    (the "Drug Substance"). [60]                    **Redacted**

[61]

---

[58] *Viscomi 2008* at 1074-1075.

[59] Corrado Blandizzi et al., *Impact of Crystal Polymorphism on the Systemic Bioavailability of Rifaximin, an Antibiotic Acting Locally in the Gastrointestinal Tract, in Healthy Volunteers,* 9 DRUG DESIGN, DEV. AND THERAPY 1, 2 (2015) [hereinafter *Blandizzi 2015*] ("According to the European Pharmacopoeia, rifaximin shows crystal polymorphism, and several polymorphs (α, β, γ, δ, ε) have been described."); *Viscomi 2008* at 1074-1075; Forms of Rifaximin and Uses Thereof, U.S. Patent No. 8,067,429 B2 (issued Nov. 29, 2011); Polymorphous Forms of Rifaximin, Processes for Their Production and Use Thereof in Medicinal Preparations, U.S. Patent No. 9,271,968 B2 (issued Mar. 1, 2016).

[60]   **Redacted**
[61]                    **Redacted**

16



**Redacted**

**Figure 1: Rifaximin Polymorphic Forms in the Drug Substance.** XRPD analysis of six rifaximin API batches (top 6 profiles). **Redacted**

**Redacted**

**Redacted**     [62] This polymorph profile of the Xifaxan® finished tablet product is referred to as the "Xifaxan® Polymorph Profile" throughout this Petition. XRPD evaluation is qualitative. As of the date of this Petition, **Redacted**
**Redacted**

**Redacted**

---

[62]     **Redacted**

17

**FDA_00065**

**Redacted**

**Redacted**

Figure 2. Xifaxan® Polymorph Profile Across Multiple Manufacturing Lots of the Xifaxan® 550 mg
Finished Tablet Product.                                    **Redacted**

    d.    *In vitro* dissolution results generated in media
containing sodium dodecyl sulphate ("SDS") are
unsuitable surrogates for *in vivo* solubility performance
of Proposed Generics,       **Redacted**
              **Redacted**       or
produce results relevant to *in vivo* performance: bio-
relevant media that distinguish between polymorph
forms must be used.

        **Redacted**

18

**FDA_00066**



Redacted

53

Redacted

Redacted

---

63                                  Redacted

19

FDA_00067



Redacted

Figure 3: Xifaxan® 550 mg Tablet Dissolution            **Redacted**

        e.    **Rifaximin polymorphs differ in aqueous solubility, each from the other.**

**Redacted**

64

65

**Redacted**

---

64                 **Redacted**

[65] *See Draft Biowaiver Guidance* at 3 (Under the BCS, "[a] drug substance is considered *highly soluble* when the highest strength is soluble in 250 mL or less of aqueous media over the pH range of 1-6.8.") (emphasis in original).    **Redacted**

20



Table 1: Aqueous Solubility **Redacted** in Various Media

**Redacted**

Each polymorph form of rifaximin displays unique solubility characteristics.

**Redacted**            56                    **Redacted**

                        **Redacted**                    67

---

66      **Redacted**        Ekarat Jantratid & Jennifer Dressman, *Biorelevant Dissolution Media Simulating the Proximal Human Gastrointestinal Tract: An Update*, DISSOLUTION TECHNOLOGIES 21 (Aug. 2009) [hereinafter *Jantratid 2009*] ("Together with the medium simulating the preprandial gastric conditions proposed by Vertzoni et al. in 2005, a core group of four biorelevant media simulating both stomach and proximal small intestine of humans in the pre- and postprandial states has been established. These media can be used to investigate the release characteristics of drugs and drug products in the stomach and small intestine, particularly in terms of food effects.") (citations omitted); *see also* Ekarat Jantratid, et al., *Dissolution Media Simulating Conditions in the Proximal Human Gastrointestinal Tract: An Update* 25 PHARMACEUTICAL RESEARCH (Jul. 2008) [hereinafter *Jantratid 2008*].
67      **Redacted**

21

**FDA_00069**



**Table 2:** Solubility of Rifaximin Forms in Various Media Under Saturation Conditions
**Redacted**

**Redacted**

22

**FDA_00070**



**Redacted**

**Figure 4:** Kinetic Solubility of Different Forms of Rifaximin          **Redacted**

**Redacted**

**Figure 5:** Kinetic Solubility of Different Forms of Rifaximin          **Redacted**

23

**FDA_00071**



**Redacted**

**Figure 6:** Kinetic Solubility of Different Forms of Rifaximin          **Redacted**

**Redacted**

**Figure 7:** Kinetic Solubility of Different Forms of Rifaximin          **Redacted**

24

**FDA_00072**



**Redacted**

**Figure 8:** Kinetic Solubility of Different Forms of Rifaximin          **Redacted**
**Redacted**

**Figure 9:** Kinetic Solubility of Different Forms of Rifaximin          **Redacted**

25

**FDA_00073**

███████████████████████

    f.    **The *in vivo* availability of dissolved rifaximin is polymorph driven.**

        (i)    **Free fluid volumes in the gastric and proximal small intestine affect rifaximin polymorph solubility.**

To understand how rifaximin polymorph dissolution *in vitro* is related to drug product formulation performance *in vivo*, it is necessary to consider the free fluid volumes present in the gastric and proximal small intestine. These volumes recently have been estimated by MRI techniques after oral dosing of a standard fluid volume.[68] The kinetics of fluid distribution after ingestion of 240 mL water is shown below in Figure 10.  **Redacted**
**Redacted**

---

[68] Deanna M. Mudie et al., *Quantification of Gastrointestinal Liquid Volumes and Distribution Following a 240 mL Dose of Water in the Fasted State*, 11 MOLECULAR PHARMACEUTICS 3039, 3046 (2014) [hereinafter *Mudie 2014*] ("This study is the first to quantify total volume and distribution of liquid in the stomach and small intestine under conditions representing BA/BE studies using a validated MRI methodology.").
[69]           **Redacted**
        **Redacted**

**FDA_00074**



**Figure 10:** Gastric (A) and Small Bowel (B) Fluid Volumes After Ingestion of 240mL of Water.[70]

> (ii) **The soluble concentration of rifaximin in the upper small intestine is a function of the polymorph forms present in the Drug Product.**
> Redacted

g. **Xifaxan® is poorly soluble *in vivo*.**

Given **Redacted** it is not surprising that Xifaxan® is poorly soluble *in vivo.* As reported in the Xifaxan label, "[i]n a mass balance study, after administration of 400 mg $^{14}$C-rifaximin orally to healthy volunteers, of the 96.94% total recovery, 96.62% of the administered radioactivity was recovered in feces mostly as the unchanged drug and 0.32% was recovered in urine mostly as metabolites with 0.03% as the unchanged drug."[71]

---

[70] *Mudie 2014* at 3042 Fig.2.
[71] *Xifaxan® PI* at § 12.3, "Excretion."

27

FDA_00075

**JA88**



h.                                      **Redacted**

The formation and inter-conversion of five crystalline rifaximin polymorph forms has been established.[72] For polymorph forms considered in this Petition, formation and inter-conversion are shown diagrammatically in Figure 11.

**Redacted**

**Figure 11:** Schematic of Rifaximin Polymorph Formation and Inter-conversion[73]

**Redacted**                                      while formation of

amorphous rifaximin can be accomplished by crystallization from non-aqueous solvents. However, regardless of starting polymorph type, under non-sink conditions and once hydrated, all forms will reach an equilibrium between a low concentration of rifaximin in solution and a precipitate                      **Redacted**

74

Kinetic dissolution of these forms in aqueous media containing          **Redacted**

These

---

[72] *Viscomi 2008* at 1076 ("Five distinct crystal forms of rifaximin (α, β, γ, δ and ε) have been prepared from the same crystallisation procedure; the distinct forms are obtained by altering the drying conditions or omitting washing. . . . Transformation of the various crystal forms is schematically summarised in Fig. 4.") (citations omitted); *Blandizzi 2015* at 2 ("[S]everal polymorphs (α, β, γ, δ and ε) have been described.") (citing *Viscomi 2008*).

[73] Taken from *Viscomi 2008* at 1079 Fig. 4                      **Redacted**

[74]          **Redacted**

28

**FDA_00076**

conditions approach the maximal concentration of aqueous surfactant that may be encountered *in vivo* in the form of bile acids present in the fed state.[75]

**Redacted**

76

**Redacted**

**Figure 12**. Kinetic Solubility of Different Forms of Rifaximin          **Redacted**

**Redacted**                    77

78                              **Redacted**

---

[75] T.C. Northfield & I. McColl, *Postprandial concentrations of free and conjugated bile acids down the length of the normal human small intestine*, 14 GUT 513, 515 (1973) [hereinafter *Northfield 1973*] ("The mean postprandial concentration of total bile acids was highest (10 mM) in the upper ileum and lowest (2 mM) in the lower ileum (p <0.05 fig 3).").

[76] Neena Washington et al., PHYSIOLOGICAL PHARMACEUTICS: BARRIERS TO DRUG ABSORPTION at 124(2d ed. 2001) [hereinafter *Washington 2001*].

[77] **Redacted**

[78]

**Redacted**
*Blandizzi 2015* at 8          **Redacted**

Corrado

29

**Redacted**

i. **Xifaxan® virtually is unabsorbed into the systemic circulation.**

With Xifaxan®'s poor *in vivo* gut solubility, it is not surprising that Xifaxan® virtually is unabsorbed in the systemic circulation. In fact, less than 0.4% of Xifaxan® is absorbed,[79] leading to extremely low plasma concentrations[80] of dissolved rifaximin. Such has been recognized in the literature.[81]

j. **Rifaximin absorption is solubility-limited, Redacted**

*In vivo*, rifaximin absorption is solubility-limited **Redacted**

---

Blandizzi et al., *Is Generic Rifaximin Still a Poorly Absorbed Antibiotic? A Comparison of Branded and Generic Formulations in Healthy Volunteers*, 85 PHARMACOLOGICAL RESEARCH 39, 42 (2014) [hereinafter *Blandizzi 2014*] **Redacted**

[79] **Redacted**

[80] **Redacted**

[81] *See, e.g.*, Herbert L. DuPont, 12(2) *Biologic Properties and Clinical Uses of Rifaximin*, EXPERT OPIN. PHARMACOTHER. 293, 299 (2011) [hereinafter *DuPont 2011*] ("Rifaximin [Xifaxan®] is largely unabsorbed with extremely low systemic concentrations . . . ."); Eric L. Brown et al., *Pretreatment of Epithelial Cells with Rifaximin Alters Bacterial Attachment and Internalization Profiles*, 54(1) ANTIMICROB. AGENTS AND CHEMOTHER. 388, 388 (2010) [hereinafter *Brown 2010*] ("Rifaximin's [Xifaxan®'s] additional pyridoimidazole ring makes it virtually nonabsorbable (0.4%) . . . .").

30

FDA_00078

**Table 3:** Kinetics of Xifaxan® 200 mg Tablet Contents Transit in the Upper GI Tract

Redacted

Redacted

Redacted                                          82

83

Redacted

---

82
83              Redacted
                                Redacted

84        Redacted
                              31



Redacted

Table 4: Mean (±SD) Plasma PK Parameters of Rifaximin 550 mg    **Redacted**

**Redacted**

k.    **Rifaximin absorption is not consistent between polymorphs,**    **Redacted**

Absorption of rifaximin is not consistent between polymorphs or    **Redacted**

**Redacted**
86

_____

85    **Redacted**

86    **Redacted**

32

**FDA_00080**

**Redacted**

**Table 5:** Dog PK Parameters            [87]

**Redacted**

**Redacted** [88] In a study of 4 beagle dogs,[89] Forms α, β, δ, γ, and ε presented differing PK profiles when administered at 100 mg/kg/day, as shown in Table 6:

**Table 6:** Study of Bioavailability of the Crystalline Forms of Rifaximin in Dogs. Mean ± S.E.M. of the PK Parameters After Oral Administration of 100 mg kg$^{-1}$ (n=4)[90]

| Rifaximin Form | Cmax$^a$ (ng/mL) | Tmax$^b$ (h) | AUC$_{0-24 h}$$^c$ | AUC$_{0-inf}$$^d$ (ng.h/mL) |
|---|---|---|---|---|
| α | 2.6 ± 0.7 | 4 | 17 ± 7 | 17 ± 7 |
| β | 1.1 ± 0.6 | 4 | 10 ± 7 | 12 ± 8 |
| γ | 1,085.1 ± 78.7 | 2 | 4,795 ± 4,120 | 4,894 ± 4,107 |
| δ | 308.3 ± 224.1 | 2 | 801 ± 517 | 830 ± 515 |
| ε | 6.9 ± 5.1 | 4 | 42 ± 35 | 77 ± 42 |

$^a$ Maximum observed plasma concentration. $^b$Time from administration to obtain C$_{max}$; the values are given as median. $^c$Area under the concentration-time curve from time zero up to last sampling (24 h after administration). $^d$Area under the concentration-time curve calculating the extrapolation to infinity.

**Redacted**

---

[87]  **Redacted**
[88]  **Redacted**
[89]  *Viscomi 2008.*
[90]  *Viscomi 2008*, Table 7.
[91]  **Redacted**
[92]  **Redacted**

33

**FDA_00081**

**JA94**

Redacted

Figure 13: Redacted

Redacted

---

93    Redacted
94

Redacted

34

FDA_00082

███████████████████████████████

**Redacted**

**Figure 14:** PK Profile of **Redacted**

Table 7 below summarizes the systemic exposure for varying polymorphs and dosage strengths across multiple clinical PK studies conducted for rifaximin.[95]    **Redacted**

**Redacted**

_____

[95] *Blandizzi 2015;*    **Redacted**

35

**FDA_00083**



Table 7: Tmax and Cmax for Various Rifaximin Dosage Forms

| Dose (mg) | Subjects (N) | Formulation and Polymorph | Tmax (min) | Cmax (ng/mL) | Ref. |
|---|---|---|---|---|---|
| 200 | NV-12 | (1x) Normix® tablet 200 mg** | 62.4 | 1.59 | 1 |
| 200 | NV-12 | (1x) Amorphous tablet 200 mg | 117.6 | 3.70 | 1 |
| 400 | NV-12 | (2x) Amorphous tablet 200 mg | 72.6 | 15.60 | 1 |
| 400 | NV-12 | (2x) Normix® tablet 200 mg** | 102.6 | 3.54 | 1 |
| | | Redacted | | | |

NV- normal volunteers, HE – hepatic encephalopathy patients
** Normix® tablet 200 mg is the rifaximin formulation approved in certain European countries

Ref 1          *Blandizzi 2015*
         **Redacted**

**Redacted**

36

FDA_00084

JA97

Redacted

Figure 15:                                  Redacted

        l.    **The site of systemic absorption of Xifaxan®**
                                      Redacted

Redacted

---

96                            **Redacted**

97                            **Redacted**

37

FDA_00085

Redacted

Redacted

38

FDA_00086

Redacted

Figure 16: Plasma PK Profiles    <sup>99</sup>    Redacted

Table 8:    Redacted

---

<sup>99</sup>    Redacted

39

FDA_00087



Redacted

100

m.   A Proposed Generic formulated with <sup>Redacted</sup> could meet the *Draft Rifaximin Bioequivalence Guidance Documents'* bioequivalence endpoints, but be less potent at topical sites of action in the GI lumen.

Redacted

---

100        Redacted

40

FDA_00088

**Redacted**

**Figure 17:**

**Redacted**

41

FDA_00089

n.    **Higher Solubility Polymorphs pose the risk of oral contraceptive failure from drug-drug interaction and related teratogenicity, especially in HE and IBS-D patients.**

Consistent with other molecules of the rifamycin class, rifaximin activates the pregnane X receptor ("PXR") *in vitro*[101] and *in vivo*, resulting in the upregulation of Cytochrome P450 3A4 ("CYP3A4") and P-glycoprotein expression.[102] In fact, the upregulation of such detoxification pathways is one putative mechanism of action for rifaximin.[103] PXR-mediated induction of CYP3A4, which is expressed primarily in the intestine and liver, may result in increased rate and extent of metabolism of its substrates.[104]

The induction caused by clinically relevant dosing regimens of Xifaxan® does not appear to result in clinically significant drug-drug interactions with co-administered CYP3A4 substrates, primarily due to Xifaxan®'s low solubility and poor systemic absorption.[105] Use of a more highly soluble and well-absorbed Proposed Generic is expected to result in higher luminal, hepatic, and systemic rifaximin exposure. Such higher exposure is expected to increase the risk of drug-drug interactions, particularly in patient populations with higher than normal intestinal permeability[106].    **Redacted**

The increased risk of PXR activation-mediated drug-drug interactions is a public health concern because CYP3A4, one of the gene targets of PXR whose expression and function are upregulated by rifamycins, is the primary metabolic pathway for the majority of

---

101    **Redacted**

*Is a Gut-Specific Human Pregnane X Receptor Activator*, 322(1) J. PHARMACOL. & EXP. THER. 391 (2007) [hereinafter *Ma 2007*].

[102] Stacey A. Jones et al., *The Pregnane X Receptor: A Promiscuous Xenobiotic Receptor That Has Diverged During Evolution*, 14 MOL. ENDOCRINOL. 27 (2000) [hereinafter *Jones 2000*]; Virginia E. Carnahan & Matthew R. Redinbo, *Structure and Function of the Human Nuclear Xenobiotic Receptor PXR*, 6 CURRENT DRUG METAB. 357 (2005) [hereinafter *Carnahan 2005*].

[103] Jie Cheng et al., *Therapeutic Role of Rifaximin in Inflammatory Bowel Disease: Clinical Implication of Human Pregnane X Receptor Activation*, 335(1) J. PHARMACOL. & EXP. THER. 32, 40 (2010) [hereinafter *Cheng 2010*] ("[T]he [PXR humanized] mice were used to demonstrate the beneficial effects of rifaximin in acute models of colitis through the activation of human PXR, and a critical role for PXR in IBD."); Jie Cheng et al., *Pregnane X Receptor as a Target for Treatment of Inflammatory Bowel Disorders*, 33(6) TRENDS PHARMACOL. SCI. 323 (2012) [hereinafter *Cheng 2012*].

[104] *Cheng 2012* at 4 ("[R]ifaximin alone or in combination with other antibiotics appeared to have a significant effect at inducing remission in active IBD. Because rifaximin is a gut-specific agonist of human PXR, one plausible mechanism is that rifaximin induces CYP3A4 leading to clinically significant reductions in the bioavailability of established drugs that are CYP3A4 substrates. Coupled with increased clearance, this induction of CYP3A4 may reduce the possibility of drug-induced hepatic or renal toxicity.") (citations omitted).

[105] Javier A. Adachi & Herbert L. DuPont, *Rifaximin: A Novel Nonabsorbed Rifamycin for Gastrointestinal Disorders*, 42 CLINICAL INFECTIOUS DISEASES 541, 545 (2006) [hereinafter *Adachi 2006*] ("Rifaximin is unlikely to have drug interactions with other medications metabolized by the cytochrome P-450 system."); *also, see infra*, this section, "Xifaxan® in clinical CYUP3A4 induction drug-drug interaction studies."

106    **Redacted**

42

**FDA_00090**

marketed drugs. In fact, CYP3A4 induction causes increased metabolism and decreased efficacy for multiple oral contraceptives. Oral contraceptives are one of the most common methods of contraception for women between ages 15 and 44 (female sterilization is the other)[107]; hence, oral contraceptive failure will increase the risk of unplanned pregnancy.[108] That risk is concerning, because it is magnified in patients taking rifaximin, which has been identified by FDA as a dose-dependent teratogen. The remainder of this section discusses this risk in greater detail.

### (i)   Rifaximin as a PXR activator

Investigators at the National Cancer Institute utilized a humanized mouse model of PXR activation to compare the effects of orally-administered Xifaxan® with rifampin (the latter a prototypical PXR activation agent).[109] Results of that study showed that rifaximin-mediated PXR activation was limited to the intestine and was not observed to a significant extent in the liver, a function of Xifaxan®'s high local exposure in the GI tract and extremely limited systemic exposure. In contrast, PXR activation was seen in both intestine and liver with exposure to the more soluble and permeable rifampin. Further, the investigation indicated that localization and extent of PXR activation correlated with tissue exposure. These observations are consistent with the concentration-dependent activation of PXR *in vitro*, and the substantially lower solubility, permeability, and systemic exposure of rifaximin from Xifaxan® as compared to rifampin. In summary, the low cellular and systemic bioavailabilities of Xifaxan® (as compared with rifampin) result in substantially decreased effects on PXR and its primary downstream target gene, CYP3A4.

### (ii)   Xifaxan® in clinical CYP3A4 induction drug-drug interaction studies

The potential for Xifaxan® 550 mg tablets to cause PXR-mediated drug-drug interactions has been evaluated **Redacted**

---

[107] Jo Jones et al., Ctrs. for Disease Prevention and Control, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, 60 NAT'L HEALTH STATISTICS REPORTS 1, Abstract (2012) [hereinafter *Jones 2012*].

[108] Barry D. Dickinson et al., *Drug Interactions Between Oral Contraceptives & Antibiotics*, 98 OBSTETRICS & GYNECOLOGY 853 (2001) [hereinafter *Dickinson 2001*].

[109] *Ma 2007*.

[110] FDA, GUIDANCE FOR INDUSTRY – DRUG INTERACTION STUDIES – STUDY DESIGN, DATA ANALYSIS, IMPLICATIONS FOR DOSING, AND LABELING RECOMMENDATIONS (2012) (draft guidance) [hereinafter *Drug Interaction Studies Draft Guidance*].

43

FDA_00091

**Redacted**

                              **Redacted**

One example of that risk is given by a study conducted by Blode and colleagues.[111] The study characterized the effects of rifampin on the steady-state pharmacokinetics of the components of a new oral contraceptive. Rifampin co-administration resulted in geometric mean $AUC_{0-24}$ ratios of 56% for estradiol valerate and 17% for dienogest. Based on these findings, the authors concluded: "another type of contraception should be used when coadministration of CYP3A4 inducers like rifampicin is unavoidable."

labeling does not include such warnings **Redacted**
**Redacted**                    Given the potential of exposure to Higher Solubility Polymorphs in a Proposed Generic, ANDA applicants must conduct drug interaction studies to evaluate the potential for a Proposed Generic to cause clinically significant drug interactions that could result in oral contraceptive failure. Conduct of this study is particularly crucial given rifaximin's labeling as a teratogen, as described *infra*. In fact, FDA emphasizes the importance of characterizing oral contraceptive drug-drug interaction risk for teratogens in its *Drug Interaction Studies Draft Guidance*.

In addition to the risk of unplanned pregnancy, the risk of teratogenic effects must be considered for any Proposed Generic. Based on the results of animal reproduction studies

---

[111] Hartmut Blode et al., *Evaluation of the Effects of Rifampicin, Ketoconazole and Erythromycin on the Steady-State Pharmacokinetics of the Components of a Novel Oral Contraceptive Containing Estradiol Valerate and Dienogest in healthy Postmenopausal Women*, 86(4) CONTRACEPTION 337 (2012) [hereinafter *Blode 2012*].

FDA_00092

**JA105**

conducted with rifaximin, FDA directed the following description of teratogenic risk to be stated in the package insert for Xifaxan®:

8      USE IN SPECIFIC POPULATIONS

8.1    Pregnancy
       Risk Summary

There are no available data on XIFAXAN® use in pregnant women to inform any drug associated risks. Teratogenic effects were observed in animal reproduction studies following administration of rifaximin to pregnant rats and rabbits during organogenesis at doses approximately 0.9 to 5 times and 0.7 to 33 times, respectively of the recommended human doses of 600 mg to 1650 mg per day. In rabbits, ocular, oral and maxillofacial, cardiac, and lumbar spine malformations were observed. Ocular malformations were observed in both rats and rabbits at doses that caused reduced maternal body weight gain [see Data]. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2 to 4% and 15 to 20%, respectively. Advise pregnant women of the potential risk to a fetus.

Data
*Animal Data*

Rifaximin was teratogenic in rats at doses of 150 to 300 mg/kg (approximately 2.5 to 5 times the recommended dose for TD [600 mg per day], and approximately 1.3 to 2.6 times the recommended dose for HE [1100 mg per day], and approximately 0.9 to 1.8 times the recommended dose for IBS-D [1650 mg per day] adjusted for body surface area). Rifaximin was teratogenic in rabbits at doses of 62.5 to 1000 mg/kg (approximately 2 to 33 times the recommended dose for TD [600 mg per day], and approximately 1.1 to 18 times the recommended dose for HE [1100 mg per day], and approximately 0.7 to 12 times the recommended dose for IBS-D [1650 mg per day] adjusted for body surface area). These effects include cleft palate, agnathia, jaw shortening, hemorrhage, eye partially open, small eyes, brachygnathia, incomplete ossification, and increased thoracolumbar vertebrae.

A pre and postnatal development study in rats showed no evidence of any adverse effect on pre and postnatal development at oral doses of rifaximin up to 300 mg/kg per day (approximately 5 times the recommended dose for TD [600 mg

45

FDA_00093

**JA106**

per day], and approximately 2.6 times the recommended dose for HE [1100 mg per day], and approximately 1.8 times the recommended dose for IBS-D [1650 mg per day] adjusted for body surface area).[112]

Given FDA's direction that this language be stated in the Xifaxan® PI, it is necessary that the risk of rifaximin-induced contraceptive failure be assessed for any Higher Solubility Polymorph formulation that is planned for use in women of childbearing age.

> o.  **Different Polymorph Proposed Generics composed of Higher Solubility Polymorphs pose the risk of systemic antibiotic resistance in all users; also, Different Polymorph Proposed Generics composed of Lower Solubility Polymorphs pose the risk of systemic antibiotic resistance in HE patients.**

To date, published studies report low rates of emergence of bacteria resistant to rifaximin, consistent with low systemic exposure and low selective pressure in patients who receive Xifaxan®.[113]

**Redacted**

116

Resistance driven by use of more systemically available polymorphs of rifaximin, however, is a public health concern.[117] Rifampin, like rifaximin, is an antibiotic from the rifamycin antibiotic class. Rifampin and rifaximin are similar compounds, but rifampin is much more soluble than rifaximin and is used for the treatment of tuberculosis. Resistance to rifampin is observed during the treatment of patients with that disease. Additionally, there is evidence of cross-resistance between rifaximin and rifampin.

---

[112] *Xifaxan® PI* at § 8.1.

**Redacted**

[113] P. Brigidi et al., *Effects of Rifaximin Administration on the Intestinal Microbiota in Patients with Ulcerative Colitis*, 14(3) J. CHEMOTHER. 290 (2002) [hereinafter *Brigidi 2002*]; Herbert L. DuPont et al., *Antibacterial Chemoprophylaxis in the Prevention of Traveler's Diarrhea: Evaluation of Poorly Absorbed Oral Rifaximin,* 41 (Suppl. 8) CLINICAL INFECTIOUS DISEASES S571 (2005) [hereinafter *DuPont 2005*].
[114]

**Redacted**

[115]                           **Redacted**
[116]  **Redacted**
[117] *See, e.g., Blandizzi 2015*                **Redacted**

46

**FDA_00094**

As with other rifamycin-type drugs, resistance to rifaximin occurs primarily through mutations in the rpoB (RNA polymerase subunit B) gene. A wide variety of rpoB mutations have been described to date,[118] and in most cases these mutations reduce the overall competitive fitness of the bacteria such that growth in the absence of the antibiotic is overtaken by the wild-type form. This outcome has been confirmed for patients exposed to rifaximin, where resistant forms can be detected in the stool following treatment, but are not found to persist in the absence of the drug.[119] However, more recent studies have identified rifaximin-resistant strains from rifaximin-treated IBD patients that have mutations in the phe-arg-β-naphthylamide-inhibitable efflux pump, mutations that increase pump activity and therefore decrease intracellular rifaximin concentrations.[120] Unlike mutations in rpoB, these mutations have been shown to remain stable in the bacterial population through greater than 30 generations.

Use of a Proposed Generic composed of a Higher Solubility Polymorph will increase the risk of systemic bacterial resistance over that seen from Xifaxan®, due to increased systemic rifaximin exposure. Depending on the extent of the Proposed Generic's solubility, the risk of bacterial resistance may approach that observed for rifampin.

In contrast, an alternative polymorph mixture of            **Redacted**

                                         Under-dosing would be expected to lead to the development of rifaximin-resistant forms. [121] As discussed previously, rifaximin resistance can result in changes in efficacy upon retreatment, but if these resistant forms are confined to the GI tract, they may not present a significant safety issue—in healthy users.

The same is not true for sick users (e.g. HE patients) in which bacterial translocation from the intestine to the mesenteric lymph nodes and peritoneal fluid provides a route by which bacteria escape from the GI tract. Under-dosing the small bowel, in comparison to Xifaxan®, would increase the risk of systemic resistance due to such bacterial escape.

Therefore, any Proposed Generic must be studied as extensively as was Xifaxan® for development of systemic antibiotic resistance due to over- or under-dosing.

---

[118] Mary G. Reynolds, *Compensatory Evolution in Rifampin-Resistant* Escherichia coli, 156 GENETICS 1471 (2000) [hereinafter *Reynolds 2000*].

[119] C. De Leo et al., *Rapid Disappearance from the Intestinal Tract of Bacteria Resistant to Rifaximin*, 12(12) DRUGS EXP. CLIN. RES. 979 (1986) [hereinafter *De Leo 1986*].

[120] *Kothary 2013.*

[121] Tawanda Gumbo et al., *Concentration-Dependent* Mycobacterium tuberculosis *Killing and Prevention of Resistance by Rifampin*, 51(11) ANTIMICROBIAL AGENTS AND CHEMOTHER. 3781 (2007) [hereinafter *Gumbo 2007*].

47

FDA_00095

**JA108**

p. **Different Polymorph Proposed Generics pose the risk of harming diversity of the healthy colonic microbiome.**

The integrity of the colonic microbiome is important to maintaining health and fighting disease.[122] The diversity of commensal bacteria in the colon is now thought to influence a variety of physiological processes including diabetes and metabolic syndrome, obesity and susceptibility to pathogenic bacterial species, such as *C. difficile*.[123] The emergence of antibiotic resistance has become a major concern to public health authorities across the world. In fact, "FDA, in cooperation with other Public Health Service Agencies, has been involved in several major initiatives to address what is considered to be a major threat to the Public Health in the new millennium: the emergence of drug-resistant bacteria."[124]

This subject was discussed at length during the FDA Advisory Committee meeting convened to review the efficacy and safety of Xifaxan® on November 16, 2011. The meeting was convened after Salix received a complete response letter concerning its supplemental NDA seeking an indication for treatment of IBS-D with Xifaxan® 550 mg. According to FDA, "[t]he basis for the complete response letter to Salix Pharmaceuticals was [among other issues] . . . the concern with bacterial resistance, particularly to Clostridium difficile and the potential for serious enteric infections, resulting in insufficient proof for product labeling and a chronic disease such as irritable bowel syndrome characterized by recurrence."[125]

FDA participants and Advisory Committee members expressed concern with bacterial resistance during the meeting:

*   "Other issues that obviously arise when reviewing an antibiotic application is the possibility of development of resistant bacteria and the long-term impact on the GI flora of repeat uses. The Division of Anti-Infective Products was consulted, and Dr. Purfield will discuss their analysis."[126]

---

[122] H.L. DuPont, *Review Article: The Antimicrobial Effects of Rifaximin on the Gut Microbiota*, 43(Suppl. 1) ALIMENT PHARMACOL. THER. 3, 4 (2016) [hereinafter *DuPont Aliment Pharmacology 2016*] ("[T]he vast diversity of the organisms that comprise the gut microbiota form a complex ecological system that interacts with host and external factors to maintain overall health.").

[123] H.L. DuPont, *Rifaximin: An Antibiotic with Important Biologic Effects*, 15(1) MINI-REVIEWS IN MEDICINAL CHEMISTRY 1, 4 (2016) [hereinafter *DuPont Mini-Reviews 2016*] ("It is known that abnormality in diversity of intestinal flora is associated with a host of disorders including CDI, IBD, irritable bowel syndrome, diabetes and metabolic syndrome and fatty liver disease, chronic neurologic disease, colorectal carcinoma and obesity.").

[124] FDA, *Antimicrobial Resistance Information for Health Professionals and Consumers*, *available at* http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm135344.htm (last accessed Sept. 26, 2016).

[125] FDA, CTR. FOR DRUG EVAL. & RESEARCH, GASTROINTESTINAL DRUGS ADVISORY COMM., Transcript at 19.8-20.8 (Nov. 16, 2011) [hereinafter *ADCOMM Tr.*] (quoting Dr. Mulberg, Deputy Director, Division of Gastroenterology and Inborn Error Products, ODE III, CDER).

[126] *ADCOMM Tr.* at 123.14-20 (quoting Dr. Dimick-Santos, Medical Officer, Division of Gastroenterology and Inborn Error Products, ODE III, CDER).

48

FDA_00096

- "The prevalence of C. difficile isolates with higher relative MIC [minimum inhibitory concentration] values varies by study design and geographic location. Based on my review of the literature, it appears that a larger proportion of C. difficile isolates have higher MIC values in countries were [sic] rifaximin is used in the population more frequently."[127]

- "In the case of rifaximin, we don't have data at this time to predict how the proposed use of rifaximin in the IBS population will affect the emergence of rifaximin resistance. However, **the development of some resistance is probable and likely**."[128]

- "Basically, C. difficile has been associated with every antibiotic and every antimicrobial out there that's ever been used except maybe aminoglycosides. So for this not to increase risk for C. difficile, I would be very, very surprised. And all it's going to take is some rifaximin-resistant strains to get into the population, and I think you'll start to see that. You won't see it until you get the rifaximin-resistant strains of C. difficile into the population. But they're there already, and they will enrich, and you'll get more of them. I mean, I don't think this is totally theoretical. I mean, **the theoretical risk of antibiotics for C. difficile is not theoretical at all, and it's universal across all the antibiotics except maybe aminoglycosides. So that's not quite so theoretical.**[129]

- "My sense, from what I know here, is that **these risks aren't just hypothetical; they're real.** And there are risks within the person and then there are risks across the population."[130]

In sum, they stated that the risk of antibiotic resistance – especially to *C. difficile* – from rifaximin used to treat IBS-D was "real," "probable and likely," and "not theoretical at all." In addition, there was concern of microbiome alteration: "I'll say this again, but I do think the biggest risk here is not rifaximin resistance, but it's altering the microbiota in a way to make people more susceptible to colonization with multi-drug-resistant Gram-negatives that are carbapenem-resistant, and all these other things out there."[131]

Dr. DuPont echoes those concerns for rifaximin polymorphs that differ **Redacted**

> Resistance acquisition after administration of different rifaximin polymorphs needs adequate study to determine the potential for inducing

---

[127] *ADCOMM Tr.* at 136.18-137.2 (quoting Dr. Purfield, Clinical Microbiology Reviewer).

[128] *ADCOMM Tr.* at 139.3-139.8 (quoting Dr. Purfield) (emphasis added).

[129] *ADCOMM Tr.* at 331.11-332.7 (quoting Dr. McDonald, Chief, Prevention and Response Branch Division of Healthcare Quality Promotion National Center for Infectious Diseases Centers for Disease Control and Prevention) (emphasis added).

[130] *ADCOMM Tr.* at 372.18-21 (quoting Dr. Fleming, Professor and Chair Department of Biostatistics University of Washington) (emphasis added).

[131] *ADCOMM Tr.* at 311.3-311.9 (quoting Dr. McDonald).

49

FDA_00097

resistance among both the systemic bacterial microbiota and local gut microbiota. The organisms of greatest worry for post-antibiotic superinfection include *Enterococcus* spp. and *C. difficile*. In one study, a short-course use of Xifaxan® did not increase the likelihood of acquisition of enterococci. Prolonged or intermittent exposure to Xifaxan® in patients with hepatic encephalopathy or diarrhea-predominant irritable bowel syndrome is associated with fecal acquisition of *C. difficile* only rarely but has not been seen in most trials. This probably relates to the very low rifaximin minimal inhibitory concentration for strains of *C. difficile* and the fact that sufficiently high levels of the drug in the colon further prevent the selection of mutant strains with resistance.[132]

\*\*\*

Different polymorphs of rifaximin with higher absorption, by contrast, may not reach the same level of drug in the colon. With a more absorbed drug, the intraluminal concentrations may be reduced with different polymorphs of rifaximin and insufficient to inhibit the emergence of *C. difficile* infection to the same degree as Xifaxan®, particularly during prolonged use as with therapy of HE or IBS-D. These patients take intermittent Xifaxan® over long periods of time for IBS-D, and for life in the case of HE.[133]

\*\*\*

In contrast, a polymorph of rifaximin that is *less* water soluble may not provide the levels of biologically active drug to inhibit *C. difficile* and may therefore may not only promote superinfection, but also reduce the drug's efficacy when compared to Xifaxan.[134]

At the recommendation of the Committee,

**Redacted**

---

[132] Affidavit of Herbert L. DuPont, M.D. [hereinafter *DuPont Affidavit*] ¶ 30 (internal citations omitted).
[133] *DuPont Affidavit* ¶ 31.
[134] *DuPont Affidavit* ¶ 32.

50

**FDA_00098**

Table 9:                              Redacted

Table 10:                             Redacted

51

FDA_00099

**Redacted**

**Redacted** there is no reason to assume that a Different Polymorph Proposed Generic will behave in a manner bioequivalent to Xifaxan® with respect to the intestinal microbiome.
**Redacted**

Thus, if a Proposed Generic is not an Identical Polymorph Proposed Generic that satisfies all of the bioequivalence testing requested in this Petition, it must undergo the same degree of resistance and alteration study that was completed for Xifaxan®.

For HE patients who receive Xifaxan® on a chronic basis, no significant changes in the luminal intestinal microbiome have been observed.[135] However, recent evidence has documented changes in the mucosal microbiome of HE patients treated with Xifaxan® that are not seen in the luminal microbiome.[136] As discussed in that publication, such changes could reflect events associated with the efficacy of Xifaxan® in this patient population. Clearly, rifaximin concentrations at the mucosal level will be in equilibrium with and dependent on the total pool of soluble rifaximin present. For a Different Polymorph Proposed Generic, there can be no assurance of bioequivalence to Xifaxan®.

    2.    **Application of technical facts**

        a.    **For approved Xifaxan® indications, potency of a finished rifaximin drug product depends on the polymorph of which its active ingredient is composed, because the bioavailability of dissolved rifaximin is polymorph-specific.**

It is obvious that the extent of biological activity (*i.e.*, potency) of the drug substance is influenced by the local concentration of soluble drug. For rifaximin, the targets of action

---

[135] Jasmohan S. Bajaj et al., *Linkage of Gut Microbiome with Cognition in Hepatic Encephalopathy,* 302 AM. J. PHYSIOL. GASTROINTEST. LIVER PHYSIOL. G168 (2011) [hereinafter *Bajaj 2011*].

[136] Jasmohan S. Bajaj et al., *Colonic Mucosal Microbiome Differs from Stool Microbiome in Cirrhosis and Hepatic Encephalopathy and Is Linked to Cognition and Inflammation,* 303 AM. J. PHYSIOL. GASTROINTEST. LIVER PHYSIOL. G675 (2012) [hereinafter *Bajaj 2012*].

**FDA_00100**

include bacteria residing in various intestinal locations as well as the PXR localized to the intestinal epithelium.[137] Rifaximin acts against bacteria[138] and is anti-virulent,[139] depending on the bacterial species. In addition, these two activities have specific dose response relationships[140] and are, therefore, dependent on the concentration of soluble rifaximin present within the intestinal lumen or at the mucosal interface.

The solubility of rifaximin influences its antibacterial efficacy: Individual bile acids as well as human bile significantly enhance both rifaximin solubility and its antibacterial potency, as shown in Figures 18 and 19.[141]

---

[137] *Ma 2007.*

[138] S.M. Finegold et al., *Study of the In Vitro Activities of Rifaximin and Comparator Agents Against 536 Anaerobic Intestinal Bacteria from the Perspective of Potential Utility in Pathology Involving Bowel Flora,* 53(1) ANTIMICROBIAL AGENTS & CHEMOTHER. 281 (2009) [hereinafter *Finegold 2009*].

[139] Zhi-Dong Jiang et al., *Rifaximin-Induced Alteration of Virulence of Diarrhoea-Producing* Escherichia coli *and* Shigella sonnei, 35(3) INT. J. ANTIMICROB. AGENTS 278 (2010) [hereinafter *Jiang 2010*].

[140] E.A. Debbia et al., *Effects of Rifaximin on Bacterial Virulence Mechanisms at Supra- and Sub-Inhibitory Concentrations,* 20(2) J. CHEMOTHER. 186 (2008) [hereinafter *Debbia 2008*].

[141] Charles Darkoh et al., *Bile Acids Improve the Antimicrobial Effect of Rifaximin,* (54)9 ANTIMICROBIAL AGENTS & CHEMOTHER. 3618 (2010) [hereinafter *Darkoh 2010*]; B.W. Van Deest et al., *Bile Salt and Micellar Fat Concentration in Proximal Small Bowel Contents of Ileectomy Patients,* 47 J. CLINICAL INVESTIGATION 1314 (1968) [hereinafter *Van Deest 1968*].

FDA_00101



**Figure 18:** Solubility of Rifaximin in the Presence of Increasing Concentrations of a Mixture of Synthetic Bile Acids[142]



**Figure 19:** Growth of ETEC Strain H10407 in the Presence of and Absence of 16 ug/mL Rifaximin and the Indicated Bile Acids at a Concentration of 4 mM [143]

At a bile acid concentration of 10-15 mM, the concentration of soluble rifaximin plateaus at about 12 μg/mL, **Redacted**

        *In vivo*, the bile acid concentration is highest in the proximal small bowel and is significantly increased post-prandial to about 10-15mM. [144] This

---

[142] This Figure 19 is taken from data reported in *Darkoh 2010*.

[143] This Figure 20 is taken from data reported in *Darkoh 2010*.

[144] Yvonne Meier et al., *Regional Distribution of Solute Carrier mRNA Expression Along the Human Intestinal Tract*, 35(4) DRUG METAB. DISPOS. 590 (2007) [hereinafter *Meier 2007*].

**FDA_00102**

**JA115**

concentration then drops by an order of magnitude when the ascending colon is reached due to IBAT-mediated bile acid re-uptake in the terminal ileum.[145] This would favor higher antibacterial activity of rifaximin in the small bowel than in the colon and may indeed be the reason for minimal quantitative changes in the luminal colonic flora post-rifaximin treatment.[146]

**Redacted**

drug potency in the small intestine is expected to be influenced by the polymorph type in the final drug product. The efficacy and safety databases established for Xifaxan® are, therefore, specific to a drug product containing the Xifaxan® Polymorph Profile. It cannot be assumed that a Proposed Generic will match the established efficacy and safety profile of Xifaxan® unless its polymorph profile is the same as the Xifaxan® Polymorph Profile. These issues are discussed below for the 3 individual indications for which the Xifaxan® is approved.

### (i) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of TD.

Travelers' diarrhea is caused by the presence of an infectious pathogen in the intestine. Depending on the pathogen, the infected region may be the small intestine (enterotoxigenic *E. coli*), large intestine (*Campylobacter*, *Shigella*) or both. The effectiveness of Xifaxan® 200 mg in treating TD is a function of the pathogen encountered and the polymorph form present in the formulation. The efficacy of Xifaxan® in the treatment of invasive pathogens (*i.e.*, those causing fever with blood in stool) has not been established, as pointed out in the package insert:

---

[145] A. Gupta, et al., *Role of small intestinal bacterial overgrowth and delayed gastrointestinal transit time in cirrhotic patients with minimal hepatic encephalopathy*, 849 53(5) j. Hepatol (2010) [hereinafter *Gupta 2010*]; DW Jun, et al. *Association between small intestinal bacterial overgrowth and peripheral bacterial DNA in cirrhotic patients*, 55(5) Dig Dis Sci. 1465 (2010) [hereinafter *Jun 2010*]; C Pande, et al., *Small-intestinal bacterial overgrowth in cirrhosis is related to the severity of liver disease*, 29(12) Aliment Pharmacol Ther. 1273 (2009) [hereinafter *Pande 2009*].

[146] David N. Taylor et al., *A Randomized, Double-Blind, Multicenter Study of Rifaximin Compared with Placebo and with Ciprofloxacin in the Treatment of Travelers' Diarrhea*, 74(6) AM. J. TROP. MED. & HYG. 1060 (2006) [hereinafter *Taylor 2006*].

FDA_00103

**5.0 WARNINGS AND PRECAUTIONS**
**5 1 Travelers' Diarrhea Not Caused by Escherichia coli**

XIFAXAN® was not found to be effective in patients with diarrhea complicated by fever and/or blood in the stool or diarrhea due to pathogens other than Escherichia coli.

Discontinue XIFAXAN® if diarrhea symptoms get worse or persist more than 24 to 48 hours and alternative antibiotic therapy should be considered.

XIFAXAN® is not effective in cases of travelers' diarrhea due to Campylobacter jejuni. The effectiveness of XIFAXAN® in travelers' diarrhea caused by Shigella spp. and Salmonella spp. has not been proven. XIFAXAN® should not be used in patients where Campylobacter jejuni, Shigella spp., or Salmonella spp. may be suspected as causative pathogens [see Indications and Usage (1.1)].

This label restriction is due to the longer TLUS values observed in patients harboring these pathogens and may be due to solubility limitations on rifaximin once delivered to the large intestine (Table 11).[147]

**Table 11:** Summary of Efficacy Results of All Patients Enrolled in the Traveler's Diarrhea Study Comparing Xifaxan® 200 mg, Ciprofloxacin and Placebo[148]

|  | Rifaximin 200 mg three times a day x 3 days | Placebo | Cipro 500 mg two times a day x 3 days |
|---|---|---|---|
| Intention-to-treat population | $n = 197$ | $n = 101$ | $n = 101$ |
| Median TLUS (hours) | 32.0 | 65.5 | 28.8 |
| Clinical wellness | 76.6% | 61.4% | 78.2% |
| Treatment failure | 14.7% | 26.7% | 6.9% |
| Efficacy evaluable population | $n = 186$ | $n = 91$ | $n = 94$ |
| Median TLUS (hours) | 30.6 | 48.3 | 28.4 |
| Clinical wellness | 78.5% | 65.9% | 81.9% |
| Treatment failure | 13.4% | 26.4% | 7.4% |
| Subgroups |  |  |  |
| Patients with diarrheagenic E. coli* | $n = 73$ | $n = 38$ | $n = 40$ |
| Median TLUS (hours) | 24.0 | 38.0 | 23.4 |
| Clinical wellness | 65/73 (89.0%) | 28/38 (73.7%) | 33/40 (82.5%) |
| Microbial eradication | 56/73 (76.7%) | 24/38 (63.2%) | 37/40 (92.5%) |
| Patients with invasive pathogens+ | $n = 22$ | $n = 9$ | $n = 7$ |
| Median TLUS (hours) | 43.7 | 58.3 | 24.4 |
| Clinical wellness | 15/22 (68.2%) | 5/9 (55.6%) | 6/7 (85.7%) |
| Microbial eradication | 16/22 (72.7%) | 4/9 (44.4%) | 5/7 (71.4%) |
| Patients with no detectable pathogen | $n = 67$ | $n = 38$ | $n = 37$ |
| Median TLUS (hours) | 23.5 | 71.6 | 29.7 |
| Clinical wellness | 56/67 (83.6%) | 22/38 (57.9%) | 30/37 (81.1%) |

For the subgroup analyses, median TLUS and clinical wellness were calculated for the intent-to-intent population, and microbiological eradication was calculated for the modified intent-to-treat population, defined as all patients in the intent-to-treat population with positive pretreatment stool samples and a posttreatment sample.

*This subgroup excludes subjects with concurrent invasive pathogens defined as *Campylobacter jejuni*, *Shigella* species, and *Salmonella* species.

+ The analysis of invasive pathogens was performed excluding data from the Goa site so that TLUS could be calculated. TLUS could not be calculated for the Goa site because over half the subjects were lost to follow-up.

---

[147] *Taylor 2006.*
[148] *Taylor 2006*, Table 3.

FDA_00104

It is therefore concluded that polymorph type, through its influence on rifaximin luminal solubility, will influence the efficacy of the Proposed Generic for this indication of Xifaxan®.

> ### (ii)   Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of HE.

Hepatic encephalopathy is effectively treated by Xifaxan® 550 mg, but it is unclear where in the GI tract the drug exerts its primary effectiveness. One primary target for alleviating HE symptoms is the amount of ammonia produced by bacteria in the intestine.[149] Under normal circumstances, the majority of intestinal bacteria reside in the colon. It would follow that the primary site of ammonia production, and hence Xifaxan®'s effectiveness, would be the colon.

**Redacted**

In addition to the reduction in intestinal ammonia production as a contributing factor in the mechanism of Xifaxan® in HE, recent evidence shows that HE patients may harbor specific bacterial populations in the mucosal layer (the mucosal microbiome), which are distinct from the lumenal microbiome population.[153] While Xifaxan® 550 mg does not produce major alterations in the lumenal microbiome, it does alter the diversity of the mucosal microbiome, coincident with the resolution of HE symptoms.[154] Therefore, penetration of soluble rifaximin into the mucosal layer is also considered an important

---

[149] *Bajaj 2011* at G168 ("There is evidence that pathogenic abnormalities in HE are related to the gut flora and their byproducts such as ammonia and endotoxin in the setting of intestinal barrier dysfunction and systemic inflammation.") (citations omitted).

[150] Rahul Rai et al., *Gut Microbiota: Its Role in Hepatic Encephalopathy*, 5 J. Clinical and Experimental Hepatology, S29-36 (March 2015) [hereinafter *Rai 2015*] ; Reiner Wiest et al., *Pathological Bacterial Translocation in Liver Cirrhosis*, 60 J. of Hepatology 197-209 (Jan. 2014) [hereinafter *Wiest 2014*]; *Gupta 2010* at 849-855.

[151] D. Huglo et al., *Simultaneous Determination of Pulmonary and Intestinal Permeability in Patients with Alcoholic Liver Cirrhosis*, 28(10) Eur. J. Nucl. Med. 1505 (2001) [hereinafter *Huglo 2001*] ; M.J. Zuckerman et al., *Assessment of Intestinal Permeability and Absorption in Cirrhotic Patients with Ascites Using Combined Sugar Probes*, 49(4) Dig. Dis. Sci. 621 (2004) [hereinafter *Zuckerman 2004*].

[152] Urmila Khettry et al., *Impact of Model for End-Stage Liver Disease (MELD) Scoring System on Pathological Findings at and after Liver Transplantation*, 12 LIVER TRANSPLANTATION 958 (2006) [hereinafter *Khettry 2006*].

[153] *Bajaj 2012.*

[154] *Bajaj 2012.*

FDA_00105

determinant of efficacy. Clearly, differences in solubility due to differences in rifaximin polymorph forms can influence such penetration, hence the potency in treating HE.

### (iii) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of IBS-D.

Irritable bowel syndrome affects between 25 and 45 million people in the United States (10 to 15% of the population); 50% of IBS patients suffer from IBS-D. Approximately 60% to 65% of individuals who report IBS in the community are female. IBS is a major women's health issue and a majority of affected women are of child-bearing age. As discussed in earlier sections, this raises additional safety concerns if systemic exposure to rifaximin changes upon approval of a Proposed Generic.

Xifaxan® 550 mg is approved for the treatment of diarrhea-predominant IBS. A normal course of treatment is 550 mg TID for 10 days. A durable response is observed for 24 weeks on average following the treatment regimen. The mechanism of action proposed to be responsible for the clinical activity of Xifaxan® in this indication is related to effects on SIBO.[155] This mechanism points to the small bowel as the important site of action; the activity of a rifaximin formulation would be dependent on achieving soluble drug levels in the small intestine that are comparable to those achieved with Xifaxan®. As discussed previously, the concentration of soluble rifaximin delivered to the small bowel is in turn dependent on the polymorph profile of the drug product.

**Redacted**

---

[155] Mark Pimentel et al., *The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome, a Randomized Trial*,145 ANNALS OF INTERNAL MEDICINE 557 (Oct. 17, 2006) [hereinafter *Pimentel 2006*].
[156] **Redacted**

FDA_00106

**JA119**



b. **Potency of the finished rifaximin drug product also depends on fasted/fed conditions** Redacted **because bile acids in the proximal small bowel affect solubility,** Redacted

Potency of a finished rifaximin drug product depends on fasted/fed conditions, because the solubility of rifaximin is affected by bile acids in the proximal small bowel. **Redacted**

c. **PK parameters are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan®, because Xifaxan® acts topically, is poorly soluble and poorly absorbed,** Redacted **Redacted**

**Redacted**

d. *In vitro* **dissolution results generated in media containing SDS are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics, because that methodology cannot** Redacted **produce results relevant to *in vivo* performance: biologically relevant conditions that distinguish between polymorph forms must be tested.**

**Redacted**

59

**FDA_00107**

As FDA pointed out in its August 23, 2016 final response letter to the May 7, 2015 citizen petition by Cubist Pharmaceuticals ("Cubist FRL"):[157]

> In the GI tract, stability of the [topically acting GI] drug substance varies depending on pH, and solubility of the drug substance varies depending on lipid content/surfactant level. Therefore, to simulate in vivo drug release in different portions of the GI tract, we recommend that an applicant use multiple dissolution media at different pH values and with different surfactant levels. The dissolution method should be validated and discriminate against formulation differences.[158]

Such testing should also be required for approval of Proposed Generics.

**D.    Application of legal and technical facts**

      **1.    FDA can lawfully approve ANDAs for Identical Polymorph Proposed Generics, but only if the criteria requested in this Petition are satisfied.**

FDA can approve ANDAs for Identical Polymorph Proposed Generics; however, at a minimum, the Requested Actions must be granted in order for ANDA approval to be lawful.

      **2.    Different Polymorph Proposed Generics cannot be demonstrated to meet the sameness of active ingredient, sameness of strength or bioequivalence criteria, because testing technology needed to make those demonstrations does not exist.**

For many drugs, polymorph form of the active ingredient does not affect potency. For Xifaxan®, polymorph form matters, greatly. As discussed *supra*, FDA recognizes that, in reviewing an ANDA for approval, it must assess active ingredient "sameness" on a case-by-case basis, and may need to prescribe standards—including specification of crystalline structure—when necessary to ensure sameness. This is one of those cases: Different Polymorph Proposed Generics are expected to have topical and systemic drug potencies different from those of Xifaxan®. Thus, such Proposed Generics cannot meet the sameness of active ingredient criterion.

Additionally, a Different Polymorph Proposed Generic cannot be demonstrated to have sameness of strength to, or be bioequivalent to, Xifaxan®. Testing technology needed to make those demonstrations for an ANDA does not exist.        **Redacted**

Second, *in vitro* dissolution

---

[157] Letter from Janet Woodcock, M.D. (FDA) to Pamela Sears (Cubist Pharmaceuticals) (Aug. 23, 2016), Docket No. FDA-2015-P-1595 (hereinafter *Cubist FRL*).
[158] *Cubist FRL* at 9.

60

**FDA_00108**

**JA121**

results are unsuitable surrogates for *in vivo* solubility performance of Different Polymorph Proposed Generics. Third, PK parameters are unsuitable surrogates for prediction of Different Polymorph Proposed Generics' topical or systemic bioavailability.

Fourth, results of a bioequivalence study with clinical endpoints cannot demonstrate sameness of systemic bioavailability/potency, because a rifaximin polymorph different from Xifaxan® could appear to have efficacy non-inferior to Xifaxan®, yet have systemic or topical bioavailability/potency different than Xifaxan®. In fact, FDA has recognized the limitations to bioequivalence studies with clinical endpoints in situations with facts and conditions similar to those addressed in this Petition:

> However, we recommend that the use of comparative clinical trials as an approach to demonstrate BE generally be considered insensitive and be avoided where possible (21 CFR 320.24). The use of BE [bioequivalence] studies with clinical trial endpoints can be appropriate to demonstrate BE for orally administered drug products when measurement of the active ingredients or active moieties in an accessible biological fluid (pharmacokinetic approach) or pharmacodynamic approach is infeasible.[159]

Further, even if non-inferiority is indicated by a bioequivalence study, safety for any indications (between which systemic absorption levels of rifaximin differ) cannot be assessed given the small numbers of subjects used.

> ### 3.    FDA cannot lawfully approve ANDAs for Different Polymorph Proposed Generics, because they cannot meet the sameness or bioequivalence criteria.

As discussed *supra*, FDA cannot lawfully approve an ANDA unless the sameness and bioequivalence criteria are satisfied. Because Different Polymorph Proposed Generics cannot be demonstrated to meet those criteria, the ANDA approval pathway currently is not available for such Proposed Generics.

> ### 4.    FDA can lawfully approve ANDAs for Non-Q1/Q2 Identical Polymorph Proposed Generics, but only where appropriately designed bioequivalence studies with clinical endpoints are successfully completed.

This section addresses additional criteria that must be met to approve an ANDA for a Proposed Generic that has a polymorph profile identical to the Xifaxan® Polymorph

---

[159] FDA, GUIDANCE FOR INDUSTRY, BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES FOR ORALLY ADMINISTERED DRUG PRODUCTS—GENERAL CONSIDERATIONS, 9-10 (2003) (hereinafter *Draft BA & BE Studies Guidance 2003*].

61

**FDA_00109**

Profile, but is not qualitatively and quantitatively the same (*i.e.*, "Q1/Q2") as Xifaxan.®160 The points made in this section draw from the points made by FDA in the Cubist FRL.

For such a Proposed Generic ("Non-Q1/Q2 Identical Polymorph Proposed Generic"), differences in the type and amount of excipients may affect the absorption and antibacterial activity of the rifaximin active ingredient at the sites of action. Clearly, for Xifaxan® approved indications, sameness in the *in vitro* dissolution profile and sameness in plasma PK cannot ensure the Non-Q1/Q2 Identical Polymorph Proposed Generic will deliver the same amount of available drug to sites of action in the GI tract. If rifaximin dissolution were increased, the Proposed Generic could have increased systemic potency. Such would lead to concerns raised by the use of Higher Solubility Polymorphs.[161] If rifaximin dissolution were decreased, the Proposed Generic could have less potency at topical sites of action, but a difference in PK profile might not be seen.[162] Such would lead to concerns of antibiotic resistance and microbiome alteration. Thus, a bioequivalence study with clinical endpoints is needed to demonstrate that any Non-Q1/Q2 Identical Polymorph Proposed Generic is bioequivalent to Xifaxan®.

As FDA explained in the Cubist FRL:

> When an in vivo bioequivalence study with clinical endpoints is recommended, the clinical endpoints for bioequivalence evaluation should be selected based on an evaluation of the approach that is most sensitive and reproducible in the context of demonstrating bioequivalence. The amount of supportive clinical data as well as the design of the clinical studies, including endpoints, will depend on the specifics of the application.[163]

### a. Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 200 mg indicated for treatment of TD[164].

In the context of demonstrating bioequivalence to Xifaxan® 200 mg tablets, FDA's *200mg Draft Bioequivalence Guidance* recommends a bioequivalence study with clinical endpoints. However, the primary endpoint listed in the *200mg Draft Bioequivalence Guidance* differs in kind from the primary endpoint on which approval of the RLD was based. Such difference renders the recommended study incapable of generating evidence of bioequivalence between the Proposed Generic and Xifaxan® 200 mg.

---

[160] That is, the Identical Polymorph Proposed Generic contains excipients that differ in amount or type from those in the Xifaxan® RLD.

[161] *See supra* §§ II.C.1 n, o, p.

[162] Such would be analogous to use of a Proposed Generic with                    **Redacted**

[163] *Cubist FRL* at 10.

[164] FDA, GUIDANCE FOR INDUSTRY – NON-INFERIORITY CLINICAL TRIALS (2010) (draft guidance) [hereinafter *Non-Inferiority Draft Guidance*].

62

The primary endpoint in the *200mg Draft Bioequivalence Guidance* would evaluate the proportion of subjects in which TD symptoms would abate after a specific length of treatment (5 days). Abatement would be assessed on the number unformed (soft and watery) stools per subject. In comparison, the pivotal Xifaxan® studies evaluated whether the duration of diarrhea was shortened.[165] This duration was determined by calculation of the TLUS which was defined as the time to the last unformed stool passed, **after which the subject was declared to be clinically well** (*i.e.* resolution of diarrhea and other non-diarrhea symptoms). The treatment groups were compared in terms of survival distribution functions. Therefore, the pivotal study endpoints were measures of the rate at which patients achieved symptom resolution and clinical wellness.

These distinctions from FDA's recommended bioequivalence clinical endpoints study are important: it is well documented that certain sequelae of TD are correlated with the extent and duration of symptoms. The rate at which clinical symptoms resolve will be directly related to the concentration of soluble drug substance at the site of pathogen invasion. Since TD is a self-limiting disease it is possible that a 5-day endpoint recommended by *200mg Draft Bioequivalence Guidance* could very well yield an observed "bioequivalent" outcome for both groups, even though the time at which clinical cure was achieved was not statistically bioequivalent. Thus, the pivotal study endpoints should be recommended for any Non-Q1/Q2 Identical Polymorph Proposed Generic seeking approval for the TD indication.

Additionally, the non-inferiority margin recommended by the *200mg Draft Bioequivalence Guidance* is unacceptably wide,[166] when consideration is given to data from the pivotal TD studies, displayed below in Table 12.

**Table 12:** Clinical Response in Study 1 (ITT population)

|  | Xifaxan®<br>(n=125) | Placebo<br>(n = 129) | Estimate<br>(97.5% CI) |
|---|---|---|---|
| Median TLUS (hours) | 32.5 | 58.6 | 2[a]<br>(1.26, 2.5) |
| Clinical cure, n (%) | 99 (79) | 78 (60) | 19[b]<br>(5.3, 32.1) |

[a] Hazard Ratio (p-value <0.001)
[b] Difference in rates (p-value <0.01)

The region should be established based on non-inferiority principles. The principles involve retention of certain fraction of the treatment effect, for example 50%, of RLD over placebo. Pivotal studies of Xifaxan® estimated the treatment effect to be 19%. The non-inferiority margin should be set to ensure that there would be no more than a 50% loss of efficacy based on this effect estimate: a difference between the Proposed Generic and Xifaxan® of 9.5%. Thus, the proposed bioequivalence region of [-20%, +20%] in the *200mg Draft Bioequivalence* Guidance is not reasonable.

---

[165] *Xifaxan® PI* § 14.1.
[166] That is, the 90% confidence interval of the Proposed Generic to Xifaxan® contained within [-20%, +20%].

63

**FDA_00111**

Two approaches could be taken to set the non-inferiority margin, $\partial$ :

$$\partial \leq r\Delta_{R-P,} \; 0 < r \leq 0.5$$

or

$$\partial < \text{Lower Limit of 95\% CI on } \Delta_{R-P}$$

Where:

- $\Delta_{R-P}$ is the overall difference in clinical cure rates (rifaximin minus placebo) from pivotal TD studies, and
- r is the fraction of treatment effect to be preserved; for example $r = 0.5$ means 50% retention of treatment effect of RLD to placebo.

The first approach gives a non-inferiority margin of 9.5% (equivalence region of [-9.5%, +9.5%]), and the second a non-inferiority margin of 5.3% (equivalence region of [-5.3%, +5.3%]). This demonstrates that a non-inferiority margin between 5.3% to 9.5% is reasonable to establish bioequivalence between a Non-Q1/Q2 Identical Polymorph Proposed Generic and Xifaxan®.

Therefore, for a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 200 mg indicated for treatment of TD, the following is needed for ANDA approval: bioequivalence studies that include TLUS and *declaration of cure* clinical endpoints and appropriate non-inferiority margins based on non-inferiority principles.

> **b.    Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 550 mg indicated for treatment of HE.**

In the context of demonstrating bioequivalence to Xifaxan® 550 mg tablets, FDA's *550mg Draft Bioequivalence Guidance* failed to recommend a bioequivalence study with clinical endpoints for the 550 mg strength. FDA was willing to rely on the results of the above-mentioned TD bioequivalence study with clinical endpoints as adequate evidence of bioequivalence between a Proposed Generic and Xifaxan® 550 mg. FDA's approach will not provide adequate evidence of such bioequivalence. For the following reasons, a clinical endpoint study is needed to demonstrate bioequivalence between a Non-Q1/Q2 Identical Polymorph Proposed Generic and Xifaxan® 550 mg in patients with HE:

**Redacted**

**Redacted**    Third, TD and HE are fundamentally different diseases caused by different physiological mechanisms. Further, TD is self-limiting and usually

**FDA_00112**

**JA125**

experienced by otherwise healthy people, whereas HE is not self-limiting and often is experienced by people who are not otherwise healthy. Fourth, there is no evidence that the mechanisms by which Xifaxan® 200 mg acts to treat TD and Xifaxan® 550 mg acts to treat HE are the same.

Therefore, for a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of HE, the following is needed as part of testing for ANDA approval: bioequivalence studies with inclusion criteria and endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the HE indication and appropriate non-inferiority margins based on non-inferiority principles.

          **c.**     **Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 550 mg indicated for treatment of IBS-D.**

Additionally, if the Proposed Generic is intended to treat IBS-D and the above-mentioned bioequivalence studies are not completed for the HE indication, such studies must be done in IBS-D patients. This is for the following reasons:

**Redacted**

Third, TD
and IBS-D are fundamentally different diseases caused by different physiological mechanisms. Further, TD is self-limiting and usually experienced by otherwise healthy people, whereas IBS-D is not self-limiting. Fourth, there is no evidence that the mechanisms by which Xifaxan® 200 mg acts to treat TD and Xifaxan® 550 mg acts to treat IBS-D are the same.

Therefore, for a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of IBS-D, the following is needed as part of testing for ANDA approval if the above-mentioned clinical endpoint study of Xifaxan® 550 mg was not done for the HE indication: bioequivalence studies with inclusion criteria and endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the IBS-D indication and appropriate non-inferiority margins based on non-inferiority principles.

          **5.**     **Failure to grant the actions requested in this Petition will pose substantial public health risks.**

As discussed *supra*, approval of ANDAs for Different Polymorph Proposed Generics poses risks of efficacy differences, toxicity in HE patients, oral contraceptive failure and subsequent related teratogenicity, the risk of systemic antibiotic resistance, and the risk of *C. difficile* resistance and harming diversity of the healthy colonic microbiome.[167] These

---

[167] *See supra* §§ II.C.1 n, o, p.

65

FDA_00113

public health risks are not merely theoretical, but real. Indeed, FDA itself has identified antibiotic resistance as a significant risk.

As discussed in Section II.C.1.n, rifaximin belongs to the same class of antibiotics as rifampin. Thus, the public health concern posed by a Higher Solubility Polymorph is heightened due to potential for drug-drug interaction with oral contraceptives in the user populations for which Xifaxan® is indicated. Such a Proposed Generic, if approved, would by definition have labeling identical to that of Xifaxan®. Yet based on the results of Xifaxan® clinical trials, Xifaxan's® labeling does not include warnings of drug-drug interaction with oral contraceptives because clinically significant risk was not seen. Because of the potential for unplanned pregnancy and its associated impact on reproductive rights, as well as FDA's view of potential teratogenicity, the risk of contraceptive failure posed by such a Proposed Generic must be carefully assessed.[168]

Granting the Requested Actions will help ensure that these risks are addressed in the approval process for any Proposed Generics.

### E.    Conclusion

Based on the legal and technical grounds stated *supra*, Salix requests that FDA require, at a minimum, the actions requested in this Petition.

---

[168] Under both the Constitution and the Administrative Procedure Act ("APA"), Agencies may not act in ways that are arbitrary and capricious or irrational. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215-16 (D.C. Cir. 2013). *See also City of Cleburne, Tex. v. Cleburne*, 473 U.S. 432, 439 (1985) (the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."); *Washington v. Davis*, 426 U.S. 229, 239 (1976) (Due Process Clause of the Fifth Amendment contains an equal protection component).

66

FDA_00114

**JA127**

## III.   Environmental Impact

The petitioner requests a categorical exclusion from the requirement of preparing an environmental assessment. As provided in 21 C.F.R. § 25.31, neither an environmental assessment nor an environmental impact statement is required. To the best of the petitioner's knowledge, no extraordinary circumstances exist that may significantly affect the human environment as discussed under 21 C.F.R. § 25.21.

## IV.   Economic Impact

As provided in 21 C.F.R. §10.30(b), the petitioner agrees to submit economic impact information only if requested by the Commissioner of Food and Drugs following review of the Petition.

## V.   Certification

I certify that, to my best knowledge and belief: (a) this petition includes all information and views upon which the petition relies; (b) this petition includes representative data and/or information known to the petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure that any representative data and/or information which are unfavorable to the petition were disclosed to me. I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date:

- **Information contained in the executive summary of Petition (Petition § II.A):** The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). The following study became available to Salix its date of finalization or initial publication: **Redacted**   The final information in the following guidance became available to Salix on the date it was released: *200mg Draft Bioequivalence Guidance* (Nov. 1, 2011); *550mg Draft Bioequivalence Guidance* (Feb. 7, 2012); *Draft Biowaiver Guidance* (May 4, 2015). The following Federal Register notices on the dates they were released: *Watson Laboratories Withdrawal* (Apr. 9, 2014); *Impax Laboratories Withdrawal* (March 18, 2013). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding legal grounds of Petition (Petition § II.B):** Each version of the Orange Book became available to Salix on the date of its publication by FDA (most recently July 1, 2016). The final information in the following guidance became available to Salix on the date it was released: *Polymorphism Guidance* (July 9, 2007); *Draft BA & BE Studies Guidance* (March 12, 2014). The following correspondence became available to Salix on the date of their transmission: Holcombe letter (April 8, 2002); Woodcock letter (June 17, 1997); Peck letter (Apr. 6, 1992); *FDA Lovenox CP Response* (July 23, 2010). The following published article became available to Salix on its date of initial publications, except as otherwise noted: *Lee 2014* (published ahead of print on

67

May 16, 2014). The following became available on the date of its initial publication: *ANDA Regulations* (Apr. 28, 1992). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the description of Xifaxan® (Petition § II.C.1.a):** Some of the information included in the Petition became available to Salix prior to submission of that information to FDA in NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). The following became available to Salix upon its submission to FDA: Cross Discipline Team Leader Review (March 8, 2010). The following published articles became available to Salix on their dates of initial publications, except as otherwise noted: *Kothary 2013* (published ahead of print on Nov. 26, 2012); *Huang 2013* (published ahead of print on April 1, 2013); *Viscomi 2008* (published ahead of print on May 28, 2008); *Campbell 2001* (March 23, 2001). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin crystallizes into different polymorph forms, depending on manufacturing methods and controls (Petition § II.C.1.b):** Some of the information included in the Petition became available to Salix in 2001 and was submitted in NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The following published articles became available to Salix on their dates of initial publications, except as otherwise noted: *Viscomi 2008* published ahead of print on May 28, 2008); *Blandizzi 2015* (published ahead of print on Dec. 14, 2014). The following patents became available to Salix on their dates of publication: Karen S. Gushurst et al., Forms of Rifaximin and Uses Thereof, United States Patent US 8,067,429 B2 (Nov. 29, 2011); Guiseppe Claudio Viscomi et al., Polymorphous Forms of Rifaximin, Processes for Their Production and Use thereof in Medicinal Preparations, United States Patent US 9,271,968 B2 (March 1, 2016). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Xifaxan® has a specific polymorph profile (Petition § II.C.1.c):** Some of the information included in the Petition became available to Salix in 2001 and was submitted in NDA 21-361 (Xifaxan®

FDA_00116

200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-0361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The following became available to Salix upon its submission to FDA:          **Redacted**          The following study became available to Salix on its date of finalization:          **Redacted**          **Redacted**          All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that *in vitro* dissolution results generated in media containing sodium dodecyl sulphate ("SDS") are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics,** **Redacted** **or produce results relevant to *in vivo* performance: bio-relevant media that distinguish between polymorph forms must be used (Petition § II.C.1.d):** The following became available to Salix on the date of its submission to FDA: **Redacted**

  All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin polymorphs differ in aqueous solubility, each from the other (Petition § II.C.1.e):** Some of the information included in the Petition became available to Salix in 2001 and was submitted in NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The following studies became available to Salix on the dates they were finalized:          **Redacted**

  The final information in the following draft guidance became available to Salix on the date it was released: *Draft Biowaiver Guidance* (May 4, 2015). The following published articles became available to Salix on their dates of initial publication, except as otherwise noted: *Jantratid 2009* (Aug. 1, 2009); *Jantratid 2008* (published ahead of print on April 11, 2008). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that the *in vivo* availability of dissolved rifaximin is polymorph driven (Petition § II.C.1.f):** The following published article became available to Salix on its date of initial publication: *Mudie 2014* (Aug. 12, 2014). The final information in the following comments to draft guidance became available to Salix on the date that they were finalized: **Redacted**

69

**FDA_00117**

**JA130**



**Redacted**

**Redacted** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Xifaxan® is poorly soluble *in vivo* (Petition § II.C.1.g):** The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that                    Redacted**

    **(Petition § II.C.1.h):** The following published articles became available to Salix on their dates of initial publication, except as otherwise noted: *Viscomi 2008* (published ahead of print on May 28, 2008); *Blandizzi 2015* (published ahead of print on Dec. 14, 2014); *Northfield 1973* (published July 1, 1973, but not known to Salix until first NDA 21-361 (Xifaxan® 200 mg; TD indication) was submitted on December 21, 2001, and the data were collected over a several year time period in the years preceding publication); *Washington 2001* (Dec. 21, 2000); Blandizzi 2014 (July 1, 2014). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Xifaxan® virtually is unabsorbed into the systemic circulation (Petition § II.C.1.i):** The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted:    **Redacted**
    *DuPont 2011* (published ahead of print on Jan. 13, 2011); *Brown 2010* (published ahead of print on Oct. 26, 2009). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin absorption is solubility-limited,    Redacted    (Petition § II.C.1.j):** The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted:    **Redacted**    *Blandizzi 2014* (July 1, 2014);    **Redacted**    All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin absorption is not consistent between polymorphs,    Redacted    (Petition § II.C.1.k):** The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted: **Redacted**

70

FDA_00118

**Redacted**   ; *Viscomi 2008* (published ahead of print on May 28, 2008);
*Blandizzi 2015* (published ahead of print on Dec. 14, 2014);   **Redacted**

All final opinions developed for
purposes of the Petition became available to Salix on the date that this Petition
was signed.

• **Information regarding the point that the site of systemic absorption of Xifaxan®**   **Redacted**

**(Petition § II.C.1.***l***)**: The following published
article and study became available to Salix on their dates of initial publication or
finalization:   **Redacted**   ; *Wilding 2000* (Nov. 1, 2000). All
final opinions developed for purposes of the Petition became available to Salix on
the date that this Petition was signed.

• **Information regarding the point that a Proposed Generic formulated** ᴿᵉᵈᵃᶜᵗᵉᵈ **Redacted could meet the *Draft Rifaximin Bioequivalence Guidance Documents*' Bioequivalence endpoints, but be less potent at topical sites of action in the GI lumen (Petition § II.C.1.m)**:. All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

• **Information regarding the point that Higher Solubility Polymorphs pose the risk of oral contraceptive failure from drug-drug interaction and related teratogenicity, especially in HE and IBS-D patients (Petition § II.C.1.n)**: The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted:   **Redacted**
**Redacted**   ; *Ma 2007* (published ahead of print on April 18, 2007); *Jones 2000* (Jan. 1, 2000); *Carnahan 2005* (Aug. 1, 2005); *Cheng 2010* (published ahead of print on July 13, 2010); *Cheng 2012* (June 1, 2012); *Adachi 2006* (Feb. 15, 2006); *Jones 2012* (Oct. 18, 2012); *Dickinson 2001* (Nov. 1, 2001); *Blode 2012* (Oct. 1, 2012);   **Redacted**   . The final
information in the following guidance became available to Salix on the date it was released: *Drug Interaction Studies Draft Guidance* (Feb. 15, 2012). The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

• **Information regarding the point that Different Polymorph Proposed Generics composed of Higher Solubility Polymorphs pose the risk of systemic antibiotic resistance in all users; also, Different Polymorph Proposed Generics composed of Lower Solubility Polymorphs pose the risk of systemic antibiotic resistance in HE patients (Petition § II.C.1.o)**: The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted: *Brigidi 2002* (June 1,

71

2002); *DuPont 2005* (Dec. 1, 2005);         **Redacted**         ; *Blandizzi 2015* (published ahead of print on Dec. 14, 2014); *Reynolds 2000* (Dec. 1, 2000); *De Leo 1986* (published Dec. 1, 1986, but known to Salix upon the filing of NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001); *Kothary 2013* (published ahead of print on Nov. 26, 2012); *Gumbo 2007* (published ahead of print Aug. 27, 2007). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- Information regarding the point that Different Polymorph Proposed Generics pose the risk of harming diversity of the healthy colonic microbiome (Petition § II.C.1.p): The following published articles, studies and other sources became available to Salix on their dates of initial publication, except as otherwise noted: *DuPont Aliment Pharmacology 2016* (Jan. 1, 2016); *DuPont Mini-Reviews 2016* (Feb. 1, 2016); *FDA, Antimicrobial Resistance Information for Health Professionals and Consumers (last updated Feb. 19, 2016*); ADCOMM Tr. (Nov. 16, 2011); *DuPont Affidavit* (Oct. 13, 2016); *Bajaj 2011* (published ahead of print on Sept. 22, 2011); *Bajaj 2012* (published ahead of print on July 19, 2012). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- Information regarding the point that for approved Xifaxan® indications, potency of a finished rifaximin drug product depends on the polymorph of which its active ingredient is composed, because the bioavailability of dissolved rifaximin is polymorph-specific (Petition § II.C.2.a): The following published articles and studies became available to Salix on their dates of initial publication, except as otherwise noted:  *Ma 2007* (published ahead of print on April 18, 2007); *Finegold 2009* (published ahead of print on Oct. 27, 2008); *Jiang 2010* (published ahead of print on Jan. 4, 2010); *Debbia 2008* (April 1, 2008); *Darkoh 2010* (published ahead of print on June 14, 2010); *Van Deest 1968* (published June 1, 1968, but not known to Salix until Salix was formed on November 1, 1989); *Meier 2007* (published ahead of print on January 12, 2007); *Gupta 2010* (published ahead of print on July 17, 2010); *Jun 2010* (published ahead of print on June 11, 2009); *Pande 2009* (June 15, 2009); *Taylor 2006* (June 1, 2006); *Bajaj 2011* (published ahead of print on Sept. 22, 2011); *Rai 2015* (published ahead of print on Jan. 6, 2015); *Wiest 2014* (published ahead of print on Aug. 29, 2013); *Huglo 2001* (published ahead of print on Aug. 23, 2001); *Zuckerman 2004* (April 1, 2004); *Khettry 2006* (published ahead of print on April 5, 2006); *Bajaj 2012* (published ahead of print on July 19, 2011); *Pimentel 2006* (Oct. 17, 2006);         **Redacted**         . All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- Information regarding the point that potency of the finished rifaximin drug product also depends on fasted/fed conditions   **Redacted**   because bile acids in the proximal small bowel affect solubility,   **Redacted**   (Petition § II.C.2.b): All

72

**FDA_00120**

**JA133**

[black redaction box]

final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that PK parameters are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan®, because Xifaxan® acts topically, is poorly soluble and poorly absorbed,** Redacted
  Redacted

  (**Petition § II.C.2.c**): All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that** *in vitro* **dissolution results generated in media containing SDS are unsuitable surrogates for** *in vivo* **solubility performance of Proposed Generics, because that methodology cannot** Redacted **produce results relevant to** *in vivo* **performance: biologically relevant conditions that distinguish between polymorph forms must be tested (Petition § II.C.2.d):** The following correspondence became available to Salix on the date of its transmission: *Cubist FRL* (Aug. 23, 2016). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that FDA can lawfully approve ANDAs for Identical Polymorph Proposed Generics, but only if the criteria requested in this Petition are satisfied (Petition § II.D.1):** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Different Polymorph Proposed Generics cannot be demonstrated to meet the sameness of active ingredient, sameness of strength or bioequivalence criteria, because testing technology needed to make those demonstrations does not exist (Petition § II.D.2):** The following guidance became available to Salix on its dates of initial publication: *Draft BA & BE Studies Guidance* 2003 (March 19, 2003); *Non-Inferiority Draft Guidance* (March 1, 2010). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that FDA cannot lawfully approve ANDAs for Different Polymorph Proposed Generics, because they cannot meet the sameness or bioequivalence criteria (Petition § II.D.3):** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that FDA can lawfully approve ANDAs for Non-Q1/Q2 Identical Polymorph Proposed Generics, but only where appropriately designed bioequivalence studies with clinical endpoints are successfully completed (Petition § II.D.4):** The following correspondence

73

FDA_00121

**JA134**

became available to Salix on the date of its transmission: *Cubist FRL* (Aug. 23, 2016). The following guidance became available to Salix on its dates of initial publication: *Non-Inferiority Draft Guidance* (March 1, 2010). The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

• **Information regarding the point that failure to grant the actions requested in this Petition will pose substantial public health risks (Petition § II.D.5):** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: Salix Pharmaceuticals, Inc. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.

October 17, 2016                                        Respectfully submitted

Lance L. Shea

Counsel to Salix Pharmaceuticals, Inc.

74

**FDA_00122**

*Contains Nonbinding Recommendations*

**Draft Guidance on Rifaximin**

---

This draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA, or the Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the Office of Generic Drugs.

---

**Active Ingredient:**      Rifaximin

**Dosage Form; Route:**      Tablet; oral

**Recommended Studies:**      Two options

**Option 1:**

If the test product formulations are qualitatively and quantitatively (Q1/Q2) the same as the Reference Listed Drug (RLD) with respect to inactive ingredients, bioequivalence (BE) may be established by conducting both in vivo BE studies with pharmacokinetic (PK) endpoints and in vitro comparative dissolution studies.

<u>In vivo BE study with PK endpoints:</u>

1. Type of study: Fasting
   Design: Single-dose, two-treatment, two-period crossover in vivo
   Strength: 200 mg
   Subjects: Healthy males and nonpregnant/nonlactating females, general population.
   Additional Comments: Applicants may consider using a reference-scaled average bioequivalence approach for this drug product. Please refer to the Progesterone Capsule Guidance for additional information regarding the reference-scaled average bioequivalence approach.

2. Type of study: Fed
   Design: Single-dose, two-treatment, two-period crossover in vivo
   Strength: 200 mg
   Subjects: Healthy males and nonpregnant/nonlactating females, general population.
   Additional Comments: Same as comments above

<u>In vitro dissolution study:</u>

3. Type of study: Comparative dissolution study
   Strength: 200 mg
   Apparatus: U.S. Pharmacopeia (USP) Apparatus 2 (paddle)
   Media: pH 4.5, 0.125% and 0.375% SDS
            pH 6.8, 0.125% and 0.375% SDS
   Volume: 1000 mL
   Temperature: 37°C
   Rotation speed: 75 rpm
   Sampling times: 10, 20, 30, 45, 60, 90, and 120 minutes

4. Type of study: Comparative dissolution study
   Strength: 550 mg

*Recommended Nov 2011, Feb 2012; Revised Mar 2017*

**FDA_00210**

Apparatus: U.S. Pharmacopeia (USP) Apparatus 2 (paddle)
Media: pH 4.5, 0.25% and 0.5% SDS
            pH 6.8, 0.25% and 0.5% SDS
 Volume: 1000 mL
 Temperature: 37°C
 Rotation speed: 75 rpm
 Sampling times: 10, 20, 30, 45, 60, 90, and 120 minutes

**Analytes to measure (in appropriate biological fluid):** Rifaximin in plasma

**Bioequivalence based on (90% CI):** Rifaximin

**Waiver request of in vivo testing:** 550 mg strength based on (i) acceptable bioequivalence studies on the 200 mg strength, (ii) proportional similarity of the formulations between both strengths, and (iii) acceptable in vitro dissolution testing of both strengths.

**Dissolution test method and sampling times:** The dissolution information for this drug product can be found on the FDA-Recommended Dissolution Methods web site, available to the public at the following location:  http://www.accessdata.fda.gov/scripts/cder/dissolution/. Conduct comparative dissolution testing on 12 dosage units each of both strengths of the test and reference products.  Specifications will be determined upon review of the abbreviated new drug application (ANDA).

---

**Option 2:**
If the test product formulations are not Q1/Q2 the same as the RLD with respect to inactive ingredients, BE should be established by conducting an in vivo study with clinical endpoints, in vivo study with PK endpoints, and in vitro comparative dissolution testing.

<u>In vivo BE study with PK endpoints:</u>

The same studies as recommended under Option 1.

<u>In vitro dissolution study:</u>

The same studies as recommended under Option 1.

<u>In vivo BE study with clinical endpoints:</u>

Type of study: BE Study with Clinical Endpoints
Design: Three-arm, randomized, double blind, parallel, placebo controlled in vivo
Strength: 200 mg (dosed: three times daily for 3 days)
Subjects: Male and nonpregnant/nonlactating female subjects with travelers' diarrhea
Additional comments: Specific recommendations are provided below.

FDA_00211

**JA137**

**Additional comments regarding the BE study with clinical endpoints (200 mg):**

1. The Office of Generic Drugs (OGD) recommends conducting a BE study with clinical endpoints in the treatment of travelers' diarrhea. After three unformed stools are recorded within the 24 hours immediately preceding randomization, subjects are to be randomized to receive the generic rifaximin 200 mg oral tablet, the reference listed drug (RLD) 200 mg oral tablet or placebo three times daily for 3 days (i.e., on study Days 1, 2, and 3). The primary endpoint is clinical cure at the test of cure (TOC) visit on study Day 5.

2. A placebo control arm is recommended to demonstrate that the test product and RLD are active and as a parameter to establish that the study is sufficiently sensitive to detect differences between products.

3. Inclusion Criteria (the sponsor may add additional criteria)
   a. Adult male or nonpregnant and non-lactating female aged ≥ 18 years non-indigenous travelers (e.g., visiting students/faculty or international tourists) affected by naturally acquired acute diarrhea. Diarrhea is defined as the passage of at least three unformed stools in a 24-hour period. Stools are classified as formed (retains shape), soft (assumes shape of container), or watery (can be poured). When using this classification, both soft and watery stools are unformed and abnormal.
   b. At least three unformed stools recorded within the 24 hours immediately preceding randomization.
   c. At least one of the following signs and symptoms of enteric infection:
      • abdominal pain or cramps
      • nausea
      • vomiting
      • fecal urgency
      • excessive gas/flatulence
      • tenesmus
   d. Women of child-bearing potential with a negative pregnancy test prior to beginning therapy and who agree to use effective contraceptive methods during the study.

4. Exclusion Criteria (the sponsor may add additional criteria)
   a. Pregnant, breast feeding, or planning a pregnancy.
   b. Immediately prior to randomization, acute diarrhea for > 72 hours.
   c. Presence of:
      • fever (≥ 100 °F or ≥ 37.8 °C), or
      • hematochezia (blood in stool), or
      • clinical findings suggesting moderate or severe dehydration.
   d. Active, uncontrolled, or clinically significant diseases or disorders of the heart, lung, kidney, GI tract (other than infectious diarrhea in travelers), or central nervous system.
   e. Administration of any of the following:
      • any antimicrobial agents with an expected activity against enteric bacterial pathogens within 7 days preceding randomization

FDA_00212

- more than two doses of a symptomatic antidiarrheal compound such as antimotility agents, absorbent agents, and antisecretory agents within 8 hours preceding randomization
  f. Use of any drug such as aspirin or ibuprofen (Advil), which can cause GI bleeding. Acetaminophen (Tylenol) or paracetamol is acceptable.
  g. If required during the study antimalarial prophylactic treatment, including doxycycline, is permitted prior to and during the study

5. Stools at subject screening (Day 0) and end of study (Day 5) should be cultured for pathogenic organisms, but microbiological cure rates will be considered as supportive of the similarity of populations in each arm of the study and not considered as evidence of bioequivalence.

6. Possible patient subgroups with travelers' diarrhea that should be considered in planning for the populations size required for this study include:
   - inflammatory/invasive pathogens,
   - diarrheagenic *E. coli* without evidence of inflammatory/invasive pathogens,
   - other agents without evidence of inflammatory/invasive pathogens.

7. The protocol should include a list of the prescription and over-the-counter drug products, procedures, and activities that are prohibited during the study, such as:
   a. Prescription and over-the-counter (OTC) anti-diarrheal drug product other than study product.
   b. Opioid analgesics.

8. The recommended primary endpoint is clinical cure at the TOC visit (study Day 5). Clinical cure is defined as either:
   a. No stools or only formed stools within a 48 hour period and no fever, with or without other enteric symptoms, OR
   b. No watery stools or no more than two soft stools passed within a 24 hour period with no fever and no other enteric symptoms except for mild excess gas/flatulence.

9. In addition, clinical deterioration by study Day 5 or failure to achieve formed stool in $\leq 3$ days is a clinical failure.

10. The recommended secondary endpoint is Time to Last Unformed Stool (TLUS) defined as the interval beginning with the first dose of study drug and ending with the last unformed stool passed.

11. The protocol should clearly define the per-protocol (PP), modified intent-to-treat (mITT) and safety populations:
   a. The accepted PP population used for bioequivalence evaluation includes all randomized subjects who met all inclusion/exclusion criteria, were dosed a pre-specified proportion of the scheduled administrations (e.g., 75% to 125%) of the assigned product for the specified duration of the study, do not miss a pre-specified number of scheduled doses for more than pre-specified number of days (e.g. 1 consecutive day), and complete the evaluation within the

FDA_00213

designated visit window (+/- 1 day) with no protocol violations that would affect the treatment evaluation. The protocol should specify how compliance will be verified, e.g., by the use of subject diaries.

   b. The mITT population includes all randomized subjects who dose at least one dose of assigned product.

   c. The safety population includes all randomized subjects who receive study product.

12. Subjects who are discontinued early from the study due to lack of treatment effect after completing 3 days of treatment should be included in the PP population using Last Observation Carried Forward (LOCF). Subjects whose condition worsens and who require alternate or supplemental therapy for the treatment of travelers' diarrhea should be discontinued, included in the PP population analysis using LOCF, and provided with effective treatment. Subjects discontinued early for other reasons should be excluded from the PP population, but included in the mITT population, using LOCF.

13. The start and stop date of concomitant medication use during the study should be provided in the data set in addition to the reason for the medication use.

14. All adverse events (AEs) should be reported, whether or not they are considered to be related to the treatment. The report of AEs should include date of onset, description of the AE, severity, relation to study medication, action taken, outcome and date of resolution. This information is needed to determine if the incidence and severity of adverse reactions is different between the test product and RLD.

15. The method of randomization should be described in the protocol and the randomization schedule should be provided. It is recommended that an independent third party generate and hold the randomization code throughout the conduct of the study in order to minimize bias. The sponsor may generate the randomization code if not involved in the packaging and labeling of the study medication. A sealed copy of the randomization scheme should be retained at the study site and should be available to FDA investigators at the time of site inspection to allow for verification of the treatment identity of each subject.

16. A detailed description of the blinding procedure is to be provided in the protocol. The packaging of the test, reference and placebo products should be similar in appearance to make differences in treatment less obvious to the subjects and to maintain adequate blinding of evaluators. When possible, neither the subject nor the investigator should be able to identify the treatment. The containers should not be opened by the subject at the study center.

17. Please refer to 21 CFR 320.38, 320.63 and the Guidance for Industry, "Handling and Retention of BA and BE Testing Samples", regarding retention of study drug samples and 21 CFR 320.36 for requirements for maintenance of records of bioequivalence testing. In addition, the investigators should follow the procedures of 21 CFR 58 and ICH E6, "Good Clinical Practice: Consolidated Guideline", for retention of study records and data in order to conduct their studies in compliance with Good Laboratory Practices (GLP) and Good Clinical Practices (GCP). Retention samples

FDA_00214

should be randomly selected from the drug supplies received prior to dispensing to subjects. Retention samples should not be returned to the sponsor at any time.

18. It is the sponsor's responsibility to enroll sufficient subjects for the study to demonstrate bioequivalence between the products.

19. To establish bioequivalence for a dichotomous endpoint, it is recommended the following compound hypotheses be tested using the per protocol population:

$$H_O: \pi_T - \pi_R \leq \Delta_1 \text{ or } \pi_T - \pi_R \geq \Delta_2 \quad \text{versus} \quad H_A: \Delta_1 < \pi_T - \pi_R < \Delta_2$$

where  $\pi_T$ = the success rate of the primary endpoint for the treatment group, and
$\pi_R$ = the success rate of the primary endpoint for the reference group.

The null hypothesis, $H_O$, is rejected with a type I error ($\alpha$) of 0.05 (two one-sided tests) if the estimated 90% confidence interval for the difference of the success rates between test and reference products ($\pi_T - \pi_R$) is contained within the interval [$\Delta_1, \Delta_2$], where $\Delta_1$ = -0.20 and $\Delta_2$ = 0.20.  Rejection of the null hypothesis supports the conclusion of equivalence of the two products.

20. To establish sensitivity within the study for either a dichotomous or continuous primary endpoint, the test and reference product should both be statistically superior to the placebo.  Conduct an appropriate inferential test with a type I error ($\alpha$) of 0.05, using the mITT population and the primary endpoint.

21. Study data should be submitted to the OGD in electronic format.
    a. Include a list of file names, a description of the content of each file, an explanation of the variables within each file, and a description of all variable codes (for example, for the treatment variable, A = RLD and B = TEST).
    b. Provide two primary data sets, one with No Last Observation Carried Forward (NO-LOCF - pure data set) and one with the Last Observation Carried Forward (LOCF - modified data set).
    c. Provide a separate data set for demographic, vital sign, adverse event, disposition (including reason for discontinuation of treatment), concomitant medication, medical history, compliance, and comment variables.

22. Please provide a summary dataset containing a separate line listing for each subject (if data exist) using the following headings, if applicable:
    a. Study identifier
    b. Subject identifier
    c. Site identifier: study center
    d. Age
    e. Age units (years)
    f. Sex
    g. Race
    h. Name of Actual Treatment (exposure): test product, RLD, placebo control
    i. Duration of Treatment (total exposure in days)
    j. Completed the study (yes/no)

*Recommended Nov 2011; Feb 2012; Revised Mar 2017*

6

FDA_00215

k.    Protocol Violations (yes/no)
l.    Reason for premature discontinuation of subject
m.    Subject required additional treatment for diarrhea due to unsatisfactory treatment response (yes/no)
n.    Per Protocol (PP) population inclusion (yes/no)
o.    Reason for exclusion from PP population
p.    Modified Intent to Treat (mITT) population inclusion (yes/no)
q.    Reason for exclusion from mITT population
r.    Safety population inclusion (yes/no)
s.    Reason for exclusion from Safety population
t.    Number of unformed bowel movements during 24 hours immediately prior to randomization
u.    Number of formed bowel movements during 24 hours immediately prior to randomization
v.    Number of unformed bowel movements during study Day 1
w.    Number of formed bowel movements during study Day 1
x.    Number of unformed bowel movements during study Day 2
y.    Number of formed bowel movements during study Day 2
z.    Number of unformed bowel movements during study Day 3
aa.    Number of formed bowel movements during study Day 3
bb.    Number of unformed bowel movements during study Day 4
cc.    Number of formed bowel movements during study Day 4
dd.    Number of unformed bowel movements during study Day 5
ee.    Number of formed bowel movements during 2 study Day 5
ff.    After randomization, no stools or only formed stools within a 48 hour period (yes/no)
gg.    After randomization, no watery stools or no more than two soft stools passed within a 24 hour period (yes/no)
hh.    After randomization, clinical deterioration (yes/no)
ii.    Achieved formed stool in $\leq 3$ days after randomization (yes/no)
jj.    At TOC visit, any enteric symptom except for mild excess gas/flatulence (yes/no)
kk.    Clinical cure at TOC visit (yes/no)
ll.    Time to Last Unformed Stool (hours)
mm.    Treatment compliance: number of missed doses per subject
nn.    Concomitant medication (yes/no)
oo.    Adverse event(s) reported (yes/no)

Please refer to Table 1 as an example. This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

FDA_00216

**JA142**

**Table 1: Example of a summary dataset containing one line listing for each subject**

| STUDYID | SUBJID | SITEID | AGE | AGEU | SEX | RACE | EXTRT | EXDUR | completd | prot_vio | disc_rs | add_trt | pp | pp_rs | mitt | mitt_rs | safety | safe_rs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 1 | 01 | 21 | YEARS | F | 1 | A | 14 | Y | N | | N | Y | | Y | | Y | |
| 101 | 2 | 01 | 30 | YEARS | F | 1 | B | 14 | Y | N | | N | Y | | Y | | Y | |

| bas_ubm | bas_fbm | day1_ubm | day1_fbm | day2_ubm | day2_fbm | day3_ubm | day3_fbm | day4_ubm | day4_fbm | day5_ubm | day5_fbm | 48hrcure | 24hrcure | cl_deter | fstool | ent_sx | cl_cure | tlus | complian | CM | AE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 0 | | | | | | | | | | | Y | Y | N | Y | N | Y | 70 | 0 | Y | Y |
| 7 | 0 | | | | | | | | | | | N | Y | N | Y | N | Y | 48 | 0 | N | N |

Note: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2 Final dated 11/12/08.

| | |
|---|---|
| STUDYID: | Study Identifier |
| SUBJID: | Subject Identifier for the Study |
| SITEID: | Study Site Identifier |
| AGE: | Age |
| AGEU: | Age units (years) |
| SEX: | Sex, e.g., M=Male, F=Female, U=Unknown |
| RACE: | Race, e.g., 1=White, 2=Black or African American, 3=Asian, 4=American Indian or Alaska Native, 5=Native Hawaiian or Other Pacific Islanders |
| EXTRT: | Name of Actual Treatment (exposure), e.g., A=test product, B= RLD, C=placebo control |
| EXDUR: | Duration of Treatment (total exposure in days) |
| completd: | Subject completed the study, e.g., Y=Yes, N=No |
| prot_vio: | Protocol Violations, e.g., Y=Yes, N=No |
| disc_rs: | Reason for premature discontinuation from the study, e.g., A=adverse event, B=death, C=lost to follow-up, D=non-compliance with treatment, E=treatment unblinded, F=subject moved out of area, G=unsatisfactory treatment response, H=withdrew consent, I=protocol violation, K=other event |
| add_trt: | Subject required additional treatment for diarrhea due to unsatisfactory treatment response, e.g., Y=Yes, N=No |
| pp: | Per Protocol (PP) population inclusion, e.g., Y=Yes, N=No |
| pp_rs: | Reason for exclusion from PP population, e.g., A=prematurely discontinued, B=lost to follow-up, C=subject moved out of the area, D=noncompliant, etc. |
| mitt: | Modified Intent to Treat (mITT) population inclusion, e.g., Y=Yes, N=No |
| mitt_rs: | Reason for exclusion from mITT population, e.g., A=never treated, etc. |
| safety: | Safety population inclusion, e.g., Y=Yes, N=No |
| safe_rs: | Reason for exclusion from Safety population, e.g., A=never treated, etc. |

FDA_00217

| | |
|---|---|
| bas_ubm: | Number of unformed bowel movements during 24 hours immediately prior to randomization |
| bas_fbm: | Number of formed bowel movements during 24 hours immediately prior to randomization |
| day1_ubm: | Number of unformed bowel movements during study Day 1 |
| day1_fbm: | Number of formed bowel movements during study Day 1 |
| day2_ubm: | Number of unformed bowel movements during study Day 2 |
| day2_fbm: | Number of formed bowel movements during study Day 2 |
| day3_ubm: | Number of unformed bowel movements during study Day 3 |
| day3_fbm: | Number of formed bowel movements during study Day 3 |
| day4_ubm: | Number of unformed bowel movements during study Day 4 |
| day4_fbm: | Number of formed bowel movements during study Day 4 |
| day5_ubm: | Number of unformed bowel movements during study Day 5 |
| day5_fbm: | Number of formed bowel movements during study Day 5 |
| 48hrcure: | After randomization, no stools or only formed stools within a 48 hour period, e.g., Y=Yes, N=No |
| 24hrcure: | After randomization, no watery stools or no more than two soft stools passed within a 24 hour period, e.g., Y=Yes, N=No |
| cl_deter: | After randomization, clinical deterioration, e.g., Y=Yes, N=No |
| fstool: | Achieved formed stool in ≤ 3 days after randomization, e.g., Y=Yes, N=No |
| ent_sx: | At TOC visit, any enteric symptom except for mild excess gas/flatulence, e.g., Y=Yes, N=No |
| cl_cure: | Clinical cure at TOC visit, e.g., Y=Yes, N=No |
| tlus: | Time to Last Unformed Stool (hours) |
| complian: | Treatment compliance, e.g., number of missed doses per subject |
| CM: | Concomitant medication, e.g., Y=Yes, N=No |
| AE: | Adverse event(s) reported, e.g., Y=Yes, N=No |

23. Please provide a dataset containing a separate line listing for each visit per subject (if data exist) using the following headers, if applicable:
    a.  Study identifier
    b.  Subject identifier
    c.  Name of Actual Treatment (exposure): test product, RLD, placebo control
    d.  Visit number
    e.  Visit date
    f.  Study day; i.e., day of randomization is study day 1
    g.  Fever (yes/no)
    h.  Moderate or severe dehydration (yes/no)
    i.  Hematochezia (blood in stool) (yes/no)
    j.  Abdominal pain or cramps (yes/no)
    k.  Nausea (yes/no)
    l.  Vomiting (yes/no)
    m.  Fecal urgency (yes/no)
    n.  Excessive gas/flatulence (yes/no)
    o.  Tenesmus (yes/no)
    p.  Use of anti-diarrheal drug product, other than study product, or opioid analgesic reported during this visit (yes/no)
    q.  If reported during this visit, provide date(s) of use of anti-diarrheal drug product, other than study product, or opioid analgesic.
    r.  Concomitant medication reported during this visit (yes/no)
    s.  Adverse event reported during this visit (yes/no)

FDA_00218

t.   Laboratory testing during this visit (yes/no)

Please refer to Table 2 as an example. This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

**Table 2: Example of dataset containing one line listing for each visit per subject**

| STUDYID | SUBJID | EXTRT | VISITNUM | SVSTDTC | ELTMBS | fever | dehydrat | hematoc | abd_pain | nausea |
|---------|--------|-------|----------|---------|--------|-------|----------|---------|----------|--------|
| 101 | 1 | A | 1 | 2004-07-01 | 1 | | | | | |

| vomiting | fec_urg | ex_gas | tenesmus | proh_med | proh_m_d | CMrpt | AErpt | LBtest |
|----------|---------|--------|----------|----------|----------|-------|-------|--------|
| | | | | N | | Y | Y | N |

<u>Note</u>: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2 Final dated 11/12/08.

| | |
|---|---|
| STUDYID: | Study Identifier |
| SUBJID: | Subject Identifier for the Study |
| EXTRT: | Name of Actual Treatment (exposure), e.g., A=test product, B=RLD, C= placebo control |
| VISITNUM: | Visit Sequence Number |
| SVSTDTC: | Visit date: (SVSTDTC=Subject Visit Start Date Time-Character) |
| ELTMBL: | Elapsed Time since Baseline (days) |
| fever: | Fever , e.g., Y=Yes, N=No |
| dehydrate: | Moderate or severe dehydration, e.g., Y=Yes, N=No |
| hematoc: | Hematochezia (blood in stool), e.g., Y=Yes, N=No |
| abd_pain: | Abdominal pain or cramps e.g., Y=Yes, N=No |
| nausea: | Nausea, e.g., Y=Yes, N=No |
| vomiting: | Vomiting, e.g., Y=Yes, N=No |
| fec_urg: | Fecal urgency, e.g., Y=Yes, N=No |
| ex_gas: | Excessive gas/flatulence, e.g., Y=Yes, N=No |
| tenesmus: | Tenesmus, e.g., Y=Yes, N=No |
| proh_med: | Use of anti-diarrheal drug product, other than study product, or opioid analgesic reported during this visit, e.g., Y=Yes, N=No |
| proh_m_d: | If reported during this visit, provide date(s) of use of anti-diarrheal drug product, other than study product, or opioid analgesic. |
| CMrpt: | Concomitant Medication reported during this visit, e.g., Y=Yes, N=No |
| AErpt: | Adverse Event reported during this visit, e.g., Y=Yes, N=No |
| LBtest: | Laboratory Testing performed during this visit, e.g., Y=Yes, N=No |

FDA_00219

24. The study data should be submitted in standardized format.  Please refer to more details at http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm248635.htm.

25. These recommendations are specific to this product and may not be appropriate for bioequivalence studies of any other product, including any other dosage forms or strengths of rifaximin.

---

Type of study: BE Study with Clinical Endpoints
Design: Three–arm, randomized, double blind, parallel, placebo-controlled in vivo
Strength:  550 mg (dosed: three times a day for 14 days)
Subjects: Male and nonpregnant/non-lactating female subjects with irritable bowel syndrome with diarrhea (IBS-D)

**Additional comments regarding the BE study with clinical endpoints (550 mg):**

1. The Office of Generic Drugs (OGD) recommends conducting a BE study with clinical endpoints in the treatment of irritable bowel syndrome with diarrhea (IBS-D).  After a 1-2-week screening period, subjects are to be randomized to receive the generic rifaximin 550 mg tablet, the reference listed drug (RLD) 550 mg tablet or placebo tablet three times a day for 14 days.  Subjects are then to be followed for an additional 4 weeks.  Rifaximin may be taken with or without food.

2. A placebo control arm is recommended to demonstrate that the test product and RLD are active and as a parameter to establish that the study is sufficiently sensitive to detect differences between products.

3. Inclusion Criteria (the sponsor may add additional criteria)

    a. Male or nonpregnant/non-lactating female aged ≥ 18 years with a clinical diagnosis of irritable bowel syndrome with diarrhea (IBS-D) confirmed by the Rome III diagnostic criteria.  At least 12 weeks, which need not be consecutive, in the preceding 12 months of abdominal discomfort or pain associated with 2 or more of the following:
        i. Relieved with defecation
        ii. Onset associated with a change in frequency of stool
        iii. Onset associated with a change in form(appearance) of  stool
    b. **Abdominal Pain Intensity**: weekly average of *worst daily (in past 24 hours) abdominal pain* score of > 3.0 on a 0 to 10 point scale

        and

        **Stool Consistency**: at least one stool with a consistency of Type 6 or Type 7 Bristol stool score (BSS) on at least 2 days per week
    c. Subject has undergone a colonoscopy within the last 2 years as part of an evaluation for IBS or IBS symptoms (which excluded inflammatory or neoplastic disease).  The subject has a colonoscopy scheduled and completed within 30 days of signing the informed consent.

*Recommended Nov 2011; Feb 2012; Revised Mar 2017*                                    11

FDA_00220

    d.   Subject required to maintain a stable diet for the duration of the study.

    e.   Subjects on stable treatment with a daily dietary fiber supplementation or bulking agents may be enrolled provided that the administration schedule is intended to be maintained throughout the study and the subject has been on therapy for at least 30 days prior to signing the informed consent.

    f.   Women of child-bearing potential have a negative pregnancy test prior to beginning therapy and agree to use effective contraceptive methods during the study.

4.   Exclusion Criteria: (the sponsor may add additional)

    a.   Subjects presenting with the following symptoms of constipation IBS (during the diary eligibility phase of $\geq 7$ days immediately prior to the first dose of study drug):

        i.   Less than 3 bowel movements a week

        ii.   Hard or lumpy stools

        iii.   Straining during a bowel movement

    b.   Subject fails to record at least 7 days of daily diary assessments during the screening phase.

    c.   Subject had current evidence of duodenal ulcer, gastric ulcer, diverticulitis, gastroesophageal reflux disease (GERD), or infectious gastroenteritis. **Note:** Subjects with GERD controlled by stable doses of medication or diet are eligible to participate in the study.

    d.   Subject has a history of inflammatory bowel disease (e.g., Crohn's disease, ulcerative colitis, and celiac disease), GI malignancy, GI obstruction, gastroparesis, carcinoid syndrome, pancreatitis, amyloidosis, ileus, or cholelithiasis. Subjects may participate if they have a cholecystectomy.

    e.   Subject has diabetes (Type 1 or Type 2).

    f.   Subject is a candidate for GI surgery or has a history of GI surgery (exceptions appendectomy, cholecystectomy, benign polypectomy, and inguinal hernia).

    g.   Subject has lactose intolerance not controlled by a lactose-free diet.

    h.   Subject had a positive stool test for Yersinia enterocolitica, Campylobacter jejuni, Salmonella, Shigella, ovum and parasites, and/or Clostridium difficile. (Note: Stool sample was not required if a negative test was obtained within 14 days of randomization).

    i.   Subject has psychiatric disorder not controlled with current therapy.

    j.   Subject has current or recent (within 12 months) history of drug or alcohol abuse.

    k.   Subject is pregnant, breast feeding, or planning a pregnancy.

    l.   Subject has a history of HIV, Hepatitis (B or C), abnormal thyroid function not controlled by medication, hepatic disease manifested by twice the ULN for AST, ALT, alkaline phosphatase or total bilirubin (except an isolated elevation of unconjugated bilirubin).

    m.   Subject has renal disease manifested by 1.5 times the ULN of serum creatinine or blood urea nitrogen levels.

    n.   Subject has unstable cardiovascular or pulmonary disease, categorized by a worsening in the disease condition that requires a change in treatment or medical care within one month of randomization.

    o.   Subject has any condition or circumstance that could cause noncompliance with treatment or visits.

    p.   Subject has known allergy to rifaximin or rifampin or excipients.

    q.   Subject has had an active malignancy except for basal cell carcinoma or in situ cervical carcinoma that has been excised within the last 5 years.

    r.   Subject has participated in an investigational drug or device study within the 30 days prior to signing the informed consent.

FDA_00221

s.   Subject has taken rifaximin within 60 days of signing the ICF.
t.   Subject has taken any experimental drugs within 30 days of signing the ICF and subjects who have taken probiotics after initiation of the diary eligibility phase (yogurt and standard food products are allowed).
u.   Subject has taken any antibiotics within 14 days prior to signing the ICF.
v.   Subject has taken antipsychotic drugs, antispasmodics, antidiarrheals (e.g. loperamide, lubiprostone, and bismuth subsalicylate), narcotics, prokinetic drugs, drugs indicated for IBS (e.g. Alosetron), or warfarin after the initiation of the diary eligibility phase.

5.   The protocol should include a list of the prescription and over-the-counter drug products, procedures, and activities that are prohibited during the study.  This may include over-the-counter anti-diarrheals or a significant change in diet.

6.   The study should include a 1- to 2- week screening period.  The 1- to 2-week screening period can be used to establish the presence and persistence of trial entry criteria and train patients in the mode of data collection selected for the trial.  The screening period can also be used to select patients with specified levels of severity of signs and symptoms.[1]  Baseline should be defined from the diary data collected during seven days immediately preceding the beginning of the treatment period.

7.   The recommended primary endpoint is responder rate at week 6 and should measure the effect of treatment on two major IBS signs and symptoms (i.e. abnormal defecation and abdominal pain). A patient should be categorized as an overall responder if the patient is weekly responder for at least two weeks during the four-week follow-up period. A patient is categorized as a weekly responder if the patient achieves the following improvement in both pain intensity and stool consistency for a week as described below:

- ≥30% improvement from the baseline in the weekly average abdominal pain score based on the daily question:  "In regards to your specific IBS symptoms of abdominal pain, on a scale of 0-10, what was your worst IBS-related abdominal pain over the last 24 hours? 'Zero' means you have no pain at all; 'ten' means the worst possible pain you can imagine"
- At least a 50% reduction in the number of days in a week with a daily stool consistency of Bristol Stool Scale type 6 or 7 compared with the baseline where 6=fluffy pieces with ragged edges, a mushy stool; 7=watery stool, no solid pieces; entirely liquid.

8.   Sponsors should choose a format for daily sign or symptom assessment (e.g., interactive voice response or personal digital assistant) so that patients can evaluate IBS signs or symptoms on a daily basis throughout the trial. Daily questionnaire should be answered at approximately same time each day. Appropriate questions to evaluate IBS signs and symptoms include (sponsor may add additional):
a.   How many bowel movements did you have in the last 24 hours?
b.   On a scale of 1-7, what was the score of your least formed bowel movement in the last 24 hours (Bristol Stool Scale)?
   1 = Separate hard lumps, like nuts (hard to pass)
   2 = Sausage-shaped but lumpy
   3 = Like a sausage but with cracks on its surface
   4 = Like a sausage or snake, smooth and soft

---

[1] Guidance for Industry Irritable Bowel Syndrome-Clinical Evaluation of Drugs for Treatment, May 2012.

FDA_00222

        5 = Soft blobs with clear cut edges (passed easily)
        6 = Fluffy pieces with ragged edges, a mushy stool
        7 = Watery stool, no solid pieces; entirely liquid.

    c.  Have you felt or experienced a sense of urgency in the last 24 hours with any of your bowel movements?  (Yes/No)

    d.  In regards to your specific IBS symptom of abdominal pain, on a scale of 0-10, what was your worst IBS-related abdominal pain over the last 24 hours?  'Zero' means you have no pain at all; 'Ten' means the worst possible pain you can imagine.

    e.  In regards to your specific IBS symptom of bloating, on a scale of 0-6, how bothersome was your IBS-related bloating in the last 24 hours?

        0 = not at all
        1 = hardly
        2 = somewhat
        3 = moderately
        4 = a good deal
        5 = a great deal
        6 = a very great deal

    f.  In regards to all your symptoms of IBS, on a scale of 0-6, how bothersome were your symptoms of IBS in the last 24 hours?

        0 = not at all
        1 = hardly
        2 = somewhat
        3 = moderately
        4 = a good deal
        5 = a great deal
        6 = a very great deal

9.  The protocol should clearly define the PP, mITT and safety populations.

    a.  The accepted PP population used for bioequivalence evaluation includes all randomized subjects who meet all inclusion/exclusion criteria, dose a pre-specified proportion of the scheduled doses (e.g., 75% to 125%) of the assigned product for the specified duration of the study, do not miss a pre-specified number of scheduled doses for more than pre-specified number of days (e.g. 1 consecutive day), and complete the evaluation within the designated visit window with no protocol violations that would affect the treatment evaluation. The protocol should specify how compliance will be verified (e.g., by the use of subject diaries).

    b.  The mITT population includes all randomized subjects who dose at least one dose of assigned product.

    c.  The safety population includes all randomized subjects who receive study product.

10. Subjects who are discontinued early (any time before end of week 6) from the study due to lack of treatment effect should be included in the PP population.  Subjects whose condition worsens and who require alternate or supplemental therapy for the treatment of diarrhea during the treatment phase of the study should be discontinued, included in the PP population analysis using LOCF, and provided with effective treatment.  Subjects discontinued early for other reasons should be excluded from the PP population, but included in the mITT population.

11. The start and stop date of concomitant medication use during the study should be provided in the data set in addition to the reason for the medication use.

12. All AEs should be reported, whether or not they are considered to be related to the treatment. The report of AEs should include date of onset, description of the AE, severity, relation to study medication, action taken, outcome and date of resolution. This information is needed to determine if the incidence and severity of adverse reactions is different between the test product and RLD.

13. The method of randomization should be described in the protocol and the randomization schedule should be provided. It is recommended that an independent third party generate and hold the randomization code throughout the conduct of the study in order to minimize bias. The sponsor may generate the randomization code if not involved in the packaging and labeling of the study medication. A sealed copy of the randomization scheme should be retained at the study site and should be available to FDA investigators at the time of site inspection to allow for verification of the treatment identity of each subject.

14. A detailed description of the blinding procedure is to be provided in the protocol. The packaging of the test, reference and placebo products should be similar in appearance to make differences in treatment less obvious to the subjects and to maintain adequate blinding of evaluators. When possible, neither the subject nor the investigator should be able to identify the treatment. The containers should not be opened by the subject at the study center.

15. Please refer to 21 CFR 320.38, 320.63 and the Guidance for Industry, "Handling and Retention of BA and BE Testing Samples", regarding retention of study drug samples and 21 CFR 320.36 for requirements for maintenance of records of bioequivalence testing. In addition, the investigators should follow the procedures of 21 CFR 58 and ICH E6, "Good Clinical Practice: Consolidated Guideline", for retention of study records and data in order to conduct their studies in compliance with Good Laboratory Practices (GLP) and Good Clinical Practices (GCP). Retention samples should be randomly selected from the drug supplies received prior to dispensing to subjects. Retention samples should not be returned to the sponsor at any time.

16. It is the sponsor's responsibility to enroll sufficient subjects for the study to demonstrate bioequivalence between the products.

17. To establish bioequivalence for a dichotomous endpoint, it is recommended the following compound hypotheses be tested using the per protocol population:

$$H_O: \pi_T - \pi_R \leq \Delta_1 \text{ or } \pi_T - \pi_R \geq \Delta_2 \quad \text{versus} \quad H_A: \Delta_1 \leq \pi_T - \pi_R \leq \Delta_2$$

where  $\pi_T$ = the success rate of the primary endpoint for the treatment group, and
$\pi_R$ = the success rate of the primary endpoint for the reference group.

The null hypothesis, $H_O$, is rejected with a type I error rate ($\alpha$) of 0.05 (two one-sided tests) if the estimated 90% confidence interval for the difference of the success rates between test and reference products ($\pi_T - \pi_R$) is contained within the interval $[\Delta_1, \Delta_2]$, where $\Delta_1$ = -0.20 and $\Delta_2$ = 0.20. Rejection of the null hypothesis supports the conclusion of equivalence of the two products.

18. To establish sensitivity within the study for either a dichotomous or continuous primary endpoint, the test and reference product should both be statistically superior to the placebo. Conduct an appropriate inferential test with a type I error rate ($\alpha$) of 0.05, using the mITT population and the primary endpoint.

FDA_00224

19. Study data should be submitted to the OGD in electronic format.
    a. Include a list of file names, a description of the content of each file, an explanation of the variables within each file, and a description of all variable codes (for example, for the treatment variable, A = test, B = RLD, C = placebo).
    b. Provide two summary data sets, one without missing data imputation (pure data set) and one with missing data imputation (modified data set).
    c. Provide daily diary data of each subject in a separate dataset.
    d. Provide a separate data set for demographic, vital sign, adverse event, disposition (including reason for discontinuation of treatment), concomitant medication, medical history, compliance, and comment variables.

20. Please provide a summary dataset containing a separate line listing for each subject (if data exist) using the following headings, if applicable:
    a. Study identifier
    b. Subject identifier
    c. Site identifier: study center
    d. Age
    e. Age units (years)
    f. Sex
    g. Race
    h. Name of planned treatment based on randomization
    i. Name of Actual Treatment (exposure): test product, RLD, placebo control
    j. Duration of Treatment (total exposure in days)
    k. Completed the study (yes/no)
    l. Reason for premature discontinuation of subject
    m. Subject required additional treatment for diarrhea due to unsatisfactory treatment response (yes/no)
    n. Per Protocol (PP) population inclusion (yes/no)
    o. Reason for exclusion from PP population
    p. Modified Intent to Treat (mITT) population inclusion (yes/no)
    q. Reason for exclusion from mITT population
    r. Safety population inclusion (yes/no)
    s. Reason for exclusion from Safety population
    t. Mean abdominal pain score at baseline
    u. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 at baseline
    v. Mean abdominal pain score at Week 1
    w. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 1
    x. Mean abdominal pain score at Week 2
    y. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 2
    z. Mean abdominal pain score at Week 3
    aa. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 3
    bb. Mean abdominal pain score at Week 4
    cc. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 4
    dd. Mean abdominal pain score at Week 5
    ee. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 5
    ff. Mean abdominal pain score at week 6
    gg. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 6
    hh. Weekly responder in abdominal pain intensity for Week 3 (yes/no)
    ii. Weekly responder in stool consistency for Week 3 (yes/no)
    jj. Weekly responder for Week 3 (yes/no)
    kk. Weekly responder in abdominal pain intensity for Week 4 (yes/no)

FDA_00225

ll.  Weekly responder in stool consistency for Week 4 (yes/no)
mm.      Weekly responder for Week 4 (yes/no)
nn.  Weekly responder in abdominal pain intensity for Week 5 (yes/no)
oo.  Weekly responder in stool consistency for Week 5 (yes/no)
pp.  Weekly responder for Week 5 (yes/no)
qq.  Weekly responder in abdominal pain intensity for Week 6 (yes/no)
rr.  Weekly responder in stool consistency for Week 6 (yes/no)
ss.  Weekly responder for Week 6 (yes/no)
tt.  Overall responder (yes/no)
uu.  Treatment compliance: number of missed doses per subject
vv.  Concomitant medication (yes/no)
ww.      Adverse event(s) reported (yes/no)

Please refer to Table 1 as an example.  This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

**Table 1: Example of a summary dataset containing one line listing for each subject**

| STUDYID | SUBJID | SITEID | AGE | AGEU | SEX | RACE | ARM | EXTRT | EXDUR | completd | disc_rs | add_trt | pp | pp_rs | mitt | mitt_rs | safety | safe_rs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 1 | 01 | 21 | YEARS | F | 1 | A | A | 14 | Y | | N | Y | | Y | | Y | |
| 101 | 2 | 01 | 30 | YEARS | F | 1 | B | B | 14 | Y | | N | Y | | Y | | Y | |

| pain_0 | stool_0 | pain_1 | stool_1 | pain_2 | stool_2 | pain_3 | stool_3 | pain_4 | stool_4 | pain_5 | stool_5 | pain_6 | stool_6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5.4286 | 4 | 4.5714 | 4 | 3.8571 | 3 | 3.1429 | 3 | 2.4286 | 2 | 1.5714 | 1 | 0.8571 | 1 |
| 3.5714 | 3 | 3.1429 | 3 | 2.7143 | 2 | 2.1429 | 2 | 1.7143 | 2 | 1.2857 | 1 | 0.4286 | 0 |

| presp_3 | sresp_3 | resp_3 | presp_4 | sresp_4 | resp_4 | presp_5 | sresp_5 | resp_5 | presp_6 | sresp_6 | resp_6 | resp | complian | CM | AE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | 0 | Y | Y |
| Y | N | N | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | 0 | N | N |

<u>Note</u>: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2

**FDA_00226**

| | |
|---|---|
| STUDYID: | Study Identifier |
| SUBJID: | Subject Identifier for the Study |
| SITEID: | Study Site Identifier |
| AGE: | Age |
| AGEU: | Age units (years) |
| SEX: | Sex, e.g., M=Male, F=Female, U=Unknown |
| RACE: | Race, e.g., 1=White, 2=Black or African American, 3=Asian, 4=American Indian or Alaska Native, 5=Native Hawaiian or Other Pacific Islanders |
| ARM: | Name of planned treatment based on randomization |
| EXTRT: | Name of Actual Treatment (exposure), e.g., A=test product, B= RLD, C=placebo control |
| EXDUR: | Duration of Treatment (total exposure in days) |
| completd: | Subject completed the study, e.g., Y=Yes, N=No |
| disc_rs: | Reason for premature discontinuation from the study, e.g., A=adverse event, B=death, C=lost to follow-up, D=non-compliance with treatment, E=treatment unblinded, F=subject moved out of area, G=unsatisfactory treatment response, H=withdrew consent, I=protocol violation, K=other event |
| add_trt: | Subject required additional treatment for constipation due to unsatisfactory treatment response, e.g., Y=Yes, N=No |
| pp: | Per Protocol (PP) population inclusion, e.g., Y=Yes, N=No |
| pp_rs: | Reason for exclusion from PP population, e.g., A=prematurely discontinued, B=lost to follow-up, C=subject moved out of the area |
| mitt: | Modified Intent to Treat (mITT) population inclusion, e.g., Y=Yes, N=No |
| mitt_rs: | Reason for exclusion from mITT population, e.g., A=never treated, etc. |
| safety: | Safety population inclusion, e.g., Y=Yes, N=No |
| safe_rs: | Reason for exclusion from Safety population, e.g., A=never treated, etc. |
| pain_0: | Mean abdominal pain score at baseline |
| stool_0: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 at baseline |
| pain_1: | Mean abdominal pain score during Week 1 |
| stool_1: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 1 |
| pain_2: | Mean abdominal pain score at during Week 2 |
| stool_2: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 2 |
| pain_3: | Mean abdominal pain score during Week 3 |
| stool_3: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 3 |
| pain_4: | Mean abdominal pain score during Week 4 |
| stool_4: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 4 |
| pain_5: | Mean abdominal pain score during Week 5 |

FDA_00227

| | |
|---|---|
| stool_5: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 5 |
| pain_6: | Mean abdominal pain score during Week 6 |
| stool_6: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 6 |
| presp_3: | Weekly responder in abdominal pain intensity for Week 3 |
| sresp_3: | Weekly responder in stool consistency for Week 3 |
| resp_3: | Weekly responder for Week 3 |
| presp_4: | Weekly responder in abdominal pain intensity for Week 4 |
| sresp_4: | Weekly responder in stool consistency for Week 4 |
| resp_4: | Weekly responder for Week 4 |
| presp_5: | Weekly responder in abdominal pain intensity for Week 5 |
| sresp_5: | Weekly responder in stool consistency for Week 5 |
| resp_5: | Weekly responder for Week 5 |
| presp_6: | Weekly responder in abdominal pain intensity for Week 6 |
| sresp_6: | Weekly responder in stool consistency for Week 6 |
| resp_6: | Weekly responder for Week 6 |
| resp: | Overall responder |
| complian: | Treatment compliance, e.g., number of missed doses per subject |
| CM: | Concomitant medication, e.g., Y=Yes, N=No |
| AE: | Adverse event(s) reported, e.g., Y=Yes, N=No |

21.  Please provide a dataset containing a separate line listing of diary data for each study day (including the screening, treatment and follow-up periods) per subject (if data exist) using the following headers, if applicable:
    a.  Study identifier
    b.  Subject identifier
    c.  Study Site Identifier
    d.  Name of Actual Treatment (exposure): test product, RLD, placebo control
    e.  Date/time of answer to daily IBS sign and symptom questionnaire
    f.  Number of days since treatment start date
    g.  Worst abdominal pain score on a scale of 0-10 in the past 24 hours
    h.  Bristol Stool Scale score of the least formed bowel movement in the past 24 hours
    i.  Rescue medication (e.g. anti-diarrheal) use reported during the past 24 hours  (yes/no)
    j.  Concomitant medication reported during this visit (yes/no)
    k.  Adverse event reported during this visit (yes/no)
    l.  Laboratory testing during this visit (yes/no)

Please refer to Table 2 as an example.  This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

**Table 2: Example of dataset containing one line listing for each study dayper subject**

FDA_00228

| STUDYID | SUBJID | SITEID | EXTRT | QSDTC | QSDY | pain | bss | RSCrpt | CMrpt | Aerpt | LBtest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 1 | 01 | A | 2004-07-01 | 1 | 3 | 6 | N | Y | Y | N |

<u>Note</u>: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2.

| | |
|---|---|
| STUDYID: | Study Identifier |
| SUBJJID: | Subject Identifier for the Study |
| SITEID: | Study Site Identifier |
| EXTRT: | Name of Actual Treatment (exposure), e.g., A=test product, B=RLD, C= placebo control |
| QSDTC: | Date/time of answer to daily IBS sign and symptom questionnaire |
| QSDY: | Actual study day of answer to IBS sign and symptom questionnaire expressed in integer days relative to RFSTDTC (date/time of first exposure to study treatment) |
| pain: | Worst abdominal pain score on a scale of 0-10 in the past 24 hours |
| bss: | Bristol Stool Scale score of the least formed bowel movement in the past 24 hours |
| RSCrpt: | Rescue medication (e.g. anti-diarrheal) use reported during the past 24 hours, e.g., Y=Yes, N=No |
| CMrpt: | Concomitant Medication reported during this visit, e.g., Y=Yes, N=No |
| AErpt: | Adverse Event reported during this visit, e.g., Y=Yes, N=No |
| LBtest: | Laboratory Testing performed during this visit, e.g., Y=Yes, N=No |

22. The study data should be submitted in standardized format.  Consider the implementation and use of data standards as early as possible in the product development lifecycle, so that standards are accounted for in the design, conduct, and analysis of clinical studies.  For more details, please refer to http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm248635.htm.

23. The protocol should include a complete and detailed statistical analysis plan and describe how missing data (both daily missing data and weekly missing data), if present, will be handled.

24. These recommendations are specific to this product and may not be appropriate for bioequivalence studies of any other product, including any other dosage form or strength of rifaximin.

**Waiver request of in vivo testing:** clinical endpoint BE studies on the 200 mg strength and PK studies on the 550 mg strength based on (i) proportional similarity of the formulations between both strengths, (ii) acceptable BE studies with clinical endpoints on the 550 mg strength, (iii) acceptable BE studies with PK endpoints on the 200 mg strength, and (iv) acceptable comparative in vitro dissolution tests on both 200 mg and 550 mg strengths.

*Recommended Nov 2011; Feb 2012; Revised Mar 2017*                    20

FDA_00229

**Dissolution test method and sampling times:**  The dissolution information for this drug product can be found on the FDA-Recommended Dissolution Methods web site, available to the public at the following location:  http://www.accessdata.fda.gov/scripts/cder/dissolution/. Conduct comparative dissolution testing on 12 dosage units each of both strengths of the test and reference products.  Specifications will be determined upon review of the abbreviated new drug application (ANDA).



**MAR 1 6 2017**

Lance L. Shea
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304

Vice President, Research & Development and Chief Development Officer
Salix Pharmaceuticals, Inc.
8510 Colonnade Center Drive
Raleigh, NC 27615

        RE:    Docket Nos. FDA-2016-P-3418 and FDA-2008-P-0300

Dear Mr. Shea and Sir or Madam:

This letter responds to your citizen petitions dated May 14, 2008 (2008 Petition), submitted by Salix Pharmaceuticals, Inc. (Salix), and October 17, 2016 (2016 Petition), submitted by Baker & Hostetler LLP on behalf of Salix.[1]  In the 2016 and 2008 Petitions, you request that the Food and Drug Administration (FDA, the Agency, or we) refuse to approve any abbreviated new drug application (ANDA) referencing any strength of Salix's Xifaxan (rifaximin) tablets that does not contain scientifically appropriate data demonstrating bioequivalence (BE).[2]

Specifically, in the 2016 Petition you request that FDA take the following actions:

(1) Refuse to approve any ANDA referencing any strength and indication of Xifaxan unless the application includes characterization studies that demonstrate that the active ingredient of the proposed generic product has the same polymorph profile as Xifaxan.

(2) Refuse to approve any ANDA for a proposed generic with excipients that are qualitatively (Q1) the same and quantitatively (Q2) the same as those in Xifaxan unless the application includes:

---

[1] The version of the 2016 Petition that Salix submitted on October 17, 2016 was redacted and accompanied by publicly-available references only.  On October 19, 2016, Salix submitted a version of the 2016 Petition that was unredacted and accompanied by a full set of references.  In determining what information to include in this response, we have independently evaluated whether the information in the 2016 Petition is confidential.

[2] You also request that we apply these requirements to applications submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) that rely on Xifaxan as the listed drug.  We note, however, that 505(b)(2) applications are not required to demonstrate BE to a listed drug.  In addition, because 505(b)(2) applications can differ from the listed drugs in a variety of ways, we cannot address hypothetical requests for what demonstrations would be needed for a 505(b)(2) application.  Therefore, this response focuses solely on your request with respect to ANDAs submitted pursuant to section 505(j) of the FD&C Act.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

FDA_00231

Docket Nos. FDA-2016-P-3418 and FDA-2008-P-0300

rifaximin product is bioequivalent to Xifaxan (2008 Petition at 1).[66]

As discussed in section II.A.2 of this response, we continue to believe that applicants referring to Xifaxan should conduct BE studies with clinical endpoints for proposed generic rifaximin products that are not Q1 and Q2 the same as Xifaxan. If the formulation of a proposed generic product referencing Xifaxan is Q1 and Q2 the same as Xifaxan, however, we currently do not believe that a comparative clinical endpoint study is generally necessary to establish BE. If a product is Q1 and Q2 the same as Xifaxan, the excipients in the generic product would not affect the release, absorption, metabolism, or antibacterial activity of the active ingredient at the site of action in a different manner from those in Xifaxan. We generally believe that applicants with proposed products that are Q1 and Q2 the same can establish BE by demonstrating that the products have the same in vitro dissolution profile and the same plasma pharmacokinetics as Xifaxan, as discussed in greater detail below.

a.    In Vitro Dissolution Testing

As discussed above in section II.A., we presently generally believe that applicants should conduct in vitro dissolution testing of proposed generics of Xifaxan under multiple physiologically relevant pH conditions and surfactant levels. We agree with the 2016 Petition that the in vitro dissolution testing method that was included in the 2011 and 2012 draft product-specific guidances for the 200 mg and 550 mg strengths of Xifaxan should be able to assess a tablet's stability and release characteristics, but could not discriminate between tablets containing different polymorph forms (2016 Petition at 19). This is because the in vitro dissolution testing that was included in the 2011 and 2012 draft product-specific guidances was designed primarily to assess product quality, not to demonstrate BE. The 2011 draft product-specific guidance, if finalized as written, would recommend establishing BE by conducting a comparative clinical endpoint study of the 200 mg strength, while the 2012 draft product specific guidance, if finalized as written, would recommend establishing BE by conducting a comparative clinical endpoint study of the 200 mg strength and fasting and fed PK endpoint studies of the 550 mg strength.

We also generally agree with the 2016 Petition that dissolution under sink conditions would not be a suitable predictor of in vivo drug release of locally acting GI rifaximin for the purpose of establishing BE (2016 Petition at 19). "Sink conditions" are defined by the United States Pharmacopeia as the volume of dissolution medium at least three times that required to form a saturated solution of a drug substance.[67] Non-sink conditions provide a more accurate picture of in vivo rifaximin release, because they allow the concentration of the drug in the dissolution medium to build up such that the solution becomes supersaturated. This is what commonly

---

[66] The 2008 Petition's request that FDA not approve an ANDA seeking to rely on Xifaxan as the RLD unless certain tests established BE did not assert that the tests should vary based on whether the proposed generic drug product was Q1 and Q2 the same as Xifaxan.

[67] United States Pharmacopeia and National Formulary (USP 38/NF 33), The Dissolution Procedure: Development and Validation (1092) (2015): 1090-1097.

FDA_00252

Docket Nos. FDA-2016-P-3418 and FDA-2008-P-0300

occurs under finite volume conditions in the GI tract. In addition, rifaximin does not dissolve under sink conditions without the addition of a large quantity of surfactant to the dissolution media. Such a large quantity of surfactant does not reflect in vivo conditions and would mask differences in the intrinsic solubility of the various rifaximin polymorphic forms.

Under our current thinking, we believe that comparative dissolution studies should be conducted under multiple non-sink conditions, that is, at multiple pH levels, to reflect the range of pH levels found along the GI tract, and at multiple surfactant levels, to reflect the varying levels of surfactants, such as bile acid, found there. There is no validated in vitro dissolution study under a single artificial condition that correlates with in vivo drug release; presently, we believe that conducting testing at multiple pH conditions and at multiple surfactant levels, however, allows for the simulation of in vivo drug release in different portions of the GI tract.

The in vitro dissolution testing that we currently believe should be conducted is designed to be sufficiently sensitive to discriminate between two rifaximin formulations with different in vivo drug release rates. We note that in vivo drug release along the GI tract may or may not be a function of polymorphism. For both formulation development and quality control reasons, in vitro dissolution testing needs to be sufficiently sensitive to discriminate between two rifaximin formulations, rather than simply between two active ingredients with different polymorphic forms.

For these reasons, the 2016 Petition's request that FDA require in vitro dissolution testing of proposed generics of Xifaxan under multiple physiologically relevant pH conditions and surfactant levels is granted to the extent that FDA will recommend such testing in the revised draft product-specific guidance, while the 2008 Petition's request that we require in vitro dissolution testing under artificial conditions that demonstrates one aspect of the solubility of proposed generics is denied.

       b.     PK BE Studies

The 2016 Petition contends that PK BE studies "are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan," for the following reasons: rifaximin is poorly soluble and poorly absorbed and acts topically rather than systemically; rifaximin does not exhibit dose-proportional pharmacokinetics; and rifaximin exhibits different pharmacokinetics and different potency across indications (2016 Petition at 59). Both the 2016 and the 2008 Petitions argue that PK BE studies should be done under both fasted and fed conditions, "because the solubility of rifaximin is affected by bile acids in the proximal small bowel" (2016 Petition at 59; see also 2008 Petition at 19-20).

We agree that rifaximin is poorly soluble and poorly absorbed and that it acts topically. This is why we currently believe that applicants should conduct in vitro dissolution testing in addition to PK BE studies, and why, for proposed generic products that are not Q1 and Q2 the same as Xifaxan, we additionally believe, under our current thinking, that comparative BE studies with clinical endpoints should be conducted. We also generally agree based on our current thinking that PK BE studies comparing proposed generic rifaximin products to Xifaxan should be done

FDA_00253

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

184  statutory schemes to a single group of applications with a common RLD could result in conflict
185  between the MMA and pre-MMA provisions.  The eligibility, triggering, and forfeiture features
186  of the different 180-day exclusivity schemes could render one applicant ineligible for exclusivity
187  while another applicant could retain its eligibility.  To avoid these inequitable outcomes, all
188  ANDAs submitted referencing the same RLD will be subject to one statutory scheme.

189
190       B.    First Applicants
191
192  **Q2.    How does an ANDA applicant qualify as a "first applicant"?**
193
194  A *first applicant* is an ANDA "applicant that, on the first day on which a substantially complete
195  application containing a [paragraph IV] certification … is submitted for approval of a drug,
196  submits a substantially complete application that contains and lawfully maintains a [paragraph
197  IV] certification … for the drug."[23]

198
199  An applicant that previously submitted a substantially complete ANDA that did not contain a
200  paragraph IV certification may become eligible for 180-day exclusivity by amending its ANDA
201  to contain a paragraph IV certification to a listed patent for the RLD on the first day that an
202  ANDA or amendment containing a paragraph IV certification is submitted.

203
204  The listed patent or patents to which an ANDA applicant submitted a paragraph IV certification
205  that gives rise to the eligibility for 180-day exclusivity is referred to in this draft guidance as the
206  *qualifying patent(s)*.

207
208  **Q3.    What constitutes a substantially complete application?**
209
210  A s*ubstantially complete application* is an ANDA that on its face is sufficiently complete to
211  permit a substantive review.  Sufficiently complete means that the ANDA contains all the
212  information required under section 505(j)(2)(A) of the FD&C Act and does not contain a
213  deficiency described in 21 CFR 314.101(d) and (e).[24]  FDA indicates its determination that an
214  ANDA is substantially complete when the Agency *receives* the ANDA for review under 21 CFR
215  314.101.  If FDA determines, after an initial evaluation, that an ANDA was substantially
216  complete as of the date it was submitted to FDA, FDA will consider the ANDA to have been
217  received as of the date of submission.[25]

218
219  **Q4.    Does an ANDA applicant have to be the first to submit a paragraph IV certification**
220  **to all of the RLD's listed patents to be a first applicant?**
221
222  No.  The statute requires "a" paragraph IV certification;[26] it does not require a first applicant to
223  be the first to submit a paragraph IV certification to more than a single patent (or all of the
224  patents), even if multiple patents are listed for the RLD.

---

[23] Section 505(j)(5)(B)(iv)(II)(bb) of the FD&C Act; see also 21 CFR 314.3(b).

[24] 21 CFR 314.3(b); see also section 505(j)(5)(B)(iv)(II)(cc) of the FD&C Act.

[25] 21 CFR 314.101(b)(2).

[26] Section 505(j)(5)(B)(iv)(II)(bb) of the FD&C Act.

FDA_00394

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

225
226   There can be multiple patents that could qualify a single ANDA applicant as a first applicant, so
227   long as they are certified to on that same first day that the first paragraph IV certification in an
228   ANDA for that RLD is submitted. As a result, each qualifying patent separately can affect
229   exclusivity. For example, if an ANDA applicant submitted paragraph IV certifications to two
230   separate patents on the same first day and the first patent expires prior to triggering of 180-day
231   exclusivity, the paragraph IV certification to the second patent can remain a basis for first-
232   applicant status and for 180-day exclusivity.

233
234   **Q5.    Can an ANDA applicant qualify as a first applicant when it includes both a**
235   **paragraph IV certification and a section viii statement to a single listed patent?**

236
237   Yes. FDA has determined that when both drug product or drug substance claims and method-of-
238   use claims are contained within the same patent, an applicant may file a paragraph IV
239   certification with respect to the drug product or drug substance patent claim(s) and a section viii
240   statement with respect to the method-of-use claim(s) in the patent. This type of certification is
241   commonly referred to as a *split certification*. This approach preserves the NDA holder's
242   statutory right to assert its patent rights regarding the drug substance or drug product claims
243   before ANDA approval while permitting the ANDA applicant to exercise its statutory right to
244   avoid infringing a method-of-use claim by seeking approval for fewer than all of the approved
245   conditions of use for the RLD. Consistent with this principle, the paragraph IV certification in a
246   split certification can qualify an applicant for first applicant eligibility.

247
248   **Q6.    Can an ANDA applicant be a first applicant if the applicant includes a paragraph**
249   **III certification to a patent that expires after the patent to which a paragraph IV**
250   **certification was submitted?**

251
252   Yes. The statutory definition of "first applicant" requires "a" paragraph IV certification. The
253   statute does not require that the paragraph IV certification be to the latest expiring patent. For
254   example, a first applicant could have a paragraph IV certification to a patent expiring on January
255   1, 2020 (the only qualifying patent) and a paragraph III certification to a patent expiring on June
256   1, 2030.

257
258   **Q7.    Could the timing of sending notice of paragraph IV certification affect first**
259   **applicant status?**

260
261   Yes. For original ANDAs, notice of paragraph IV certification must be provided on or after the
262   date on which the applicant receives a paragraph IV acknowledgment letter from FDA, but not
263   later than 20 days after the date of the postmark on the paragraph IV acknowledgment letter.[27]
264   The paragraph IV acknowledgment letter is a written, postmarked communication from FDA to
265   an applicant stating that the Agency has determined that an ANDA containing a paragraph IV
266   certification is sufficiently complete to permit a substantive review and has been received for

---

[27] 21 CFR 314.95(b)(1).

FDA_00395

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

267  review.[28]  Any notice sent before the ANDA applicant's receipt of a paragraph IV
268  acknowledgment letter is invalid.[29]
269
270  For amendments containing a paragraph IV certification submitted before the ANDA has been
271  received for review (i.e., before receipt of a paragraph IV acknowledgment letter), the ANDA
272  applicant must send notice according to the timeframe described above for original ANDAs.  If
273  an ANDA applicant's notice of its paragraph IV certification is timely provided and the applicant
274  has not submitted a previous paragraph IV certification, FDA will base its determination of
275  whether the ANDA applicant is a first applicant on the date of submission of the amendment
276  containing the paragraph IV certification.[30]
277
278  For amendments submitted after the ANDA has been received for review (i.e., after receipt of an
279  acknowledgment letter or a paragraph IV acknowledgment letter) and supplements, notice of
280  paragraph IV certification must be provided at the same time that the amendment or supplement
281  is submitted to FDA.  If notice is not sent simultaneously with an amendment or supplement,
282  FDA considers the paragraph IV certification not to be effective until notice is provided.[31]  For
283  example, if an ANDA applicant submitted a supplement containing a paragraph IV certification,
284  but notice of the paragraph IV certification was not provided until 30 days after the submission
285  of the supplement, FDA would evaluate whether the applicant was a first applicant based on the
286  date notice was provided, rather than the date of submission of the supplement.  Thus, a delay in
287  giving notice of certain amendments or supplements could mean a later date for the paragraph IV
288  certification to become effective which could result in failure to obtain first applicant status (if
289  another applicant submits a certification that becomes effective in the interim).
290
291  Regardless of whether it is an original ANDA, an amendment, or a supplement, a paragraph IV
292  certification must not be submitted earlier than the first working day after the day the patent is
293  published in the Orange Book.[32]  Any notice sent before the first working day after the day the
294  patent is published in the Orange Book is invalid.[33]
295
296  **Q8.    What does it mean to "lawfully maintain" a paragraph IV certification?**
297
298  The definition of first applicant requires that the applicant "lawfully maintain[] a [paragraph IV]
299  certification."[34]  This requires an uninterrupted paragraph IV certification to the qualifying patent
300  or patent claim.  For example, an applicant has not lawfully maintained its paragraph IV
301  certification if the applicant initially submits a paragraph IV certification to a patent or patent
302  claim, and then later amends its ANDA to include a paragraph III certification or a section viii
303  statement to the qualifying patent or patent claim, and then amends its ANDA again to include a
304  paragraph IV certification to the same patent or patent claim.  However, if the applicant initially
305  submits a paragraph IV certification to a qualifying patent or patent claim and subsequently

---

[28] See 21 CFR 314.3(b).
[29] 21 CFR 314.95(b)(2).
[30] 21 CFR 314.95(d)(2).  See also 21 CFR 314.94(a)(12)(viii)(C)(*1*)(*ii*).
[31] Cf. *Purepac Pharmaceutical Co. v. Thompson*, 354 F. 3d 877 (D.C. Cir. 2004).
[32] See 21 CFR 314.94(a)(12)(viii)(C)(*1*)(*ii*).
[33] See 21 CFR 314.95(b)(2).
[34] Section 505(j)(5)(B)(iv)(II)(bb) of the FD&C Act and 21 CFR 314.3(b).

FDA_00396

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

306  submits an amendment that contains a paragraph IV certification to the same qualifying patent or
307  patent claim (and notice of the paragraph IV certification is sent in accordance with 21 CFR
308  314.95(d)), the first applicant has lawfully maintained the paragraph IV certification to the patent
309  or patent claim upon which eligibility for 180-day exclusivity is based.[35]
310
311  In addition, if a district court decides that the qualifying patent has been infringed (and the patent
312  is valid), and the judgment of the district court is not appealed or is affirmed, the ANDA
313  applicant's paragraph IV certification that the patent was invalid, unenforceable, or not infringed
314  is no longer accurate.  The applicant would be required to amend its ANDA to change its
315  paragraph IV certification to a paragraph III certification, which acknowledges the date the
316  patent expires.[36]
317
318  **Q9.    Can there be more than one first applicant for a single drug product?**
319
320  Yes.  The 180-day exclusivity provisions contemplate that there can be multiple first applicants.[37]
321  Multiple ANDAs that include paragraph IV certifications to one or more patents listed for an
322  RLD often will be submitted to FDA on the day the first such application (or the first paragraph
323  IV certification) is submitted.  If multiple applicants submit paragraph IV certifications on the
324  first day that paragraph IV certifications for that RLD are submitted, all will be considered first
325  applicants.  In addition, different ANDA applicants each can qualify as first applicants by
326  certifying to different listed patents on the same first day.
327
328  **Q10.    Do multiple first applicants for a single drug product each get their own 180-day**
329  **exclusivity period?**
330
331  No.  There is one 180-day exclusivity period for each drug product.  Accordingly, whether
332  multiple first applicants enjoy the full 180-day exclusivity period depends on when those
333  ANDAs are approved in relation to when the 180-day exclusivity period is triggered.[38]
334
335  **Q11.    Can there be different first applicants for different strengths of a drug product?**
336
337  Yes.  Separate 180-day exclusivity periods are available for each strength of the same drug
338  product, because each strength is a distinct drug product.  Thus, it is possible for there to be
339  different first applicants for different strengths of the RLD.  For example, assume ANDA A
340  applicant submitted the first substantially complete application that contained a paragraph IV
341  certification for a 30 mg strength RLD and lawfully maintained that certification.  A few days
342  later, ANDA B applicant submitted its ANDA containing a paragraph IV certification for the 30
343  mg strength RLD.  The Agency then approves a 60 mg strength RLD, and lists a patent in the
344  Orange Book submitted by the NDA holder for that strength.  ANDA B applicant amends its
345  ANDA to include the 60 mg strength and includes the first paragraph IV certification to the
346  patent listed for the 60 mg strength and lawfully maintains that certification.  ANDA A applicant

---

[35] 81 FR 69580, 69617 (Oct. 6, 2016).
[36] See 21 CFR 314.94(a)(12)(viii)(A).
[37] See, e.g., section 505(j)(5)(D)(iii) of the FD&C Act (refers to "first applicants").
[38] See Question 17 below.

FDA_00397

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

347    similarly amends its ANDA to include the 60 mg strength, but three days later.  In these
348    circumstances, ANDA A applicant is the first applicant for the 30 mg strength, and ANDA B
349    applicant is the first applicant for the 60 mg strength.
350
351        C.    180-day Exclusivity and Patents
352
353    **Q12.    Does an ANDA applicant need to win its patent litigation to be considered a first**
354    **applicant that retains eligibility for 180-day exclusivity?**
355
356    No.  An applicant potentially may retain eligibility for 180-day exclusivity even if it is not sued
357    as a result of its qualifying paragraph IV certification or, if sued, the case is resolved, for
358    example, through settlement that allows the applicant to enter the market before the patent
359    expires.[39]
360
361    **Q13.    Can a patent that an NDA holder requests to remove from the Orange Book still**
362    **give rise to 180-day exclusivity?**
363
364    Yes.  An NDA holder can request that FDA remove a patent from the Orange Book in certain
365    circumstances: for example, if a court declared the patent invalid.  However, if an NDA holder
366    requests that a patent be removed from the Orange Book and one or more first applicants are
367    already eligible for 180-day exclusivity based on a paragraph IV certification to that patent, FDA
368    will not remove the patent until any 180-day exclusivity stemming from the listed patent has
369    expired, or has been extinguished or relinquished.[40]  Until the patent is removed from the Orange
370    Book—after any associated 180-day exclusivity has expired or has been extinguished or
371    relinquished—ANDA applicants must submit or maintain appropriate certifications to the patent
372    notwithstanding the NDA holder's request to remove the patent.  This practice ensures that NDA
373    holders cannot unilaterally extinguish an ANDA applicant's eligibility for 180-day exclusivity
374    by requesting removal of the patent from the Orange Book prior to ANDA approval.[41]  In such
375    circumstances, FDA will indicate in the Orange Book that the NDA holder has requested
376    removal of the patent.[42]
377
378    **Q14.    Does an ANDA applicant retain 180-day exclusivity after the qualifying patent**
379    **expires?**
380
381    No.  In keeping with the statutory language and purpose of 180-day exclusivity, FDA has
382    construed the statute such that 180-day exclusivity attaches based only on paragraph IV
383    certifications to unexpired patents.   A paragraph IV certification does not survive the expiry of a
384    listed patent.  Upon patent expiry, the statute and FDA's regulations require ANDA applicants to

---

[39] Cf. *Mova Pharms. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998).
[40] See 21 CFR 314.94(a)(12)(viii)(B); see also discussion in sections E and F of this guidance.
[41] See *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010); see also 21 CFR 314.53(f)(2)(i).
[42] See FDA's website on *Orange Book Data Files*, at
http://www.fda.gov/drugs/informationondrugs/ucm129689.htm (describing use of the *patent delist request flag* as
indicating that the "[s]ponsor has requested [that the] patent be delisted [but the] patent has remained listed because,
under [s]ection 505(j)(5)(D)(i) of the [FD&C] Act, a first applicant may retain eligibility for 180-day exclusivity
based on a paragraph IV certification to this patent for a certain period").

**FDA_00398**

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

385    amend their certifications from a paragraph IV certification to a paragraph II certification, which
386    states that the patent has expired.[43]  If an applicant neglects to amend its certification to a
387    paragraph II certification after a patent expires, FDA will construe the application as including a
388    paragraph II certification.[44]  As noted above, applications with only paragraph II certifications
389    are eligible for immediate effective approval.[45]  Therefore, once the only qualifying patent
390    expires, there are no longer any ANDAs blocked by 180-day exclusivity.
391
392    This interpretation of the statute effectuates the goals of the Hatch-Waxman Amendments.  The
393    180-day exclusivity provisions were drafted to give ANDA applicants an incentive to be the first
394    to challenge a listed patent, potentially removing that patent as a barrier to approval.  Once a
395    listed patent expires and is no longer a barrier to ANDA approval, there is no longer a need to
396    provide an incentive to challenge it in court.  Thus, an expired patent does not serve as the basis
397    for a 180-day exclusivity award, and 180-day exclusivity does not extend beyond the life of the
398    patent.
399
400           D.       180-day Exclusivity Trigger and Scope of 180-Day Exclusivity
401
402    **Q15.**   **How is 180-day exclusivity triggered?**
403
404    The FD&C Act provides that the 180-day exclusivity period is triggered by "first commercial
405    marketing of the drug (including the commercial marketing of the listed drug) by any first
406    applicant."[46]  FDA has interpreted the statutory phrase "including the commercial marketing of
407    the listed drug" to provide that exclusivity can be triggered by the marketing of an authorized
408    generic[47] by a first applicant, even if that first applicant's ANDA has not yet been approved.
409
410    Concluding that 180-day exclusivity is triggered upon the first applicant's commercial marketing
411    of an authorized generic or the RLD prevents potential subversion of the statutory scheme
412    through collusion between NDA holders and first applicants.  If 180-day exclusivity were
413    triggered only by commercially marketing the first applicant's ANDA product, a first applicant
414    that struck a deal with the NDA holder to commercially market the authorized generic or RLD

---

[43] Section 505(j)(2)(A)(vii)(II), (IV); 21 CFR 314.94(a)(12)(viii)(C)(*1*)(*i*) ("An applicant must amend a submitted certification or statement if, at any time before the date of approval of the ANDA, the applicant learns that the submitted certification or statement is no longer accurate").

[44] 81 FR 69580, 69615 (Oct. 6, 2016).

[45] Section 505(j)(2)(A)(vii)(II); (j)(5)(B)(i) (when an applicant submits only a paragraph II certification, approval of the applicant's ANDA "may be made effective immediately"); 21 CFR 314.94(a)(12)(viii).

[46] Section 505(j)(5)(B)(iv)(I) of the FD&C Act; see also 21 CFR 314.3(b) ("*Commercial marketing* is the introduction or delivery for introduction into interstate commerce of a drug product described in an ANDA, outside the control of the ANDA applicant, except that the term does not include transfer of the drug product for investigational use under part 312 of this chapter or transfer of the drug product to parties identified in the ANDA for reasons other than sale.  Commercial marketing includes the introduction or delivery for introduction into interstate commerce of the reference listed drug by the ANDA applicant.").

[47] Section 505(t)(3) of the FD&C Act defines an authorized generic as "a listed drug (as that term is used in subsection (j)) that: (A) has been approved under subsection (c); and (B) is marketed, sold, or distributed directly or indirectly to retail class of trade under a different labeling, packaging (other than repackaging as the listed drug in blister packs, unit doses, or similar packaging for use in institutions), product code, labeler code, trade name, or trade mark than the listed drug."  See also 21 CFR 314.3(b).

FDA_00399

415  instead of marketing the product described in its ANDA potentially could block approval of
416  subsequent ANDAs until patent expiration.
417
418  **Q16.   Once triggered, can 180-day exclusivity be suspended or postponed?**
419
420  Once triggered, the 180-day period runs without interruption.
421
422  **Q17.   How does the trigger of the 180-day exclusivity period by one first applicant affect**
423  **other first applicants?**
424
425  The effect of one first applicant's trigger of the 180-day exclusivity period on other first
426  applicants flows from the fact that there is only one exclusivity period available for each drug
427  product (see Question 10 above).  Any first applicant's trigger of the exclusivity period triggers
428  the 180-day exclusivity period for all first applicants for that drug product and exclusivity for all
429  first applicants ends 180 days after the initial trigger.  Other first applicants will benefit from
430  exclusivity only to the extent they commercially market during this exclusivity period.  The
431  following examples illustrate how shared 180-day exclusivity might operate.  Assume ANDA A,
432  ANDA B, and ANDA C all qualified as first applicants.
433

434  •   If all three ANDAs are approved on the same day, and if all three first commercially
435       market that same day, triggering the exclusivity period, all three applicants benefit from
436       the full 180-day exclusivity period.

437  •   If all three ANDAs are approved on the same day, but only ANDA A is commercially
438       marketed on that first day triggering the exclusivity period, it is triggered for all three
439       ANDAs.  Thus, if ANDA B is not commercially marketed until day 30, that applicant
440       will benefit from exclusivity only for the remainder of the 180-day period (i.e., 150 days).
441       If ANDA C is not commercially marketed until day 179, it will benefit from only one day
442       of exclusivity.

443  •   If one or more ANDAs are approved on the same day, but one or more applicants first
444       commercially market the drug product 60 days after approval, the 180-day exclusivity
445       period is triggered upon commercial marketing and runs for 180 days.

446
447  **Q18.   Does 180-day exclusivity block approval of all ANDAs that reference the same**
448  **RLD?**
449
450  No.  180-day exclusivity blocks only the approval of subsequent ANDAs that also contain a
451  paragraph IV certification.[48]  There are several examples in which 180-day exclusivity does not
452  block approval of another ANDA referencing the same RLD:
453

454  •   If an ANDA was approved before the NDA holder submitted a patent that provides the
455       basis for first applicant status for a pending ANDA, any related 180-day exclusivity
456       would not affect the previously approved ANDA.

---

[48] See section 505(j)(5)(B)(iv)(I) of the FD&C Act.

FDA_00400

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

766  FD&C Act[70] such that the time it took FDA to respond to the 505(q) petition prevented approval
767  within 30 months from the date of submission, the 30-month deadline for obtaining a tentative or
768  final approval will be extended by the amount of time the 505(q) petition was under review.
769
770  Second, section 1133(a) of FDASIA extended the 30-month period for certain ANDAs.  Under
771  FDA's interpretation of these provisions, for applications submitted between January 9, 2010,
772  and July 9, 2012, containing a paragraph IV certification (or amended to first contain a paragraph
773  IV certification during that period of time), and approved or tentatively approved during the
774  period of time beginning on July 9, 2012, and ending on September 30, 2015, section 1133(a) of
775  FDASIA extended this period to 40 months.  For applications submitted between January 9,
776  2010, and July 9, 2012 (or amended to first contain a paragraph IV certification during that
777  period of time), and approved or tentatively approved during the period of time beginning on
778  October 1, 2015, and ending on September 30, 2016, section 1133(a) of FDASIA extended this
779  period to 36 months.  In addition, if an application was submitted between January 9, 2010, and
780  July 9, 2012 containing a paragraph IV certification (or amended to first contain a paragraph IV
781  certification during that period of time), and FDA had not approved or tentatively approved the
782  application but must consider whether the applicant had forfeited exclusivity because a
783  potentially blocked application is ready for approval, FDA applied the 36-month period if it
784  made the forfeiture determination between the period of time beginning on October 1, 2015, and
785  ending on September 30, 2016.  For all other applications, the 30-month period set forth in
786  section 505(j)(5)(D)(i)(IV) of the FD&C Act applies.
787
788  **Q33.   Does the "failure to obtain tentative approval" forfeiture provision apply to**
789  **circumstances in which the first applicant was not eligible for tentative approval but failed**
790  **to obtain final approval by the 30-month forfeiture date?**
791
792  Yes.  Unless the 30-month period is extended for one of the reasons described above,[71] a first
793  applicant that fails to obtain either tentative approval or final approval of its ANDA by the 30-
794  month forfeiture date generally will forfeit eligibility for 180-day exclusivity.  Viewed in
795  isolation, the phrase *tentative approval* in section 505(j)(5)(D)(i)(IV) of the FD&C Act might
796  suggest that this section applies only when an ANDA is eligible for a tentative approval due to a
797  patent, 30-month stay, or exclusivity blocking final approval.  Such a reading of the statute
798  would result in incongruous circumstances in which first applicants that are eligible for tentative
799  approval can forfeit under this provision, but first applicants that only are eligible for final
800  approval (and arguably closer to marketing) cannot forfeit under this provision.  Other references
801  to this forfeiture provision in the statute make clear that the provision has a broader scope.  For
802  example, section 505(q)(1)(G) of the FD&C Act expressly states that if "approval" of the first
803  applicant's application was delayed because of a petition, the 30-month period described in
804  section 505(j)(5)(D)(i)(IV) of the FD&C Act will be extended.  In light of this language, FDA
805  has concluded that section 505(j)(5)(D)(i)(IV) establishes a 30-month period within which a first
806  applicant generally must obtain either tentative approval or final approval of its ANDA.  This
807  interpretation squares both with the statutory language and with the statutory purpose of

---

[70] In general, section 505(q) of the FD&C Act pertains, in relevant part, to petitions that request an action that could
delay approval of a pending ANDA or 505(b)(2) application.
[71] See Question 32.

FDA_00409

808  preventing first applicants' ANDAs that do not meet the substantive requirements for approval
809  from delaying approval of subsequent applicants' ANDAs.
810
811  **Q34.   How does a first applicant qualify for the exception in the "failure to obtain**
812  **tentative approval" forfeiture provision?**
813
814  To qualify for the exception to this forfeiture provision, the failure to obtain tentative or final
815  approval must be "caused by a change in or a review of the requirements for approval of the
816  application imposed after the date on which the application is filed."[72]  In other words, two
817  conditions must both be met: (1) FDA changed or reviewed (i.e., considered whether to change)
818  the requirements for approval while the application was under review and (2) this change in, or
819  review of, approval requirements was a cause of the failure to obtain tentative approval or final
820  approval by the 30-month forfeiture date.  However, FDA has determined that "but-for"
821  causation is not required to qualify for this exception.  In other words, if one of the causes of
822  failure to obtain tentative or final approval by the 30-month forfeiture date was a change in or
823  review of the requirements for approval imposed after the application was filed, an applicant will
824  not forfeit eligibility for exclusivity notwithstanding that there may have been other causes for
825  failure to obtain tentative approval or final approval by the 30-month forfeiture date.
826  Consequently, to qualify for the exception, the record must show that acceptability of at least one
827  aspect of the ANDA (e.g., bioequivalence) was delayed and, irrespective of what other review
828  issues may have been outstanding at the 30-month date, that this delay was caused, at least in
829  part, by a change in, or review of, the requirements for approval.  FDA has determined that this
830  interpretation of the statute best effectuates the policy underlying the exception.  It does not
831  penalize applicants for FDA's reviews of, or changes in, approval requirements imposed on
832  applicants after their ANDAs are filed that are a cause of the failure to obtain final approval or
833  tentative approval within 30 months.  This interpretation also continues to incentivize ANDA
834  applicants to challenge patents by preserving in many instances the opportunity to obtain 180-
835  day exclusivity.
836
837  **Q35.   Can a first applicant qualify for the exception if, at the 30-month forfeiture date,**
838  **FDA is reviewing an ANDA amendment submitted to address a change in the requirements**
839  **for approval?**
840
841  Yes.  FDA generally will presume that failure to obtain tentative approval or final approval was
842  caused by a change in, or review of, approval requirements if, at the 30 month date, the evidence
843  demonstrates that there was a change in, or review of, the requirements for approval and that the
844  applicant was actively addressing issues related to the change in, or review of, approval
845  requirements (or FDA was considering such efforts), and these efforts precluded tentative
846  approval or final approval at that time.  When the evidence fails to demonstrate that the applicant
847  was actively addressing the change in, or review of, approval requirements, and that these
848  activities precluded tentative approval or final approval at the 30-month date, FDA generally
849  does not presume that the failure was caused by a change in, or review of, approval
850  requirements.  If FDA were to hold otherwise, an applicant that receives one or more
851  deficiencies resulting from a change in approval requirements could avoid forfeiture by a delay

---

[72] Section 505(j)(5)(D)(i)(IV) of the FD&C Act.

FDA_00410

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

852  in addressing those deficiencies.  When evaluating causation for purposes of determining
853  forfeiture under this provision, FDA will take into account how close the change in or review of
854  the requirement for approval occurred to the 30-month date as well as the amount of effort
855  needed to respond to the change.  Further, if the applicant's response is submitted after the 30-
856  month date, FDA will consider, among other factors, how close the response is submitted to the
857  30-month date.
858
859  **Q36.   Does the exception to the "failure to obtain tentative approval" forfeiture provision**
860  **apply if FDA's review of an ANDA takes longer than 30 months in the absence of a change**
861  **in or review of the approval requirements?**
862
863  No.  Under this forfeiture provision, exclusivity is forfeited "unless" there is a review of or
864  change in the approval requirements that has delayed final approval or tentative approval of the
865  ANDA.  The statute does not permit FDA to consider an exception based on whether the
866  application could have received tentative approval or final approval before the 30-month
867  forfeiture date had FDA's review been conducted differently.  Section 1133 of FDASIA
868  (referenced in Question 32), which, among other things, extended the 30-month forfeiture period
869  to 40 months for certain ANDAs and to 36 months for certain other ANDAs, reflects Congress's
870  understanding that, even in the absence of a change in or review of the requirements for
871  approval, FDA's review of an ANDA might take more than 30 months and might contribute to a
872  first applicant's failure to obtain tentative approval or final approval by the 30-month forfeiture
873  date and result in forfeiture of exclusivity.
874
875  **Q37.   What are examples of changes in the requirements for approval that formed the**
876  **basis of an exception to the "failure to obtain tentative approval" forfeiture provision?**
877
878  The following are examples of changes in the requirements for approval imposed after ANDA
879  submission that FDA has determined were a cause of failure to obtain tentative or final approval
880  in 30 months and therefore formed the basis of an exception to this forfeiture provision:
881
882  • FDA's change in approval requirements related to drug quality that required an applicant
883  to conduct additional testing and include an additional new drug substance specification;

884  • FDA's change in approval requirements for demonstrating bioequivalence for a drug
885  product;

886  • Changes in the RLD labeling that required changes in the ANDA applicant's generic
887  drug labeling;

888  • Changes in an RLD's formulation that required an ANDA applicant to respond (for
889  example, by seeking approval for a change in formulation); and

890  • The publication in the *United States Pharmacopeia-National Formulary* of a final
891  monograph for a drug product making it necessary for applicants to demonstrate
892  compliance with the new compendial standards.[73]

---

[73] This list is intended to be illustrative and not exhaustive.

23

FDA_00411

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) C.A. No. 20-430 (RGA) |
| NORWICH PHARMACEUTICALS, INC., | ) ) |
| Defendant. | ) |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Salix Pharmaceuticals, Ltd. and Salix Pharmaceuticals, Inc. (collectively, "Salix"), Bausch Health Ireland Ltd. ("Bausch"), and Alfasigma S.p.A. ("Alfasigma") (collectively, "Plaintiffs") for their First Amended Complaint against Defendant Norwich Pharmaceuticals, Inc. ("Norwich" or "Defendant"), hereby allege as follows:

**THE PARTIES**

1.      Plaintiff Salix Pharmaceuticals, Ltd. is a corporation organized and existing under the laws of Delaware having its principal place of business at 400 Somerset Corporate Blvd., Bridgewater, New Jersey 08807.

2.      Plaintiff Salix Pharmaceuticals, Inc. is a corporation organized and existing under the laws of California having its principal place of business at 400 Somerset Blvd., Bridgewater, New Jersey 08807.

3.      Plaintiff Bausch is a company organized and existing under the laws of Ireland having an office at 3013 Lake Drive, Citywest Business Campus, Dublin 24, Ireland.

FDA_00520

4. Plaintiff Alfasigma is a corporation organized and existing under the laws of Italy having a principal place of business at Via Ragazzi del '99, 5 Bologna, Italy.

5. On information and belief, Norwich is a corporation organized and existing under the laws of Delaware, having a principal place of business at 6826 Highway 12, Norwich, New York 13815.

6. On information and belief, Norwich is in the business of, among other things, manufacturing and packaging pharmaceutical products that it distributes in the State of Delaware and throughout the United States.

7. On information and belief, Alvogen PB Research and Development LLC ("Alvogen") is the regulatory agent for Norwich. According to Alvogen's website, Norwich is a subsidiary of Alvogen that provides, *inter alia*, manufacturing and packaging services. (Exhibit A [screen printout of https://alvogen.com/what-we-do)]).

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

9. This Court has personal jurisdiction over the Defendant by virtue of the fact that, *inter alia*, it has committed the tortious act of patent infringement pursuant to 35 U.S.C. § 271(e)(2)(A) that has led to foreseeable harm and injury to Plaintiffs in the State of Delaware and throughout the United States.

10. This Court also has personal jurisdiction over Norwich by virtue of the fact that Norwich is at home in Delaware as reflected by the fact that it is incorporated in Delaware, regularly does or solicits business in Delaware, engages in other persistent courses of conduct in Delaware, and/or derives substantial revenue from services or things used or consumed in

2

FDA_00521

Delaware, including by distributing its pharmaceutical products in Delaware and, therefore, can reasonably expect to be subject to jurisdiction in the Delaware courts. Among other things, on information and belief, Norwich conducts marketing and sales activities in the State of Delaware, including, but not limited to, distribution, marketing, and/or sales of pharmaceutical products to Delaware residents that are continuous and systematic.

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

**NATURE OF THE ACTION**

12.     This is an action for infringement of United States Patent Nos. 7,045,620 (the "'620 patent"); 7,612,199 (the "'199 patent"); 7,902,206 (the "'206 patent"); 7,906,542 (the "'542 patent"); 7,915,275 (the "'275 patent"); 8,158,644 (the "'644 patent"); 8,158,781 (the "'781 patent"); 8,193,196 (the "'196 patent"); 8,309,569 (the "'569 patent"); 8,518,949 (the "'949 patent"); 8,642,573 (the "'573 patent"); 8,741,904 (the "'904 patent"); 8,829,017 (the "'017 patent"); 8,835,452 (the "'452 patent"); 8,853,231 (the "'231 patent"); 8,946,252 (the "'252 patent"); 8,969,398 (the "'398 patent"); 9,271,968 (the "'968 patent"); 9,421,195 (the "'195 patent"); 9,629,828 (the "'9,828 patent"); 10,314,828 (the "'4,828 patent"); 10,335,397 (the "'397 patent"); 10,456,384 (the "'384 patent"); 10,703,763 (the "'763 patent"); 10,709,694 (the "'694 patent"); and 10,765,667 (the "'667 patent") (collectively, the "Xifaxan® patents") under the Food and Drug Laws and the Patent Laws of the United States, Titles 21 and 35 of the United States code, respectively.  This action involves the 550 mg dosage form of Plaintiffs' drug product Xifaxan®, indicated for reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

3

FDA_00522

## THE XIFAXAN® NDA

13.    Salix Pharmaceuticals, Inc. is the holder of approved New Drug Application ("NDA") Nos. 021361 and 022554 (a supplement to NDA No. 021361 that was granted a new NDA number) for Xifaxan® (rifaximin) 550 mg tablets.

14.    The FDA approved NDA No. 021361 for Xifaxan® 200 mg tablets on May 25, 2004 and approved NDA No. 022554 for Xifaxan® 550 mg tablets on March 24, 2010.  Xifaxan® 550 mg tablets are indicated for reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

## THE PATENTS-IN-SUIT

15.    On May 16, 2006, the '620 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in medicinal preparations," was duly and legally issued.  The '620 patent is assigned to and owned by Alfasigma.  A true and correct copy of the '620 patent is attached hereto as Exhibit B.

16.    On November 3, 2009, the '199 patent, entitled "Polymorphic forms α, β, and γ of rifaximin," was duly and legally issued.  The '199 patent is assigned to and owned by Alfasigma. A true and correct copy of the '199 patent is attached hereto as Exhibit C.

17.    On March 8, 2011, the '206 patent, entitled "Polymorphic forms α, β and γ of rifaximin," was duly and legally issued.  The '206 patent is assigned to and owned by Alfasigma. A true and correct copy of the '206 patent is attached hereto as Exhibit D.

18.    On March 15, 2011, the '542 patent, entitled "Pharmaceutical compositions comprising polymorphic forms α, β, and γ of rifaximin," was duly and legally issued.  The '542 patent is assigned to and owned by Alfasigma.  A true and correct copy of the '542 patent is attached hereto as Exhibit E.

4

FDA_00523

19.     On March 29, 2011, the '275 patent, entitled "Use of polymorphic forms of rifaximin for medical preparations," was duly and legally issued.  The '275 patent is assigned to and owned by Alfasigma.  A true and correct copy of the '275 patent is attached hereto as Exhibit F.

20.     On April 17, 2012, the '644 patent, entitled "Pharmaceutical compositions comprising polymorphic forms α, β, and γ of rifaximin," was duly and legally issued.  The '644 patent is assigned to and owned by Alfasigma.  A true and correct copy of the '644 patent is attached hereto as Exhibit G.

21.     On April 17, 2012, the '781 patent, entitled "Polymorphic forms α, β and γ of rifaximin," was duly and legally issued.  The '781 patent is assigned to and owned by Alfasigma. A true and correct copy of the '781 patent is attached hereto as Exhibit H.

22.     On June 5, 2012, the '196 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations," was duly and legally issued.  The '196 patent is assigned to and owned by Alfasigma.  A true and correct copy of the '196 patent is attached hereto as Exhibit I.

23.     On November 13, 2012, the '569 patent, entitled "Methods for treating diarrhea-associated irritable bowel syndrome," was duly and legally issued.  The '569 patent is assigned to and owned by Salix Pharmaceuticals, Inc.  A true and correct copy of the '569 patent is attached hereto as Exhibit J.

24.     On August 27, 2013, the '949 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations," was duly and legally issued.  The '949 patent is assigned to and owned by Alfasigma.  A true and correct copy of the '949 patent is attached hereto as Exhibit K.

5

FDA_00524

25. On February 4, 2014, the '573 patent, entitled "Methods of treating hepatic encephalopathy," was duly and legally issued. The '573 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '573 patent is attached hereto as Exhibit L.

26. On June 3, 2014, the '904 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations," was duly and legally issued. The '904 patent is assigned to and owned by Alfasigma. A true and correct copy of the '904 patent is attached hereto as Exhibit M.

27. On September 9, 2014, the '017 patent, entitled "Methods of treating traveler's diarrhea and hepatic encephalopathy," was duly and legally issued. The '017 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '017 patent is attached hereto as Exhibit N.

28. On September 16, 2014, the '452 patent, entitled "Polymorphic forms α, β and γ of rifaximin," was duly and legally issued. The '452 patent is assigned to and owned by Alfasigma. A true and correct copy of the '452 patent is attached hereto as Exhibit O.

29. On October 7, 2014, the '231 patent, entitled "Pharmaceutical compositions comprising polymorphic forms α, β, and γ of rifaximin," was duly and legally issued. The '231 patent is assigned to and owned by Alfasigma. A true and correct copy of the '231 patent is attached hereto as Exhibit P.

30. On February 3, 2015, the '252 patent, entitled "Methods of treating traveler's diarrhea and hepatic encephalopathy," was duly and legally issued. The '252 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '252 patent is attached hereto as Exhibit Q.

FDA_00525

31.     On March 3, 2015, the '398 patent, entitled "Methods of treating hepatic encephalopathy," was duly and legally issued.  The '398 patent is assigned to and owned by Salix Pharmaceuticals, Inc.  A true and correct copy of the '398 patent is attached hereto as Exhibit R.

32.     On March 1, 2016, the '968 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations," was duly and legally issued.  The '968 patent is assigned to and owned by Alfasigma.  A true and correct copy of the '968 patent is attached hereto as Exhibit S.

33.     On August 23, 2016, the '195 patent, entitled "Methods of treating hepatic encephalopathy," was duly and legally issued.  The '195 patent is assigned to and owned by Salix Pharmaceuticals, Inc.  A true and correct copy of the '195 patent is attached hereto as Exhibit T.

34.     On April 25, 2017, the '9,828 patent, entitled "Methods of treating traveler's diarrhea and hepatic encephalopathy," was duly and legally issued.  The '9,828 patent is assigned to and owned by Salix Pharmaceuticals, Inc.  A true and correct copy of the '9,828 patent is attached hereto as Exhibit U.

35.     On June 11, 2019, the '4,828 patent, entitled "Methods of treating hepatic encephalopathy," was duly and legally issued.  The '4,828 patent is assigned to and owned by Salix Pharmaceuticals, Inc.  A true and correct copy of the '4,828 patent is attached hereto as Exhibit V.

36.     On July 2, 2019, the '397 patent, entitled "Methods of treating hepatic encephalopathy," was duly and legally issued.  The '397 patent is assigned to and owned by Salix Pharmaceuticals, Inc.  A true and correct copy of the '397 patent is attached hereto as Exhibit W.

7

FDA_00526

37. On October 29, 2019, the '384 patent, entitled "Methods of treating irritable bowel syndrome (IBS)," was duly and legally issued. The '384 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '384 patent is attached hereto as Exhibit X.

38. On July 7, 2020, the '763 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations," was duly and legally issued. The '763 patent is assigned to and owned by Alfasigma. A true and correct copy of the '763 patent is attached hereto as Exhibit Y.

39. On July 14, 2020, the '694 patent, entitled "Methods of treating hepatic encephalopathy," was duly and legally issued. The '694 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '694 patent is attached hereto as Exhibit Z.

40. On September 8, 2020, the '667 patent, entitled "Methods for treating irritable bowel syndrome (IBS)," was duly and legally issued. The '667 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '667 patent is attached hereto as Exhibit AA.

41. In accordance with 21 U.S.C. § 355(b)(1) and 21 C.F.R. § 314.53, and in conjunction with NDA No. 022554, the Xifaxan® patents are listed in the FDA's APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS (also known as the "Orange Book") for Xifaxan® 550 mg tablets.

42. Pursuant to agreements entered into between Bausch, Salix Pharmaceuticals, Ltd., and Salix Pharmaceuticals, Inc., Bausch has substantial rights in the '569, '573, '017, '252, '398, '195, '9,828, '4,828, '397, '384,'694, and '667 patents (collectively, the "Salix patents") including, but not limited to, an exclusive license to the Salix patents in the United States, and the right to sue for infringement of the Salix patents in the United States.

8

43.     Pursuant to agreements entered into between Bausch, Salix Pharmaceuticals, Inc. and Alfasigma, Bausch and Salix Pharmaceuticals, Inc. have substantial rights in the '620, '199, '206, '542, '275, '644, '781, '196, '949, '904, '452, '231, '968, and '763 patents (collectively, the "Alfasigma patents") including, but not limited to, an exclusive license to the Alfasigma patents in the United States, and the right to sue for infringement of the Alfasigma patents in the United States. Pursuant to these agreements, Salix Pharmaceuticals, Inc. is the sole distributor in the United States of Xifaxan® tablets.

## CLAIMS FOR RELIEF – PATENT INFRINGEMENT

44.     By a letter dated February 14, 2020 (the "Norwich Notice Letter"), Alvogen, as the regulatory agent for Norwich, advised Plaintiffs that Norwich had submitted ANDA No. 214369 to the FDA seeking approval to manufacture, use, or sell Norwich's ANDA Product prior to the expiration of the Xifaxan® patents.

45.     On information and belief, Defendant submitted ANDA No. 214369 to the FDA under § 505(j) of the Federal Food, Drug, and Cosmetic Act, seeking approval to engage in the commercial manufacture, use, and sale of Norwich's ANDA Product as a generic version of Xifaxan® 550 mg tablets.

46.     On information and belief, ANDA No. 214369 seeks FDA approval of Norwich's ANDA Product for the indications of reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

47.     The Norwich Notice Letter also advised Plaintiffs that Defendant's ANDA submission included certifications under 21 U.S.C. § 355(j)(2)(B)(iv)(II) that, in Defendant's opinion, certain claims of the Xifaxan® patents are invalid, unenforceable, and/or not infringed.

FDA_00528

48.     The Norwich Notice Letter does not allege non-infringement of certain claims of the '199, '206, '452, and '231 patents.  By not identifying non-infringement defenses for certain claims of the '199, '206, '452, and '231 patents in the Norwich Notice Letter, Defendant admits Norwich's ANDA Product meets all limitations of those claims.

49.     The Norwich Notice Letter does not allege invalidity or unenforceability of certain claims of the '620 patent.  By not identifying invalidity and unenforceability defenses for certain claims of the '620 patent in the Norwich Notice Letter, Defendant admits those claims of the '620 patent are valid and enforceable.

50.     By a letter dated October 6, 2020 (the "Second Norwich Notice Letter"), Alvogen, as the regulatory agent for Norwich, advised Plaintiffs that Norwich had amended ANDA No. 214369 to include a certification under 21 U.S.C. § 355(j)(2)(B)(iv)(II) that, in Defendant's opinion, the claims of the '763 and '694 patents are invalid, unenforceable, and/or not infringed.

51.     On information and belief, Defendant's statements of the factual and legal bases for its opinions regarding non-infringement and invalidity of the Xifaxan® patents are devoid of an objective good faith basis in either the facts or the law.  This case is exceptional.

52.     There is an actual, real, immediate, and justiciable controversy between Plaintiffs and Defendant regarding the infringement, validity, and enforceability of the Xifaxan® patents.

## COUNT I
### Infringement of the '620 Patent

53.     Plaintiffs incorporate each of the preceding paragraphs 1 to 52 as if fully set forth herein.

54.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including

10

FDA_00529

Delaware, prior to expiration of the '620 patent, Defendant committed an act of infringement of the '620 patent under 35 U.S.C. § 271(e)(2)(A).

55.     The '620 patent claims, *inter alia*, crystalline forms of rifaximin and processes for the production of crystalline forms of rifaximin.

56.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '620 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '620 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

57.     On information and belief, Defendant was aware of the existence of the '620 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '620 patent in the Norwich Notice Letter.

58.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

<u>**COUNT II**</u>
**Infringement of the '199 Patent**

59.     Plaintiffs incorporate each of the preceding paragraphs 1 to 58 as if fully set forth herein.

60.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '199 patent, Defendant committed an act of infringement of the '199 patent under 35 U.S.C. § 271(e)(2)(A).

61.     The '199 patent claims, *inter alia*, crystalline forms of rifaximin.

11

FDA_00530

62.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '199 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '199 patent under 35 U.S.C. § 271(a).

63.     On information and belief, Defendant was aware of the existence of the '199 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '199 patent in the Norwich Notice Letter.

64.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

<u>**COUNT III**</u>
**Infringement of the '206 Patent**

65.     Plaintiffs incorporate each of the preceding paragraphs 1 to 64 as if fully set forth herein.

66.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '206 patent, Defendant committed an act of infringement of the '206 patent under 35 U.S.C. § 271(e)(2)(A).

67.     The '206 patent claims, *inter alia*, crystalline forms of rifaximin, crystalline forms of rifaximin prepared by specified processes, and solid pharmaceutical compositions comprising crystalline forms of rifaximin.

68.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '206 patent, including

FDA_00531

any applicable exclusivities or extensions, will infringe one or more claims of the '206 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

69.     On information and belief, Defendant was aware of the existence of the '206 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '206 patent in the Norwich Notice Letter.

70.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

### COUNT IV
### Infringement of the '542 Patent

71.     Plaintiffs incorporate each of the preceding paragraphs 1 to 70 as if fully set forth herein.

72.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '542 patent, Defendant committed an act of infringement of the '542 patent under 35 U.S.C. § 271(e)(2)(A).

73.     The '542 patent claims, *inter alia*, pharmaceutical compositions comprising crystalline forms of rifaximin.

74.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '542 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '542 patent under 35 U.S.C. § 271(a).

13

FDA_00532

75.     On information and belief, Defendant was aware of the existence of the '542 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '542 patent in the Norwich Notice Letter.

76.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

<u>COUNT V</u>
**Infringement of the '275 Patent**

77.     Plaintiffs incorporate each of the preceding paragraphs 1 to 76 as if fully set forth herein.

78.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '275 patent, Defendant committed an act of infringement of the '275 patent under 35 U.S.C. § 271(e)(2)(A).

79.     The '275 patent claims, *inter alia*, methods of treating bacterial infections in patients suffering from bowel related disorders with crystalline forms of rifaximin.

80.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '275 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '275 patent under 35 U.S.C. §§ 271(b) and/or (c).

81.     On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome

14

FDA_00533

**JA183**

with diarrhea in patients, which uses will constitute direct infringement of claims of the '275 patent.

82. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

83. On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '275 patent.

84. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '275 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

85. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to the '275 patent's expiry will contribute to the direct infringement of one or more claims of the '275 patent.

86. On information and belief, Defendant's acts will be performed with knowledge of the '275 patent and with intent to encourage infringement prior to the '275 patent's expiry.

87. On information and belief, Defendant was aware of the existence of the '275 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '275 patent in the Norwich Notice Letter.

88. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

FDA_00534

## COUNT VI
### Infringement of the '644 Patent

89.     Plaintiffs incorporate each of the preceding paragraphs 1 to 88 as if fully set forth herein.

90.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '644 patent, Defendant committed an act of infringement of the '644 patent under 35 U.S.C. § 271(e)(2)(A).

91.     The '644 patent claims, *inter alia*, solid pharmaceutical compositions comprising crystalline forms of rifaximin.

92.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '644 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '644 patent under 35 U.S.C. § 271(a).

93.     On information and belief, Defendant was aware of the existence of the '644 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '644 patent in the Norwich Notice Letter.

94.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

16

FDA_00535

## COUNT VII
### Infringement of the '781 Patent

95.     Plaintiffs incorporate each of the preceding paragraphs 1 to 94 as if fully set forth herein.

96.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '781 patent, Defendant committed an act of infringement of the '781 patent under 35 U.S.C. § 271(e)(2)(A).

97.     The '781 patent claims, *inter alia*, crystalline forms of rifaximin.

98.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '781 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '781 patent under 35 U.S.C. § 271(a).

99.     On information and belief, Defendant was aware of the existence of the '781 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '781 patent in the Norwich Notice Letter.

100.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

## COUNT VIII
### Infringement of the '196 Patent

101.    Plaintiffs incorporate each of the preceding paragraphs 1 to 100 as if fully set forth herein.

FDA_00536

102. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '196 patent, Defendant committed an act of infringement of the '196 patent under 35 U.S.C. § 271(e)(2)(A).

103. The '196 patent claims, *inter alia*, crystalline forms of rifaximin, solid pharmaceutical compositions comprising crystalline forms of rifaximin, methods of treating bacterial activity in the gastrointestinal tract of subjects with crystalline forms of rifaximin, and processes for the production of crystalline forms of rifaximin.

104. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '196 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '196 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

105. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '196 patent.

106. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

18

FDA_00537

107.    On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '196 patent.

108.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '196 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

109.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to the '196 patent's expiry will contribute to the direct infringement of one or more claims of the '196 patent.

110.    On information and belief, Defendant's acts will be performed with knowledge of the '196 patent and with intent to encourage infringement prior to the '196 patent's expiry.

111.    On information and belief, Defendant was aware of the existence of the '196 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '196 patent in the Norwich Notice Letter.

112.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

### COUNT IX
### Infringement of the '569 Patent

113.    Plaintiffs incorporate each of the preceding paragraphs 1 to 112 as if fully set forth herein.

114.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale,

FDA_00538

and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '569 patent, Defendant committed an act of infringement of the '569 patent under 35 U.S.C. § 271(e)(2)(A).

115. The '569 patent claims, *inter alia*, methods of treating diarrhea-associated irritable bowel syndrome with rifaximin.

116. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '569 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '569 patent under 35 U.S.C. §§ 271(b) and/or (c).

117. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '569 patent.

118. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

119. On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '569 patent.

120. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '569 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

20

FDA_00539

121.     On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to the '569 patent's expiry will contribute to the direct infringement of one or more claims of the '569 patent.

122.     On information and belief, Defendant's acts will be performed with knowledge of the '569 patent and with intent to encourage infringement prior to the '569 patent's expiry.

123.     On information and belief, Defendant was aware of the existence of the '569 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '569 patent in the Norwich Notice Letter.

124.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

### COUNT X
### Infringement of the '949 Patent

125.     Plaintiffs incorporate each of the preceding paragraphs 1 to 124 as if fully set forth herein.

126.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '949 patent, Defendant committed an act of infringement of the '949 patent under 35 U.S.C. § 271(e)(2)(A).

127.     The '949 patent claims, *inter alia*, solid pharmaceutical compositions comprising crystalline forms of rifaximin and crystalline forms of rifaximin prepared by specified processes.

21

FDA_00540

128.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '949 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '949 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

129.     On information and belief, Defendant was aware of the existence of the '949 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '949 patent in the Norwich Notice Letter.

130.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

<u>**COUNT XI**</u>
**Infringement of the '573 Patent**

131.     Plaintiffs incorporate each of the preceding paragraphs 1 to 130 as if fully set forth herein.

132.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '573 patent, Defendant committed an act of infringement of the '573 patent under 35 U.S.C. § 271(e)(2)(A).

133.     The '573 claims, *inter alia*, methods of maintaining remission of hepatic encephalopathy with rifaximin.

134.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '573 patent, including any

22

FDA_00541

applicable exclusivities or extensions, will infringe one or more claims of the '573 patent under 35 U.S.C. §§ 271(b) and/or (c).

135.    On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '573 patent.

136.    On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

137.    On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '573 patent.

138.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '573 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

139.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '573 patent.

140.    On information and belief, Defendant's acts will be performed with knowledge of the '573 patent and with intent to encourage infringement prior to patent expiry.

FDA_00542

141. On information and belief, Defendant was aware of the existence of the '573 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '573 patent in the Norwich Notice Letter.

142. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

<u>**COUNT XII**</u>
**Infringement of the '904 Patent**

143. Plaintiffs incorporate each of the preceding paragraphs 1 to 142 as if fully set forth herein.

144. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '904 patent, Defendant committed an act of infringement of the '904 patent under 35 U.S.C. § 271(e)(2)(A).

145. The '904 patent claims, *inter alia*, crystalline forms of rifaximin, methods of treating bacterial activity in the gastrointestinal tract of subjects with crystalline forms of rifaximin, and medicinal preparations comprising crystalline forms of rifaximin.

146. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '904 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '904 patent under 35 U.S.C. §§ 271(a), (b), and/or (c).

147. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic

24

FDA_00543

encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '904 patent.

148.  On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

149.  On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '904 patent.

150.  On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '904 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

151.  On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to the '904 patent's expiry will contribute to the direct infringement of one or more claims of the '904 patent.

152.  On information and belief, Defendant's acts will be performed with knowledge of the '904 patent and with intent to encourage infringement prior to the '904 patent's expiry.

153.  On information and belief, Defendant was aware of the existence of the '904 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '904 patent in the Norwich Notice Letter.

FDA_00544

154.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

### COUNT XIII
### Infringement of the '017 Patent

155.    Plaintiffs incorporate each of the preceding paragraphs 1 to 154 as if fully set forth herein.

156.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '017 patent, Defendant committed an act of infringement of the '017 patent under 35 U.S.C. § 271(e)(2)(A).

157.    The '017 patent claims, *inter alia*, methods of treating patients having hepatic encephalopathy with rifaximin and methods of treating patients suffering from hepatic encephalopathy with rifaximin.

158.    Defendant's manufacture, use, sale, offer for sale, or importation into the United States Norwich's ANDA Product prior to the expiration of the '017 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '017 patent under 35 U.S.C. §§ 271(b) and/or (c).

159.    On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome

FDA_00545

with diarrhea in patients, which uses will constitute direct infringement of claims of the '017 patent.

160. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

161. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '017 patent.

162. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '017 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

163. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '017 patent.

164. On information and belief, Defendant's acts will be performed with knowledge of the '017 patent and with intent to encourage infringement prior to patent expiry.

165. On information and belief, Defendant was aware of the existence of the '017 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '017 patent in the Norwich Notice Letter.

166. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

27

FDA_00546

## COUNT XIV
## Infringement of the '452 Patent

167.     Plaintiffs incorporate each of the preceding paragraphs 1 to 166 as if fully set forth herein.

168.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '452 patent, Defendant committed an act of infringement of the '452 patent under 35 U.S.C. § 271(e)(2)(A).

169.     The '452 patent claims, *inter alia*, crystalline forms of rifaximin and pharmaceutical compositions comprising crystalline forms of rifaximin.

170.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '452 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '452 patent under 35 U.S.C. § 271(a).

171.     On information and belief, Defendant was aware of the existence of the '452 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '452 patent in the Norwich Notice Letter.

172.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

28

FDA_00547

## COUNT XV
## Infringement of the '231 Patent

173.    Plaintiffs incorporate each of the preceding paragraphs 1 to 172 as if fully set forth herein.

174.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '231 patent, Defendant committed an act of infringement of the '231 patent under 35 U.S.C. § 271(e)(2)(A).

175.    The '231 patent claims, *inter alia*, pharmaceutical compositions comprising crystalline forms of rifaximin.

176.    Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '231 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '231 patent under 35 U.S.C. § 271(a).

177.    On information and belief, Defendant was aware of the existence of the '231 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '231 patent in the Norwich Notice Letter.

178.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

FDA_00548

## COUNT XVI
### Infringement of the '252 Patent

179.    Plaintiffs incorporate each of the preceding paragraphs 1 to 178 as if fully set forth herein.

180.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '252 patent, Defendant committed an act of infringement of the '252 patent under 35 U.S.C. § 271(e)(2)(A).

181.    The '252 patent claims, *inter alia*, methods of reducing the risk of overt hepatic encephalopathy recurrence in subjects with rifaximin.

182.    Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '252 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '252 patent under 35 U.S.C. §§ 271(b) and/or (c).

183.    On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '252 patent.

184.    On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

30

FDA_00549

185.    On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '252 patent.

186.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '252 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

187.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '252 patent.

188.    On information and belief, Defendant's acts will be performed with knowledge of the '252 patent and with intent to encourage infringement prior to patent expiry.

189.    On information and belief, Defendant was aware of the existence of the '252 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '252 patent in the Norwich Notice Letter.

190.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

### COUNT XVII
### Infringement of the '398 Patent

191.    Plaintiffs incorporate each of the preceding paragraphs 1 to 190 as if fully set forth herein.

192.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including

31

FDA_00550

Delaware, prior to expiration of the '398 patent, Defendant committed an act of infringement of the '398 patent under 35 U.S.C. § 271(e)(2)(A).

193.    The '398 patent claims, *inter alia*, methods of decreasing the risk of a hepatic encephalopathy breakthrough episode with rifaximin.

194.    Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '398 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '398 patent under 35 U.S.C. §§ 271(b) and/or (c).

195.    On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '398 patent.

196.    On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

197.    On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '398 patent.

198.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '398 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

FDA_00551

199.     On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '398 patent.

200.     On information and belief, Defendant's acts will be performed with knowledge of the '398 patent and with intent to encourage infringement prior to patent expiry.

201.     On information and belief, Defendant was aware of the existence of the '398 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '398 patent in the Norwich Notice Letter.

202.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

**COUNT XVIII**
**Infringement of the '968 Patent**

203.     Plaintiffs incorporate each of the preceding paragraphs 1 to 202 as if fully set forth herein.

204.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '968 patent, Defendant committed an act of infringement of the '968 patent under 35 U.S.C. § 271(e)(2)(A).

205.     The '968 patent claims, *inter alia*, pharmaceutical compositions comprising crystalline forms of rifaximin.

206.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '968 patent, including

33

FDA_00552

any applicable exclusivities or extensions, will infringe one or more claims of the '968 patent under 35 U.S.C. § 271(a).

207.    On information and belief, Defendant was aware of the existence of the '968 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '968 patent in the Norwich Notice Letter.

208.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

### COUNT XIX
### Infringement of the '195 Patent

209.    Plaintiffs incorporate each of the preceding paragraphs 1 to 208 as if fully set forth herein.

210.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '195 patent, Defendant committed an act of infringement of the '195 patent under 35 U.S.C. § 271(e)(2)(A).

211.    The '195 patent claims, *inter alia*, methods of reducing the risk of hepatic encephalopathy recurrence with rifaximin.

212.    Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '195 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '195 patent under 35 U.S.C. §§ 271(b) and/or (c).

34

FDA_00553

213.     On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '195 patent.

214.     On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

215.     On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '195 patent.

216.     On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '195 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

217.     On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '195 patent.

218.     On information and belief, Defendant's acts will be performed with knowledge of the '195 patent and with intent to encourage infringement prior to patent expiry.

219.     On information and belief, Defendant was aware of the existence of the '195 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '195 patent in the Norwich Notice Letter.

FDA_00554

220.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

**COUNT XX**
**Infringement of the '9,828 Patent**

221.     Plaintiffs incorporate each of the preceding paragraphs 1 to 220 as if fully set forth herein.

222.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '9,828 patent, Defendant committed an act of infringement of the '9,828 patent under 35 U.S.C. § 271(e)(2)(A).

223.     The '9,828 patent claims, *inter alia*, methods of reducing the risk of overt hepatic encephalopathy recurrence with rifaximin.

224.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '9,828 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '9,828 patent under 35 U.S.C. §§ 271(b) and/or (c).

225.     On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '9,828 patent.

36

FDA_00555

226.     On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

227.     On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '9,828 patent.

228.     On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '9,828 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

229.     On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '9,828 patent.

230.     On information and belief, Defendant's acts will be performed with knowledge of the '9,828 patent and with intent to encourage infringement prior to patent expiry.

231.     On information and belief, Defendant was aware of the existence of the '9,828 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '9,828 patent in the Norwich Notice Letter.

232.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

## COUNT XXI
### Infringement of the '4,828 Patent

233.     Plaintiffs incorporate each of the preceding paragraphs 1 to 232 as if fully set forth herein.

37

234. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '4,828 patent, Defendant committed an act of infringement of the '4,828 patent under 35 U.S.C. § 271(e)(2)(A).

235. The '4,828 patent claims, *inter alia*, methods of maintaining remission of hepatic encephalopathy with rifaximin.

236. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '4,828 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '4,828 patent under 35 U.S.C. §§ 271(b) and/or (c).

237. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '4,828 patent.

238. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

239. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '4,828 patent.

38

FDA_00557

240.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '4,828 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

241.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '4,828 patent.

242.    On information and belief, Defendant's acts will be performed with knowledge of the '4,828 patent and with intent to encourage infringement prior to patent expiry.

243.    On information and belief, Defendant was aware of the existence of the '4,828 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '4,828 patent in the Norwich Notice Letter.

244.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

## COUNT XXII
### Infringement of the '397 Patent

245.    Plaintiffs incorporate each of the preceding paragraphs 1 to 244 as if fully set forth herein.

246.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '397 patent, Defendant committed an act of infringement of the '397 patent under 35 U.S.C. § 271(e)(2)(A).

39

FDA_00558

247.    The '397 patent claims, *inter alia*, methods of reducing the risk of experiencing a breakthrough overt hepatic encephalopathy episode with rifaximin.

248.    Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '397 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '397 patent under 35 U.S.C. §§ 271(b) and/or (c).

249.    On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '397 patent.

250.    On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

251.    On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '397 patent.

252.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '397 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

253.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '397 patent.

FDA_00559

254.    On information and belief, Defendant's acts will be performed with knowledge of the '397 patent and with intent to encourage infringement prior to patent expiry.

255.    On information and belief, Defendant was aware of the existence of the '397 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '397 patent in the Norwich Notice Letter.

256.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

### COUNT XXIII
### Infringement of the '384 Patent

257.    Plaintiffs incorporate each of the preceding paragraphs 1 to 256 as if fully set forth herein.

258.    By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '384 patent, Defendant committed an act of infringement of the '384 patent under 35 U.S.C. § 271(e)(2)(A).

259.    The '384 patent claims, *inter alia*, methods of treating symptoms of irritable bowel syndrome in subjects 65 years of age or older with rifaximin.

260.    Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '384 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '384 patent under 35 U.S.C. §§ 271(b) and/or (c).

41

FDA_00560

261.    On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '384 patent.

262.    On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

263.    On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '384 patent.

264.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '384 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

265.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '384 patent.

266.    On information and belief, Defendant's acts will be performed with knowledge of the '384 patent and with intent to encourage infringement prior to patent expiry.

267.    On information and belief, Defendant was aware of the existence of the '384 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '384 patent in the Norwich Notice Letter.

FDA_00561

268. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

## COUNT XXIV
### Infringement of the '763 Patent

269. Plaintiffs incorporate each of the preceding paragraphs 1 to 268 as if fully set forth herein.

270. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '763 patent, Defendant committed an act of infringement of the '763 patent under 35 U.S.C. § 271(e)(2)(A).

271. The '763 patent claims, *inter alia*, methods of treating bacterial activity in the gastrointestinal tract of subjects with crystalline forms of rifaximin.

272. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '763 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '763 patent under 35 U.S.C. §§ 271(b) and/or (c).

273. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '763 patent.

43

FDA_00562

274.   On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

275.   On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '763 patent.

276.   On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '763 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

277.   On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '763 patent.

278.   On information and belief, Defendant's acts will be performed with knowledge of the '763 patent and with intent to encourage infringement prior to patent expiry.

279.   The '763 patent issued after the Norwich Notice Letter dated February 14, 2020 was mailed.

280.   The '763 patent was listed in the Orange Book for Xifaxan® 550 mg tablets (NDA No. 022554) on or about July 14, 2020.

281.   On information and belief, Defendant was aware of the existence of the '763 patent and its listing in the Orange Book prior to the filing date of this First Amended Complaint as demonstrated by Defendant's reference to the '763 patent in the Second Norwich Notice Letter.

FDA_00563

282.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

## COUNT XXV
### Infringement of the '694 Patent

283.     Plaintiffs incorporate each of the preceding paragraphs 1 to 282 as if fully set forth herein.

284.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '694 patent, Defendant committed an act of infringement of the '694 patent under 35 U.S.C. § 271(e)(2)(A).

285.     The '694 patent claims, *inter alia*, methods of reducing the risk of experiencing a breakthrough overt hepatic encephalopathy episode with rifaximin.

286.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '694 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '694 patent under 35 U.S.C. §§ 271(b) and/or (c).

287.     On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '694 patent.

45

FDA_00564

288.     On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

289.     On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '694 patent.

290.     On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '694 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

291.     On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '694 patent.

292.     On information and belief, Defendant's acts will be performed with knowledge of the '694 patent and with intent to encourage infringement prior to patent expiry.

293.     The '694 patent issued after the Norwich Notice Letter dated February 14, 2020 was mailed.

294.     The '694 patent was listed in the Orange Book for Xifaxan® 550 mg tablets (NDA No. 022554) on or about July 23, 2020.

295.     On information and belief, Defendant was aware of the existence of the '694 patent and its listing in the Orange Book prior to the filing date of this First Amended Complaint as demonstrated by Defendant's reference to the '694 patent in the Second Norwich Notice Letter.

FDA_00565

296.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

## COUNT XXVI
### Infringement of the '667 Patent

297.     Plaintiffs incorporate each of the preceding paragraphs 1 to 296 as if fully set forth herein.

298.     By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '667 patent, Defendant committed an act of infringement of the '667 patent under 35 U.S.C. § 271(e)(2)(A).

299.     The '667 patent claims, *inter alia*, methods of treating symptoms of irritable bowel syndrome in subjects 65 years of age or older with rifaximin.

300.     Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '667 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '667 patent under 35 U.S.C. §§ 271(b) and/or (c).

301.     On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '667 patent.

47

FDA_00566

302.    On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

303.    On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '667 patent.

304.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '667 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

305.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '667 patent.

306.    On information and belief, Defendant's acts will be performed with knowledge of the '667 patent and with intent to encourage infringement prior to patent expiry.

307.    The '667 patent issued after the Norwich Notice Letter dated February 14, 2020 was mailed.

308.    The '667 patent was listed in the Orange Book for Xifaxan® 550 mg tablets (NDA No. 022554) on or about October 19, 2020, after the Second Norwich Notice Letter dated October 6, 2020 was mailed.

309.    On information and belief, Defendant was aware of the existence of the '667 patent and its listing in the Orange Book prior to the filing date of this First Amended Complaint as demonstrated by Plaintiffs' November 3, 2020 email correspondence to Defendant notifying Defendant that the '667 patent issued and was listed in the Orange Book after Plaintiffs filed their

48

FDA_00567

original Complaint and that Plaintiffs sought to amend their Complaint to add claims of infringement of the '667 patent.

310.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    A judgment that Defendant has infringed one or more claims of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569;  8,518,949;  8,642,573;  8,741,904;  8,829,017;  8,835,452;  8,853,231;  8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694;  and  10,765,667 by submitting ANDA No. 214369 seeking FDA approval for the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product before the expiration of the Xifaxan® patents, inclusive of any exclusivities and extensions, under 35 U.S.C. § 271(e)(2)(A);

B.    A judgment that Defendant's commercial manufacture, use, offer for sale, sale in, and/or importation into the United States of Norwich's ANDA Product will infringe one or more claims of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644;  8,158,781;  8,193,196;  8,309,569;  8,518,949;  8,642,573;  8,741,904;  8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667 under 35 U.S.C. §§ 271(a), (b), (c), and/or (g);

49

FDA_00568

C.     A judgment that United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667 remain valid and enforceable;

D.     A permanent injunction under 35 U.S.C. §§ 271(e)(4)(B) and/or 283 restraining and enjoining Defendant, its officers, agents, servants, and employees, and those persons in active concert or participation with any of them, from engaging in the commercial manufacture, use, offer for sale, sale in, and/or importation into the United States of Norwich's ANDA Product prior to the expiration date of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667, inclusive of any exclusivities and extensions;

E.     An order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of ANDA No. 214369 under Section 505(j) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355(j)) shall be a date that is not earlier than the expiration date of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667, inclusive of any exclusivities and extensions;

F.     A declaration that this case is "exceptional" under 35 U.S.C. § 285 and an award of attorneys' fees;

50

FDA_00569

G.    Costs and expenses in this action; and

H.    Such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Cameron P. Clark*

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
cclark@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104-3800
(212) 218-2100

November 13, 2020

51

FDA_00570

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 13, 2020, upon the following in the manner indicated:

Karen E. Keller                                                      *VIA ELECTRONIC MAIL*
David M. Fry
SHAW KELLER LLP
I.M. Pei Building
1105 N. Market St., 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*


Matthew J. Becker                                              *VIA ELECTRONIC MAIL*
Stacie L. Ropka
Matthew S. Murphy
Chad A. Landman
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
*Attorneys for Defendant*


/s/ Cameron P. Clark
Cameron P. Clark (#6647)

FDA_00571

**JA221**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 20-430 (RGA) |
| NORWICH PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

**STIPULATION AND [PROPOSED] ORDER**

WHEREAS Plaintiff Salix Pharmaceuticals, Inc. is the holder of New Drug Application ("NDA") Nos. 021361 and 022554 (a supplement to NDA No. 021361) for Xifaxan (rifaximin) 550 mg tablets that were approved by the U.S. Food and Drug Administration ("FDA");

WHEREAS Defendant Norwich Pharmaceuticals, Inc. ("Norwich" or "Defendant") filed Abbreviated New Drug Application ("ANDA") No. 214369 for approval to manufacture and sell rifaximin 550 mg tablets ("ANDA Product");

WHEREAS Plaintiffs Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Bausch Health Ireland Ltd., and Alfasigma S.p.A. (collectively, "Plaintiffs") filed a First Amended Complaint on November 13, 2020 (D.I. 59) alleging infringement of U.S. Patent Nos. 7,045,620 (the "'620 Patent"); 7,612,199 (the "'199 Patent"); 7,902,206 (the "'206 Patent"); 7,906,542 (the "'542 Patent"); 7,915,275 (the "'275 Patent"); 8,158,644 (the "'644 Patent"); 8,158,781 (the "'781 Patent"); 8,193,196 (the "'196 Patent"); 8,309,569 (the "'569 Patent"); 8,518,949 (the "'949 Patent"); 8,642,573 (the "'573 Patent"); 8,741,904 (the "'904 Patent"); 8,829,017 (the "'017 Patent"); 8,835,452 (the "'452 Patent"); 8,853,231 (the "'231 Patent"); 8,946,252 (the "'252

FDA_00579

**JA222**

Patent"); 8,969,398 (the "'398 Patent"); 9,271,968 (the "'968 Patent"); 9,421,195 (the "'195

Patent"); 9,629,828 (the "'9,828 Patent"); 10,314,828 (the "'4,828 Patent"); 10,335,397 (the "'397

Patent"); 10,456,384 (the "'384 Patent"); 10,703,763 (the "'763 Patent"); 10,709,694 (the "'694

Patent"); and 10,765,667 (the "'667 Patent");

WHEREAS the parties jointly submitted a proposed scheduling order requiring the parties

to reduce the number of asserted patent claims and prior art-based invalidity positions (D.I. 23,

paragraph 3(g)(iv)), which the Court entered;

WHEREAS Plaintiffs did not present evidence of infringement of any patent claim of the

following patents at trial: the '620 patent; '542 Patent; the '275 Patent; '644 Patent; the '781 Patent;

the '196 Patent; the '949 Patent; the '904 Patent; the '017 Patent; the '452 Patent; the '231 Patent;

the '252 Patent; the '398 Patent; the '968 Patent; the '9,828 Patent; the '4,828 Patent; the '384

Patent; the '763 Patent; and the '694 Patent; and

WHEREAS the parties completed the evidentiary phase of trial on March 21-24, 2022;

WHEREAS Plaintiffs presented alleged evidence of infringement of claim 2 of the '569

Patent, claim 3 of the '667 Patent, claim 4 of the '199 Patent, claim 36 of the '206 Patent, claim 8

of the '573 Patent, claim 6 of the '195 Patent, and claims 11-12 of the '397 Patent at trial

(collectively, the "Asserted Trial Patent Claims");

NOW THEREFORE, the parties hereby stipulate and agree as follows, subject to the

approval of the Court:

1.    A final judgment of noninfringement be entered with respect to Norwich's current

ANDA No. 214369, including the current ANDA Product[1] and any use of the current ANDA

---

[1] For the sake of clarity, "Norwich's current ANDA No. 214369" and "current ANDA Product"
as used in this Stipulation includes any amendments or supplements to the ANDA that do not
change the indications of use, the polymorph forms, or the formulation, and includes any

FDA_00580

Product, concerning each claim of the '620 patent; the '542 Patent; the '275 Patent; '644 Patent;
the '781 Patent; the '196 Patent; the '949 Patent; the '904 Patent; the '017 Patent; the '452 Patent;
the '231 Patent; the '252 Patent; the '398 Patent; the '968 Patent; the '9,828 Patent; the '4,828
Patent; the '384 Patent; the '763 Patent; and the '694 Patent;

2.      Norwich's counterclaims of invalidity with respect to each claim of the '620 patent;
the '542 Patent; the '275 Patent; '644 Patent; the '781 Patent; the '196 Patent; the '949 Patent; the
'904 Patent; the '017 Patent; the '452 Patent; the '231 Patent; the '252 Patent; the '398 Patent; the
'968 Patent; the '9,828 Patent; the '4,828 Patent; the '384 Patent; the '763 Patent; and the '694
Patent, shall be dismissed without prejudice;

3.      A final judgment of non-infringement be entered with respect to Norwich's current
ANDA No. 214369, including the current ANDA Product and any use of the current ANDA
Product, concerning claims 2 and 4-16 of the '667 Patent, claims 1-3 and 5-7 of the '199 Patent,
claims 1-33, 35, and 37-57 of the '206 Patent, claims 2-5 of the '573 Patent, claims 2-4 and 7-12
of the '195 Patent, and claims 2-8 and 13 of the '397 Patent;

4.      Norwich's counterclaims of invalidity with respect to claims 2 and 4-16 of the '667
Patent, claims 1-3 and 5-7 of the '199 Patent, claims 1-33, 35, and 37-57 of the '206 Patent, claims
2-5 of the '573 Patent, claims 2-4 and 7-12 of the '195 Patent, and claims 2-8 and 13 of the '397
Patent, shall be dismissed without prejudice;

5.      The parties will not rely on any final judgment or dismissal regarding any patent
claim entered pursuant to Paragraphs 2, 3, 4, and 5 with respect to Plaintiffs' assertion of each of

---

amendments or supplements to the label that are required due to an amendment or supplement to
the Xifaxan® label.

3

FDA_00581

the Asserted Trial Patent Claims or Norwich's counterclaims and defenses to each of the Asserted

Trial Patent Claims in post-trial briefing;

6. Plaintiffs and Norwich agree that any judgment concerning the validity, invalidity,

infringement, and/or non-infringement regarding each Asserted Trial Patent Claim shall apply to

each patent claim from which that Asserted Trial Patent Claim depends. For avoidance of doubt,

this Paragraph shall apply to claim 1 of the '569 Patent, claim 1 of the '667 Patent, claim 34 of the

'206 Patent, claims 1 and 6-7 of the '573 Patent, claims 1 and 5 of the '195 Patent, or claims 1 and

9 of the '397 Patent.

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | SHAW KELLER LLP |
| */s/ Cameron P. Clark* | */s/ Karen E. Keller* |
| Jack B. Blumenfeld (#1014) | Karen E. Keller (#4489) |
| Karen Jacobs (#2881) | 1105 N. Market St., 12th Floor |
| Cameron P. Clark (#6647) | Wilmington, DE 19801 |
| 1201 North Market Street | (302) 298-0702 |
| P.O. Box 1347 | kkeller@shawkeller.com |
| Wilmington, DE 19899-1347 | |
| (302) 658-9200 | *Attorneys for Defendant Norwich* |
| jblumenfeld@morrisnichols.com | *Pharmaceuticals, Inc.* |
| kjacobs@morrisnichols.com | |
| cclark@morrisnichols.com | OF COUNSEL: |
| | |
| *Attorneys for Plaintiffs Salix Pharmaceuticals,* | Matthew S. Murphy |
| *Ltd., Salix Pharmaceuticals, Inc., Bausch* | Chad A. Landmon |
| *Health Ireland Ltd., and Alfasigma S.p.A.* | Matthew J. Becker |
| | Stacie L. Ropka |
| OF COUNSEL: | Rebecca L. Clegg |
| | AXINN, VELTROP & HARKRIDER LLP |
| Scott K. Reed | 90 State House Square |
| Steven C. Kline | Hartford, CT 06103 |
| Shannon K. Clark | (860) 275-8100 |
| Daniel A. Apgar | |
| Alexis M. McJoynt | |
| VENABLE LLP | |
| 1290 Avenue of the Americas | |
| New York, NY 10104 | |
| (212) 218-2100 | |

FDA_00582

Damien N. Dombrowski
Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5500

May 12, 2022

**SO ORDERED** this  12  day of May, 2022.

_____
/s/ Richard G. Andrews
The Honorable Richard G. Andrews
United States District Court Judge

5

FDA_00583

**JA226**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) ) ) ) |
| Plaintiffs, | ) ) C.A. No. 20-430 (RGA) |
| v. | ) ) ) |
| NORWICH PHARMACEUTICALS, INC., | ) ) |
| Defendant. | ) ) |

**FINAL JUDGMENT**

This action, having been tried before the Court from March 21 through March 25, 2022, and the Court having issued an opinion after trial (D.I. 191):

IT IS HEREBY ORDERED and ADJUDGED:

1.    Judgment is entered in favor of Plaintiffs Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Bausch Health Ireland Ltd., and Alfasigma S.p.A. (collectively, "Plaintiffs") and against Defendant Norwich Pharmaceuticals, Inc. ("Norwich") on Plaintiffs' claim that Norwich will induce infringement of claim 8 of U.S. Patent No. 8,642,573 (the "'573 Patent"), claim 6 of U.S. Patent No. 9,421,195 (the "'195 Patent"), and claims 11-12 of U.S. Patent No. 10,335,397 (the "'397 Patent").in connection with Norwich's proposed generic rifaximin 550 mg tablets ("ANDA Product") that are the subject of Norwich's Abbreviated New Drug Application ("ANDA") No. 214369.

2.    Judgment is entered in favor of Plaintiffs and against Norwich on Norwich's counterclaims for non-infringement and invalidity of claim 8 of the '573 Patent, claim 6 of the '195 Patent, and claims 11-12 the '397 Patent.

FDA_00602

3. Judgment is entered in favor of Plaintiffs and against Norwich that pursuant to 35 U.S.C. § 271(e)(2), Norwich's submission of Norwich's ANDA No. 214369 was an act of infringement of claim 8 of the '573 Patent, claim 6 of the '195 Patent, and claims 11-12 the '397 Patent.

4. Judgment is entered in favor of Norwich and against Plaintiffs on Norwich's counterclaims for invalidity of claim 2 of U.S. Patent No. 8,309,569, claim 3 of U.S. Patent No. 10,765,667, claim 4 of U.S. Patent No. 7,612,199, and claim 36 of U.S. Patent No. 7,902,206.

5. Pursuant to 35 U.S.C. § 27l(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled. Norwich shall notify the FDA of this judgment within two (2) business days of its entry (with a copy of such notice given simultaneously to Plaintiffs).

6. In the event that a party appeals this Final Judgment, any motion for attorneys' fees and/or costs under Fed. R. Civ. P. 54 and/or Local Rules 54.1 or 54.3, or any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within thirty (30) days after final disposition of any such appeal.

SO ORDERED this 10ᵗʰ day of August, 2022.

_____
United States District Judge

2

FDA_00603

**JA228**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A.,, <br><br> Plaintiffs, <br><br> v. <br><br> NORWICH PHARMACEUTICALS, INC., <br><br> Defendant. | Civil Action No. 20-430-RGA |

## MEMORANDUM ORDER

I filed a final judgment in this case. (D.I. 193). Shortly thereafter, Defendant filed a motion to modify that judgment pursuant to Federal Rule of Civil Procedure 60(b). (D.I. 205). Subsequent briefing made clear that Defendant was primarily relying upon Rule 60(b)(5), which provides: "On motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Plaintiffs oppose the motion. (D.I. 213).

The background to the pending motion is that Defendant filed an ANDA seeking to make and market a drug for two different methods of treatment—the IBS-D indication and the HE indication. I had a bench trial. After trial, I ruled in Defendant's favor on the IBS-D indication (as well as the composition claims), finding all patent claims asserted in relation to those two issues

1

FDA_00607

**JA229**

to be invalid. I ruled in Plaintiffs' favor only on the HE indication, finding all claims asserted in relation to that issue to be infringed and not invalid. In the final judgment, I ordered the FDA not to approve the ANDA before the latest expiration (in about 2029) of the patents on which Plaintiffs won. About a month after entry of the final judgment, Defendant filed an amended ANDA that purports to carve out everything relating to the HE indication. Defendant says, if the FDA approves the amended ANDA, Defendant would not be inducing infringement by marketing the pharmaceutical with the amended label. Other than providing the proposed label, Defendant has refused to provide any other information about the amended ANDA, including its status with the FDA or anything else.

I do not think Defendant's request fits in comfortably with the requirements of Rule 60(b)(5), and I do not think, even if it did, that it could be resolved in the summary fashion that Defendant seems to think it should be.

First, the Rule. Defendant says the judgment has been "satisfied," but I think it is pretty clear that the "satisfied, released, or discharged" language is talking about money, and is therefore inapplicable. Defendant says the injunction prohibiting FDA approval before 2029 is "no longer equitable" because Defendant no longer seeks to do the act that was the basis for the injunction. The case law says that Rule 60(b)(5) is for a significant change in circumstances. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). While such a change in circumstances does not have to be entirely unforeseeable, a "modification should not be granted where a party relies upon events that actually were anticipated at the time" the final judgment was entered. *Id.* at 385. I do not think "changed circumstances" applies here. The case was tried as essentially three independent up-or-down decisions. In my experience with ANDAs, it is common, and certainly not rare, to have split decisions. ANDA practitioners and pharmaceutical companies

2

**FDA_00608**

**JA230**

surely know this. Thus, there were a limited number of possible outcomes at trial. But, of course,

the trial results are not the changed circumstances, as the actual outcomes were previewed two

weeks before the final judgment (D.I. 189) and disclosed at the same time as the final judgment.

The only changed circumstance is that Defendant decided to amend its ANDA, which it filed on

September 6, 2022 (D.I. 206 at 2), nearly one month after the final judgment. The changed

circumstance is simply a voluntary decision of the trial loser to change course, which is neither

unanticipated nor unforeseeable.

I also wonder about "equitableness" generally. Defendant made various strategic choices

along the way, but now does not want to live with the consequences of those choices.[1] Defendant

says that it is now worse off than other generics that settled with Plaintiffs and apparently can

launch in 2028. While true, Defendant does not argue that it could not have settled and gotten the

same deal as the other generics. Defendant says that it has gone to the effort of proving the asserted

composition and IBS-D patent claims invalid, so other generics will be able to enter the market a

lot sooner than 2028 by taking advantage of Defendant's accomplishments.[2] Defendant suggests

this is inequitable (and perhaps it is), but the inequity does not exist between Plaintiffs and

Defendant. To the extent there is inequity, it is between Defendant and other generics. Defendant

says that the public will be harmed because Plaintiffs will not have any generic competition (with

attendant lower costs) on the IBS-D treatment method for some period of time, even though

---

[1] I was assigned one related ANDA, where Defendant was only seeking approval to market the IBS-D indication, and not the HE indication. *Salix Pharms., Ltd. v. Sun Pharms. Inds., LTD*, No. 19-734-RGA (D.Del. filed April 24, 2019). That Defendant quickly resolved its case with Plaintiffs.

[2] This may be a bit speculative too, because Plaintiffs have lots of relevant patents and patent claims, and, while presumably they advanced their best claims at the trial in this case, I would expect they have more listed in the Orange Book to assert against the next generic to file an ANDA.

3

Plaintiffs have no right to a monopoly on that treatment method. This is a bit speculative, since there is no information about if or when the FDA might approve the amended ANDA.

Second, the record. It is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement.[3] Defendant, other than saying it has successfully carved out the HE indication, and providing me the label, has presented no evidence in support of its assertion. Further, Rule 60(b) "does not allow relitigation of issues that have been resolved by the judgment." 11 WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE § 2863, at 459 (3d ed. 2012). Defendant presents no facts indicating that it could not have litigated the carve-out or that it was denied a full and fair opportunity to do so. *Allergan, Inc. v. Sandoz Inc.*, 2013 WL 6253669, at *3 (E.D. Tex. Dec. 3, 2013), *aff'd*, 587 F. App'x 657 (Fed. Cir. 2014). As in *Allergan*, Defendant fully litigated the merits of its non-infringement and invalidity case, lost, and now seeks a way around the final judgment through Rule 60(b) that "is tantamount to seeking summary judgment premised on new allegations that only came to exist after the final judgment was rendered . . . ." *Id.*

Defendant states that Plaintiffs have not tried to state a claim against the carve out, and therefore, they cannot. I am unpersuaded that Plaintiffs have some duty now to state a claim on something that Defendant never raised as an issue before entry of final judgment. It is not surprising that Defendant has cited no case that requires a plaintiff to be able to state a claim on a new issue after judgment. What Defendant wants would essentially be a second litigation.

---

[3] I had an ANDA trial in January 2023 where one of the issues is whether the carve out has been successful. The issue is hotly disputed. *See Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, No. 20-804-RGA, D.I. 355 at 2 (D.Del. Feb. 17, 2023) (arguing non-infringement because Sandoz removed certain information from its proposed label).

4

**FDA_00610**

Third, the law. Plaintiffs say, and Defendant does not present any argument to the contrary, that what Defendant seeks is unprecedented in an ANDA case. I am hesitant to be the first, because it just seems wrong to me that Defendant can litigate a case through trial and final judgment based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with, and win in a summary proceeding.

Thus, I DENY Defendant's Rule 60(b) motion. (D.I. 205).

IT IS SO ORDERED this $\underline{7^{th}}$ day of May, 2023.

United States District Judge

5

FDA_00611

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORWICH PHARMACEUTICALS, INC.,

       *Plaintiff*,

   v.

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services,

ROBERT M. CALIFF, M.D., in his official
capacity as Commissioner of Food and Drugs,

and

UNITED STATES FOOD AND DRUG
ADMINISTRATION,

       *Defendants*.

Civil Action No.  23-1611

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

FDA_00620

at 1.2, 1.3, 2.2, and 2.3.[7]  Norwich currently seeks FDA approval to market generic rifaximin 550 mg tablets only for the treatment of IBS-D.[8]

The cost of Xifaxan is astounding.  Salix's parent company reported domestic annual sales for all of Xifaxan's uses, including its substantial use for the treatment of IBS-D, of over $1.69 billion in 2022.  *See* Bausch Health Companies Inc. 2022 Annual Report at 83.[9] According to GoodRx, a 14-day course of treatment (totaling 42 Xifaxan 550 mg tablets) for IBS-D retails for around $2,300.[10]

By 2019, Salix listed 23 patents[11] in the Orange Book with various Use Codes.  These Use Codes include:[12]

- U-2643: Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults 65 Years Of Age Or Older And Symptoms Thereof

---

[7] *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/021361s023lbl.pdf (last visited June 4, 2023).

[8] A 200 mg strength of rifaximin is indicated for the treatment of travelers' diarrhea.  The issues involved in this litigation, however, relate solely to the 550 mg strength of rifaximin.

[9] https://ir.bauschhealth.com/~/media/Files/V/Valeant-IR/reports-and-presentations/ny20007033x3-ars-bausch-health-edgar-asfiled.pdf (last visited June 4, 2023). Salix reported $2.09 billion in sales and 81% of those were due to Xifaxan, which results in $1.69 billion for Xifaxan.

[10] GOODRX: XIFAXAN, https://www.goodrx.com/xifaxan?form=tablet&dosage=550mg&quantity=42&label_override=xifaxan (last visited June 4, 2023)

[11] U.S. Patent Nos. 10,314,828; 10,335,397; 10,456,384; 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; and 9,629,828.  https://thefdalawblog.com/wp-content/uploads/2020/06/OB-Annual-2020-40th-Ed.pdf at ADA 231 (last visited June 4, 2023).

[12] *See id.* at ADA 231, ADB 101, 103-04, 108, 118, 142, 144.

FDA_00633

- U-2644: Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults 65 Years Of Age Or Older

- U-1707:  Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults And Symptoms Thereof

- U-1708:  Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults

- U-1526:  The Treatment Of Patients With Travelers' Diarrhea (TD) Or The Reduction In Risk Of Overt Hepatic Encephalopathy (HE) Recurrence

- U-1481:  Reduction In Risk Of Overt Hepatic Encephalopathy (HE) Recurrence

- U-2579:  Reduction In A Subject's Risk Of Experiencing A Breakthrough Overt Hepatic Encephalopathy (HE) Episode

- U-1562:  Treatment Of Patients With Hepatic Encephalopathy (HE)

- U-1994:  Reduction In Risk Of Overt Hepatic Encephalopathy (HE) In Adults.

## II.    OTHER ANDA FILERS FOR RIFAXIMIN

On information and belief, Teva Pharmaceutical Industries Ltd. (hereinafter, "Teva")[13]

and at least two other rifaximin ANDA applicants, Sandoz, Inc. ("Sandoz") and Sun

Pharmaceutical Industries, Inc. ("Sun"), engaged in and settled their patent litigation with Salix,

Bausch Health Ireland Ltd., and Alfasigma S.p.A., whereby they agreed to refrain from

marketing their generic products until January 1, 2028.  *See* Press Release, Bausch Health,

Bausch Health Announces Resolution of XIFAXAN® Intellectual Property Litigation (Sep. 12,

---

[13] Actavis Laboratories FL, Inc. (hereinafter, "Actavis") was the filer of ANDA No. 208959, but Teva announced that it acquired Actavis on August 2, 2016, and is therefore the holder of ANDA No. 208959.  *See* Press Release, Teva,  Teva Completes Acquisition of Actavis Generics (August 2, 2016), *available at* https://www.tevapharm.com/news-and-media/latest-news/teva-completes-acquisition-of-actavis-generics/#:~:text=Teva%20Pharmaceutical%20Industries%20Ltd.,(%E2%80%9CActavis%20Generics%E2%80%9D) (last visited June 4, 2023).  Any documents discussing "Actavis" therefore apply to Teva.

9

2018) (hereinafter, "Bausch-Teva Press Release"); Press Release, Bausch Health, Bausch
Health And Alfasigma Announce Resolution Of XIFAXAN® Intellectual Property Litigation
(May 06, 2020); Press Release, Bausch Health, Bausch Health And Alfasigma Announce
Resolution Of XIFAXAN® Intellectual Property Litigation (Sep. 22, 2020) (collectively,
"Bausch Press Releases").[14]  The terms of that settlement also allow Teva the option to launch
an "authorized generic" of rifaximin – an unbranded version of Xifaxan marketed under Salix's
NDA[15] – instead of selling its own generic ANDA product.  Bausch-Teva Press Release.[16]
Finally, the settlement allows all three manufacturers to market their generic rifaximin products
before 2028 should a competitor enter the market.  *Id.*

### III.    NORWICH'S ANDA AND FDA'S REFUSAL TO GRANT IT FINAL APPROVAL

In December 2019, Norwich submitted ANDA No. 214369 ("Norwich's Original
ANDA") to FDA, seeking authorization to market generic rifaximin 550 mg tablets
("Norwich's ANDA Product").  *Salix Pharms., Ltd., Salix Pharms., Inc., Bausch Health Ireland
Ltd., and Alfasigma S.p.A. v. Norwich Pharms. Inc.*, No. 1-20-cv-00430-RGA (D. Del.)
(hereinafter "*Salix v. Norwich*"), ECF No. 158 at ¶ 16, Landmon Decl., Ex. 1.  Norwich's

---

[14] https://ir.bauschhealth.com/tools/viewpdf.aspx?page={3862BA6E-F366-4B8B-80DA-
7507A2665FC1} (last visited June 4, 2023); https://www.prnewswire.com/news-
releases/bausch-health-and-alfasigma-announce-resolution-of-xifaxan-intellectual-property-
litigation-301053561.html (last visited June 4, 2023); https://ir.bauschhealth.com/news-
releases/2020/09-22-2020-120037282 (last visited June 4, 2023).

[15] Food and Drug Administration *FDA List of Authorized Generics Drugs*, WWW.FDA.GOV,
https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-
drugs (explaining that an "'authorized generic' drug is most commonly used to describe an
approved brand name drug that is marketed without the brand name on its label.") (last visited
June 4, 2023).

[16] https://ir.bauschhealth.com/tools/viewpdf.aspx?page={3862BA6E-F366-4B8B-80DA-
7507A2665FC1} (last visited June 4, 2023).

FDA_00635

Original ANDA contained Paragraph IV certifications for all 23 patents listed in the Orange

Book for rifaximin tablets at the time of filing.  *See* 2020 Orange Book at 231.[17]

      After receiving Norwich's Notice Letter, Salix filed a patent suit against Norwich in the

U.S. District Court for the District of Delaware under 35 U.S.C. § 271(e)(2) based on the

Paragraph IV certifications.[18]  *Salix v. Norwich*, Exhibit 1 to ECF No. 158 at ¶ 119, Landmon

Decl., Ex. 2.  A four-day bench trial was held in March 2022, and the court issued its opinion

and judgment on August 10, 2022.  *Salix v. Norwich*, ECF No. 191, Landmon Decl., Ex. 23; *id.*,

ECF No. 193 (hereinafter, the "Final Judgment"), Landmon Decl., Ex. 3.  The court held that

the patents covering polymorphic forms of the rifaximin drug substance and patents directed to

the use of rifaximin to treat IBS-D were invalid as obvious.  *Salix v. Norwich*, ECF No. 191 at

46, Landmon Decl., Ex. 2.  The court also held that Norwich's original ANDA label seeking

approval for the HE Indication would induce a third party to infringe the asserted claims of the

HE Patents.  It further held that the asserted claims of the HE Patents relating to the HE

Indication had not been proven invalid.  *Id.*  Norwich has not, and does not intend to, appeal the

district court's holdings that Norwich's Original ANDA infringes the Asserted HE Patents or

that the HE Patents had not been shown invalid.

      Based on these mixed holdings and over Norwich's objection to the scope of the Final

Judgment, the court ordered "that the effective date of any final approval by [FDA] of

[Norwich's Original ANDA] is to be a date not earlier than the date of expiration of the last to

---

[17] *See* n. 11, 12 *supra.*

[18] Salix eventually asserted all 23 patents plus three additional patents that were not listed in the
Orange Book when Norwich submitted its ANDA.  *See Salix v. Norwich*, Exhibit 1 to ECF No.
158 at 1, Landmon Decl., Ex. 1.

FDA_00636

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORWICH PHARMACEUTICALS, INC., | |
| *Plaintiff,* | |
| v. | Civil Action No. 23-1611 (RDM) |
| XAVIER BECERRA, *Secretary of Health and Human Services, et al.,* | |
| *Defendants.* | |

**MEMORANDUM OPINION**

Battles over the entry of generic drugs to market are often hard fought, particularly in cases involving brand-named drugs with annual sales that substantially exceed $1 billion. *See* Dkt. 1 at 11 (Compl. ¶ 41). This is a case in point.

Defendant-Intervenor Salix Pharmaceuticals, Inc. ("Salix") currently markets rifaximin (under the brand name Xifaxan) for the treatment of irritable bowel syndrome with diarrhea ("IBS-D") and the reduction of risk of hepatic encephalopathy ("HE") recurrence in adults. Dkt. 1 at 3, 11 (Compl. ¶¶ 10, 39); Dkt. 12-1 at 3. Plaintiff Norwich Pharmaceuticals, Inc. ("Norwich") wants to market a generic version of the drug. Dkt. 1 at 24 (Compl.). But before it may do so, it must obtain final Food and Drug Administration ("FDA") approval of its Abbreviated New Drug Application ("ANDA") for the drug. *See* 21 U.S.C. § 355. Obtaining approval of an ANDA, however, requires more than evidence of bioequivalence, safe manufacturing procedures, and proper labeling. The generic drug applicant must also work its way through a maze rules that lie at the intersection of FDA regulation and the patent laws.

1

FDA_00660

Here, that maze began with the filing of Norwich's original ANDA, which identified twenty-three patents that, according to Salix, protected Xifaxan from competition. Dkt. 4-1 at 14. That filing constituted an act of patent infringement, leading Salix to initiate infringement litigation against Norwich. *Id.* at 17. Over the course of the litigation, the field of dispute narrowed, ultimately leading to a district court decision that invalidated two drug substance patents and the two method-of-use patents covering the IBS-D indication. Dkt. 4-4 at 47. But the district court found that Salix's three HE method-of-use patents were valid and infringed. *Id.* Based on that finding, the court entered an order directing "that the effective date of any final approval order of the [FDA] of Norwich's ANDA . . . is to be the date not earlier than the expiration of the" HE method-of-use patents—that is, October 2, 2029. Dkt. 4-5 at 3.

That, however, was not the end of the road for Norwich. In light of the district court's decision, it returned to the FDA and filed an amended ANDA, which omitted the HE indication from its proposed label, and it filed a motion under Federal Rule of Civil Procedure ("Rule") 60(b) in the district court seeking to modify the judgment to permit the FDA to approve the amended ANDA without delay. Dkt. 4-1 at 18–19. The district court denied that motion, Dkt. 51 at 113–16, and Norwich appealed the scope of the district court's final judgment to the Federal Circuit. Dkt. 4-10 at 2. (Salix, for its part, cross-appealed the district court's invalidity findings.) The FDA, then, tentatively approved Norwich's ANDA, but it declined to grant final approval (that is, the approval necessary to go to market) before October 2, 2029, in compliance with the agency's reading of the district court's final judgment. Dkt. 51 at 119, 121.

That brings us to this case, in which Norwich challenges the FDA's decision only tentatively—and not finally—to approve Norwich's amended ANDA. Dkt. 1 at 23–24 (Compl. ¶¶ 95–103). Invoking the Administrative Procedure Act ("APA"), Norwich maintains that the

FDA_00661

FDA's "grant of tentative rather than final approval of Norwich's [a]mended ANDA is arbitrary, capricious, and contrary to law," *id.* at 24, and it seeks injunctive and declaratory relief directing the FDA immediately to approve Norwich's amended ANDA, *id.*, so that the drug can go to market. In Norwich's view, the FDA misread the district court's order and, instead, should have read it to apply only to the company's original ANDA, which included the HE indication. On the same day that Norwich filed suit, it moved for a preliminary injunction. Dkt. 4. The FDA and Salix oppose that motion; the FDA has cross-moved for summary judgment, Dkt. 37; and Salix has both cross-moved for summary judgment and, in the alternative, moved to dismiss, Dkt. 54. At the parties' request, the Court consolidated the hearing on Norwich's motion for a preliminary injunction with proceedings on the merits pursuant to Rule 65(a).

For the reasons explained below, the Court will **DENY** Norwich's motion for a preliminary injunction and will **GRANT** the FDA and Salix's cross-motions for summary judgment.

## I. BACKGROUND

### A. Statutory Background

To obtain approval to market a new drug, the manufacturer must submit a new drug application ("NDA") to the FDA demonstrating, among other things, that the new drug is safe and effective. 21 U.S.C. § 355(b)(1). The NDA must also include "the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug." *Id.*; *see Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys, Inc.*, 527 F.3d 1278, 1282 (Fed. Cir. 2008). This listing can include patents that "protect[] the drug compound itself" and those that "gives the [drug] manufacturer exclusive rights over a particular method of using

3

FDA_00662

the drug." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012). Once the NDA is approved, the drug becomes a "listed drug" and all associated patents are listed in the "Approved Drug Products with Therapeutic Equivalence Evaluations" or, as it is commonly known due to its orange cover, the "Orange Book." *See Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 301 (D.D.C. 2012).

In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98–417, 98 Stat. 1585 (1984), popularly known as the "Hatch–Waxman Act." The Hatch-Waxman Act aims to strike "a balance between two competing policy interests: (1) inducing pioneering research and [the] development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002). To that end, the Hatch-Waxman Act streamlined the process for bringing generic versions of previously approved drugs to market by creating the abbreviated new drug application—or ANDA—process, which permits the generic manufacturer to "piggyback[ ] on the original manufacturer's evidence of safety and efficacy," *Teva Pharm., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008), thereby avoiding the "need [to] conduct its own" costly clinical trials, *Mylan Lab'ys, Inc. v. Thompson*, 389 F.3d 1272, 1275 (D.C. Cir. 2004). To obtain FDA approval for a generic drug, the ANDA must demonstrate, among other things, that the generic version of the drug is "bioequivalent" to the listed drug and, at least in the ordinary course, that the labeling for the generic version is "the same as the labeling approved for the listed drug." 21 U.S.C. §355(j)(2)(A). As explained further below, however, the proposed ANDA labeling may—at times—carve out certain methods of use to avoid patent infringement. *See Caraco Pharm. Lab'ys*, 566 U.S. at 406.

4

FDA_00663

Of particular relevance here, the ANDA must also contain "one of four certifications addressing each Orange-Book-listed patent associated with the listed drug." *Caraco Pharm. Lab'ys.*, 527 F.3d at 1282. For "each patent which claims the listed drug . . . or which claims a use for such listed drug for which the applicant is seeking approval," the ANDA must contain a certification:

(I)     that [the required] patent information has not been filed [with the FDA];

(II)     that such patent has expired;

(III)     of the date on which such patent will expire; or

(IV)     that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

21 U.S.C. § 355(j)(2)(A)(vii). "This certification is significant, in that it determines the date on which approval of an ANDA . . . can be made effective, and hence the date on which commercial marketing may commence." *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 677 (1990). If the applicant makes the first or second certification in its ANDA, "approval can be made effective immediately." *Id.* (citing § 355(c)(3)(A), 355(j)(4)(B)(i)). If the applicant makes the third certification, "approval of the application can be made effective as of the date the patent expires." *Id.* (citing § 355(c)(3)(B), 355(j)(4)(B)(ii). If, however, the applicant relies on the fourth certification—a so-called "Paragraph IV certification"—then a process to adjudicate a potential patent dispute is triggered and the outcome of that dispute will determine the effective date of the ANDA. *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004) ("In essence, applicants use paragraph IV certifications to challenge the validity of brand-name manufacturers' patents.").

As an alternative to a Paragraph IV certification, a drug company seeking approval for a generic drug may include a "section viii statement, which asserts that the generic manufacturer

5

FDA_00664

will market the drug for one or more methods of use not covered by [the listed] patents." *Caraco Pharm. Lab'ys*, 566 U.S. at 406 (citing 21 U.S.C. § 355(j)(2)(A)(viii)). "For example, if a brand-name manufacturer's patent covers a drug's use for treating depression, and the ANDA applicant seeks approval to use the drug to treat any other condition, then a section viii statement would be appropriate." *Purepac Pharm.*, 354 F.3d at 880. In short, "applicants use [P]aragraph IV certifications to challenge the validity of admittedly applicable patents, they use section viii statements to assert that patents do not apply." *Id.* "A section viii statement is typically used when the [listed] patent on the drug compound has expired and [the manufacturer] holds patents on only some [but not all] approved methods of using the drug." *Caraco Pharm. Lab'ys*, 566 U.S. at 406. Along with the section viii statement, the ANDA must also include a proposed label for the generic drug that "carves out" from the listed drug's approved label the still-patented methods of use. *Id.* (citing 21 CFR § 314.94(a)(8)(iv)). As noted above, "[t]he FDA may approve such a modified label as an exception to the usual rule that a generic drug must bear the same label as the brand-name product." *Id.* (citing 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G)); *Purepac Pharm.*, 354 F.3d at 880 ("The FDA has long required that for every patent ANDA applicants use either a paragraph IV certification or a section viii statement—they may not use both. As the FDA puts it, 'either the applicant is seeking approval for the use claimed in the patent, or it is not.'" (quoting *TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 77 (D.D.C. 2003))).

If the generic applicant does not pursue the section-viii-statement route and instead relies on a Paragraph IV certification in its ANDA, it "must provide [a] notice of [its] Paragraph IV certification to both the patent owner and the NDA holder," which explains "the factual and legal basis for the opinion of the applicant that the patent is invalid or will not be infringed." *Caraco*

FDA_00665

*Pharm. Lab'ys*, 527 F.3d at 1283 (quoting 21 U.S.C. § 355(j)(2)(B)(iv)(II)). Because "the mere act of filing a Paragraph IV ANDA constitutes an act of patent infringement," the patent holder has the option at this point of filing an infringement action in a federal district court against the ANDA filer. *Id.* (citing 35 U.S.C. § 271(e)(2)). If the patent owner or NDA holder does not do so, the FDA's approval of the ANDA "shall be made effective immediately." 21 U.S.C. § 355(j)(5)(B)(iii). But if the patent owner or NDA holder brings suit within 45 days of receiving notice of the Paragraph IV certification, "'the approval shall be made effective upon the expiration of [a] thirty-month period beginning on the date of the receipt of the notice,' unless the district court rules on the infringement claim within the 30-month period." *Mylan Lab'ys*, 389 F.3d at 1275 (quoting 21 U.S.C. § 355(j)(5)(B)(iii)).

"If the district court issues a ruling during the 30-month . . . period, the ANDA approval date is determined by the decision of the district court, or the appellate court if appealed." *Id.* Multiple possibilities exist. Unsurprisingly, "[i]f before the expiration of [the thirty-month] period the district court decides that the patent is invalid or not infringed . . . , the approval shall be made effective on the date on which the court enters judgment reflecting the decision." 21 U.S.C. § 355(j)(5)(B)(iii)(I)(aa). Alternatively, if "the district court decides that the patent has been infringed" and "if the judgment of the district court is appealed, the approval shall be made effective on the date on which the court of appeals decides that the patent is invalid or not infringed." *Id.* § 355(j)(5)(B)(iii)(II)(aa)(AA). Finally, if "the district court decides that the patent has been infringed" and "if the judgment of the district court is not appealed or is

7

FDA_00666

**JA245**

affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35." *Id.* § 355(j)(5)(B)(iii)(II)(bb).[1]

If "an applicant who has submitted a [P]aragraph IV certification . . . is sued for patent infringement" and "if a court enters a final decision from which no appeal has been or can be taken . . . that includes a finding that the patent is infringed," FDA regulations require the ANDA applicant to "submit an amendment to change its certification." 21 C.F.R. § 314.94(a)(12)(viii)(A). The applicant can either certify "under paragraph (a)(12)(i)(A)(3) . . . that the patent will expire on a specific date [(i.e., a Paragraph III certification)]" or, "with respect to a patent claiming a method of use, the applicant may instead provide a statement under paragraph (a)(12)(iii) of this section if the applicant amends its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent." *Id.* Paragraph (a)(12)(iii), in turn, implements the section-viii-statement escape hatch and permits the ANDA filer to explain "that the [a listed] method-of-use patent does not claim" a use for which the applicant is seeking approval. 21 C.F.R. § 314.94(a)(12)(iii)(A); *see also* 21 U.S.C. § 355(j)(2)(viii). "Once an amendment for the change has been submitted, the ANDA will no longer be considered to contain a [P]aragraph IV certification to the patent." *Id.*

Finally, "[i]n order to encourage [P]aragraph IV challenges, thereby increasing the availability of low-cost generic drugs, the [Food, Drug, and Cosmetic Act] provides that the first company to win FDA approval of an ANDA containing a [P]aragraph IV certification has the right to sell its drug without [generic] competition for 180 days." *Purepac Pharm.*, 354 F.3d at

---

[1] FDA regulations mirror this statutory language and provide that "[i]f before the expiration of the 30–month period . . . the district court decides that the patent has been infringed, and if the judgment of the district court is not appealed or is affirmed, the . . . ANDA may be approved no earlier than the date specified by the district court in an order under 35 U.S.C. 271(e)(4)(A)." 21 C.F.R. § 314.107(b)(1)(iv).

8

FDA_00667

879 (quoting 21 U.S.C. § 355(j)(5)(B)(iv)); *Amneal Pharms. LLC v. Food & Drug Admin.*, 285

F. Supp. 3d 328, 334 (D.D.C. 2018) ("To 'compensate [generic] manufacturers for research and

development costs as well as the risk of litigation from patent holders,' Congress enacted an

incentive for generic drug manufacturers to submit ANDAs and, if necessary, to engage in patent

litigation." (quoting *Teva Pharm., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008))).

"The statute and the implementing regulation create this exclusivity period by prohibiting the

FDA from approving any other ANDA that contains a [P]aragraph IV challenge to the same

patent until 180 days after the first [ANDA filer] markets its drug or 180 days after the first

[filer] wins a patent-infringement suit involving that patent, whichever comes first." *Purepac*

*Pharm. Co. v. Thompson*, 354 F.3d at 880 (citing 21 C.F.R. § 314.107(c)(1)). In contrast, the

approval of an ANDA with "a section viii statement does not entitle a successful applicant to the

180–day period of exclusivity bestowed on [P]aragraph IV applicants." *Id.*

**B.    Factual Background**

    Norwich filed its original ANDA for a generic form of rifaximin in December 2019. Dkt.

4-1 at 16. That ANDA contained Paragraph IV certifications for twenty-three listed patents.

After receiving notice of Norwich's Paragraph IV certifications, Salix filed a timely patent

infringement action in the U.S. District Court for the District of Delaware (the "Delaware

District Court"). *See Salix Pharmaceuticals, Ltd. et al v. Norwich Pharmaceuticals, Inc.*, 20-cv-

430 (D. Del.) (hereafter "*Norwich I*"). Salix's complaint asserted all twenty-three patents, but

during the litigation, the parties narrowed the field of dispute to seven patents by stipulating to

the entry of "[a] final judgment of noninfringement . . . with respect to Norwich's current ANDA

No. 214369, including the current ANDA Product and any use of the current ANDA Product,

concerning each claim of the" remaining sixteen patents. *Norwich I*, Dkt. 180 at 1–2. The

9

FDA_00668

stipulation defined "Norwich's current ANDA No. 214369" and "current ANDA Product" to "include[] any amendments or supplements to the ANDA that do not change the indications of use, the polymorph forms, or the formulation, and include[] any amendments or supplements to the label that are required due to an amendment or supplement to the Xifaxan label." *Id.* at 2 n.1.

The seven disputed patents fell into three categories: (1) drug substance and product patents; (2) method-of-use patents covering the HE indication; and (3) method-of-use patents covering the IBS-D indication. After a four-day bench trial, the Delaware District Court issued an opinion on August 10, 2022 finding that (1) the drug substance and product patents were invalid as obvious, (2) the method-of-use patents covering the HE indication were valid and infringed by Norwich's ANDA, and (3) the method-of-use patents covering the IBS-D indication were invalid as obvious. Dkt. 4-4 at 47.

Prior to issuing its final judgment, the Delaware District Court ordered the parties to "meet and confer and file a joint proposed final judgment." *See Norwich I*, July 28, 2022 Min. Order. In response, the parties presented starkly contrasting views about "whether the Court should determine now if Norwich's ANDA would induce infringement in the future based on hypothetical changes Norwich may make to its ANDA (which [at that time was] still under review and lacks tentative approval)." *Norwich I*, Dkt. 196 at 2. Salix challenged Norwich's proposed final judgment on the ground that it

> would automatically allow the FDA to approve [the pending] ANDA if Norwich were to amend it to carve out the HE indication (i.e., a label that is different from the one litigated by the parties) without any further action by [the Delaware District Court], by limiting the relief under § 271(e)(4)(A) (setting the date of earliest ANDA approval) to only an "ANDA with proposed labeling containing the indication 'reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults."

10

FDA_00669

**JA248**

*Id.* Salix argued that that would be "improper because[,] under § 271(e)(4)(A), the date of

approval is tied to the drug product, not an indication." *Id.* Instead, Salix argued, the court's

order and judgment should "apply to 'Norwich's ANDA,' period." *Id.* According to Salix's

submission, "'Norwich's ANDA' served as the act of infringement under § 271(e)(2)(A) giving

rise to jurisdiction, not a particular indication. The parties litigated and the [Delaware District

Court] asked the parties to assume that it decided that 'Norwich's ANDA' would induce

infringement of the Asserted HE Patents." *Id.*

> Unsurprisingly, Norwich took a very different view. It argued:

> Salix's assertion that Norwich's proposed judgment seeks an advisory opinion
> is erroneous. In fact, the opposite is true. Norwich's proposed judgment is based
> on only what has been adjudicated by this Court—that the HE indication in
> Norwich's label induces infringement of the HE patents and that the HE patents
> are valid. In contrast, by ordering that FDA delay the effective date of approval
> of Norwich's ANDA regardless of whether the ANDA contains an indication
> directed to HE, Salix seeks a judgment that deems any label proposed in
> Norwich's ANDA infringing. Yet, Salix is not entitled to such broad or
> speculative relief because that issue exceeds the scope of jurisdiction of this
> Court.

> This is especially true where the law permits ANDA applicants to carve out an
> indication from the drug label. 21 U.S.C. § 355(j)(2)(A)(viii). If Norwich were
> to carve out the HE indication from its proposed ANDA labeling, then the
> predicate for delaying the approval of Norwich's ANDA until after the
> expiration of the asserted HE patent claims under Section 271(e) would no
> longer exist. Norwich does not ask this Court to enter judgment regarding, or
> "pre-approve," a proposed "skinny" label for only the IBS-D indication. It asks
> this Court to reject any proposed judgment that presupposes labeling excluding
> the HE indication would infringe the asserted HE patent claims[] or [that]
> precludes Norwich's ability to seek a skinny label.

*Id.* at 5.

> After considering the parties' submissions, the Delaware District Court issued an order,

which provided, in relevant part, as follows:

> Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date
> of any final approval by the Food and Drug Administration ("FDA") of

11

FDA_00670

> Norwich's ANDA No. 214369 is to be a date not earlier than the date of
> expiration of the last to expire of the '573, '195, and '397 Patents (currently
> October 2, 2029) [(the HE method-of-use patents)], plus any regulatory
> exclusivity to which Plaintiffs are or become entitled.

Dkt. 4-5 at 3. In a memorandum accompanying this order, the Delaware District Court explained

that it chose this formulation because:

> [t]he scope of my ruling is that the HE patents are not invalid, and that the HE
> indication would infringe the HE patents. Norwich's proposed ANDA has the
> HE indication. I cannot rule on facts that are not before me. That Norwich may
> seek to carve out the HE indication as permitted by 21 U.S.C.
> § 355(j)(2)(A)(viii) is immaterial to this analysis. That label is not before me.

Dkt. 4-6 at 3.

Following this decision, Norwich took steps to fill that vacuum. It submitted "a Patent

and Labeling Amendment" to its ANDA, in which it withdrew its Paragraph IV certifications

regarding the HE method-of-use patents and substituted a section viii statement in their place.

Dkt. 51 at 55–57 (A.R. 301–303). Then, the next day, Norwich filed a Rule 60(b) motion in the

Delaware District Court, seeking to modify the court's order and final judgment.[2] In particular,

Norwich sought "to modify a portion of the [Delaware District Court's] Final Judgement . . . by

limiting the order under Section 271(e)(4)(A) that is blocking the approval of Norwich's ANDA

until the expiration of the . . . HE Patents directed to hepatic encephalopathy." Dkt. 51 at 23

(A.R. 269). In support of this request, Norwich provided the court with a copy of its amendment

and the revised label, and it argued that because the new, proposed label excluded the HE

---

[2] Under Rule 60(b), a "court may relieve a party . . . from a final judgment, order, or
proceeding," due to: (1) "mistake, inadvertence, surprise, or excusable neglect;" (2) "newly
discovered evidence" under certain circumstances; (3) fraud . . . , misrepresentation, or
misconduct by an opposing party;" (4) a "void" judgment; (5) the satisfaction, release, or
discharge of a judgment; or (6) "any other reason that justifies relief." Fed. R. Civ. P. 60(b).

FDA_00671

**JA250**

indication, "the predicate for ordering [the] FDA to delay the effective date of the approval of Norwich's ANDA . . . no longer exists." *Id.*

The Delaware District Court was unpersuaded for three reasons. First, that court disagreed that Norwich's decision to carve-out the HE indication, even if the carve-out was done properly, constituted "a significant change in circumstances" sufficient to warrant relief under Rule 60(b)(5). Dkt. 51 at 113–14 (A.R. 359–60). Rather, the court concluded, Norwich's decision to amend it ANDA was "simply a voluntary decision of the trial loser to change course, which is neither unanticipated nor unforeseeable" and therefore outside the ambit of Rule 60(b)(5). *Id.*

Second, the court observed that "[i]t is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement" and that Norwich "presented no evidence in support of its assertion" that it had properly done so. *Id.* at 115 (A.R. 361). The court also stressed that Rule 60(b) is not an invitation to relitigate issues that were or could have been resolved at trial and that Norwich had failed to present any basis to conclude "that it could not have litigated the carve-out or that it was denied a full and fair opportunity to do so." *Id.* In response to Norwich's contention that Salix had not even "tried to state a claim against the carve out," the court merely observed that it was "unpersuaded that [Salix] [had] some duty . . . to state a claim on something that [Norwich] never raised as an issue before entry of final judgment." *Id.* In short, in the view of the Delaware District Court, Norwich's Rule 60(b) motion amounted to a request for "a second litigation," a door that the court was unprepared to open based on Norwich's minimal showing. *Id.*

13

FDA_00672

**JA251**

Finally, the Delaware District Court noted that Norwich's request was "unprecedented in an ANDA case." *Id.* at 116 (A.R. 362). Against this backdrop, the court wrote: "I am hesitant to be the first, because it seems wrong to me that [Norwich] can litigate a case through trial and final judgment based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with, and win in a summary proceeding." *Id.*

Both Norwich and Salix have appealed aspects of the Delaware District Court's judgment to the Federal Circuit. Norwich has appealed the court's final judgment "to the extent that it bars the U.S. Food and Drug Administration from approving Norwich's ANDA No. 214369 ('ANDA') prior to the expiration of [the HE indication method-of-use patents] when the ANDA does not contain a Paragraph IV patent certification to any of those patents," Dkt. 4-10 at 2, and, instead, includes a paragraph viii statement. Salix, in turn, has appealed the final judgment to the extent the Delaware District Court found that Salix's IBS-D method-of-use patents and its drug substance and product patents are invalid. *Norwich I*, Dkt. 198 at 1.

After both parties noticed their appeals to the Federal Circuit, the FDA granted "tentative approval" to Norwich's ANDA on June 2, 2023. FDA regulations explain that "[t]entative approval is notification that an NDA or ANDA otherwise meets the requirements for approval under the Federal Food, Drug, and Cosmetic Act, but cannot be approved . . . because a court order pursuant to 35 U.S.C. 271(e)(4)(A) orders that the NDA or ANDA may be approved no earlier than the date specified." 21 C.F.R. § 314.3(b). "A drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter after any necessary additional review of the NDA or ANDA." *Id.*

The FDA explained that it was "unable to grant final approval to [Norwich's] ANDA at this time" for the following reasons:

14

FDA_00673

**JA252**

> [Norwich's] ANDA contains paragraph IV certifications under section 505(j)(2)(A)(vii)(IV) of the FD&C Act stating that the patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Rifaximin Tablets, 550 mg, under this ANDA.... Litigation was initiated within the statutory 45-day period against Norwich for the infringement of the '620, '199, '206, '542, '275, '644, '781, '196, '569, '949, '573, '904, '452, '231, '968, '195, '397 and '384 patents in the United States District Court for the District of Delaware .... [Norwich] notified the Agency that on August 10, 2022, the court decided, "Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled. Norwich shall notify the FDA of this judgment within two (2) business days of its entry (with a copy of such notice given simultaneously to Plaintiffs)." [Norwich] further notified the Agency that on May 17, 2023, the court denied Norwich's Rule 60(b) motion to modify the final judgment. Therefore, final approval cannot be granted until October 2, 2029 as specified in the court order.

Dkt. 51 at 119, 121 (A.R. 365, 367). In reaching this conclusion, the FDA acknowledged that Norwich had sought to carve-out the HE indication from its amended ANDA. The agency observed that "with respect to" the '573, '195, and '397 patents, which the Delaware District Court found that Norwich's original ANDA infringed, Norwich's amended ANDA "contains [paragraph viii statements representing that] these are method-of-use patents that do not claim any indication for which you are seeking approval under [its] ANDA." *Id.* at 120–21 (A.R. 367–68); *see also id.* at 123 n.2 (A.R. 369). But, notwithstanding that acknowledgement, the FDA failed to grant final approval to Norwich's amended ANDA.

## C.    Procedural History

Disappointed by that decision, Norwich brought this suit on June 6, 2023. Dkt. 1. It alleges that the FDA's decision "refus[ing] to grant Norwich's amened ANDA final approval[,] despite a properly-filed statement under 21 C.F.R. § 314.94(a)(12)(viii)(A) that it is not seeking FDA approval for a patented method of use" was "arbitrary, capricious, and unlawful." *Id.* at 2

15

FDA_00674

**JA253**

(Compl. ¶ 1). It seeks both a declaratory judgment and "an injunction directing [the] FDA to immediately grant Norwich's [a]mended ANDA final approval." *Id.* at 3 (Compl. ¶10). The same day that it initiated the action, Norwich moved for a preliminary injunction. Dkt. 4.

In a joint status report filed on June 12, 2023, the parties urged the Court to consolidate Norwich's motion for a preliminary injunction "with a full consideration of the merits under Rule 65(a)(2) of the Federal Rules of Civil Procedure" in order "to conserve judicial and party resources." Dkt. 8 at 1. That same day, Salix moved to intervene as a defendant, Dkt. 12, and the Court subsequently granted that motion, *see* June 18, 2023 Min. Order. The Court also granted the parties' joint motion to consolidate the pending motion for a preliminary injunction with consideration of the merits of the action and set a schedule for further briefing, *see* June 18, 2023 Min. Order.[3]

Now pending before the Court are Norwich's motion for a preliminary injunction and consolidated motion for judgment on the merits, the FDA's cross-motion for summary judgment, and Salix's cross-motion to dismiss or, in the alternative motion, for summary judgment. *See* Dkt. 4, 37, 54.

---

[3] About two months later, another generic manufacturer, Teva Pharmaceuticals USA, Inc., moved to intervene, asserting that an order requiring the FDA immediately to grant approval to Norwich's amended ANDA would interfere with Teva's asserted right to a period of 180-days of generic exclusivity. Dkt. 56. After Norwich clarified that it was no longer seeking immediate relief and conceded that, even if Norwich was successful in this case, the FDA would still need to resolve the question of generic exclusivity, if any, in the first instance, *see* Dkt. 58, the Court denied Teva's motion to intervene. The Court left the door open to Teva's intervention, however, should the question of immediate relief reappear in the case. *See* Oct. 6, 2023 Min. Order.

16

FDA_00675

**JA254**

## II. STANDARD OF REVIEW

### A.     Federal Rule of Civil Procedure 65

A preliminary injunction "is an extraordinary remedy never awarded as of right,"

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking

the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251,

258 (D.C. Cir. 2004).  To obtain a preliminary injunction, the movant "must establish [1] that [it]

is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of

preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is

in the public interest." *Winter*, 555 U.S. at 20.

### B.     Federal Rule of Civil Procedure 12(b)(1)

As the party seeking to invoke the Court's jurisdiction, Norwich bears the burden of

establishing that it has standing to sue. *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002).

To survive a Rule 12(b)(1) motion to dismiss for a lack of standing, the plaintiff "must state a

plausible claim that [it] has suffered an injury in fact fairly traceable to the actions of the

defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of

the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).  "In this posture, the Court must accept the

factual allegations of the complaint as true but must nonetheless assess the 'plausibility' of the

plaintiff's standing allegations in light of the relevant context and the Court's 'judicial

experience and common sense.'" *Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 195

(D.D.C. 2019) (quoting *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 71 (D.D.C. 2019)).

### C.     Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss for failure to state a claim upon which relief can be granted under

Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Browning v. Clinton*, 292 F.3d 235,

17

FDA_00676

**JA255**

242 (D.C. Cir. 2002). In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). For the purposes of assessing a Rule 12(b)(6) motion, the Court may consider only "the facts contained within the four corners of the complaint, along with any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record." *Afanasieva v. Wash. Metro. Area Transit Auth.*, 588 F. Supp. 3d 99, 105 (D.D.C. 2022) (quotation marks omitted).

**D.    Federal Rule of Civil Procedure 56**

Under Rule 56, summary judgment is available if the movant demonstrates "that there is no genuine dispute as to any material fact and" that, based on the uncontested facts, "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the unique context of a case brought under the APA, however, the district court "sit[s] as an appellate tribunal," *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011). "In short, it is the role of the administrative agency to 'resolve factual issues' and 'to arrive at a decision that is supported by the administrative record,' while it is the role of the district court 'to determine

18

FDA_00677

**JA256**

whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Amneal Pharms. LLC v. Food & Drug Admin.*, 285 F. Supp. 3d 328, 339 (D.D.C. 2018) (quoting *Hi–Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 18 (D.D.C. 2008)).

## III. ANALYSIS

### A. Standing

Because standing is a threshold issue, the Court addresses it first. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015). "To invoke the jurisdiction of the federal courts, a plaintiff must allege (1) a concrete injury (2) caused by the defendant (3) that a favorable judicial decision will redress." *Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014). "Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (quotations and citations omitted).

The FDA argues that Norwich lacks standing to sue because the company has not, and will not, suffer any injury caused by the FDA's decision to grant only preliminary approval to the amended ANDA. As the FDA frames the issue, Norwich's "present inability to market rifaximin is traceable to the Delaware [District] Court's Patent Orders and not [the] FDA." Dkt. 40 at 23. In advancing this argument, the FDA acknowledges that Norwich is challenging the FDA's tentative approval decision, but it counters that because the FDA's reasoning for its tentative-approval decision rests solely on the Delaware District Court's final judgment, any injury that Norwich has suffered, or will suffer, is traceable to that judgment and not to any independent action (or inaction) taken by the FDA. *Id.* at 23–24.

19

FDA_00678

**JA257**

The problem with the FDA's argument is that it assumes that it is right on the merits of the question of whether the Delaware District Court's judgment compelled the FDA to postpone the grant of final approval to Norwich's amended ANDA until October 2, 2029. But that is precisely the question that Norwich asks this Court to resolve. The heart of the dispute in this litigation is whether the FDA correctly read the Delaware District Court's order to apply to Norwich's *amended* ANDA. *See, e.g.*, Dkt. 1 at 19 (Compl. ¶ 69) ("[I]t was . . . improper for FDA to refuse to grant final approval to Norwich's Amended ANDA based on the district court's order relating to the HE Patents."); *id.* at 18 (Compl. ¶ 65) ("FDA's decision to not approve Norwich's Amended ANDA contravenes FDA's own regulations, FDA's statements when it issued the proposed and final regulations, and numerous cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels."); *id.* at 23 (Compl. ¶ 96) ("As set forth above, FDA improperly decided that it could not grant final approval to Norwich's Amended ANDA based on the decision by the Delaware District Court.").

An admittedly imperfect parallel can be drawn to *Teva Pharmaceuticals, USA, Inc. v. U.S. Food & Drug Administration*, 182 F.3d 1003 (D.C. Cir. 1999). In that case, an ANDA applicant claimed that the FDA's determination that a district court order did not trigger a period of exclusivity for successful ANDA applicants was arbitrary and capricious. *Id.* at 1004. Specifically, the FDA had declined to "recognize the dismissal of a declaratory judgment complaint for patent infringement as a 'court decision'" because the period of exclusivity was only for applicants who had obtained "a 'decision of a court' in a patent or declaratory judgment action 'holding' that the patent is either "invalid or not infringed" and the FDA did not read the district court order had held as such. *Id.* at 1004–05 In reviewing the lower court's resolution of the arbitrary and capricious claim, the D.C. Circuit did not dismiss the case for lack of standing

20

FDA_00679

for the obvious reason that the alleged injury was traceable to the FDA's interpretation (or understanding) of the district court's order. Here, too, this lawsuit challenges only the FDA's interpretation of the Delaware District Court's final judgment.

The cases that the FDA cites involve a very different scenario, in which the plaintiff is not challenging the agency's reading of a court order but the substance of the order itself. In *Cigar Association of America v. U.S. Food & Drug Administration*, 411 F. Supp. 3d 1 (D.D.C. 2019), for example, the plaintiff sought declaratory relief, "not premised on any claimed violation of law by the FDA, or by the FDA's failure to take required action," *id.* at 4, but on the FDA's implementation of a court order (in a different lawsuit) that compelled the agency "to implement the substantial equivalence requirement for all newly deemed products [including cigar and pipe tobacco products] within ten months." *id.* at 3. There, the asserted injury was "entirely a function of a judicial ruling," and, notably, the plaintiffs "effectively concede[d] as much." *Id.* Here, in contrast, the scope of the Delaware District Court Order is both disputed and central to the case. Although a separate action challenging the substance of the Delaware District Court's order is pending before the Federal Circuit, this case raises the distinct claim that the FDA simply misread the court's final judgment. To be sure, there is a noticeable tension between Norwich's argument before the Federal Circuit that the Delaware District Court's judgment sweeps too broadly and its contention here that the FDA erred in reading the final judgment more broadly than warranted. But nothing in the law precludes the company from hedging against any uncertainty about how this Court and the Federal Circuit might read the judgment.

Finally, the FDA argues that, even if Norwich has Article III standing, this Court should decline to exercise jurisdiction "over Norwich's impermissible collateral attack on the patent

21

FDA_00680

orders." Dkt. 40 at 24 (capitalization altered). As the FDA correctly observes, "federal district courts lack the power to void or otherwise alter other federal courts' orders through a collateral attack." *Id.* at 25 (quoting *McNeil v. Brown*, No. 17-2602, 2018 WL 4623057, at *7 (D.D.C. Sept. 26, 2018)). Salix, for its part, frames this argument in slightly different terms, arguing that (1) Norwich is collaterally estopped from challenging the Delaware District Court's final judgment in this action, rather than simply pursuing the pending Federal Circuit appeal or, in the alternative, (2) that principles of comity preclude this Court from "wading into issues pending" before other courts. Dkt. 39 at 16–18. But however framed, the argument fails for the same reason the FDA's challenge to Norwich's standing fails. As clarified beyond any doubt at oral argument, Norwich is not challenging the correctness of the Delaware District Court's final judgment *in this case* and is not asking *this Court* to substitute its views for those of the Delaware District Court or the Federal Circuit. It is merely challenging the FDA's reading of the final judgment entered by the Delaware District Court. *See* Oct. 6, 2023 Hrg. Tr. at 9–10. Whether that argument is meritorious, and whether "principles of comity" might counsel in favor of waiting for further guidance from the Federal Circuit, is beside the point when it comes to the Court's jurisdiction. And when it comes to the merits, the Court has (as explained below) considered whether it would be prudent to wait for the Federal Circuit before resolving this dispute.

## B.     Adequate Alternative Remedy

Defendants also argue that the Court should dismiss Norwich's APA claim because the company has an "adequate alternative remedy" through its appeal to the Federal Circuit and, therefore, does not have a claim under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017) (holding "the absence of [an adequate alternative] remedy is . . . an element

22

FDA_00681

of the cause of action created by the APA" rather than a jurisdictional question). For reasons similar to those just discussed, the Court is unpersuaded.

The APA "limits judicial review under that statute to agency actions 'for which there is no other adequate remedy in a court.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (quoting 5 U.S.C. § 704). This limitation "reflects Congress' judgment that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Id.* at 1244 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)). "Courts must, however, avoid lightly 'constru[ing] [§ 704] to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action.'" *Id.* (alterations in original) (quoting *Bowen*, 487 U.S. at 903).

To determine "whether an alternative remedy is 'adequate' and therefore preclusive of APA review," the Court must "look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *Id.* (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)). "Thus, for example, relief will be deemed adequate 'where a statute affords an opportunity for de novo district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522–23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005). In such cases, "Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously both [the review provision] and the APA." *Id.* at 523 (quoting *El Rio Santa Cruz Neighborhood Health Ctr.*, 396 F.3d at 1270).

Defendants maintain that the patent-infringement adjudicatory process, including Norwich's Rule 60(b) motion in the underlying patent litigation and its appeal to the Federal

23

FDA_00682

Circuit, have provided (and are continuing to provide) Norwich with a more than adequate remedial process. In their view, "[i]n enacting [the] Hatch-Waxman [Act], 'Congress plainly contemplated that the affirmative patent infringement action [that follows a Paragraph IV certification]'—rather than administrative action by FDA—would 'resolve any dispute between the patentholder and the [ANDA] applicant and lead to the establishment of the effective date of approval for the [ANDA].'" Dkt. 40 at 28 (quoting *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 33 (D.D.C. 2022)). And "[b]ecause Norwich seeks relief from the consequences of a judgment in a patent suit," they argue that Norwich's "pending Federal Circuit appeal is more than adequate to displace APA review." *Id.*

Although that argument is not without initial appeal, it once again misunderstands the nature of Norwich's claim in this case: Norwich maintains (at least for purposes of this litigation) (1) that the judgment entered by the Delaware District Court did not address—and did not purport to address—an amended ANDA that was not before the court and (2) that the FDA simply misread that final judgment. Norwich is not arguing that the Delaware District Court was wrong in finding the HE method-of-use patents valid and infringed. *See* Dkt. 4-1 at 17 ("Norwich has not, and does not intend to, appeal the district court's holdings that Norwich's Original ANDA infringes the Asserted HE Patents or that the HE Patents had not been shown invalid."). Nor is it arguing—at least here—that the Delaware District Court erred in denying its Rule 60(b) motion or that this Court should expressly or implicitly modify the Delaware District Court's judgment to add clarity that the judgment itself lacks. Rather, it contends that the judgment itself is clear; that it does not apply to the company's amended ANDA; and that the FDA's interpretation of the final judgment was arbitrary and capricious and contrary to law. *See id.* at 21–22 ("Although FDA apparently believes that it is hamstrung by the district court's

24

FDA_00683

order, FDA's decision to not approve Norwich's Amended ANDA contravenes FDA's own regulations, FDA's statements when it issued the proposed and final regulations, and numerous cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels."); Dkt. 49 at 8 ("With the benefit of the Administrative Record and FDA's memorandum to this Court, it is now apparent that FDA took it upon itself to (in FDA's own words) 'interpret' the Delaware Court's May 17 Order to arrive at its incorrect determination that the earlier Section 271(e)(4)(A) Order applies to Norwich's Amended ANDA. There is no basis for FDA's interpretation . . . ."). The Hatch-Waxman Act does not provide ANDA applicants with a cause of action to challenge the FDA's interpretation of a § 271(e)(4)(A) order entered by a district court at the conclusion of patent-infringement case.

     The distinction between the relief that a Paragraph-IV-triggered adjudication provides and the relief that Norwich is seeking here can be seen in the difference between this case and *Avadel CNS Pharmaceuticals, LLC v. Becerra*, 638 F. Supp. 3d 23 (D.D.C. 2022). In *Avadel*, an ANDA applicant tried to use the APA to challenge the FDA's instruction that it submit a patent certification for a particular patent. *Id.* at 28. The ANDA applicant maintained that the instruction was arbitrary and capricious because the patent at issue was not infringed by the application. *Id.* The district court declined to consider the merits of the ANDA applicant's APA claim, concluding that the applicant could challenge the patent through a patent infringement action as provided for by the Hatch-Waxman Amendments, which would determine whether the ANDA infringed a valid patent or not and therefore whether a patent certification was needed. *Id.* at 32. In other words, the applicant there had an adequate alternative remedy because its claim was of the very sort that a patent infringement suit triggered by a Paragraph IV certification is intended to resolve. Norwich, in contrast, has already gone through that

25

FDA_00684

Paragraph IV-triggered adjudicatory process, and it has already received a judgment, the substance of which it does not challenge. Instead, it merely alleges that the FDA misapplied that judicial decision—an argument that does not differ in material respects from a claim that the FDA has misapplied a statute or regulation. Most fundamentally, the challenge is not directed at the lawfulness of Delaware District Court's final judgment, which is all that the Federal Circuit can consider on appeal, but rather at the FDA's alleged failure to comprehend what that judgment actually means.

The flaw with Defendants' alternative-adequate-remedy argument can be highlighted by imagining that the Delaware District Court's judgment was crystal clear and that the FDA indisputably misread the judgment; imagine, for example, that the judgment unambiguously carved out the IBS-D indication and that the FDA simply failed to notice that exclusion. Under those circumstances, Norwich would lack any remedy in the patent litigation, and its only remedy would lie under the APA. Yet, the only material distinction between that scenario and this case is the strength of Norwich's claim, and that is a distinction without a difference when it comes to Defendants' threshold argument. The question at this stage of the analysis is not whether Norwich's argument has legs, but only whether it can leave the starting blocks. Because no other adequate remedy exists for the wrong that Norwich seeks to remedy in this case, Defendants' threshold § 704 defense is unavailing.

## C.   Arbitrary and Capricious Review

As explained, the gravamen of Norwich's claim is that the FDA's determination that the Delaware District Court's final judgment precluded it from granting final approval to Norwich's amended ANDA prior to October 2, 2029, was "arbitrary, capricious, . . . or otherwise not in accordance with law" and must therefore be set aside. 5 U.S.C. § 706(2)(A). Because the Court

26

FDA_00685

**JA264**

consolidated the hearing on Norwich's motion for a preliminary injunction with the merits at the parties' request, and because the parties' legal and factual arguments have been thoroughly developed, the Court need not pause to consider Norwich's likelihood of success of the merits or any of the other preliminary injunction factors. Instead, the Court will proceed to the ultimate merits of the case.

That inquiry might take one of two forms. First, the Court might consider whether the FDA's reading of the Delaware District Court's final judgment was "arbitrary and capricious." That form of judicial review "is 'fundamentally deferential.'" *Amneal Pharms.*, 285 F. Supp. 3d at 340 (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)). This "does not mean . . . that courts must 'simply accept whatever conclusion an agency proffers,'" *id.* (quoting *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)); rather, "it is the Court's role to decide whether the agency acted 'within the scope of its lawful authority,' and whether it engaged in 'reasoned decision[-]making,' but not to second guess an agency's reasonable exercise of the authority that Congress gave it," *id.* (quoting *Tripoli Rocketry Ass'n*, 437 F.3d at 77). Second, the Court might consider whether the FDA's reading of the Delaware District Court's final judgment was "contrary to law," just as it might consider whether the agency's reading of an unambiguous statute or regulation is contrary to law. In considering that question, the Court cannot discern any basis to defer to the FDA's reading of the order. The FDA has no unique expertise in reading federal court orders (and certainly no greater expertise than a court), nor is this a case in which one can plausibly argue that *Chevron*'s gap-filling or political-accountability rationales are served. *See* Moss, Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel, 52 Admin. L. Rev. 1303, 1328 (Fall 2000) (discussing the twin rationales for *Chevron* deference). For present purposes,

27

FDA_00686

**JA265**

however, it makes little difference which approach the Court takes, since the FDA's reading of the Delaware District Court's final judgment was not only reasonable but was by far the better reading.

The FDA read the Delaware District Court's final judgment to preclude the agency—without limitation—from granting final approval to Norwich's ANDA before October 2, 2029. That is, on the FDA's reading, the judgment does not recognize an exception for the IBS-D indication (or any other non-HE indication) and, instead, applies to the ANDA without exception. The FDA explained the basis for this conclusion in two documents. The first is a letter that the FDA sent to Norwich, dated June 2, 2023. That letter explained that the FDA was "unable to grant final approval to [Norwich's] ANDA at this time because" the Delaware District Court "ordered that the effective date of *any* final approval by the Food and Drug Administration ("FDA") of Norwich's *ANDA No. 214369* is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled." Dkt. 51 at 119, 121 (A.R. 365, 367) (emphasis added). Norwich does not dispute that, even as amended, the ANDA at issue is "ANDA No. 214369." Nor was the FDA unaware of the Delaware District Court's decision denying Norwich's Rule 60(b) motion. It added: Norwich "notified the Agency that on May 17, 2023, the [Delaware District Court] denied Norwich's Rule 60(b) motion to modify the final judgment. Therefore, final approval cannot be granted until October 2, 2029 as specified in the court order." *Id.* at 121 (A.R. 365).

The second document in which the FDA explained its tentative-approval decision is a ██████████████████████████████████████

██████ explains that:

28

FDA_00687

Norwich's ANDA is eligible for only a Tentative Approval based on the 271(e)(4)(A) judgment 

we interpret the May 17 order refusing to modify the judgment to say that the prior ███ still stands and applies to Norwich's post-amendment ANDA.

███ (A.R. 374); Dkt. 40 at 20, 24.

As a result, the basis for the FDA's decision is clear: in the agency's view, the Delaware District Court's final judgment dictated that the earliest date that the FDA could grant final approval to ANDA No. 214369, regardless of whether the ANDA had been amended to carve-out the HE indication, was October 2, 2029. Dkt. 40 at 19–20; Dkt 4-1 at 21; Dkt. 39 at 9–10. Norwich does not dispute that the basis for the FDA's decision is adequately explained and, instead, argues that the agency's decision is both unreasonable and contrary to law because it "contravenes FDA's own regulations, FDA's statements when it issued the proposed and final regulations, and numerous cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels." Dkt. 4-1 at 22.

At this point, the Court must return to Norwich's concession—a concession that is necessary to avoid interjecting this Court in a matter appropriately left to the Federal Circuit— that this case does not challenge the lawfulness of the Delaware District Court's final judgment and, certainly, does not posit that the FDA acted unreasonably or in contravention of law by adhering to a district court order that, in Norwich's view, misunderstood the governing FDA regulations and the "cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels." *Id.* At oral argument on the pending motions, Norwich unequivocally disavowed that it was making any such argument, *see* Oct. 6,

29

FDA_00688

2023 Hrg. Tr. at 9–10, and, instead, explained that it merely contends "that the best construction

of [the Delaware District Court's] order is that [the court] wasn't saying anything at all about an

amended ANDA." *Id.* The reasonableness (and accuracy) of the FDA's reading of that order

might, of course, be informed by the surrounding statutory and regulatory environment, but, in

the end, all that matters for present purposes is how that order is best understood.

    In considering that question, the Court starts with the plain text of the Delaware District

Court's final judgment. Paragraph 5 of that judgment provides as follows:

> Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date
> of any final approval by the Food and Drug Administration ("FDA") of
> Norwich's ANDA No. 214369 is to be a date not earlier than the date of
> expiration of the last to expire of the '573, '195, and '397 Patents (currently
> October 2, 2029) [(the HE method-of-use patents)], plus any regulatory
> exclusivity to which Plaintiffs are or become entitled.

Dkt. 4-5 at 3. Norwich's ANDA, even as amended, is still ANDA No. 214369. *Id.* As a result,

the FDA's determination tracks the most straightforward reading of the final judgment—the

FDA may not grant "final approval" to "Norwich's ANDA No. 214369" before October 2, 2029.

    That plain-language reading of the final judgment is reinforced, moreover, by the

extensive briefing and argument that came before and after its entry. Prior to issuing its

judgment, the Delaware District Court directed the parties to "meet and confer and file a joint

proposed final judgment." *See Norwich I*, July 28, 2022 Min. Order. In a letter responsive to

that directive, the parties presented their views about whether the Court's judgment should

restrict the effective date of approval of Norwich's ANDA only with respect to the HE method-

of-use patents and corresponding labeling or with respect to the ANDA more generally,

irrespective of any amendment Norwich might submit to the FDA limiting the labeling to the

IBS-D indication. Those views were starkly conflicting: Salix asked that the final judgment

"apply to 'Norwich's ANDA,' period." *Norwich I*, Dkt. 196 at 2. Norwich, in contrast, argued

FDA_00689

**JA268**

that such an order would be overly "broad or speculative" and asked, instead, that the Delaware District Court "reject any proposed judgment that presupposes labeling excluding the HE indication would infringe the asserted HE patent claims, or precludes Norwich's ability to seek a skinny label." *Id.* at 5. Faced with these competing views, the Delaware District Court decided to phrase the final judgment as it did—using broad language with no apparent exemption for a future "skinny label."

To be sure, the Delaware District Court explained in a memorandum accompanying its final judgment that the possibility that "Norwich may seek to carve out the HE indication as permitted by 21 U.S.C. § 355(j)(2)(A)(viii) [was] immaterial to [its] analysis" because such a label was not before the court. Dkt. 4-6 at 3. In Norwich's view, this shows that the court did not intend that its final judgment would foreclose the FDA from approving an amended ANDA that carved-out the HE indication. Had the story ended there, Norwich would have been on stronger footing in challenging the reasonableness of the FDA's interpretation of the final judgment. But it did not end there.

After the Delaware District Court entered its judgment, Norwich amended its ANDA to carve-out the HE indication and then moved to amend the court's judgment to clarify that the judgment did not apply to the amended label. Dkt. 51 at 23 (A.R. 269). Specifically, Norwich asked the court to adopt an amended judgment that would have provided as follows:

> Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled, *to the extent Norwich's ANDA No. 214369 maintains Paragraph IV certifications pursuant to 21 U.S.C. §355(j)(2)(A)(vii)(IV) stating that the '573, '195, and '397 patents are invalid or will not be infringed by the manufacture, use, or sale of the product specified in Norwich's ANDA.*

31

FDA_00690

*Id.* at 48 (A.R. 294) (emphasis added to reflect proposed revision). The Delaware District Court denied that motion—not because the proposed amendment was unnecessary, but because the court thought it "wrong . . . that [Norwich] can litigate a case through trial and final judgment based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with, and win in a summary proceeding." Dkt. 4-9 at 6.

Given this history, it is a stretch for Norwich to argue that the final judgment is best read *implicitly* to include the qualifying language that the court *explicitly* declined to include—twice. *Cf. Cigar Ass'n of Am.*, 411 F. Supp. 3d at 4 (concluding that it was implausible to read a court order as exempting cigar and loose tobacco products when "the court's order vacating the [FDA's] Guidance not only notes that the FDA's Guidance applies to cigars," but "declares broadly that 'the August 2017 Guidance must be vacated,'" and "when [p]laintiffs sought clarification from the . . . court as to the breadth of its rulings, that court made clear that its remedial order applies to cigars and pipe tobacco"). Norwich's principal answer to this difficulty merely posits that federal courts, like federal agencies, should be afforded a presumption of regularity, *cf. Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)), and that reading the final judgment to preclude Norwich from amending its ANDA to exclude labeling for the HE method of use would run afoul of the FDA's governing regulations and the policy favoring the prompt approval of non-infringing generic alternatives to pricier branded drugs. Dkt. 4-1 at 22.

For support, Norwich points to 21 C.F.R. § 314.94(a)(12)(viii)(A), which provides as follows:

> An applicant who has submitted a paragraph IV certification and is sued for patent infringement *must submit an amendment to change its certification if a court enters a final decision from which no appeal has been or can be taken*, or signs and enters a settlement order or consent decree in the action that includes

32

FDA_00691

**JA270**

> a finding that the patent is infringed, unless the final decision, settlement order, or consent decree also finds the patent to be invalid. In its amendment, the applicant must certify under paragraph (a)(12)(i)(A)(3) of this section that the patent will expire on a specific date *or, with respect to a patent claiming a method of use, the applicant may instead provide a statement under paragraph (a)(12)(iii)* of this section if the applicant amends its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent. *Once an amendment for the change has been submitted, the ANDA will no longer be considered to contain a paragraph IV certification to the patent.* If a final judgment finds the patent to be invalid and infringed, an amended certification is not required.

21 C.F.R. § 314.94(a)(12)(viii)(A) (emphasis added). According to Norwich, it did just what this regulation contemplates: after the Delaware District Court entered a final judgment finding that its ANDA infringed Salix's HE method-of-use patents, Norwich amended the ANDA under paragraph (a)(12)(iii) to include a section viii statement excluding the infringing method of use. It thereby limited the scope of its amended ANDA to those indications covered exclusively by the invalid or non-infringing patents and removed any and all Paragraph IV certifications from the ANDA. Dkt. 4-1 at 22. Norwich maintains that because its ANDA no longer contains a Paragraph IV certification and contains only a section viii statement, its "ANDA may be approved . . . immediately," 21 C.F.R. § 314.107(b)(1)(ii), like any other ANDA that contains a section viii statement (rather than a Paragraph IV certification). *See also* 81 Fed. Reg. 69580, 69624 (Oct. 6, 2016) (explaining that the current version of 21 C.F.R. § 314.94 "clarif[ies] that if a[n] . . . ANDA applicant submits a statement . . . explaining that a method-of-use patent does not claim an indication or other condition of use for which the applicant is seeking approval and submits proposed labeling that appropriately carves out information related to the patented method of use, then the . . . ANDA may be eligible for immediate approval").

As explained above, however, Norwich does not—and cannot—argue in this case that the Delaware District Court erred. Instead, it is left to argue that the law is so clear, and that the

FDA_00692

**JA271**

final judgment is so unclear, that the only path forward is to construe the final judgment in the manner that Norwich proposed to the Delaware District Court and that court declined to embrace. Although Norwich raises a substantial argument regarding the meaning of § 314.94(a)(12)(viii)(A), the Court is unpersuaded that the law is as clear, or that the final judgment is as unclear, as Norwich posits.

To start, 21 C.F.R. § 314.94(a)(12)(viii)(A) does not stand alone. Among other relevant provisions, 21 U.S.C. § 355(j)(5)(B)(iii)(II) mandates that the FDA approve an (otherwise sufficient) ANDA with a Paragraph IV certification that is the subject of patent litigation as follows:

> [I]f before the expiration of [the thirty-month stay] the district court decides that the patent has been infringed—
>
> (aa)    if the judgment of the district court is appealed, the approval shall be made effective on—
>
>     (AA)    the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or
>
>     (BB)    the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or
>
> (bb)    if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35.

21 U.S.C. § 355(j)(5)(B)(iii)(II). Section 271(e)(4)(A) of Title 35, in turn, requires a district court that has found that a Paragraph IV certification constituted an act of infringement of a valid patent to "order the effective date of *any* approval of *the drug . . . involved in the infringement* to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A) (emphasis added); *see also Vanda Pharm. Inc. v. West-*

34

FDA_00693

**JA272**

*Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1139 (Fed. Cir. 2018) ("[T]he FDA is entitled not to set

an approval date prior to the expiration of a patent that has been found to be infringed under

§ 271(e)(4)(A) and not invalid in a Hatch-Waxman case."); *In re Omeprazole Pat. Litig.*, 536

F.3d 1361, 1367 (Fed. Cir. 2008) ("[I]f the FDA has not approved the ANDA before the district

court determines that the patent has been infringed, the FDA may not approve the ANDA until

the effective date specified by the district court under section 271(e)(4)(A).").

   How this statutory scheme interacts with the regulatory path to approval following a

finding of infringement raises difficult questions, which have occupied the Federal Circuit and

lower courts. Although not directly on point, *Ferring B.V. v. Watson Laboratories, Inc.-Fla.*,

764 F.3d 1382 (Fed. Cir. 2014), is instructive. In that case, a generic manufacturer submitted an

ANDA that contained a Paragraph IV certification. The patent owner sued the ANDA filer, and

the district court found that the ANDA "was silent with respect to [a key issue]" and thus

"permitted [the generic manufacturer] to violate the patent." *Id.* at 1386. During trial, however,

the applicant "agreed to amend its ANDA specification to include [an important] restriction,"

leading the district court to find that the generic manufacturer's "proposed amendment would be

outside the scope" of the patent. *Id.* Then, after trial, the generic manufacturer amended its

ANDA in the relevant respect, the FDA approved the amendment, and the district court

subsequently "concluded that the [amended] ANDA did not infringe the patents-in-suit." *Id.* at

1387. Ultimately, the district court found that the ANDA, as originally submitted, infringed the

patent but that, by amending its ANDA, the generic manufacturer mooted the plaintiff's

complaint. *Id.*

   On appeal, the patent holder argued that 35 U.S.C. § 271(e)(4)(A) requires "that once a

section 271(e)(2) infringement is found based on the ANDA as first submitted, the district court

35

FDA_00694

*must* order a change in the effective date of the ANDA." *Id.* at 1389 (emphasis in original). The Federal Circuit, however, rejected this bright-line rule and, instead, held that a "district court *may* reconsider its own finding of infringement in light of an amended ANDA or other information." *Id.* at 1391 (emphasis added). The court explained, "[w]e do not suggest that a district court must always consider any ANDA amendment;" rather, "[a]llowing an amendment is within the discretion of the district court, guided by principles of fairness and prejudice to the patent-holder." *Id.* Applying that abuse-of-discretion standard, the Federal Circuit affirmed the district court's decision to consider the ANDA that was amended *after trial*. In the view of the Federal Circuit, there was little prejudice to the brand-name drug company in considering the amended ANDA because, "even at trial the district court made clear that it was inclined to allow an amendment by [the ANDA applicant] clarifying the dissolution rate of its product, and the district court judge discussed the language of the amendment on the record." *Id.*

Other courts, however, have declined to grant relief under Rule 60(b) based on post-trial amendments to ANDAs that were found at trial to infringe listed patents. In *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, No. 14-1119, 2019 WL 3574249 (D. Del. Aug. 6, 2019), for example, the district court declined to vacate a finding of infringement pursuant to Rule 60(b) based on a post-trial amendment to the defendant's ANDA. In reaching that conclusion, the court distinguished *Ferring* on four grounds. Unlike in *Ferring*: (1) the court's "finding of infringement was not based solely on the ANDA, but also on actual testing of [the] generic product;" (2) "there was no discussion at the trial . . . suggesting that [the defendant] would or should amend its ANDA to moot the issue of infringement;" (3) the plaintiff was likely to suffer prejudice due to the post-amendment amendment, including the cost of further discovery and factfinding regarding the doctrine of equivalents and the risk that the parties would seek to raise

36

FDA_00695

new arguments based on the amendments; and (4) principles of fairness weighed against permitting the defendant "to engage in a do-over, after . . . learn[ing] of the weaknesses in its legal theory." *Id.* at *7–*8. Similarly, in *Allergan, Inc. v. Sandoz Inc.*, No. 09-97, 2013 WL 6253669 (E.D. Tex. Dec. 3, 2013), the district court held that the defendant's "request for a ruling of non-infringement based on the changed ANDA [was] tantamount to seeking summary judgment premised on new allegations that only came to exist after the final judgment was rendered and affirmed." *Id.* at *3. In the court's view, that effort ran afoul of the principle that "a party may not use a Rule 60(b) motion as an occasion to relitigate a case." *Id.* (cleaned-up).

To be sure, the relief that Norwich sought before the Delaware District Court is not on all fours with any of these cases. But many of the same principles apply, and much of the analysis in these decisions mirrors the analysis in the Delaware District Court's decision rejecting Norwich's Rule 60(b) motion. Common sense, moreover, at least arguably suggests that this is not a one-size-fits all question, in which district courts are empowered only to specify an approval date with respect to the infringing methods-of-use and must, invariably, carve out from their judgments any future, amended ANDAs that are limited in scope to those methods-of-use that were not found to be infringing at trial. As Salix notes, that approach might—at least at time—unfairly prejudice patent holders, who focus their litigation strategy and discovery on the ANDA *as it existed at trial*, and might—at least at times—invite multiple rounds of litigation, as patent holders seek to respond to post-trial ANDA amendments by raising arguments that were either left on the cutting-room floor or unapparent prior to the amendment.

The Court expresses no view on the ultimate merits of these questions—and, certainly, takes no view on how these principles might apply to the Delaware District Court's Rule 60(b) decision. Those questions are not before this Court, and they are the sole domain of the Federal

37

FDA_00696

**JA275**

Circuit. All that matters for present purposes is that Norwich has failed to show that the law is so clear that the FDA should have stretched to read the Delaware District Court's final judgment and Rule 60(b) decision in a manner that ignores their plain terms. That proposition is unsustainable, as is Norwich's ultimate contention that the FDA erred as a matter of reasoned-decision-making and law in reading those documents to leave the agency free to approve the company's amended ANDA prior to October 2, 2029.

**D.  Summary Judgment**

The Court pauses to consider one final question. Although the Court is persuaded that the Delaware District Court unambiguously directed that the FDA wait until October 2, 2029 to approve ANDA No. 214369 (including any amendment to that ANDA), the direct appeal of the Delaware District Court's judgment is pending before the Federal Circuit, and the Federal Circuit's decision in that appeal might possibly shed additional light on the best reading of the district court's judgment and the surrounding legal principles. For that reason, the Court has considered whether it should simply deny Norwich's motion for a preliminary injunction but wait for any relevant guidance from the Federal Circuit before resolving the parties' cross-motions for summary judgment. For four reasons, however, the Court concludes that there is no reason to postpone the resolution of the pending cross-motions.

First, Norwich and the FDA agreed to consolidate the hearing on Norwich's motion for a preliminary injunction with the merits "[i]n order to conserve judicial and party resources," Dkt. 8 at 1, and they are entitled to the benefit of that streamlined procedure. Second, Norwich has not asked that the Court wait for a decision from the Federal Circuit, nor has it filed an "affidavit or declaration" pursuant to Rule 56(d) showing that it "it cannot present facts essential to justify its opposition." Third, and most importantly, if the Federal Circuit issues a decision that casts

38

FDA_00697

doubt on the FDA's reading of the Delaware District Court's final judgment, Norwich's remedy is not to return to this Court for further consideration but, rather, to ask the FDA to reconsider its decision. Counsel for Norwich conceded as much at oral argument, acknowledging that "there's never a time when you can't" ask the FDA to reconsider and that the only reason it has not done so to date is because the company "didn't think it would be fruitful." *See* Transcript, Oct. 6, 2023 Hrg. Tr. at 17. The Court put the question even more directly to counsel for the FDA, asking what would happen if the Federal Circuit were to read the final judgment in the manner that Norwich urges in this case (and not as Norwich urges in the direct appeal). He responded: "then Norwich would notify [the] FDA of the authoritative construction of the order." *Id.* at 30–31. The availability of reconsideration before the agency resolves the matter, since basic tenets of administrative law require agencies, whenever possible, to consider and opine on new arguments before those arguments are raised in APA litigation, and, here, the parties agree that Norwich will have the opportunity to bring any relevant developments to the attention of the agency in the first instances. Finally, the prospect that the Federal Circuit will construe the Delaware District Court's final judgment in the manner that Norwich urges in this case is, at best, remote. For the reasons explained above, that reading is exceedingly difficult to square with the text of the final judgment and with the court's Rule 60(b) decision, and, notably, no party—not even Norwich—is urging the Federal Circuit to adopt that unconventional reading.

39

FDA_00698

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff's motion for a preliminary

injunction, Dkt. 4, will **GRANT** the FDA and Salix's cross-motions for summary judgment, Dkt.

37, Dkt. 54.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 1, 2023

40

FDA_00699

**JA278**

# United States Court of Appeals for the Federal Circuit

---

**SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., BAUSCH HEALTH IRELAND LTD., ALFASIGMA S.P.A.,**
*Plaintiffs-Appellants*

v.

**NORWICH PHARMACEUTICALS INC.,**
*Defendant-Cross-Appellant*

---

2022-2153, 2023-1952

---

Appeals from the United States District Court for the District of Delaware in No. 1:20-cv-00430-RGA, Judge Richard G. Andrews.

---

Decided: April 11, 2024

---

WILLIAM R. PETERSON, Morgan, Lewis & Bockius LLP, Houston, TX, argued for plaintiffs-appellants. Also represented by MICHAEL J. ABERNATHY, KARON NICOLE FOWLER, MICHAEL SIKORA, Chicago, IL; JULIE S. GOLDEMBERG, Philadelphia, PA; JOSHUA DANIEL CALABRO, SHANNON KEOUGH CLARK, STEVEN C. KLINE, ALEXIS M. MCJOYNT, SCOTT K. REED, BECKY E. STEEPHENSON, Venable LLP, New York, NY.

CHAD A. LANDMON, Axinn, Veltrop & Harkrider LLP,

FDA_00702

Hartford, CT, argued for defendant-cross-appellant.  Also
represented by MATTHEW BECKER, REBECCA L. CLEGG,
THOMAS K. HEDEMANN, MATTHEW S. MURPHY.

IRENA ROYZMAN, Kramer Levin Naftalis & Frankel
LLP, New York, NY, for amici curiae Regeneron Pharma-
ceuticals, Inc., Ocular Therapeutix, Inc.  Also represented
by CHRISTINE WILLGOOS; PAUL BRZYSKI, Washington, DC.

PAUL WHITFIELD HUGHES, III, McDermott Will & Em-
ery LLP, Washington, DC, for amicus curiae Vanda Phar-
maceuticals Inc.  Also represented by CHRISTOPHER
MICHAEL BRUNO, SARAH HOGARTH, APRIL ELISE
WEISBRUCH.

———————————

Before LOURIE, CHEN, and CUNNINGHAM, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* LOURIE.

Opinion dissenting-in-part filed by *Circuit Judge*
CUNNINGHAM.

LOURIE, *Circuit Judge*.

Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals,
Inc., Bausch Health Ireland Ltd., and Alfasigma S.P.A.
(collectively, "Salix") appeal from a final judgment of the
United States District Court for the District of Delaware
holding claim 2 of U.S. Patent 8,309,569, claim 3 of U.S.
Patent 10,765,667, claim 4 of U.S. Patent 7,612,199, and
claim 36 of U.S. Patent 7,902,206 invalid as obvious.  *See
Salix Pharms., Ltd. v. Norwich Pharms., Inc.,* No. 20-cv-
430, 2022 WL 3225381 (D. Del. Aug. 10, 2022) ("*Decision*").

Norwich Pharmaceuticals Inc. ("Norwich") cross-ap-
peals from an order that issued after the district court con-
cluded that Norwich infringed claim 8 of U.S. Patent
8,624,573, claim 6 of U.S. Patent 9,421,195, and claims 11
and 12 of U.S. Patent 10,335,397 and had failed to prove

FDA_00703

that those claims were invalid.  That order, contained
within the final judgment, instructed the FDA that the ef-
fective approval date of Norwich's Abbreviated New Drug
Application ("ANDA") may not precede the expiration dates
of those claims.  J.A. 51.  Norwich also cross-appeals from
a denial of its motion to modify the final judgment.  *See
Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430,
2023 WL 3496373 (D. Del. May 17, 2023) ("*Rule 60(b) Or-
der*").

For the following reasons, we affirm.

## BACKGROUND

Rifaximin, the active ingredient in Salix's commercial
product Xifaxan®, has been widely used as an antibiotic for
decades, having been first synthesized in the early 1980s
in Italy and approved there as an antibiotic in 1985.  *Deci-
sion* at *8; J.A. 2532.  The FDA approved Xifaxan nearly 20
years later, in 2004, as 200 mg tablets for the treatment of
travelers' diarrhea.  *Decision* at *1.  The FDA subsequently
approved 550 mg tablets for hepatic encephalopathy ("HE")
in 2010 and for irritable bowel syndrome with diarrhea
("IBS-D") in 2015.  *Id.*

Norwich sought to market a generic version of rifaximin
and, in 2019, filed an ANDA for 550 mg tablets with the
same indications as Xifaxan, certifying pursuant to
21 U.S.C. § 355(j)(2)(vii)(IV) that Salix's rifaximin patents
were invalid.  Salix timely sued, asserting that Norwich's
ANDA infringed dozens of valid, Orange Book-listed pa-
tents.  By the time of trial, the case had been streamlined
to three groups of patents:

- the '573, '195, and '397 patents, directed to treating
  HE ("the HE patents");

- the '569 and '667 patents, directed to treating IBS-D
  with 550 mg rifaximin three times a day (1,650
  mg/day) for 14 days ("the IBS-D patents"); and,

FDA_00704

SALIX PHARMACEUTICALS, LTD. v.
                                        NORWICH PHARMACEUTICALS INC.

- the '199 and '206 patents, directed to rifaximin form
  ß ("the polymorph patents").

Following a bench trial, the district court held that
Norwich infringed the HE patents' claims and had failed to
establish their invalidity. *Decision* at *10–11. Norwich did
not appeal those holdings. The court also held that Nor-
wich's ANDA infringed the IBS-D and polymorph patents,
but that those patents' claims would have been obvious
over certain prior art. *Id.* at *2–3, 16–17. Salix appealed
those invalidity holdings.

As part of the entered judgment, the district court or-
dered that the effective date of a final approval of Norwich's
ANDA should not precede October 2029, which is the latest
expiration date associated with the HE patents. J.A. 51.
Norwich then amended its ANDA in an attempt to remove
the infringing HE indication and moved to modify the judg-
ment under Federal Rule of Civil Procedure 60(b), assert-
ing that the amendment negated any possible
infringement. The court denied Norwich's motion, and
Norwich cross-appealed.

We have jurisdiction under 28 U.S.C. § 1295(a)(1).

### DISCUSSION

Salix first contends that the district court's conclusion
that the asserted claims of the IBS-D patents were invalid
as obvious was reached in error. Subsumed within that
challenge is a question of whether or not a background ref-
erence discussed by the court was properly established as
prior art. Salix also contends that the court erred in hold-
ing that the asserted polymorph patent claims were invalid
as obvious. Norwich's cross-appeal asserts that the court
erred in the phrasing of its order precluding final approval
of its ANDA until expiration of the HE patents. Norwich
further asserts that the court erred in denying its motion
to modify after the ANDA was amended in an attempt to
avoid infringement. We address each argument in turn.

FDA_00705

## I

We turn first to Salix's contention that the district court erred in concluding that the asserted claims of the IBS-D patents would have been obvious over the asserted prior art.

Whether or not a claim would have been obvious is a question of law, based on underlying factual determinations. *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1328–29 (Fed. Cir. 2020). We review the ultimate legal question of obviousness *de novo* and the underlying factual determinations for clear error. *Id.* at 1328. A finding is clearly erroneous only if we are "left with a definite and firm conviction that the district court was in error." *Id.* (citations omitted).

The IBS-D patents are directed to treating IBS-D with 550 mg rifaximin, thrice-daily (1,650 mg/day), for 14 days. For example, claim 2 of the '569 patent depends from claim 1 as follows:

> 1. A method of providing acute treatment for diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: *administering 1650 mg/day* of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms.

> 2. The method of claim 1, wherein *the 1650 mg is administered at 550 mg three times per day*.

'569 patent, col. 30 ll. 4–12 (emphases added); *see also* '667 patent, col. 46 ll. 29–33, 39–40 (claims 1 & 3, similar). The key limitation on appeal is the dosage amount that appears in the claims: 550 mg, three times per day ("TID"), for a total of 1,650 mg/day.

FDA_00706

Norwich challenged the IBS-D claims' validity by asserting as prior art references a clinical trial protocol that had been published on the ClinicalTrials.gov website in 2005 ("the Protocol")[1] and a 2006 journal article ("Pimentel").[2]  The Protocol describes a Phase II study evaluating twice-daily doses of 550 mg (1,100 mg/day) and 1,100 mg (2,200 mg/day) for 14 and 28 days for the treatment of IBS-D.  *See* J.A. 7051.  Pimentel teaches administering 400 mg, TID (1,200 mg/day), for the treatment of IBS,[3] but further opines that the "optimal dosage of rifaximin may, in fact, be higher than that used in our study."  J.A. 4644.

The district court found that those two references disclose each and every limitation of the challenged IBS-D claims, and further found that a skilled artisan would have been motivated to combine those two references to arrive at what is claimed with a reasonable expectation of success.  *Decision* at *17, *19–20.  The court then concluded that the challenged IBS-D claims were invalid as obvious.  *Id.* at

---

[1]    ClinicalTrials.gov, *History of Changes for Study: NCT00269412, Randomized, Double Blind, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Different Doses of Rifaximin Administered BID either Two or Four Weeks in the Treatment of Patients with Diarrhea-Associated Irritable Bowel Syndrome* (December 22, 2005); J.A. 7047–55.

[2]    M. Pimentel *et al.*, *The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome*, 145 ANN. INTERN. MED., 557 (2006); J.A. 4639–46.

[3]    Salix did not argue a difference between a motivation to use rifaximin to treat IBS versus IBS-D.  *Decision* at *19 n.3.  It concedes on appeal that "[r]oughly one-third of IBS patients suffer from IBS-D," Appellants' Br. at 6, and has not otherwise suggested that treatments for IBS would not inform treatments of IBS-D.

FDA_00707

*17–22.  Salix appeals, asserting that the court erred in finding that a skilled artisan would have had a reasonable expectation of success in using the claimed 1,650 mg/day dosage to treat IBS-D.  Appellants' Br. at 39–48.  Whether or not there would have been a reasonable expectation of success is a question of fact, *IXI IP, LLC v. Samsung Elecs. Co.*, 903 F.3d 1257, 1262 (Fed. Cir. 2018), which we review for clear error, *Hospira*, 946 F.3d at 1328.

Salix does not appear to dispute the district court's finding that the Protocol and Pimentel "disclose all limitations of the IBS-D claims." *See Decision* at *17.  Rather, it contends that even if the asserted combination of references effectively discloses the claimed 1,650 mg/day dosage, there remains insufficient evidence to support a finding of a reasonable expectation of success in using that particular dosage amount.  *See, e.g.*, Appellants' Br. at 39–40.  According to Salix, the highest prior art dosage amount that could have been supported with a reasonable expectation of success was the 1,200 mg/day dose evaluated by Pimentel.  *Id.* at 40.  We disagree.

The Protocol provides an outline of a planned Phase II clinical trial in which "three different doses (275, 550 and 1100 mg) of rifaximin" were to be "administered BID [*i.e.*, twice-daily] for either two or four weeks in the treatment of patients with diarrhea-associated irritable bowel syndrome." J.A. 7050 (cleaned up).  As an outline of that clinical trial plan, the Protocol provides only that those three specific, twice-daily dosage regimens were to be investigated for either two or four weeks.  The Protocol does not include any efficacy or safety data, nor does it mention a 1,650 mg/day dose or TID dosing.

Although we have rejected the idea that "efficacy data [are] always required for a reasonable expectation of success," *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019), we are hesitant to conclude as a general matter that the disclosure of a Phase II clinical trial

FDA_00708

SALIX PHARMACEUTICALS, LTD. v.
                      NORWICH PHARMACEUTICALS INC.

plan, standing alone, provides an expectation of success sufficient to render obvious a dosage that was not included within the planned clinical trial. *See* Appellants' Reply Br. at 13–14. But the Protocol was not asserted alone; it was asserted in combination with Pimentel.

Pimentel teaches that administration of 400 mg rifaximin, TID (1,200 mg/day), "resulted in greater improvement in IBS symptoms" and "lower bloating score[s] after treatment." J.A. 4639; *see also id.* at 4642–43 (providing supporting data). Pimentel explains that the 400 mg TID regimen was chosen "on the basis of a previous study that demonstrated the efficacy of rifaximin in bacterial overgrowth." *Id.* at 4640. However, Pimentel does not merely provide that daily rifaximin doses of 1,200 mg were likely to be successful in the treatment of IBS. Pimentel further teaches that "[r]ecent data suggest that the *optimal dosage* of rifaximin *may, in fact, be higher* than that used in our study." J.A. 4644; *Decision* at *20 (emphases added).

The district court did not clearly err in finding that a skilled artisan would have looked to both of those references, considered their limits, and had a reasonable expectation of success as to the efficacy of 550 mg TID dosing. The combined message that the skilled artisan would have discerned from the Protocol and Pimentel is that the optimal dosage for treating patients suffering from IBS disorders may be higher than 400 mg TID, and the next higher dosage unit from the Protocol was 550 mg. We see no clear error in the conclusion that there would have been a reasonable expectation of success in administering the claimed 1,650 mg/day to IBS-D patients. Indeed, certainty and absolute predictability are not required to establish a reasonable expectation of success. *See Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 275 (Fed. Cir. 2022) ("A finding of a reasonable expectation of success does not require absolute predictability of success."); *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018) ("This court has long rejected a

FDA_00709

requirement of conclusive proof of efficacy for obviousness." (cleaned up)).

Moreover, references establishing the background knowledge of a person of ordinary skill in the art are consistent with the reasonable expectation of success provided by the combination of the Protocol with Pimentel. For example, Cuoco[4] teaches the efficacy of 1,200 mg rifaximin/day for 14 days for the treatment of small intestinal bacterial overgrowth ("SIBO"). J.A. 4533. Salix has acknowledged that those of ordinary skill in the art identified "bacterial alterations" as a potential underlying cause for IBS, Appellants' Br. at 7, and the literature[5] describes SIBO as a condition that is "highly prevalent in patients with irritable bowel syndrome (IBS)," such that "SIBO decontamination is associated [with] a significant improvement of IBS symptoms." J.A. 4664. We therefore agree with the district court that references describing the treatment of SIBO would have been pertinent to the skilled artisan's considerations as to what treatments would have a potential for success in treating individuals suffering from IBS.

In addition to Cuoco, Lauritano[6] teaches an increase in rifaximin efficacy for the treatment of SIBO as doses were increased from 600 mg/day to 1,200 mg/day, providing the

---

[4]   L. Cuoco & M. Salvagnini, *Small intestine bacterial overgrowth in irritable bowel syndrome: a retrospective study with rifaximin*, 52 MINERVA GASTROENTEROL. DIETOL. (2006) 89; J.A. 4533–39.

[5]   E. Scarpellini et al., *High dosage rifaximin for the treatment of small intestinal bacterial overgrowth*, 25 ALIMENT. PHARMACOL. THER. 781 (2007); J.A. 4663–67 ("Scarpellini").

[6]   E.C. Lauritano et al., *Rifaximin dose-finding study for the treatment of small intestinal bacterial overgrowth*, 22 ALIMENT. PHARMACOL. THER., 31 (2005); J.A. 7267–71.

FDA_00710

10                                    SALIX PHARMACEUTICALS, LTD. v.
                                      NORWICH PHARMACEUTICALS INC.

trend that Pimentel described as indicating that doses
higher than 1,200 mg/day may be even more optimal for
the treatment of IBS. J.A. 7267 ("Higher doses of rifaximin
lead to a significant gain in terms of therapeutic efficacy in
[SIBO] eradication without increasing the incidence of
side-effects."); *see also id.* at 4644. As evidenced by Scar-
pellini and Lin,[7] those in the art advanced on those find-
ings, and subsequently evaluated higher doses. For
example, Scarpellini reported that a 1,600 mg/day dose
"showed a significantly higher efficacy" compared with
1,200 mg/day for the treatment of SIBO. J.A. 4663; *see also
id.* at 4666 (Table 1, noting study patients included those
suffering from IBS-D); *id.* at 4747 (teaching that "[a]bout
400 to about 600 mg of rifaximin may be administered TID
for about 10 days" (*i.e.*, 1,200 mg/day to 1,800 mg/day) for
the eradication of bacterial overgrowth).

The record further supports the finding that there
would have been a reasonable expectation of success in ad-
ministering higher doses of rifaximin without an intolera-
ble increase in negative side effects. For example, Cuoco
teaches that rifaximin was understood as having "a low
risk of causing microbial resistance," J.A. 4533, and that
rifaximin was well known for its "profile of tolerability and
safety widely described in the literature," *id.* at 4538. Scar-
pellini further reported that the 1,600 mg/day dose pro-
vided a "similar compliance and side-effect profile"
compared with the 1,200 mg/day dose. *Id.* at 4663. As the
district court noted, the "[w]idespread off-label use" of
rifaximin also supported the conclusion that rifaximin was
safe and effective "for the treatment of IBS-D with a rea-
sonable expectation of success." *Decision* at *19; *see also*
Appellants' Br. at 17 ("There is no dispute that skilled

---

[7] International Patent Application Publication
2006/102536; J.A. 4721–47.

FDA_00711

artisans knew of the general concept of trying off-label use of rifaximin to treat IBS-D.").

In view of the record before us, we see no clear error in the finding that a skilled artisan would have had a reasonable expectation of success in administering the claimed 1,650 mg/day regimen for the treatment of IBS-D. We therefore affirm the district court's holding that the challenged IBS-D claims would have been obvious over the cited references. *See In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) ("[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." (citation omitted)).

Salix further contends that a Press Release[8] issued by Salix in a filing with the Securities and Exchange Commission less than a year before the patents' priority date was not prior art because Norwich failed to establish that it was "by others" as required by pre-AIA 35 U.S.C. § 102(a). Appellants' Br. at 30–39. According to Salix, the district court's inclusion of that allegedly non-prior art reference in its discussion of the skilled artisan's expectation of success was harmful error. *Id.*

Although the district court cited the Press Release in its discussion of the skilled artisan's expectations, it ultimately held that the "Protocol and Pimentel [] disclose all limitations of the IBS-D claims" and that a skilled artisan "would have been motivated to combine the . . . Protocol and Pimentel [] with a reasonable expectation of success." *Decision* at *17. We therefore need not decide whether or not the Press Release was prior art because, even assuming that it was not, the Protocol and Pimentel alone established the obviousness of the claims.

---

[8] Salix Pharms., Ltd., Current Report (Form 8-K) (Sept. 5, 2007); J.A. 7477–82.

FDA_00712

We accordingly affirm the district court's determination that Norwich established that the IBS-D claims would have been obvious in view of the Protocol and Pimentel.

## II

We next turn to Salix's contention that the district court clearly erred in finding that there would have been a reasonable expectation of success in obtaining the rifaximin form β recited in the polymorph patents' claims.

Whether or not there would have been a reasonable expectation of success is a question of fact, *IXI IP, LLC v. Samsung Elecs. Co.*, 903 F.3d 1257, 1262 (Fed. Cir. 2018), which we review for clear error, *Hospira*, 946 F.3d at 1328. We review the ultimate conclusion of obviousness *de novo*. *Id.*

The polymorph patents are directed to rifaximin form β. For example, claim 4 of the '199 patent recites:

> 4. Rifaximin in polymorphic form β, wherein the rifaximin has x-ray powder diffraction pattern peaks at about 5.4°; 9.0°; and 20.9°2θ and wherein the rifaximin has a water content of greater than 5%.

'199 patent, col. 10 ll. 24–27; *see also* '206 patent, col. 11 ll. 33–37, 41–43 (claims 34 & 36, similar).

Norwich challenged the polymorph claims' validity by asserting, *inter alia*, Cannata,[9] which discloses that rifaximin exists in crystalline form with "outstanding antibacterial properties." J.A. 4528; *Decision* at *6. Cannata does not discuss rifaximin's crystal structure in detail, but it does disclose several preparation protocols for rifaximin that include solvents used for crystallization. J.A. 4529–31; *see also id.* at 3408.

---

[9]   U.S. Patent 4,557,866; J.A. 4526–32.

FDA_00713

    The district court held that expert testimony supported
a conclusion that, in view of the prior art, (1) a skilled arti-
san would have had good reason to characterize the crys-
talline rifaximin obtained by following the Cannata
protocols, (2) that such characterization was routine and
could have been performed "in one day," and (3) that doing
so would have led the skilled artisan to have "detected
rifaximin β." *Decision* at *6–7. The district court subse-
quently concluded that the challenged polymorph claims
would have been obvious over the asserted prior art in view
of the common knowledge of the skilled artisan. *Id.* at *7–
8.

    Salix first challenges the district court's conclusion of
obviousness by asserting that *Grunenthal GMBH v. Alkem
Laboratories Ltd.*, 919 F.3d 1333 (Fed. Cir. 2019) and *Phar-
macyclics LLC v. Alvogen, Inc.*, No. 2021-2270, 2022 WL
16943006 (Fed. Cir. Nov. 15, 2022) compel the opposite re-
sult. Appellants' Br. at 49–51. Salix further contends that
the court "applied the wrong test" by not following a ra-
tionale provided in the district court opinion from *Pharma-
cyclics*. *Id.* at 55–57. We disagree.

    In *Grunenthal*, we held that it was not clear error for
the district court to find that the record failed to establish
by clear and convincing evidence a reasonable expectation
of success in preparing the claimed polymorphic Form A of
tapentadol hydrochloride. *See* 919 F.3d at 1341. In that
case, the synthesis of tapentadol hydrochloride known in
the prior art produced a particular form—Form B. *Id.* The
district court found that there was a lack of evidence that
a prior art synthesis would have resulted in the claimed
Form A and that no prior art guidance existed to establish
"what particular solvents, temperatures, agitation rates,
etc., were likely to result" in the claimed polymorph. *Id.* at
1343. We found no clear error in that analysis. *Id.* at
1344–45.

FDA_00714

We also affirmed a conclusion of non-obviousness of a claimed polymorph in our non-precedential *Pharmacyclics* decision, which issued after the district court released its decision in this case. *See* 2022 WL 16943006, at *10–11. But the court here acted within its discretion when it declined to follow the district court decision in *Pharmacyclics* as though it was binding precedent. *See Decision* at *7 n.1 ("Plaintiffs call to my attention [the district court's decision in] *Pharmacyclics LLC v. Alvogen Pine Brook LLC.* I have considered that case but I do not agree with it on this point."). And our later affirmance of the factual findings in *Pharmacyclics* did not retroactively override the district court's analysis here.

Moreover, a lack of clear error in *Grunenthal* and *Pharmacyclics* does not compel a conclusion of non-obviousness here. Indeed, *Grunenthal* underscored the factual nature of these types of inquiries and expressly held that it did "not rule out the possibility that polymorph patents could be found obvious." 919 F.3d at 1344–45. "The determination of obviousness is dependent on the facts of each case." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1089 (Fed. Cir. 2008); *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007). In *Grunenthal* and *Pharmacyclics*, the issue was whether a skilled artisan would have had a reasonable expectation of success in *producing* a crystalline form of a compound. *See* 919 F.3d at 1341–43; 2022 WL 16943006, at *10–11. Here, the prior art included a process to produce a crystalline form of rifaximin, and the dispute centered around *characterizing* the crystalline form resulting from that process. *See Decision* at *13–14. These distinct factual predicates support the district courts' factual findings in each of these three cases under the clear error standard of review.

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Supreme Court set forth the background against which obviousness is to be assessed: "Under § 103, the scope and content of the prior art are to be determined"

FDA_00715

and "differences between the prior art and the claims at issue are to be ascertained." *Id.* at 17. The scope and content of the prior art here includes preparations of crystalline rifaximin, which expert testimony supports would have yielded the β form of rifaximin. *Decision* at *7; J.A. 3391–92 ("[T]he as-synthesized form of rifaximin reported by Examples 1, 6, 7, and 9 [of Cannata] were necessarily rifaximin form Beta, because of the methods used, the solvent system used, and it was later confirmed by later work, including work from the named inventors."); *id.* at 3408–09 (similar testimony); *id.* at 3393–3404 (discussing the evidence of record that supports that conclusion); *id.* at 4700–07, 4846–47, 5007–14 (providing supporting evidence for that conclusion). And the parties do not dispute that the methods for characterizing the resulting crystalline rifaximin were well known and readily available to the skilled artisan. *Decision* at *3. The difference between the prior art and the claims is thus effectively nothing more than the performance of routine characterization to identify the polymorphic forms that result from the known Cannata processes.

In this regard, Salix does not appear to dispute that there would have been a motivation to explore potential polymorphic forms of rifaximin. Appellants' Br. at 48–49. Rifaximin was, after all, a known compound with a known, useful activity. Salix further refers to the district court's finding that "polymorph β is a commonly produced polymorph and the most stable form of rifaximin" as an "undisputed" fact. *Id.*; *see also Decision* at *7. There thus appears to be no dispute that the claimed polymorph can be readily produced from the crystallization conditions disclosed in Cannata and that it would have been well within the abilities of the skilled artisan to procure and characterize the β form of rifaximin.

According to Salix, however, rifaximin's β form constituted a non-obvious invention because, although skilled artisans "actually succeed[ed]" in producing and

FDA_00716

characterizing it, they would not have "*expect*[*ed*] to succeed" because, as of the critical date, the polymorphic nature of rifaximin had not yet been reported and the identity of the β form remained undisclosed. Appellants' Br. at 49. Salix further argues that there could have been no expectation of success because the skilled artisan would not have been able to predict what polymorphic forms might result from following the preparation protocols disclosed in the prior art. *Id.* at 20–21, 50–53. Salix's framing of the issue suggests that no unknown entity could ever be obvious, as one cannot reasonably expect what was hitherto unknown, which is incorrect.

Here, the district court found a reasonable expectation of success in characterizing the crystalline product of Cannata for potential polymorphism using routine, conventional methods and skill. *Decision* at *6–7. We see no clear error in that conclusion. Indeed, Salix has done no more than combine known elements of the prior art to verify readily accessible information concerning a compound already in the hands of those of ordinary skill in the art, and such routine efforts do not justify removing this polymorph from the public domain. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007); *see also Pfizer*, 480 F.3d at 1367–68. To be sure, we do not hold that there is always a reasonable expectation of success in accessing or characterizing polymorphs. We are simply reviewing the district court's decision before us as to its factual finding of a reasonable expectation of success, and in so doing, have not been left with a definite and firm conviction that a mistake was made in reaching that finding. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1374 (Fed. Cir. 2008).

Having found no clear error in the district court's fact findings as to the existence of a reasonable expectation of success, we affirm the court's conclusion that the polymorph patent claims were invalid as obvious. Because we affirm the court's holding that the polymorph patent claims

FDA_00717

would have been obvious over the asserted prior art, we need not consider Norwich's separate argument that the polymorph claims would have also been invalid as inherently anticipated.

### III

On cross-appeal, Norwich raises two related but distinct arguments that arose after the district court held that Norwich infringed the HE patents and failed to establish invalidity. *See Decision* at *10–16. Norwich first argues that, in issuing its final decision, the district court misinterpreted 35 U.S.C. § 271(e)(4)(A), which directs a court, following a finding of infringement, to order the FDA to defer final approval of an ANDA until the expiration of the infringed patent. According to Norwich, that statute precludes delaying final approval of an entire ANDA, and instead requires delaying only the approval of the infringing use.

Norwich's second argument arises from its decision to amend its ANDA to carve out the infringing HE use after final judgment. Following that amendment, Norwich filed a motion to modify the final judgment to allow for prompt approval of the amended ANDA that purportedly no longer sought approval for the infringing HE use. The district court denied that motion, and Norwich cross-appealed.

We address both of Norwich's concerns in turn.

### A.

We first address Norwich's arguments regarding the district court's interpretation of 35 U.S.C. § 271(e)(4)(A) in ordering that a final approval of Norwich's ANDA could not be effective before the HE patents expired. J.A. 50–51.

We review issues of statutory interpretation without deference to the district court's interpretation. *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1366 (Fed. Cir. 2001). "The starting point in every case involving

FDA_00718

construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (Powell, J., concurring).  Moreover, we "give effect, if possible, to every clause and word of [the] statute." *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citation omitted).  When a statute does not define a given word or phrase, we presume that Congress intended the word or phrase to have its ordinary meaning.  *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).  However, "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (citation omitted).

Section 271(e)(4)(A) instructs that, following a finding of infringement, "the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed."  The order here instructed the FDA that "the effective date of any final approval . . . of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of [the HE patents] (currently October 2, 2029)."  J.A. 51.

Norwich argues that the language of § 271(e)(4) requires courts to tie the restriction on FDA approval to the *indication* for which the ANDA seeks approval when that indication was the source of infringement.  Cross-Appellants' Br. at 14.  Norwich's ANDA originally sought approval for the treatment of both IBS-D and HE.  Although only the HE indication was found to infringe a valid patent, the order restricted final approval of the entire ANDA, including the non-infringing indication, until 2029.  Norwich argues that the statute requires the district court's order "to specify that the approval date pertains to Norwich's ANDA seeking approval for the infringing HE Indication." *Id.* at 18.  But the district court order concerned only the

FDA_00719

specific ANDA in question that included an infringing use, referred to the ANDA by its number, and enjoined the approval of that ANDA. J.A. 51. Norwich suggests that the district court order unfairly precludes it from receiving final approval of a new non-infringing ANDA.[10] The district court did no such thing.

Section 271(e)(4)(A) describes delaying the approval of "the drug . . . involved in the infringement." Since the FDA does not approve drugs in the abstract, but rather approves drugs for particular uses (indications) of that drug, the statute is appropriately construed as directed to approval of particular infringing uses of the drug, not all uses of the drug including non-infringing uses. The statutory scheme makes clear that it is not the potential use of Norwich's rifaximin for HE that constitutes the relevant infringement here, nor is it the unpatented drug compound itself, but rather it is the submission of the ANDA that included an infringing use. *See* 35 U.S.C. § 271(e)(2)(A) (making it an "act of infringement to submit" an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent"). That the ANDA further recited a non-patent-protected indication does not negate the infringement resulting from the ANDA's submission. The order thus appropriately delayed the effective final approval date of "this infringing ANDA" submission. J.A. 48. The order appropriately said nothing that would prevent approval of a new non-infringing ANDA.

We therefore affirm the district court's order setting the effective approval date of Norwich's ANDA No. 214369

--------

[10] Norwich notes that on June 2, 2023, FDA tentatively approved its amended ANDA, which purportedly lacks the HE indication. Cross-Appellant's Br. at 6. The tentative approval letter noted, however, that "final approval cannot be granted until October 2, 2029 as specified in the court order." *Id.*

FDA_00720

to be no earlier than the date of expiration of the last to expire of the HE patents.

B.

Following entry of the final judgment, which included the resetting order barring final approval of Norwich's ANDA until 2029, Norwich amended its ANDA in an attempt to remove the infringing HE indication. Norwich then moved to modify the judgment under Federal Rule of Civil Procedure 60(b), asserting that the amendment negated any possible infringement, and that the final approval date of the ANDA, as amended, should not be tied to the HE patents. *See* Cross-Appellant's Br. at 27. The district court denied that motion, holding that Norwich "fully litigated the merits of its non-infringement and invalidity case, lost, and now seeks a way around the final judgment through Rule 60(b)." *Rule 60(b) Order* at *2. Norwich cross-appealed.

"Because denial of a Rule 60(b) motion is a procedural issue not unique to patent law, we apply the rule of the regional circuit where appeals from the district court would normally lie," *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1550 (Fed. Cir. 1987), which, here, is the Third Circuit. The Third Circuit "review[s] the denial of Rule 60(b) relief for an abuse of discretion." *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 269 (3d Cir. 2002); *see also Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (noting that Rule 60(b) motions are "extraordinary relief which should be granted only where extraordinary justifying circumstances are present" (citation omitted)).

"A district court may reconsider its own finding of infringement in light of an amended ANDA," but the court need not do so. *Ferring B.V. v. Watson Lab'ys, Inc. Fla.*, 764 F.3d 1382, 1391 (Fed. Cir. 2014). Rather, "[a]llowing an amendment is within the discretion of the district court, guided by principles of fairness and prejudice to the patentholder." *Id.* Here, the court reasonably held that

FDA_00721

consideration of the amended ANDA would be inequitable and inappropriate. *Rule 60(b) Order* at *2. The court noted that "[i]t is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement" and that what Norwich sought in its Rule 60(b) motion "would essentially be a second litigation" following final judgment. *Id.* (noting also that, other than simply asserting that it carved out the HE indication and providing the court with the amended label, Norwich "ha[d] presented no evidence in support of its assertion" that the amended ANDA would no longer infringe the HE patents).

Norwich nevertheless argues that the amended ANDA satisfies the judgment by not seeking approval for the infringing use and that, in view of the amendment, it is no longer equitable to apply the judgment prospectively. But Rule 60(b) is permissive, holding only that the court "*may* relieve a party or its legal representative from a final judgment, order, or proceeding" under various circumstances. That is—a district court has the discretion, not the obligation, to modify a final judgment in view of a post-judgment ANDA amendment. And as the district court held, simply asserting that a patented indication has been carved out of an ANDA application does not necessarily satisfy the judgment or entitle the applicant to direct entry to the market. *See Rule 60(b) Order* at *2. We see no abuse of discretion in the district court reaching that conclusion or in subsequently denying the motion.

Norwich further argues that the district court erred by not explicitly discussing Rule 60(b)(6), which provides that a court may relieve a party from a final judgment for "any other reason that justifies relief." We disagree that the district court so erred. The court's Memorandum Order thoroughly discussed the law, the equities, the record, and the arguments before it. In so doing, the court implicitly found no additional reason that justified the relief that Norwich sought.

FDA_00722

22      SALIX PHARMACEUTICALS, LTD. v.
         NORWICH PHARMACEUTICALS INC.

We therefore affirm the district court's denial of the motion to modify the final judgment.

### CONCLUSION

We have considered both parties remaining arguments and find them unpersuasive.  For the foregoing reasons, we affirm (1) the district court's holding that claim 2 of the '569 patent, claim 3 of the '667 patent, claim 4 of the '199 patent, and claim 36 of the '206 patent would have been invalid as obvious, (2) the district court's order setting the effective approval date of Norwich's ANDA to be no earlier than the date of expiration of the last to expire of the HE patents, and (3) the district court's denial of the motion to modify the final judgment.

### AFFIRMED

#### COSTS

No costs.

FDA_00723

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NORWICH PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 25-091 (BAH) |
| ROBERT F. KENNEDY JR., *in his official capacity as Secretary of Health and Human Services*, et al., | Judge Beryl A. Howell |
| Defendants, | |
| TEVA PHARMACEUTICALS USA, INC. | |
| Intervenor-Defendant, | |
| SALIX PHARMACEUTICALS, INC. | |
| Intervenor-Defendant. | |

<u>**ORDER**</u>

Upon consideration of plaintiff Norwich Pharmaceuticals, Inc.'s Motion for a Preliminary Injunction Treated as a Motion for Summary Judgment ("Motion for Summary Judgment"), ECF No. 22; plaintiff Norwich Pharmaceuticals, Inc.'s Motion for Oral Argument or, in the alternative, Leave to Fille a Sur-Reply, ECF No. 80; defendants Robert F. Kennedy Jr.'s, Sarah Berner's, and the U.S. Food and Drug Administration' U.S. Department of Justice's Cross-Motion for Summary Judgment, ECF No. 50 (collectively "government defendants"), intervenor-defendant Teva Pharmaceuticals USA, Inc's Cross-Motion for Summary Judgment, ECF No. 55, intervenor-defendant Salix Pharmaceuticals, Inc.'s Cross-Motion for Summary Judgment, ECF No. 66 (collectively "intervenor-defendants"); the memoranda, declarations, and exhibits submitted in support and opposition; and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**JA301**

**ORDERED** that government defendants' Cross-Motions for Summary Judgment, ECF No. 55, and intervenor-defendants' Cross-Motions for Summary Judgement, ECF Nos. 55 and 66, are **GRANTED**; it is further

**ORDERED** that plaintiff's Motion for Summary Judgment, ECF No. 22, is **DENIED**; it is further

**ORDERED** that plaintiff's Motion for Oral Argument or, in the alternative, Leave to File a Sur-Reply, ECF No. 80, is **DENIED**; it is further

**ORDERED** that judgment is entered in favor of government defendants and intervenor-defendants; it is further

**ORDERED** that the parties are directed to submit jointly by 3:00 PM EST on April 18, 2025, any proposed, minimum redactions of confidential business information contained in the Memorandum Opinion, initially filed under seal, supported by analysis applying the factors set out in *United States v. Hubbard*, 650 F.3d 293 (D.C. Cir. 1980); and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

*This is a final and appealable order.*

Date:   April 17, 2025

_____
**BERYL A. HOWELL**
United States District Judge

**JA302**

AO 450 (Rev. 01/09; DC-03/10)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Columbia

**FILED**

APR 1 7 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

NORWICH PHARMACEUTICALS, INC.,  )
*Plaintiff*  )
v.  )  Civil Action No. 25-091 (BAH)
ROBERT F. KENNEDY JR., et al  )
*Defendant*  )

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one):*

☐  the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus postjudgment interest at the rate of _____ %, along with costs.

☐  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____

☑  other:  ORDERED that judgment be entered in favor of government defendants and intervenor-defendants

This action was *(check one)*:

☐  tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐  tried by Judge _____ without a jury and the above decision
was reached.

☑  decided by Judge BERYL A. HOWELL _____ on a motion for

Government defendants' Cross-Motions for Summary Judgment and intervenor-defendants' Cross-Motions for
Summary Judgment, and Plaintiff's Summary Judgment

Date:  04/17/2025                    *ANGELA D. CAESAR, CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

**JA303**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NORWICH PHARMACEUTICALS, INC.,

Plaintiff,

v.

ROBERT F. KENNEDY JR., *in his official
capacity as Secretary of Health and Human
Services*, *et al.*,

Defendants,

TEVA PHARMACEUTICALS USA, INC.

Intervenor-Defendant,

SALIX PHARMACEUTICALS, INC.

Intervenor-Defendant.

Civil Action No. 25-091

(BAH) Judge Beryl A. Howell

~~FILED UNDER SEAL~~
**REDACTED AFTER
REVIEWED BY PARTIES**

<u>**MEMORANDUM OPINION**</u>

Plaintiff Norwich Pharmaceuticals, Inc. ("Norwich"), a pharmaceutical company, needs a

time machine for the remedy sought in this lawsuit of an order directing approval of its

Abbreviated New Drug Application ("ANDA") for rifaximin tablets.  *See* Norwich's Reply

Supp. Mot. Summ. J. ("Norwich's Reply") at 2, ECF No. 74 ("The important context for this

dispute is that the approval of Norwich's . . . ANDA would not have been blocked . . . prior to

the [Medicare Modernization Act passed in 2003].").  Absent such a miraculous device, Norwich

turns to this lawsuit against the United States Food and Drug Administration ("FDA"), Robert F.

Kennedy Jr., the Secretary of Health and Human Services, and Sarah Berner, the Acting

Commissioner of the FDA (collectively "government defendants"), claiming, under the

Administrative Procedure Act, 5 U.S.C. § 706 *et seq.*, that the FDA's decision to grant only

tentative approval to its ANDA for rifaximin tablets, due to a competitor's 180-day exclusivity period to market the same drug in the same form, is "arbitrary, capricious, and contrary to law." Amend. Compl. ¶ 100, ECF No. 35.[1] That competitor, Actavis Laboratories FL Inc. ("Actavis"), a wholly owned subsidiary of Teva Pharmaceuticals USA, Inc. ("Teva"), and Salix Pharmaceuticals, Inc. ("Salix"), the owner of the "brand name" drug rifaximin tablets, which Norwich seeks to use as the reference drug for ANDA approval, have intervened as defendants (collectively "intervenor defendants").[2] *See* Teva's Mot. to Intervene at 1, ECF No. 10; Min. Order (Jan. 28, 2025) (granting unopposed motion); Salix's Mot. to Intervene at 1, ECF No. 14; Min. Order (Jan. 30, 2025) (granting unopposed motion).

To force this claim to the front of this Court's queue of pending cases for resolution, Norwich initially filed a motion for preliminary injunctive relief and now seeks expedited summary judgment, arguing that the FDA's decision was erroneous because Actavis forfeited its 180-day exclusivity to market rifaximin tablets for failing to market and failing to obtain tentative approval.  Norwich's Mot. Summ. J. ("Norwich's MSJ") at 1-2, ECF No. 22. Government and intervenor defendants have filed cross-motions for summary judgment, claiming that the current statutory regime forecloses Norwich's position.  Gov't Cross-Mot. Summ. J. ("Gov't XMSJ") at 1, ECF No. 50; Gov't Mem. Supp. XMSJ ("Gov't Opp'n") at 1-2, ECF No. 61; Teva's Cross-Mot. Summ. J. ("Teva's XMSJ") at 1, ECF No. 55; Teva's Mem. Supp. XMSJ ("Teva's Opp'n") at 1-4, ECF No. 66; Salix's Cross-Mot. Summ. J. ("Salix's XMSJ") at 1-2, ECF No. 66.

---

[1]      Although plaintiff originally named as defendants the former Secretary of the U.S. Health and Human Services and the former Commissioner of the FDA, the current holders of those positions are "automatically substituted as [parties]" in their place, pursuant to Federal Rule of Civil Procedure 25(d).

[2]      All parties and the administrative record refer to Actavis as opposed to Teva, and that practice is followed in this Memorandum Opinion.

While the primary task facing the Court involves resolving straightforward questions of statutory interpretation, the palpable frustration present in Norwich's briefs and apparent in its litigation strategy is not unfounded. The ten-years' lapse between Actavis' submission of its initial ANDA and the FDA's still-outstanding grant of tentative approval may evince the need for a statutory solution that better balances the need for increased speed at which the FDA grants approval of generic drugs and rewards for the first generic manufacturer that challenges patents covering a brand name drug. *See Mylan Lab'ys Ltd. v. FDA*, 910 F. Supp. 2d 299, 311 (D.D.C. 2012) ("[I]n enacting the Hatch–Waxman Act[,] Congress sought to promote generic competition. However, Congress created the 180–day exclusivity period for that very purpose and included in the statute an express exception to forfeiture for delays in tentative approval caused by changes in approval requirements beyond an ANDA applicant's control."). That solution, however, lies with Congress and not the courts. Further, as discussed *infra* Parts I.B.1, 4., Norwich's complaint of the delay at issue here may be overstated given that (1) Actavis' generic drug will be on the market almost two years *earlier* than it could otherwise be in light of Salix's last expiring patent; and (2) litigation between Salix and Norwich remains ongoing to determine whether Norwich's ANDA at issue in this lawsuit infringes on Salix's patents. In the end, no matter which party presents the best policy choices here, the statute dictates the result. For the reasons stated below, Norwich's motion for summary judgment is denied, and the government and intervenor defendants' cross-motions for summary judgment are granted.[3]

---

[3]    Norwich has requested a hearing and sought leave to file a surreply. Norwich's Mot. for Hearing & Leave to File Sur-Reply ("Norwich's Mot.") at 1-3, ECF No. 80. This request for a hearing is denied as unnecessary given the voluminous record in this case and the clarity of both the legal and factual issues for the proper resolution of the pending motions. LCvR 7(f) (authorizing oral hearings at "the discretion of the Court"). Norwich's request for leave to file a surreply is similarly denied as this case benefited from over 600 pages of briefing, including motions, memoranda, exhibits and affidavits. Indeed, Norwich itself has filed over 300 pages of briefs, memoranda, and supporting materials. Further, while Norwich supposedly identified five "new and incorrect arguments" raised in intervenor-defendants' reply briefs, Norwich's Mot. at 1-3, the first three pages, at least, of the surreply merely "reiterate[] prior arguments," obviating the need for a surreply. *Flynn v. Veazey Const. Corp.*, 310

# I.    BACKGROUND

The relevant statutory, factual and procedural background to resolve the pending motions is reviewed below.

## A.    Statutory Background

The Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, provides the procedures that manufacturers must follow to obtain FDA approval to sell pharmaceutical products.  To get a new, branded drug to market, a manufacturer "must file a New Drug Application (NDA) with the Food and Drug Administration (FDA), showing the new drug is safe and effective and identifying the number and expiration date of any patent or patents applicable to the drug." *Teva Pharms., USA, Inc. v. Leavitt* ("*Teva v. Leavitt*"), 548 F.3d 103, 104 (D.C. Cir. 2008) (citing 21 U.S.C. §§ 355(a)-(b)).  The FDA must "publish this information" and does so by "publishing a directory of *Approved Drug Products with Therapeutic Equivalence Evaluations* (also known as the Orange Book)." *Id.* (citing 21 U.S.C. § 355(b)(1)).

"Prior to 1984, companies that manufactured generic medicines . . . also had to file NDAs supported by full investigative studies." *Teva Pharms. USA, Inc. v. Azar* ("*Teva v. Azar*"), 369 F. Supp. 3d 183, 186 (D.D.C. 2019).  In 1984, however, Congress passed the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585, popularly referred to as the "Hatch-Waxman Amendments," which "eliminated the requirement that generic manufacturers submit full NDAs and allowed generic manufacturers to 'seek FDA approval by submitting an abbreviated new drug application ('ANDA').'" *Id.* at 187 (quoting

---

F. Supp. 2d 1886, 189 (D.D.C. 2004) (describing *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 113 (D.D.C. 2002)).  In any event, "[t]he decision to grant or deny leave to file a surreply is committed to the sound discretion of the court," *Schmidt v. Shah*, 696 F. Supp. 2d 44, 59 (D.D.C. 2010), and to the extent that intervenor-defendants' arguments are "truly new," *THEC Int'l-Hamdard Codova Grp.-Nazari Constr. Co. v. Cohen Mohr, LLP*, 301 F. Supp. 3d 1, 6 (D.D.C. 2018), which does not appear to be the case, "the court [can] . . . ignore those arguments in resolving the motion," *Flynn*, 310 F. Supp. 2d at 189.

*Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1316 (D.C. Cir. 1998)); *see also* 21 U.S.C. §

355(j).  The ANDA process permits a generic manufacturer to "'piggyback[] on the original

manufacturer's evidence of safety and efficacy,' and need demonstrate only that the generic drug

has the same active ingredient(s), route of administration, dosage form, conditions of use, and

strength as the approved drug, and that the generic drug has an appropriate label and is

bioequivalent to the approved drug." *Teva v. Azar*, 369 F. Supp. 3d at 187 (internal citation

omitted) (quoting *Teva v. Leavitt*, 548 F.3d at 104); *see also* 21 U.S.C. § 355(j)(2)(A); *id.* §

355(j)(4).

　　"ANDAs must address patents that cover or might cover the relevant drugs." *Purepac

Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004).  "For each patent, companies can

satisfy this requirement by including in their ANDAs one of several 'certifications,'" *id.*, "with

respect to each" of the Orange Book patents claimed by the brand-name drug, 21 U.S.C. §

355(j)(2)(A)(vii).  Relevant here, a generic applicant that seeks to market its ANDA product

before a listed patent expires may submit a "Paragraph IV Certification," asserting that the patent

"is invalid or will not be infringed by the manufacture, use, or sale" of the generic drug "for

which the [ANDA] is submitted."  21 U.S.C. § 255(j)(2)(A)(vii).  After a generic applicant

submits a Paragraph IV Certification in its ANDA, the applicant must provide notice to the

patent owner and holder of the approved NDA "not later than 20 days after the date" on which

the FDA "informs the [ANDA] applicant that the [ANDA] has been filed."  21 U.S.C. §

355(j)(2)(B)(ii)(I).  "Filing a [P]aragraph IV [C]ertification comes with a risk, though: it

constitutes an act of patent infringement with the hazard of sparking costly litigation." *Teva

Pharms. USA, Inc. v. Sebelius* ("*Teva v. Sebelius*"), 595 F.3d 1303, 1305 (D.C. Cir. 2010)

(internal citation omitted) (citing 35 U.S.C. § 271(e)(2)(A)).  A patent owner filing an

infringement suit within 45 days of receiving notice of the Paragraph IV Certification generally triggers an automatic 30-month stay that bars the FDA from approving the ANDA until the stay expires. 21 U.S.C. § 355(j)(5)(B)(iii).

To "induce challenges to patents claimed to support brand drugs" and to "reward" "generics that stick out their necks (at the potential cost of a patent infringement suit) by" filing a Paragraph IV Certification, which effectively "claim[s] that patent law does not extend to the brand maker's monopoly as long as the brand maker has asserted," "Congress . . . created the 180-day exclusivity" incentive. *Teva v. Sebelius*, 595 F.3d at 1318; *see also* 21 U.S.C. § 255(j)(5)(B)(iv). Specifically, the "first applicant"— defined as "an applicant that, on the first day on which a substantially complete application containing a [Paragraph IV Certification] is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a [Paragraph IV Certification]," 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb)—is eligible for a "180-day exclusivity period" to market its generic drug, *id.* §§ 355(j)(5)(B)(iv)(I), (II)(aa). The statute provides for such exclusivity by directing that if a subsequent ANDA "contains a [Paragraph IV Certification] and is for a drug for which a first applicant has submitted an application containing such a certification, the [subsequent ANDA]" cannot be approved until "the date that is 180 days after the date of the first commercial marketing of the drug" "by any first applicant." *Id.* § 355(j)(5)(B)(iv)(I). This means that, when a first applicant remains eligible for the 180-day exclusivity period, the FDA must delay approval of subsequently filed ANDAs until 180 days after a first applicant begins commercial marketing of its generic drug. 21 U.S.C. § 355(j)(5)(B)(iv)(I) (delaying approval of an application that "contains a [paragraph IV certification] and is for a drug for which a first applicant has submitted . . . such a certification"); 21 C.F.R. § 314.107(c)(1) ("The ANDA of a subsequent applicant will

not be approved during the period when any first applicant is eligible for 180-day exclusivity or during the 180-day exclusivity period of a first applicant.").

"[C]ertifications are not the only way for ANDA applicants to satisfy their obligation to address all relevant patents." *Purepac*, 354 F.3d at 880. As an alternative path to asserting patent certifications, the FDCA allows generic applicants to "exclude a patented use from its label, by way of a 'section viii carveout.'" *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 327 (Fed. Cir. 2021) (citing 21 U.S.C. § 355(j)(2)(A)(viii)). In contrast to a patent Paragraph IV Certification, a section viii statement "asserts that a patent does not prevent FDA from approving the company's ANDA because the ANDA applicant seeks to market the drug for a use other than that covered by the patent." *Apotex, Inc. v. FDA*, 393 F.3d 210, 214 (D.C. Cir. 2004). This mechanism "is typically used when the brand's patent on the drug compound has expired and the brand holds patents on only some approved methods of using the drug." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 406 (2012). "Thus," as relevant here, "whereas applicants use [P]aragraph IV [C]ertifications to challenge the validity of admittedly applicable patents, they use section viii statements to assert that patents do not apply." *Purepac*, 354 F.3d at 880. "FDA acceptance of the carve-out label allows the generic company to place its drug on the market (assuming the ANDA meets other requirements), but only for a subset of approved uses—*i.e.*, those not covered by the brand's patents." *Caraco*, 566 U.S. at 406.

Generic applicants may employ either statutory mechanism for ANDA approval—by submitting Paragraph IV Certifications on a subset of patents listed for a brand drug in the Orange Book and section viii statements to another subset. *See Purepac*, 354 F.3d at 880 ("[A]pplicants use [P]aragraph IV certifications to challenge the validity of admittedly applicable patents, they use section viii statements to assert that patents do not apply."); *id.* ("The FDA has

long required that for every patent ANDA applicants use either a [P]aragraph IV [C]ertification or a section viii statement—they may not use both" as to the same patent for the drug at issue). Recall, however, that the statute authorizes a 180-day exclusivity period only to a "first applicant" who, *inter alia*, asserts a Paragraph IV Certification. 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb) (defining first applicant). As such, "the approval of an ANDA with 'a section viii statement," and no Paragraph IV Certification, "does not entitle a successful applicant to the 180–day period of exclusivity bestowed on [P]aragraph IV applicants.'" *Norwich Pharms., Inc. v. Becerra*, 703 F. Supp. 3d 1, 8 (D.D.C. 2023) (alteration in original) (quoting *Purepac*, 354 F.3d at 880).

In 2003, Congress passed, and the President signed, the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066, which established, among other things, certain conditions in which a "first applicant" could forfeit its entitlement to the 180-day marketing exclusivity. 21 U.S.C. 355(j)(5)(D); *Teva v. Sebelius*, 595 F.3d at 1306 ("On the occurrence of any one of six defined scenarios, the law now says, the entitlement to a 180–day exclusivity period shall be forfeited by a first applicant." (citation and internal quotation marks omitted)). Two such forfeiture events are relevant here: "failure to market" and "failure to receive tentative approval."

First, with respect to failure to market, the first applicant forfeits its 180-day exclusivity by failing to market the drug:

> 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:
>
> (AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme

Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

(BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

21 U.S.C. §§ 355(j)(5)(D)(i)(I)(bb), (bb)(AA)-(CC).  Second, with respect to failure to receive tentative approval, the first applicant may forfeit exclusivity by failing to "obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."  21 U.S.C. § 355(j)(5)(D)(i)(IV).

In sum, the statutory framework lays out the requirements that deem a generic manufacturer eligible for the 180-day exclusivity by qualifying as a "first applicant," *see* 21 U.S.C. §§ 355(j)(5)(D)(iv)(II)(aa), (bb), describes the circumstances under which the exclusivity provision bars approval of subsequent applicants until 180 days after a first applicant begins commercial marketing of the drug in question, *see id.* § 355(j)(5)(D)(I), and provides for defined situations where a first applicant can forfeit the 180-day exclusivity period to which it is otherwise eligible and statutorily entitled, *id.* §§ 355(j)(5)(D)(i)(I)-(VI).

### B.    Factual Background

Salix holds NDAs for 200mg and 550mg rifaximin tablets that are marketed under the brand name Xifaxan.  The 550mg strength product is approved to treat irritable bowel syndrome with diarrhea ("IBS-D indication") and heptic encephalopathy ("HE indication"), a brain disorder caused by severe liver disease.  *See* Salix Pharms. Inc., *Xifaxan Prescribing Information* §§ 1.2, 1.3 (Oct. 2023), https://perma.cc/YG3S-32TB.  The 200mg product is approved only to

treat traveler's diarrhea. *Id.* §§ 1.1, 2.1. At all times relevant to this case, FDA's Orange Book has listed multiple patents covering rifaximin. *See generally* FDA, *Patent and Exclusivity for NDA N021361*,

https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=002&Appl_No=021361&Appl_type=N (last visited Apr. 17, 2025). Some of these patents cover rifaximin's use for HE ("HE patents"), its uses for IBS-D ("IBS-D patents"), and others cover certain forms of its active ingredient ("polymorph patents"). *Id.*

### 1.    *Actavis First-Filed Rifaximin ANDA*

On December 18, 2015, Actavis submitted an ANDA for 550mg rifaximin tablets for both the IBS-D and HE indications. Certified Admin. Record ("AR") at 13, ECF No. 79. This application was substantially complete when submitted, containing Paragraph IV Certifications as to, at least, four polymorph patents (*i.e.,* 7,906,542 ("'542 patent"), 8,518,848 ("'848 patent"), 8,741,904 ("'904 patent"), and 8,193,196 ("'196 patent)); an IBS-D patent (*i.e.,* 8,309,569 ("'569 patent")); and four HE patents (*i.e.,* 8,829,017 ("'017 patent"), 8,946,252 ("'252 patent"), 9,969,398 ("'398 patent"), and 8,642,573 ("'573 patent")). AR at 13-14. Thus, December 18, 2015, was the first date on which such an application was submitted. AR at 13-14. Since filing its application, Actavis has lawfully maintained the same Paragraph IV Certifications. AR at 14.

After serving its Paragraph IV Certifications on Salix, Salix, in turn, sued Actavis for patent infringement in March 2016. *See* Compl., *Salix Pharms., Ltd. v. Actavis Lab'ys FL, Inc.*, No. 16-cv-00188-GMS (D. Del. Mar. 23, 2016), ECF No. 1. Two years later, in September 2018, the parties settled. Press Release, Bausch Health, *Bausch Health Announces Resolution of XIFAXAN® Intellectual Property Litigation* (Sept. 12, 2018),

https://www.ir.bauschhealth.com/news-releases/2018/09-12-2018-120152669. The settlement

agreement permits Actavis to enter the market no later than January 1, 2028, over 22 months

before the last of the Salix patents expires. *Id.* In the stipulated consent judgment, Actavis

admitted its ANDA product would infringe the listed patents absent a license, but without

conceding patent validity, and Salix recognized that Actavis was "entitled to maintain its

Paragraph IV [C]ertification[s]" to the non-expired patents. *See* Stipulated Judgment, *Salix*

*Pharms., Ltd. v. Actavis Lab'ys FL, Inc.*, No. 16-cv-00188-GMS (D. Del. Sept. 14, 2018), ECF

No. 111.

In parallel with the Salix-Actavis litigation, the FDA began reviewing Actavis' ANDA.

AR at 3-5. Actavis had until June 18, 2018, to obtain tentative approval or face possible

forfeiture of its 180-day exclusivity under 21 U.S.C. § 355(j)(5)(D)(i)(IV). AR at 20. At the

time Actavis submitted its ANDA, FDA had published draft guidance that, if finalized, would

have recommended applicants conduct "comparative dissolution testing" designed to assess the

product quality of a proposed generic rather than to demonstrate its bioequivalence to Salix's

reference drug. AR at 29-30 (2012 Draft Rifaximin Guidance) (recommending that applicants

follow method described in FDA's dissolution methods database). ██████████████

████████████████████████████████████████████

██████████████

While Actavis' ANDA was under review, however, the agency's thinking evolved, based

in part on a citizen petition submitted by Salix on October 17, 2016. *See generally* AR at 39-

122. As relevant here, FDA granted the petition, in part, on March 16, 2017, to the extent that it

requested the agency "recommend[] . . . [in] revised draft product-specific guidance" that it

would "require in vitro dissolution testing . . . under multiple physiologically relevant pH

conditions and surfactant levels." AR at 253. The FDA then published new draft rifaximin

guidance that, if finalized, would have recommended additional dissolution studies designed to help demonstrate bioequivalence. *See* AR at 210-230 (2017 Draft Product-Specific Rifaximin Guidance for Rifaximin Tablets ("2017 PSG"); *see also* AR at 252-53 (explaining that design of additional studies would "allow[] for the simulation of in vivo drug release in different portions of the [digestive] tract"). ███████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████

█████████████████████████████████

████████████████████████████████

█████████████████████████████

████████████████████████████████

████████████████████████████

█████████████████████████

██████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████

### 2.    **Salix-Norwich I** *Litigation*

In December 2019, Norwich filed two ANDAs for different strengths of rifaximin: ANDA No. 214369 ("the '369 ANDA") for the 550mg strength, and ANDA No. 214370 ("the '370 ANDA") for 200mg strength. AR at 14-17. Norwich's '369 ANDA sought approval for both the IBS-D and HE indications and included Paragraph IV Certifications to the certain Orange-book listed polymorph, IBS-D, and HE patents. AR at 15-16. Norwich's initial '370 ANDA did not make any Paragraph IV Certifications, electing instead to wait for approval for the listed patents to expire. AR at 881.

In response to receiving notices regarding Norwich's Paragraph IV Certifications for the '369 ANDA, Salix sued Norwich for patent infringement in the District of Delaware. AR at 520-71; *see generally Salix Pharms., Ltd. v. Norwich Pharms., Inc.* ("*Salix-Norwich I*"), Civil Action No. 20-430-RGA, 2022 WL 3225381 (D. Del. Aug. 10, 2022). Initially, Salix asserted claims of patent infringement as to twenty-six patents, but in compliance with the scheduling order, Salix limited the number of challenged patents contested at trial to seven. *Salix-Norwich I*, 2022 WL 3225381, at *1. After trial, the parties filed a joint stipulation asking the court to enter a final judgment of non-infringement regarding certain, but not all, claims, limited to "Norwich's current ANDA No. 214369" and "current ANDA product," which included only "amendments or supplements to the ANDA that do not change the indications of use, the polymorph forms, or the formulation." Proposed Stipulation at 2 n.1, *Salix-Norwich I*, ECF No. 179. The court signed the stipulation in May 2022. *See* Stipulation, *Salix-Norwich I*, ECF No. 180; AR at 579-83. The

stipulation of non-infringement included eight of Salix's patents (*i.e.*, the '542 patent, '848 patent, '904 patent, '196 patent, '569 patent, '017 patent, '252 patent, and the '398 patent).  AR at 579-83.

The district court ultimately determined that the seven contested patents at trial—which were not covered by the parties' stipulation—were infringed by Norwich's '369 ANDA, but that only the claims in the HE indication '573 patent were valid.  *Salix-Norwich I*, 2022 WL 322581, at *23.  In accordance with the Hatch-Waxman Act, the court entered a judgment order that "the effective date of any final approval by the [FDA] Norwich's ANDA No. 214369 is to be a date not earlier than the date of the expiration of the last to expire" '573 HE indication patent, which is October 2, 2029.  Order ¶ 5, *Salix-Norwich I*, ECF No. 193; AR at 603.

Undeterred, Norwich moved for reconsideration, under Federal Rule of Civil Procedure 60(b), explaining that it amended the '369 ANDA to remove the HE indication found to be covered by Salix's valid patent and infringed and asked the court to "remove the absolute prohibition on FDA's approval of Norwich's Amended ANDA."  Norwich's R.60(b) Mot. at 6, *Salix-Norwich I*, ECF No. 211.  The court denied Norwich's reconsideration motion, explaining that no "changed circumstances" warranted modifying the judgment, noting further that "[t]he only changed circumstance is that [Norwich] decided to amend its ANDA, which it filed on September 6, 2022 . . ., nearly one month after the final judgment.  The changed circumstance is simply a voluntary decision of the trial loser to change course, which is neither unanticipated nor unforeseeable."  *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, Civil Action No. 20-430-RGA, 2023WL 3496373, at *1 (D. Del. May 17, 2023).  The court also rejected Norwich's equitable arguments and stated that, even though Norwich amended its ANDA, "[i]t is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to

turn infringement into non-infringement." *Id.* at *2.  Norwich's actions amounted to an

"unprecedented" attempt to allow a defendant to "litigate a case through trial and final judgment

based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes

it had started with, and win in a summary proceeding." *Id.*

Salix and Norwich cross-appealed to the Federal Circuit.  *Salix Pharms., Ltd. v. Norwich*

*Pharms. Inc.*, 98 F.4th 1056 (Fed. Cir. 2024).  The Federal Circuit affirmed the district court in

all respects, *id.* at 1069-70, including denial of Norwich's Rule 60(b) motion because, among

other things, "simply asserting that a patented indication has been carved out of an ANDA

application does not necessarily satisfy the judgment or entitle the applicant to direct entry to the

market," *id.* at 1069.  The Supreme Court denied both parties' petitions for certiorari.  *Norwich*

*Pharms. Inc. v. Salix Pharms., Ltd.*, 145 S. Ct. 567 (2024); *Salix Pharms., Ltd. v. Norwich*

*Pharms. Inc.*, 2024 WL 5112288 (U.S. Dec. 16, 2024).

### 3.    *Norwich Sues FDA for Final Approval of the '369 ANDA*

On June 2, 2023, the FDA granted tentative approval of Norwich's '369 ANDA, which,

as amended, seeks approval to market 550mg rifaximin for IBS-D.  AR at 616.  Tentative

approval occurs when the FDA determines that an ANDA meets all other statutory requirements

for approval but cannot be granted final approval due to a patent or a statutory exclusivity.  21

U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA); 21 CFR §§ 314.3, 314.105(d).  In granting only tentative

approval of the '369 ANDA, the FDA explained that "final approval cannot be granted until

October 2, 2029, as specified in the court order" in *Salix-Norwich I.*  AR at 616.

Dissatisfied with its losses at both the trial and appellate levels in the patent infringement

lawsuit in Delaware and doubly haunted with those losses by virtue of the FDA's reliance on the

judicial holdings in that case, Norwich switched courts.  Specifically, Norwich sued the FDA in

this Court, pursuant to the Administrative Procedure Act, seeking final approval of the '369

ANDA. *See generally Norwich Pharms., Inc. v. Becerra* ("*Norwich APA*"), 703 F. Supp. 3d 1

(D.D.C. 2023). Norwich's complaint in that litigation "allege[d] that the FDA's decision

'refus[ing] to grant Norwich's amended ANDA final approval[,] despite a properly-filed

statement under 21 C.F.R. § 314.94(a)(12)(viii)(A) that it is not seeking FDA approval for a

patented method of use' was 'arbitrary, capricious, and unlawful.'" *Norwich APA*, 703 F. Supp.

3d 1, 12. Another Judge on this Court disagreed, holding that "Norwich has failed to show that

the law is so clear that the FDA should have stretched to read the Delaware District Court's final

judgment and Rule 60(b) decision in a manner that ignores their plain terms." *Id.* at 25.

Consequently, "[Norwich's] proposition is unsustainable, as is [its] ultimate contention that the

FDA erred as a matter of reasoned-decision-making and law in reading those documents to leave

the agency free to approve the company's amended ANDA prior to October 2, 2029." *Id.*

Norwich has appealed the decision to the D.C. Circuit, *Norwich Pharms., Inc. v. Kennedy*, No.

23-5311 (D.C. Cir. Dec. 29, 2023), and that appeal remains pending.

### 4.    *Norwich Amends the '370 ANDA*

As part of its multi-pronged effort to get its generic 550mg of rifaximin to market for the

treatment of IBS-D, and after losing the patent infringement lawsuit in Delaware and the APA

challenge before a different Judge on this Court upholding the FDA's adherence to the holdings

by the Delaware district court, Norwich amended its '370 ANDA on May 20, 2024, to add the

550mg dosage strength to treat IBS-D. AR at 16-17; AR at 17 n.40. Its amended '370 ANDA

contains both Paragraph IV certifications and section viii statements to various Salix patents.

AR at 16-17; AR at 17 n.41. As relevant here, as part of the amended '370 ANDA, Norwich

submitted Paragraph IV Certifications as to Salix's polymorph and IBS-D patents, and section

viii statements regarding Salix's HE indication patents—effectively seeking to have its '370 ANDA approved for the 550mg dosage to treat IBS-D only.  AR at 17.  This most recent amendment to Norwich's '370 ANDA has now resulted in two separate lawsuits.

First, during the course of the *Salix-Norwich I* litigation, new patents were issued to Salix covering the 550mg tablets for treatment of IBS-D, including U.S. Patent Nos. 11,564,912 and 11,799,571.  AR at 878-79.  In its amended '370 ANDA, Norwich included Paragraph IV Certifications applicable to the new IBS-D patents.  AR at 16-17, 878-79, 878 n.16.  Norwich sent notice of its new Paragraph IV Certifications to Salix in May 2024, and Salix filed suit in the District of New Jersey under the Hatch-Waxman Act within 45 days.  *Salix Pharms., Inc. v. Norwich Pharms., Inc.*, No. 24-cv-7140-JFM (D.N.J. 2024).  Norwich's motion to dismiss, or, in the alternative, to transfer venue in the New Jersey litigation remains pending, with discovery set to conclude in November 2025.  Order, *Salix Pharms., Inc. v. Norwich Pharms., Inc.*, 24-cv-7140-JFM (D.N.J. Apr. 1, 2024), ECF No. 66; Norwich's Mot. to Dismiss, *Salix Pharms., Inc. v. Norwich Pharms., Inc.*, 24-cv-7140-JFM (D.N.J. Apr. 10, 2024), ECF No. 67.[4]

Second, following its amendment, Norwich asked the FDA to approve its ANDA immediately with respect to 550mg rifaximin tablets to treat IBS-D.  AR at 809-31.  Norwich acknowledged that the FDA previously determined Actavis to be a first applicant eligible for 180-day exclusivity.  AR at 812.  Norwich argued, however, that its ANDA was nevertheless approvable before the 180-day exclusivity period ended because Actavis had forfeited any

---

[4]    Given that the relief requested in this lawsuit is an order directing the FDA to approve its '370 ANDA, *see* Am. Compl., Prayer for Relief ("Entry of an injunction directing FDA to grant final approval to Norwich's '370 ANDA"), the ongoing litigation in New Jersey district court to determine whether the '370 ANDA amounts to patent infringement would be highly pertinent.  Nevertheless, Norwich failed to mention this ongoing patent infringement litigation.  *See generally* Norwich' Mem. (not discussing Salix's ongoing patent infringement lawsuit against Norwich in New Jersey district court); Norwich's Reply (same); Amend. Compl. (same).  Such a "hide-the-ball" litigation strategy is rarely successful, reflects badly on the party and counsel employing the strategy, and is never appreciated by the Court.

relevant eligibility for failure to market and/or failure to obtain tentative approval.  AR at 814-31.

On January 8, 2025, the FDA issued a 21-page memorandum disagreeing with Norwich's position.  AR at 8-28.  The FDA first determined that Norwich's claim of forfeiture for failure to market failed because no event enumerated under 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) had occurred as to at least one of the HE patents to which Actavis maintains a Paragraph IV Certification qualifying it for exclusivity—namely, the '573 HE indication patent that the *Salix-Norwich I* court found to be valid and infringed by Norwich.  AR at 19-27.  The FDA proceeded from the premise that the stipulation of non-infringement in the *Salix-Norwich I* litigation regarding the '369 ANDA could act as a qualifying event with respect to six patents which Actavis and Norwich both submitted Paragraph IV Certifications—namely, the '542, '275, '196, '569, '949, and '904 patents.  AR at 20-22.  Thus, the FDA did not rely on the stipulated patents in confirming whether Actavis forfeited or not because, even if the stipulation from the *Salix-Norwich I* litigation survived, the '573 patent foreclosed any finding of forfeiture.  *Id.*

In making that determination, the FDA rejected Norwich's argument that its own section viii statement regarding the same patent meant that Actavis' certification was no longer a "qualifying" one, AR at 23-27, explaining that such an argument "improperly conflate[d]" distinct statutory provisions.  AR at 23.  In the FDA's view, Norwich is a "subsequent applicant" for rifaximin 550 mg tablets, subject to Actavis' 180-day exclusivity under the Effectiveness Provision, because Norwich's ANDA still "contains paragraph IV certifications to non-HE patents."  *Id.*; *see also* AR at 25 (explaining that Actavis' and Norwich's paragraph IV certifications overlap).  The only question is whether Actavis forfeited that exclusivity, but the FDA determined that Norwich's section viii statement to the '573 patent is irrelevant to

forfeiture because "[t]he failure to market forfeiture provision . . . clearly specifies that only a first applicant's certifications are relevant to the forfeiture analysis"; the statute requires a triggering event "as to each of the patents with respect to which the <u>first applicant</u> submitted and lawfully maintained" a paragraph IV certification, with "no exception for patents to which another applicant has submitted a section viii statement."  AR at 24 (emphasis in original) (quoting 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)).  The FDA explained that this interpretation "accords with the statutory scheme," since forfeiture clears the way for all subsequent generic applicants on a uniform basis, not just for a particular ANDA.  AR at 27.  The FDA also rejected Norwich's policy arguments about incentivizing patent challenges.  Congress directed that a subsequent applicant could trigger a forfeiture by "clear[ing] the field" with "successful patent challenges as to <u>all</u> of the patents qualifying the first applicant for 180-day exclusivity."  *Id.* (emphasis in original).  Norwich, however, failed to do so as it "lost in its challenge of the '573 patent."  *Id.*

The FDA also rejected Norwich's claims that Actavis had forfeited its eligibility for failure to obtain tentative approval within 30 months of filing.  AR at 1-7, 17-19.  The FDA determined that the change in requirements with respect to the dissolution studies needed for Actavis to show bioequivalence was a cause of Actavis' failure to obtain tentative approval within 30 months.  AR at 17-19.  ██████████████████

████████████████████████████████████████████

████████████████████████████████████

Having determined that Actavis is a first applicant eligible for 180-day eligibility, and that such eligibility has not been forfeited, the FDA was required to delay final approval of Norwich's subsequent ANDA.  AR at 890-95.  Consequently, Norwich was granted only

tentative approval, on January 10, 2025, because Norwich had otherwise submitted "adequate information . . . to demonstrate that [its] drug meets the requirements for approval."  AR at 890-95.

### C.    Procedural History

Disappointed by the FDA's grant of only tentative approval to its amended '370 ANDA, Norwich commenced the instant lawsuit against the government defendants on January 13, 2025, challenging the FDA's decision not to grant the '370 application immediate approval under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, as arbitrary, capricious, and contrary to law.  *See* Amend. Compl. ¶¶ 96-10.  As already noted, Actavis and Salix subsequently sought and were granted permission to intervene as defendants.  *See* Minute Order (Jan. 28, 2025) (granting Actavis' motion); Minute Order (Jan. 30, 2025) (granting Salix's motion).

Several days after filing its complaint, Norwich moved for a preliminary injunction. Norwich's Mot. Preliminary Inj. at 1, ECF No. 22.  At the parties' request, Norwich's motion was consolidated with the merits under Rule 65(a)(2) of the Federal Rules of Civil Procedure, "treat[ed] . . . as a motion for summary judgment," and a scheduling order for summary judgment briefing was entered.  Minute Order (Jan. 28, 2025); *see also* ECF No. 8 (Proposed Joint Stipulated Scheduling Order).  The issue is now ripe for consideration.

## II.    LEGAL STANDARD

The APA authorizes judicial review of any "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and "instructs a reviewing court to set aside agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)).  This standard "'requires agencies to engage in reasoned decisionmaking,' and........ to reasonably explain to reviewing courts the bases for the actions they take and the

conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (internal citations omitted) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.* ("*Regents*"), 591 U.S. 1, 16 (2020)). While "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action,'" *Regents*, 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)), the agency, too, "must defend its actions based on the reasons it gave when it acted," *id.* at 24.

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)), since the "'entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

## III.    DISCUSSION

Norwich frames the instant challenge to the FDA's decision to grant only tentative approval to the '370 ANDA as "arbitrary, capricious, and contrary to law," Norwich's Mem. Supp. MSJ ("Norwich's Mem.") at 3, ECF No. 38, without clearly identifying which aspects of the FDA's decision, in its view, were "arbitrary and capricious" and those that are, instead, "contrary to law," despite the fact that these respective inquiries are distinct. For example, "[t]he arbitrary and capricious standard is '[h]ighly deferential,' and it 'presumes the validity of agency action.'" *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quoting *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003)). To meet this standard, a plaintiff must show that "(1) the agency 'has relied on factors which Congress has not intended it

to consider'; (2) the agency 'entirely failed to consider an important aspect of the problem'; (3) the agency's explanation 'runs counter to the evidence before the agency'; or (4) the explanation 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 663 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). By contrast, "[i]n determining whether an agency's interpretation of its governing statute is contrary to law, [courts] must exercise [their] 'independent judgment' and 'apply[] all relevant interpretive tools' to reach 'the best reading of the statute.'" *Env't Def. Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 412 (2024)); *Norwich APA*, 703 F. Supp. 3d at 19 (describing the different inquiries into whether an agency's decision is "arbitrary and capricious" or "contrary to law"). Here, the main thrust of Norwich's attack on the FDA's January 8, 2025, decision that Actavis had not forfeited exclusivity—from which followed the January 10, 2025, tentative approval only of Norwich's '370 ANDA—is predicated on the argument that the FDA's action is "contrary to law" because the agency did not "act[] consistently with the 'best reading' of the statute," *Vanda Pharms., Inc. v. FDA*, 123 F.4th 513, 521 (quoting *Loper Bright*, 609 U.S. at 400), and is analyzed as such. *See* Norwich's Reply at 1 (arguing that the FDA's decision was "contrary to law" without any mention that the decision was allegedly arbitrary and capricious).

To determine if an agency acted consistently with the statute, a court must "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 609 U.S. at 394. In addition to deploying all "traditional tools of statutory construction," *id.* at 403, "[a]s the Court reiterated in *Loper Bright*, 'courts may—as they have from the start—[also] seek aid from the interpretations of those responsible for implementing particular statutes,'" *Lissack v.*

*Comm'r of Internal Revenue*, 125 F.4th 245, 259 (D.C. Cir. 2025) (quoting *Loper Bright*, 609 U.S. at 394).

The parties agree that: (1) Actavis is a "first applicant" eligible for the 180-day exclusivity of its drug because it was the first generic manufacturer to file a substantially complete application that contained at least one Paragraph IV Certification and lawfully maintains a Paragraph IV Certification for the drug; (2) the 180-day exclusivity effectiveness provision bars Norwich's '370 ANDA unless a forfeiture event with respect to Actavis has occurred. Norwich's Mem. at 1-3; Norwich's Reply at 1-2; Gov't's Opp'n at 1, 15; Teva's Opp'n at 16-18; Salix's Mem. Supp. XMSJ ("Salix's Opp'n") at 8-9, ECF No. 66. The only dispute is whether the FDA erred in finding that Actavis has not forfeited its 180-day marketing exclusivity. Norwich argues that Actavis has forfeited its 180-day exclusivity by failing to market and failing to obtain tentative approval. Norwich's Mem. at 1-3. Contrary to the, at times, convoluted arguments put forward by Norwich, the FDA's decision comports with the clear text and structure of the statute.

## A.    Failure to Market

All tools of statutory interpretation point, like a compass, in one direction: Actavis has not forfeited its 180-day exclusivity under the failure-to-market provision.

### 1.    *The Text*

Statutory interpretation "begins, as always, with the text of the statute." *Chao v. Day*, 436 F.3d 234, 235 (D.C. Cir. 2006) (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). If the text of the statute is "plain and ambiguous," the "analysis ends with the text as well." *Id.* (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018) ("Because the plain language [the statute] is 'unambiguous,' 'our inquiry begins with the statutory text, and ends there as well.'" (quoting

*BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion)); *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) ("We must first 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' If it does, our inquiry ends and we apply the statute's plain language." (internal citation omitted) (quoting *Robinson*, 519 U.S. at 340 and citing *Barnhart*, 534 U.S. at 450)).

The plain text states that the "180-day exclusivity period . . . shall be forfeited by a first applicant" 21 U.S.C. § 355(j)(5)(D)(ii), if "[t]he first applicant fails to market the drug by the later of"

> with respect to the first applicant . . ., the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv),

as relevant here, "[i]n an infringement action or declaratory judgment action . . . , a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. §§ 355(j)(5)(D)(i)(I)(bb), (bb)(BB).

The parties primarily dispute which patent certifications qualify Actavis for the 180-day exclusivity period. Norwich's Reply at 4-11; Gov't's Reply Supp. XMSJ ("Gov't's Reply") at 1-8, ECF No. 59; Salix's Reply Supp. XMSJ ("Salix's Reply") at 2-5, ECF No. 70; Teva's Reply Supp. XMSJ ("Teva's Reply") at 4-13, ECF No. 73. The FDA and Norwich proceed from the premise that the stipulation of non-infringement between Norwich and Salix in the *Salix-Norwich I* litigation leaves only the '573 patent that Actavis submitted a Paragraph IV Certification without a forfeiture event under 21 U.S.C. §§ 355(j)(5)(D)(i)(I)(bb). Gov't's Opp'n at 18; Norwich's Mem. at 19. [5] From there, Norwich reads subparagraph (B)(iv)(I) as requiring

---

[5]    The intervenor defendants insist that the FDA should not have made this assumption. Salix's Opp'n at 18-21; Teva's Opp'n at 31-32. In their view, Norwich's amended '369 ANDA invalidated any effect of

matching patent Paragraph IV Certifications between a first applicant's ANDA and a subsequent applicant's ANDA to prevent a first applicant from forfeiting its 180-day exclusivity. Norwich's Mem. at 22-24. In Norwich's view, its submission of a viii statement, and not a Paragraph IV Certification, for the '573 patent to market 550mg tablets of rifaximin for IBS-D means that Actavis has forfeited its 180-day exclusivity to market 550mg tablets of rifaximin for IBS-D and HE, for which Actavis lawfully maintains a Paragraph IV Certification to the '573 HE indication patent. Norwich's Reply at 1. This is referred to as a "patent-by-patent approach" to exclusivity because the proffered exclusivity turns on the patents to which both a first applicant and a subsequent applicant have asserted Paragraph IV Certifications. Norwich Reply at 5, 13-14. The government and intervenor defendants disagree. In their view, the forfeiture provision speaks only to the "first applicant's" Paragraph IV Certifications. Gov't's Reply at 3-8; Teva's Reply at 5-8; Salix's Reply at 2-5. Thus, under subparagraph (B)(iv)(II), the qualifying certifications are any of the Paragraph IV Certifications Actavis submitted and lawfully maintains, including its Paragraph IV Certification for the '573 patent, which has not experienced a forfeiture event. Gov't's Reply at 3-8; Teva's Reply at 5-8; Salix's Reply at 2-5. This is referred to as the "drug-product approach" to exclusivity because the exclusivity turns on the drug product—here, the 550mg tablets of rifaximin.

The text forecloses Norwich's position because "[w]ords are to be given the meaning that proper grammar and usage would assign them." *Nielsen v. Preap*, 586 U.S. 392, 407-08 (2019) (alteration in original) (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 140 (2012)). To trigger forfeiture, the statute requires a "forfeiture event" as to "each of the patents" the first applicant submitted and lawfully maintains "a certification

---

the stipulation. Salix's Opp'n at 18-21; Teva's Opp'n at 31-32. Like the FDA, however, this issue is not reached because the effect, or lack thereof, of the stipulation would not change the outcome of the analysis here.

qualifying the first applicant for the 180-day exclusivity period under [21 U.S.C. § 355(j)(5)(B)(iv)]." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb).  By its plain terms, a forfeiture event must occur as to each patent a first applicant has submitted and lawfully maintains a certification *qualifying* it for the 180-day exclusivity period under subparagraph (B)(iv).  "[W]here a statute's terms are undefined, our interpretation is guided by the terms' 'regular usage.'"  *Bd. of Cnty. Comm'rs v. Fed. Housing Fin. Agency*, 754 F.3d 1025, 1028-29 (D.C. Cir. 2014) (quoting *Lopez v. Gonzales*, 549 U.S. 47, 53 (2006)).  In this context, to "qualify," means "possess[ing] . . . qualities or properties . . . legally necessary to make . . . [a first applicant] eligible" for the 180-day exclusivity period.  *Qualification*, BLACK'S LAW DICTIONARY (7th ed. 1999); *see also Qualified*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("Possessing the necessary qualifications"); *Quality*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("The particular character or properties of a person, thing, or act, often essential for a particular result"); *Qualified*, WEBSTER'S THIRD NEW INT'L DICTIONARY (2002) ("[H]aving complied with the specific requirements or precedent conditions").  In turn, to identify what qualities are legally necessary to make a first applicant eligible for the 180-day exclusivity, the statute cross-references to subparagraph (B)(iv).

Subparagraph (B)(iv) has two subsections.  The first subsection provides for the "effect[]" a first applicant's ANDA will have on the marketing date of subsequent applicants and says nothing as to whether a first applicant possesses the properties legally necessary to be eligible for the 180-day marketing exclusivity.  *Id.* § 355(j)(5)(B)(iv)(I) ("Subject to [a forfeiture event in subparagraph (D)), if the [ANDA] contains a [Paragraph IV Certification] and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug . . . by any first applicant.").  On the other hand, the second

subsection, defines "first applicant" and "180-day exclusivity period," *id.* § 355(j)(5)(B)(iv)(II), identifying the precedent conditions a first applicant must meet to become eligible for the 180-day exclusivity period.  To be eligible for the "180-day exclusivity period," an applicant must be a "first applicant."  *Id.* § 355(j)(5)(B)(iv)(II)(aa).  A "first applicant," is an applicant that (1) "submits a substantially complete application" (2) "that contains and lawfully maintain[s] a [Paragraph IV Certification] for the drug" (3) "on the first day" that such an application is filed. *Id.* § 355(j)(5)(B)(iv)(II)(bb).  The "indefinite article[] 'a' . . . [is] used when 'referring to something not specifically identified . . . but [instead] treated as one of a class: one, some, any.'" *Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 354-345 (D.C. Cir. 2020).  Thus, "a certification qualifying the first applicant for the 180-day exclusivity period," 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb), is any Paragraph IV Certification for the drug.  Therefore, no forfeiture for failure to market has happened because all of the Paragraph IV Certifications Actavis has made with respect to listed Orange Book patents covering 550mg tablets of rifaximin qualify it for the 180-day exclusivity.  Consequently, for 550mg tablets of rifaximin (the drug), Actavis' Paragraph IV Certification for the '573 patent (the HE indication patent) qualified it as a first applicant, which has not been subject to a forfeiture event.

Norwich resists this natural reading of the statute and argues that whether a certification qualifies the first applicant to the 180-day exclusivity period rests on subparagraph (B)(iv)'s first subsection, 21 U.S.C. § 355(j)(5)(B)(iv)(I), which describes the applicability and effect of the 180-day exclusivity period on applicants other than a first applicant.  Norwich's Reply at 5-18. As already discussed, however, (B)(iv)'s first subsection (I) neither defines, nor describes the criteria for qualifying as, a first applicant eligible for the 180-day exclusivity period.  Instead, recall that (B)(iv)'s first subsection (I) merely reads that, subject to a forfeiture event, "if the

[ANDA] contains a [Paragraph IV Certification] and is for a drug for which a first applicant has submitted an [ANDA] containing such a certification, the application shall be made effective" after expiration of the 180-day exclusivity period. 21 U.S.C. § 355(j)(5)(B)(iv)(I). Whether a first applicant's ANDA bars subsequent ANDAs reveals nothing regarding what *qualifies* a first applicant for the 180-day exclusivity because blocking a subsequent applicant is not a "precedent condition" or "necessary" for a first applicant to qualify for the 180-day exclusivity period. 21 U.S.C. § 355(j)(5)(B)(iv)(II)(aa) (defining "180-day exclusivity period" as the period that precedes "the date on which [a subsequent ANDA] *could* become effective under this clause" (emphasis added)). Put another way, a first applicant need not bar subsequent applicants from marketing to qualify for the 180-day exclusivity, *id.*; "[a]ll that is required for the first Paragraph IV ANDA filer to receive the 180–day exclusivity period is that it submits a substantially complete ANDA that contains a Paragraph IV Certification." *Janssen Pharmaceutica, N.V. v. Apotex, Inc.*, 540 F.3d 1353, 1356 (Fed. Cir. 2008) (citing 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb)).[6]

---

[6]     Even if subparagraph B(iv)(I) were read, somehow, to factor into the qualifications a first applicant must have to be eligible for the 180-day exclusivity, that reading would not rescue Norwich. Norwich reads the language "such a certification" to mean that a "qualifying" certification for purposes of Actavis' general eligibility for, and forfeiture of, exclusivity must "match" Norwich's Paragraph IV Certifications. Norwich's Mem. at 22-25. In its view, to qualify for the "180-day exclusivity," that can be forfeited under 21 U.S.C. § 355(j)(5)(D), an applicant must both be a first applicant *and* the phrase "such a certification" means that a subsequent ANDA's Paragraph IV Certifications must match the first applicant's Paragraph IV Certifications. The phrase "such a certification" means no such thing. "The term 'such,' when used as an adjective, is an inclusive term, showing that the word it modifies is part of a larger group . . . . and . . . nearly always operates as a reference back to something previously discussed." *Takeda Pharms., USA, Inc. v. Burwell*, 78 F. Supp. 3d 65, 99 (D.D.C. 2015) (Jackson, A.) (internal citations omitted), *affirmed in part and vacated in part as moot by Takeda Pharms., USA, Inc. v. Burwell*, 691 F. App'x 634 (D.C. Cir. 2016) (per curiam); *see also Such*, BLACK'S LAW DICTIONARY 1446 (7th ed. 1999) (defining "such" as "[o]f this or that kind," or "[t]hat or those; having just been mentioned"); *Such*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1285 (New College ed. 1976) (defining "such" as "[b]eing the same as that which has been last mentioned or implied"); *Nieves v. United States*, 160 F.2d 11, 12 (D.C. Cir. 1947) ("The word 'such' is restrictive in its effect and obviously relates to an antecedent."). In Section 21 U.S.C. § 355(j)(5)(B)(vi)(I), what was "previously discussed" is "a [Paragraph IV Certification]." The antecedent referenced is a type of certification, *i.e.*, a Paragraph IV Certification and not a specific patent to which a subsequent applicant certified. Reinforcing this conclusion, the statute uses the indefinite article "a," 21 U.S.C. § 355(j)(5)(B)(iv)(I), which, as already discussed, describes "some undetermined or unspecified particular," rather than something "specific and distinct." *United States v. Raymond*, No. 21-cr-380 (CKK), 2023 WL 7005345, at *2 (D.D.C. Oct. 24, 2023); *Citizens for Resp. & Ethics in Wash. v. FEC*, 316 F. Supp. 3d 349, 390 (D.D.C. 2018) ("In short, 'an independent expenditure' means . . . an unspecified one."). The phrase "such a certification" is thus most naturally

2.    *The Structure*

While the text alone requires rejection of Norwich's arguments, at least two aspects of the structure of the statute reinforce the conclusion the text mandates.  "Courts 'must read the words Congress enacted in their context and with a view to their place in the overall statutory scheme.'"  *United States v. Little*, 78 F.4th 453, 458 (D.C. Cir. 2023) (quoting *Turkiye Halk Bakasi v. United States*, 598 U.S. 264, 275 (2023)).  First, Norwich's insistence that consideration of a subsequent applicant's certifications is necessary in determining whether a first applicant has forfeited the exclusivity, Norwich's Reply at 8 (interpreting subparagraph (b)(iv)(I) as mandating that a "first-applicant status is necessary but not sufficient condition for effectuation of 180-day exclusivity vis-à-vis a subsequent application"), ignores the fact that forfeiture events can occur without any subsequent applicant asserting Paragraph IV Certification*s*, *see, e.g.*, 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA) (first applicant forfeits exclusivity if it fails to market within 75 days of a court's final decision of invalidity or non-infringement in an action brough against the first applicant); *id*. § 355(j)(5)(D)(ii) (describing a forfeiture event when a first applicant withdraws its ANDA).  Second, Norwich's position would have the unwieldy result of creating multiple exclusivity periods because a first applicant forfeits exclusivity, not to the drug product (550mg rifaximin tablets), but only to particular patents ('573 patent for HE indication)—*i.e.*, those patents for which a first applicant and subsequent ANDA match Paragraph IV Certifications.  Norwich's Reply at 15 (acknowledging that its position results in "multiple exclusivity periods).  The statute, however, uses "a definite article with a

---

read to encompass any Paragraph IV Certification for the relevant drug—not just a Paragraph IV Certification for one specific and distinct patent.  *Cf. Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 53 (D.C. Cir. 2005) (noting that this statutory provision "grants 'exclusivity' to the first to file an ANDA containing a paragraph IV certification by delaying the effective date upon which the FDA may approve any subsequent ANDA containing a paragraph IV certification with respect to the same drug").

singular noun," *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021), when it describes "the" 180-day exclusivity period, *see, e.g.*, 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) ("*the* 180-day exclusivity period under subparagraph (B)(iv)" (emphasis added)), *id.* § 355(j)(5)(B)(iv)(II)(aa) ("The term '180-day exclusivity period' means *the* 180-day period . . . ." (emphasis added)).  The use of "a definite article with a singular noun ('the notice')" implies "a discrete thing."  *Niz-Chavez*, 593 U.S. at 166.  Accordingly, the presence of a discrete 180-day exclusivity period reinforces that only a first applicant's Paragraph IV Certifications are material in determining forfeiture because "*the* 180-day exclusivity period" forecloses indefinite exclusivity periods based only on "matching" patent certifications between a first applicant and subsequent applicant's applications.  *See U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 993 (D.C. Cir. 2024) ("Congress's choice between a definite and indefinite article matters when determining statutory meaning."); *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 99 (D.C. Cir. 2018) ("It is 'well established' that 'the' . . . acts as a 'word of limitation.'" (quoting *Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000))). [7]  Thus, read as a whole, "[t]he structure of the relevant statutory provisions reinforces [the] conclusion" commanded by the text.  *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 442 (2022).

---

[7]     To bolster the contention that the phrase "such a certification" in 21 U.S.C. 355 § (j)(5)(B)(iv)(I), matters, Norwich points to the prefatory text in 21 U.SC. § 355(j)(5)(B) ("The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii)"), which governs when the FDA may approve an ANDA based on its patent certifications.  According to Norwich, this prefatory text "conclusively rebuts" the government and intervenor defendants' position that the MMA rejects multiple exclusivity periods.  Norwich's Reply at 15.  Not so.  Norwich consistently conflates different statutory provisions to confuse the issue.  The prefatory text in 21 U.S.C. § 355(j)(5)(B) relied upon by Norwich simply describes the process involving ANDA certifications generally and does not speak to a first applicant qualifying for the exclusivity period, the effect of a first applicant's ANDA on subsequent applicants, or the events resulting in a first applicant forfeiting an exclusivity period.

### 3.    *Legislative History*

Norwich's misplaced insistence that subparagraph B(iv)(I) provides the necessary qualifications for a first applicant to qualify for exclusivity, Norwich's Mem. at 18-31, Norwich's Reply at 2-24, readily comes into focus in one sentence in its reply brief: "[t]he important context for this dispute is that approval of Norwich's '370 ANDA would not have been blocked by Actavis' 180-day exclusivity prior to the MMA."  Norwich's Reply at 2. Reliance on a pre-MMA statute in a post-MMA world is a giant cautionary red flag as to the fundamental flaw in Norwich's position(s) in this lawsuit.

Prior to the MMA, the FDA evaluated the 180-day exclusivity "on a patent-by-patent basis," the approach Norwich pushes here, by interpreting the phrase "such a certification" present in the then-statutory language and structure in effect as requiring matching patent Paragraph IV Certifications between ANDAs.  Final Rule, Abbreviated New Drug Applications and 505(b)(2) Applications ("Final Rule"), 81 Fed. Reg. 69580, 69600 (Oct. 6, 2016) (describing the FDA's pre-MMA agency practice and interpretation of phrase "such a certification"); *see TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 73 n.2 (D.D.C. 2003) ("By regulation, the FDA . . . clarified that the exclusivity provision delays the approval only of later-submitted ANDAs containing a paragraph IV certification to *the same patent* to which a previous applicant has already offered such a certification."  (emphasis in original)).  Any weight that prior interpretation may have had, though, has evaporated because the FDA's interpretation was "superseded by [statute]," specifically the MMA.  Final Rule, 81 Fed. Reg. 69580, 69628.[8]

---

[8]    Even prior to the MMA, courts were split as to the FDA's then interpretation of the phrase "such a certification."  *See Torpharm, Inc. v. FDA*, No. 03-cv-2401 (RWR), 2004 WL 64064, at *1 (D.D.C. Jan. 8, 2004) (finding FDA's interpretation of "such a certification" as authorizing a patent-by-patent approach, which resulted in shared 180-day exclusivity periods, as "contrary to the plain language" of the statute); *Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 68-69 (D.D.C. 2006) (collecting cases describing a split in cases regarding FDA's interpretation of "such a certification").  While "attempting to decipher the intent of a previous Congress is a difficult and delicate exercise, with little certainty and a generous margin for error," "the MMA may be the product of Congress'

Norwich argues that because the pre and post MMA statute retained the phrase "such a certification" in 21 U.S.C. § 355(j)(5)(B)(iv)(I), *compare id.*, *with* 21 U.S.C. § 355(j)(5)(B)(iv) (Dec. 3, 2023), Congress "ratified" the FDA's then-interpretation of the phrase.  Norwich's Reply at 12.  Far from being "re-enacted . . . without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), as Norwich maintains, Norwich's Reply at 12 (citing *Lorillard*, 434 U.S. at 580), the amended statute introduced "critical new term[s]" to the statute, *Teva v. Sebelius*, 595 F.3d at 1306, including the "forfeiture events," 21 U.S.C. § 355(j)(5)(D), and defining "first applicant," 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb)—two provisions Norwich vigorously tries to explain away, *see* Norwich's Mem. at 22 ("The central issue of statutory interpretation before this Court is whether the . . . language 'such a certification' . . . means *any* Paragraph IV certification in the first application."  (emphasis in original)).  Indeed, the MMA even amended subparagraph (B)(iv) by including the newly defined term "first applicant" in the provision describing the effect a first applicant's ANDA would have on subsequent applications.  21 U.S.C. § 355(j)(5)(B)(iv)(I); *compare id.*, *with* 21 U.S.C. § 355(j)(5)(B)(iv) (Dec. 3, 2023).

In contrast to Norwich, defendant and defendant-intervenors urge that the MMA be given full effect, Gov't's Opp'n at 7, Teva's Opp'n at 25, 29-30, Salix's Opp'n at 15-17, and the "first applicant" definition be correctly read to ensure that "exclusivity would be product-by-product rather than patent-by-patent," Erika King Lietzan, *A Brief History of 180-Day Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* ("*A Brief History*"), 59 FOOD & DRUG L.J. 287, 310 (2004).  Indeed, the "new language" in the MMA, including the interrelated definitions of "180-day exclusivity period" and "first applicant,"

---

realization that the FDA had incorrectly interpreted Hatch–Waxman, and may evidence congressional desire to bring the FDA's administration of the law into conformity with the drug-product interpretation originally intended." *Apotex*, 414 F. Supp. 2d at 73 n.6.

reflected that "Congress established one 180-day exclusivity period per . . . product," David E. Korn, Erika Lietzan, & Shaw W. Scott, *A New History and Discussion of 180-Day Exclusivity*, 64 FOOD & DRUG L.J. 334, 345 (2009), and "intended to limit exclusivity to the first to challenge any patent claiming a drug," Lietzan, *A Brief History* at 310. *See also* 149 CONG. REC. 31,783 (2003) (statement of Sen. Kennedy) (noting that in the MMA Congress intended to grant "product-by-product exclusivity rather than a patent-by-patent exclusivity"). In sum, to the extent legislative history may shed light on otherwise clear text, the history of the MMA does so by undercutting Norwich's position. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").[9]

### 4.  *Policy And Equities*

As a final point, the parties trade barbs over whether their preferred statutory interpretations promote fairness or the best public policy, but delving into these pros and cons of the differing policy impacts of the parties' positions has no place here. *See* Norwich's Mem. at 1-3, 28-30; Gov't's Opp'n at 22-24; Teva's Opp'n at 28-29; Salix's Opp'n at 1-2, 17-18. In passing the FDCA, the Hatch-Waxman Amendments, and the MMA "Congress struck a balance between two competing policy interests: (1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1370-71 (Fed. Cir. 2002). Calibrating this balance is the job of the legislative branch and counsels careful adherence to the statutory text by the judicial branch. *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 465 (2015)

---

[9]    Norwich argues that the FDA changed its interpretation of "such a certification" "incorrectly and without justification," Norwich's Mem. at 19, but without describing how this change was arbitrary and capricious, *see generally id.* Accordingly, this aspect of Norwich's argument is construed as an additional argument to support its position that the FDA's Final Decision is contrary to law.

("As we have noted, Congress legislates actively with respect to patents ......... In adhering to our

precedent ....., we promote the rule-of-law values to which courts must attend while leaving

matters of public policy to Congress."); *Teva v. Sebelius*, 595 F.3d at 1318 ("The statute's grant

of a 180-day delay in multiple generic competition for the first successful paragraph IV filer is a

pro-consumer device. And it happens to be precisely the device Congress has chosen to induce

challenges to patents claimed to support brand drugs.").  As the Supreme Court has instructed,

courts should give effect to the "best reading" of the statute's language "to effectuate the will of

Congress," *Loper Bright*, 603 U.S. at 396, and "[w]here, as here, 'the language of a provision . . .

is sufficiently clear in its context, ......'[there is no occasion] to examine the additional

considerations of 'policy'......that may have influenced the lawmakers in their formulation of the

statute.'" *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (quoting *Aaron v. SEC,* 446

U.S. 680, 695, 100 (1980)).

***

All tools of statutory interpretation lead to the conclusion that the FDA's decision of

granting Norwich's '370 ANDA tentative approval because Actavis has not forfeited its

exclusivity rights for allegedly failing to market is not contrary to law.

### B.  Failure to Obtain Tentative Approval

Failing to show that Actavis has forfeited its exclusivity for failure to market, Norwich

next argues that this exclusivity is forfeited for failure to obtain tentative approval.  Norwich's

Mem. at 31-40.  Recall that an applicant need not obtain tentative approval to be bestowed the

title of first applicant.  The statute, instead, provides that a first applicant may forfeit its

exclusivity by failing to "obtain tentative approval of the application within 30 months after the

date on which the application is filed, unless the failure is caused by a change in or a review of

the requirements for approval of the application imposed after the date on which the application

34
**JA337**

is filed." 21 U.S.C. § 355(j)(5)(D)(i)(IV).  All parties agree that Actavis failed to obtain tentative

approval of its ANDA "within 30 months" after filing its ANDA.  Norwich's Reply at 24;

Gov't's Reply at 8; Teva's Reply at 16; Salix's Reply at 16.  The parties dispute, first, whether

this statutory text, in 21 U.S.C. § 355(j)(5)(D)(i)(IV), either tolls or sets aside the 30-month

deadline for obtaining tentative approval, and, second, whether the phrase "caused by," in this

statutory text demands "but-for" causation.  *See* Norwich's Reply at 24-26; Gov't's Reply at 8-

13; Teva's Reply at 17-25; Salix's Reply at 12-16.[10]  After a brief recounting of the relevant

facts, these two disputed issues are addressed *seriatim*.

Actavis filed its ANDA on December 18, 2015, but the FDA did not grant tentative

approval within 30 months, on or before June 18, 2018.  AR at 7, 20, 312-31.  ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████  The FDA's guidance, however, changed after

Salix filed a citizen petition, AR at 39-122, resulting in new guidance, reflected in the 2017 PSG,

recommending additional dissolution studies to demonstrate bioequivalence, AR at 210-30.████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[10]       Norwich also argues that the FDA erred by declining to apply the extension rule in 21 U.S.C.
355(q)(1)(G) for delay caused by a citizen petition, which, if adopted, would have extended the deadline for Actavis
to receive tentative approval only until November 15, 2018.  Norwich's Reply at 28-32.  Norwich has waived this
argument.  Before the FDA, Norwich stated that "there was never any delay 'because of' [Salix's] petition," AR at
819, 591, and the FDA "agree[d]" with Norwich, finding "no evidence in the records that FDA's consideration of
the 2016 petition caused a delay in approval or tentative approval of Actavis' ANDA," AR at 19.  Norwich insists it
did not waive this challenge even though the FDA did not have an occasion to weigh it because the confidential
information in the administrative record was unavailable prior to instituting suit.  Norwich's Reply at 31-32.
Norwich, though, does not explain how any of the publicly available information available to it prior to this
litigation was not enough for it to make the argument it makes now.  *See id.*  Additionally, Norwich argues that it
presented its current argument "in the alternative."  Norwich's Reply at 31.  A review of the record, however, does
not support Norwich's characterization as it never argued that the FDA should have found Salix's petition to induce
a delay.  As such, Norwich did not "give the FDA an opportunity to consider the merits of its argument[]," and it is
waived.  *Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 123-24 (D.D.C. 2014).

███████████████████████████████████

███████████████████████████████████

██████████████████████████

### 1. *Tolling or Exception*

Norwich argues "[i]f a change in approval requirements occurred after the application's filing date but 'within 30 months' and caused the failure to obtain approval, the exception extends the 30-month deadline," Norwich's Reply at 26, and suggests that the statute requires "toll[ing]" of the 30-month deadline, Norwich's Mem. at 3.  Norwich's position is riddled with problems.  As an initial matter, it finds no grounding in the text.  The provision provides for forfeiture if a first applicant's ANDA is not approved "within 30 months . . . *unless* the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed." 21 U.S.C. § 355(j)(5)(D)(i)(IV).  "Unless" means "under any other circumstance than that" which precedes it.  *Unless*, WEBSTER'S THIRD NEW INT'L DICTIONARY 2503 (2002); *id.* (defining "unless" also as "except on the condition that").  Contrary to being "silent and ambiguous" as Norwich argues, Norwich's Reply at 26, the statute forecloses tolling of the deadline because the statute's use of "unless" presents a binary inquiry and the latter provision lacks any language extending the deadline.

Second, a survey of the statute confirms that Congress' decision to omit such language was intentional.  Specifically, Congress drafted other provisions in the statute to "toll" or "extend" the 30-month deadline.  For example, Section 355(q)(1)(G) explicitly provides that when the 30-month period is delayed as a result of a citizen petition, the deadline is "extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition." 21 U.S.C. § 355(q)(1)(G).

"[H]ad Congress intended" to toll the deadline in 21 U.S.C. 355(j)(5)(D)(i)(IV) "it would have said so," just as it did in Section 355(q)(1)(G). *State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 580 U.S. 26, 34 (2016); *see also Barnhart*, 534 U.S. at 452 ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

Third, unlike the specific guidance Congress provided in how the 30-month deadline is tolled in 21 U.S.C. § 355(q)(1)(G), no such guidance exists as to the calculation of a tolling period in 21 U.S.C. 355(j)(5)(D)(i)(IV), despite, as Norwich acknowledges, such calculations in how the 30-month deadline should be tolled "can vary dramatically in degree and scope," Norwich's Reply at 27. "Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).[11] The FDA did not act contrary to law in coming to the same conclusion that 21 U.S.C. 355(j)(5)(D)(i)(IV) provides an exception—not a tolling provision—and if that exception applies, the first applicant's 30-month deadline for tentative approval is set aside, not merely tolled until a later date.

---

[11] Ignoring this jurisprudential backdrop, Norwich relies on a single, unpublished, non-binding Magistrate Judge report and recommendation adopted by a district judge, *see Meijer, Inc. v. Ranbaxy Inc.*, 245 F. Supp. 3d 312, 312 (D.D.C. 2017), in an antitrust case accepting the argument about this same statutory text urged by Norwich here. Norwich's Reply at 27 (citing *Meijer, Inc. v. Ranbaxy, Inc.*, No. 15-cv-11828-NMG, 2016 WL 4697331, at *21 (D. Mass. June 16, 2016). No court has adopted the reasoning in *Meijer*, and the reasoning relies, not on tools of statutory interpretation, but on the ground that a contrary reading would "ignore . . . Congressional intent," *Meijer*, 2016 WL 4697331, at *21, which this Court concludes may not control over clear statutory text, *see supra* Part III.A.4. For the reasons provided, the statute's text and structure compel the conclusion reached here, contrary to *Meijer*'s holding. Norwich's complaints that tolling must be applied to prevent Actavis from "parking its ANDA" and thereby abusing the 180-day exclusivity, Norwich's Reply at 16-17, 27, are belied by its simultaneous concessions or lack of argument that Actavis submitted a substantially complete application on December 18, 2015, and has been actively pursuing approval of its ANDA for almost a decade, reflecting a significant investment of time and resources.

2.      *Causation*

Norwich argues that 21 U.S.C. § 355(j)(5)(D)(i)(IV) requires but-for causation, Norwich's Mem. at 32, with the consequence that an applicant must obtain approval of its application within 30 months but for a change in, or a review of, the requirements for approval of the application imposed after the date on which the application is filed, and any other deficiencies in Actavis' ANDA may be examined as independently sufficient to preclude approval by the 30-month date. *Id.* at 32-38. Thus, in its view, Actavis' failure to obtain tentative approval within 30 months was not "caused by" the 2017 PSG, but, instead, to the 2017 PSG requiring specific dissolution studies ██████████████████████

████. Norwich's Reply at 32. If Norwich is correct, then Actavis forfeited exclusivity because the 2017 PSG was not the "but for" reason Actavis failed to obtain tentative approval within 30 months as other deficiencies were identified in Actavis' ANDA submitted on December 18, 2015. *Id.* at 34. In contrast, the government defendants argue that the FDA's longstanding interpretation of the phrase "caused by," in 21 U.S.C. § 355(j)(5)(D)(i)(IV), as not requiring but-for causation, is consistent with the statute's text. Gov't Opp'n at 29. The FDA's interpretation of "caused by" is "[i]f one of the causes of failure to get tentative approval . . . was a change in or review of the requirements for approval imposed after the application was filed, an applicant will not forfeit eligibility even if there were other causes for failure to obtain tentative approval." *Mylan Labs.*, 910 F. Supp. 2d at 302 (quoting the FDA's interpretation of "caused by"); *see also* AR 410 (same). While a court may not "defer[] to the [agency's] interpretation of the statute," and instead apply "what [it] regard[s] as the statute's 'best' reading," *Sugar Corp.*, 113 F.4th at 991 (quoting *Loper Bright*, 603 U.S. at 400), the FDA's

position is correct that "caused by" in 21 U.S.C. § 355(j)(5)(D)(i)(IV) does not require but-for causation.

"[W]hen 'addressing a question of statutory interpretation, we begin with the text[,]' [a]nd in 'constru[ing] [the] text, we look to the ordinary meaning of its key terms.'" *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 948 (D.C. Cir. 2024) (first quoting *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018); and then quoting *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024)). "Cause," in this context, is defined as "a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state" and "indicates a condition or circumstance or combination of conditions and circumstances that effectively and inevitably calls forth an issue, effect, or result." *Cause*, WEBSTER'S THIRD NEW INT'L DICTIONARY 356 (2002); *Cause*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("To bring about or effect"). The "ordinary meaning," *Telematch, Inc. v. U.S. Dep't of Agric.*, 45 F.4th 343, 348 (D.C. Cir. 2022), of "cause" as "a condition . . . that brings about an effect," *Cause*, WEBSTER'S THIRD NEW INT'L DICTIONARY 356 (2002), leads to the natural conclusion that the "caused by" requirement in 21 U.S.C. § 355(j)(5)(D)(i)(IV) is satisfied as long as a change in or review of the requirements for approval of an ANDA imposed after the application was filed is one of the causes of failure to get tentative approval.

Further guidance on this issue is provided in a different statutory context by the D.C. Circuit, which interpreted the phrase "caused by" in the Foreign Sovereign Immunity Act's ("FSIA") jurisdictional provision, 28 U.S.C. § 1605(a)(7), as not requiring but-for causation. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128-30 (D.C. Cir. 2004). This illustrative analysis notes that "[a]s a moment's inspection of" the statute "makes clear, there is no textual warrant for [but-for causation]: the words 'but for' simply do not appear; only

'caused by' do." *Id.* at 1128.  The Court specifically distinguished its interpretation of "caused by" in the jurisdictional provision as a distinct inquiry from the level of causation needed to sustain a cause of action under the FSIA.  *Id.* at 1129.  The D.C. Circuit's conclusion reinforces the plain meaning of "caused by" in 21 U.S.C. § 355(j)(5)(D)(i)(IV) does not require but for causation as the operative provision neither contains the words "but for" nor describes a type of causation needed to sustain a cause of action.

Moreover, when reviewing whether a drug is safe and effective to be marketed, numerous independent and sufficient causes may hinder tentative approval.  21 C.F.R. § 314.127 (providing independent and sufficient reasons why the FDA could refuse to grant approval to an ANDA); 21 U.S.C. §§ 355(b), (j) (same).  Each of the independent, potential problems with an ANDA is a cause that may delay its approval.  This underscores why the FDA, drawing on its "body of experience and informed judgment," contemporaneously and consistently, has read "caused by" as requiring a change in or review of requirements to be only one cause for failing to obtain tentative approval, Gov't's Reply at 12-13, and where, as here, the interpretation is consistent with the statute's plain meaning, such prior consistent agency interpretation is "especially useful in determining the statute's meaning." *Loper Bright*, 603 U.S. at 394.

In contrast, Norwich argues that textbook tort and criminal law demonstrate that "cause" means but-for cause and urges rejection of *Kilburn*'s reasoning as applied only to a jurisdictional statute.  Norwich Mem. at 37-39, Norwich's Reply at 33-34.  These arguments are unpersuasive for several reasons.  First, Norwich relies on tort and criminal law cases that do not interpret the relevant phrase "caused by" but instead interpret "because" and "results from." *See Burrage v. United States*, 571 U.S. 204, 210-11 (2014) (criminal statute, 21 U.S.C. § 841(b)(1)(C), using "results from"); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-48 (2013) (relying on

common law tort case law and doctrine to interpret the term "because" in 42 U.S.C. § 2000e-3(a)).  Second, and more fundamentally, the flaw in Norwich's position is that "[t]he judicial task when interpreting statutory language . . . is to discern how Congress used . . . *word[s] in the law*."  *Thaler v. Perlmutter*, 130 F.4th 1039, 1048 (D.C. Cir. 2024) (emphasis added).  When creating causes of action for tort liability or criminalizing conduct, Congress legislates against the backdrop of "textbook tort law," *Nassar*, 570 U.S. at 346-47, and the "traditional understanding" of criminal causation, *Burrage*, 571 U.S. at 210-16.  The use of "caused by" at issue here, like the FSIA jurisdictional statute, 28 U.S.C. § 1605(a)(7), considered in *Kilburn*, is neither a tort or criminal statute, and thus the traditional jurisprudence applied to issues of tort liability or interpretation of criminal statutes is simply inapplicable.

Finally, and relatedly, Norwich's attempt to distinguish *Kilburn* on this point because of the "context" of the "FSIA" falls flat.  Norwich's Reply at 33-34.  The lesson from *Kilburn* is clear: "courts have departed from the but-for standard where circumstances warrant."  *Paroline v. United States*, 572 U.S. 434, 451 (2014).  The jurisdictional provision of the FSIA at issue in *Kilburn* and the statutory provision in 21 U.S.C. § 355(j)(5)(D)(i)(IV) do not create criminal, tort, or other type of liability nor provide the type of causation needed to sustain a cause of action and are best read as not requiring but-for causation.

In sum, the FDA's conclusion that Actavis' failure to obtain tentative approval within 30 months was caused by the FDA's determination that the change in requirements with respect to the dissolution studies needed for Actavis to show bioequivalence, is not contrary to law.[12]

---

[12]    Norwich passingly argues that even if there is no but-for requirement, the "FDA still failed to adequately assess whether a failure to obtain approval was 'caused by' a change in approval requirements."  Norwich Mem. at 39-40; Norwich Reply at 35 ("FDA[] fail[ed] to apply the correct causation standard, or conduct any actual causation analysis, in its forfeiture assessment.").  "It is not enough," however, "merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).  Accordingly, "perfunctory and undeveloped arguments, and arguments that are

## IV.    CONCLUSION

For the foregoing reasons, Norwich's motion for summary judgment is denied, Norwich's motion for oral argument or, in the alternative, leave to file a surreply is denied, *see supra* n.3, and the government defendants' and intervenor-defendants' cross-motions for summary judgment are granted.

This Memorandum Opinion will be filed under seal for a brief period to allow the parties an opportunity to request redactions of confidential business information before the public docketing of the decision.  Recognizing the "'*strong presumption* in favor of public access to judicial proceedings,' including judicial records," *In re Leopold*, 964 F.3d 1121, 1127 (D.C. Cir. 2020) (emphasis added) (quoting *United States v. Hubbard*, 650 F.3d 293, 318 (D.C. Cir. 1980)), the parties are directed to submit jointly by 3:00 PM EST on April 18, 2025, any proposed, minimum redactions, supported by analysis applying the *Hubbard* factors.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  April 17, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

unsupported by pertinent authority," like Norwich's argument here, "are deemed waived."  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 265 (D.D.C. 2018) (quoting *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)).

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORWICH PHARMACEUTICALS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> ROBERT F. KENNEDY JR., in his official capacity as Secretary of Health and Human Services, SARA BRENNER, in her official capacity as Acting Commissioner of Food and Drugs, and UNITED STATES FOOD AND DRUG ADMINISTRATION, <br><br> *Defendants*, <br><br> TEVA PHARMACEUTICALS USA, INC., <br><br> *Intervenor-Defendant*, <br><br> SALIX PHARMACEUTICALS, INC., <br><br> *Intervenor-Defendant*. | Civil Action No. 1:25-cv-91 (BAH) |

### NOTICE OF APPEAL

Plaintiff Norwich Pharmaceuticals, Inc. hereby appeals to the United States Court of Appeals for the District of Columbia Circuit this Court's judgment entered on April 17, 2025 (ECF No. 83) and its order and memorandum opinion dated April 17, 2025 (ECF Nos. 81-82, respectively) denying Plaintiff's motion for summary judgment and granting Defendants' cross-motions for summary judgment and Intervenor-Defendants' cross-motions for summary judgment.

**JA346**

Dated:  April 18, 2025                    Respectfully submitted,

                                          _/s/ Matthew S. Murphy_____
                                          Matthew S. Murphy (DDC Bar No.
                                          CT0025)
                                          AXINN, VELTROP 7 HARKRIDER
                                          LLP
                                          90 State House Square
                                          Hartford, CT 06103
                                          Phone: (860) 275-8100
                                          Fax: (860) 275-8101
                                          mmurphy@axinn.com

                                          William B. Schultz (D.C. Bar No.
                                          218990)
                                          Margaret M. Dotzel (D.C. Bar No.
                                          425431)
                                          ZUCKERMAN SPAEDER LLP
                                          1800 M Street NW, Suite 1000
                                          Washington, DC 20036
                                          Tel: (202) 778-1800
                                          Fax: (202) 822-8106
                                          wschultz@zuckerman.com
                                          mdotzel@zuckerman.com

                                          *Attorneys for Plaintiff Norwich*
                                          *Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of April, 2025, the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/Matthew S. Murphy*
Matthew S. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2025, I electronically filed the foregoing Deferred Joint Appendix with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

The confidential volumes of the Deferred Joint Appendix were served by electronic mail.

*/s/ Andrew D. Prins*
Andrew D. Prins